# U.S. District Court
# Eastern District of Missouri (St. Louis)
# CIVIL DOCKET FOR CASE #: 4:05–cv–01474–RWS

Williams v. Vandergriff

Assigned to: Sr. District Judge Rodney W. Sippel

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 09/12/2005
Date Terminated: 12/19/2012
Jury Demand: None
Nature of Suit: 535 Death Penalty –
Habeas Corpus
Jurisdiction: Federal Question

**Petitioner**

**Marcellus Williams**                    represented by    **Kent E Gipson**
LAW OFFICE OF KENT GIPSON, LLC
121 E Gregory Blvd.
Kansas City, MO 64114
816–363–4400
Fax: 816–363–4400
Email: kent.gipson@kentgipsonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Status: Active*

**Laurence E. Komp**
FEDERAL PUBLIC DEFENDER –
Kansas City
Western District of Missouri
1000 Walnut
Suite 600
Kansas City, MO 64106
816–471–8282
Fax: 816–471–8008
Email: laurence_komp@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*
*Bar Status: Gov*

**Lori Leon**
P.O. Box 45154
Kansas City, MO 64171
816–916–2424
Email: lori.leon@gmail.com
*TERMINATED: 01/05/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

*Bar Status: Gov*

**William C. Odle**
DEATH PENALTY LITIGATION
CLINIC
6155 Oak
Suite C
Kansas City, MO 64113
816–363–2795
Email: pilc@pilc.net
*TERMINATED: 10/27/2006*
*LEAD ATTORNEY*
*Designation: CJA Appointment*
*Bar Status: Gov*

V.

**Respondent**

**David Vandergriff**                                 represented by  **Michael J. Spillane**
ATTORNEY GENERAL OF MISSOURI
221 W. High Street
P.O. Box 899
Jefferson City, MO 65102–0899
573–751–3321
Fax: 573–751–3825
Email: mike.spillane@ago.mo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: State / Local Government*
*Bar Status: Gov*

 Email All Attorneys
(will not send to terminated parties)

 Email All Attorneys and Additional Recipients
(will not send to terminated parties)

| Date Filed | # | Docket Text |
|---|---|---|
| 09/12/2005 | 1 | MOTION for Leave to Proceed in forma pauperis by Petitioner Marcellus Williams. (Attachments: # 1 Declaration in Support)(CDD, ) (Entered: 09/14/2005) |
| 09/12/2005 | 2 | PETITION for Writ of Habeas Corpus by Petitioner Marcellus Williams. (Attachments: # 1 Civil Cover Sheet)(CDD, ) (Entered: 09/14/2005) |
| 09/14/2005 | | ***Complaint Letter Created. This is to advise you that this office has received and filed your complaint and has assigned it the above–referenced case number. (CDD, ) (Entered: 09/14/2005) |
| 09/14/2005 | | ***Complaint Letter Processed (see notice of electronic filing for distribution list) Wed Sep 14 09:00:46 CDT 2005 (admin,) (Entered: 09/14/2005) |
| 09/16/2005 | 3 | |

| | | |
|---|---|---|
| | | ORDER – IT IS HEREBY ORDERED that petitioner's motion for leave to proceed in forma pauperis 1 is GRANTED. IT IS FURTHER ORDERED that petitioner's motion for appointment of counsel 2 is GRANTED. IT IS FURTHER ORDERED that Kent E. Gipson and Bill Odle of the Public Interest Litigation Clinic, 305 East 63rd St., Kansas City, Missouri 64113, telephone number (816) 363–2795 are hereby appointed as counsel for petitioner. IT IS FURTHER ORDERED that the Clerk of Court shall provide appointed counsel with a copy of the complete Court file. Signed by Judge Rodney W. Sippel on 9/16/05. (LAH, ) (Entered: 09/16/2005) |
| 09/22/2005 | 4 | ENTRY of Appearance by Michael J. Spillane Respondent Donald Roper. (Spillane, Michael) (Entered: 09/22/2005) |
| 10/04/2005 | 5 | SEALED MOTION filed. (LAH, ) (Entered: 10/05/2005) |
| 10/06/2005 | 6 | SEALED ORDER Signed by Judge Rodney W. Sippel on 10/6/05. (LAH, ) (Entered: 10/06/2005) |
| 01/31/2006 | 7 | EX PARTE SEALED MOTION (LAH, ) (Entered: 01/31/2006) |
| 02/01/2006 | 8 | ORDER: (FILED UNDER SEAL); Signed by Judge Rodney W. Sippel on 2/1/06 (CMA) (Entered: 02/01/2006) |
| 08/29/2006 | 9 | PETITION for Writ of Habeas Corpus by Petitioner Marcellus Williams. (Attachments: # 1 Exhibit 1, Part 1# 2 Exhibit 1, Part 2# 3 Exhibit 1, Part 3# 4 Exhibit 2# 5 Exhibit 3# 6 Exhibit 4# 7 Exhibit 5# 8 Exhibit 6# 9 Exhibit 7# 10 Exhibit 8# 11 Exhibit 9# 12 Exhibit 10# 13 Exhibit 11, Part 1# 14 Exhibit 11, Part 2# 15 Exhibit 12, Part 1# 16 Exhibit 12, Part 2# 17 Exhibit 12, Part 3# 18 Exhibit 13# 19 Exhibit 14)(Odle, William) (Entered: 08/29/2006) |
| 08/29/2006 | 10 | MOTION for Discovery *TO CONDUCT FURTHER DNA TESTING* by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 08/29/2006) |
| 08/29/2006 | 11 | MOTION for Discovery by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 08/29/2006) |
| 09/06/2006 | 12 | MOTION for Extension of: time to respond to discovery motions by Respondent Donald Roper. (Spillane, Michael) (Entered: 09/06/2006) |
| 09/22/2006 | 13 | CASE MANAGEMENT ORDER: This case is assigned to Track 4: Capital Habeas Corpus Petition; Respondent shall file a response to Petitioner's petition by 11/6/06; Petitioner shall file his traverse w/i 45 days from the date Respondent's response is filed; If Petitioner seeks an evidentiary hearing in this matter, he shall file a motion for an evidentiary hearing by 10/13/06; Respondent shall file a response to Petitioner's motion by 11/6/06; Petitioner shall file his reply w/i 45 days from the date Respondent's response is filed; Respondent shall file a response to Petitioner's discovery motions by 11/6/06; Petitioner shall file a reply w/i 45 days from the date Respondent's response is filed; Show Cause Response due by 11/6/2006; Signed by Judge Rodney W. Sippel on 9/22/06 (CMA) (Entered: 09/22/2006) |
| 10/11/2006 | 14 | MOTION to Withdraw Attorney William C. Odle by Petitioner Marcellus Williams (Odle, William) (Modified on 10/12/2006 to Edit Docket Text – CMA) (Entered: 10/11/2006) |
| 10/11/2006 | 15 | MOTION to Substitute Attorney/Law Firm ;attorney or firm Lori Leon ;substituted for:William Odle by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 10/11/2006) |

| 10/12/2006 | <u>16</u> | MOTION for Hearing *Evidentiary Hearing* by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 10/12/2006) |
|---|---|---|
| 10/18/2006 | <u>17</u> | MOTION for Leave to file motion for admission pro hac vice without payment of fee by Petitioner Marcellus Williams. (Attachments: # <u>1</u> Motion for admission pro hac vice)(Gipson, Kent) (Entered: 10/18/2006) |
| 10/27/2006 | <u>18</u> | ORDER – IT IS HEREBY ORDERED that William C. Odle's motion to withdraw as counsel for Petitioner <u>14</u> is GRANTED. IT IS FURTHER ORDERED that Lori Leon's motion to be substituted for William C. Odle as counsel for Petitioner <u>15</u> is GRANTED. Lori Leon's motion for admission pro hac vice without payment of the admission fee <u>17</u> is GRANTED. Signed by Judge Rodney W. Sippel on 10/27/06. (LAH, ) (Entered: 10/27/2006) |
| 10/27/2006 | | ORDER RECEIPT: (see receipt) Fri Oct 27 14:26:17 CDT 2006 (LAH, ) (Entered: 10/27/2006) |
| 10/27/2006 | <u>19</u> | CJA 30: Appointment of Attorney Lori Leon for Marcellus Williams in Death Penalty Proceedings; Signed by Judge Rodney W. Sippel on 10/27/2006;(DJO) (Entered: 10/31/2006) |
| 11/03/2006 | <u>20</u> | MOTION for Extension of Time to File ;Extension to file the following: Response to show cause order and motions ;Proposed extension date December 6, 2006 by Respondent Donald Roper. (Spillane, Michael) (Entered: 11/03/2006) |
| 11/06/2006 | | Docket Text ORDER re <u>20</u> MOTION for Extension of Time to File ;Extension to file the following: Response to show cause order and motions ;Proposed extension date December 6, 2006 by Respondent Donald Roper. (Spillane, Michael) filed by Donald Roper, GRANTED Signed by Judge Rodney W. Sippel on 11/6/06. (LAH, ) (Entered: 11/06/2006) |
| 11/06/2006 | | ORDER RECEIPT: (see receipt) Mon Nov 6 17:34:51 CST 2006 (LAH, ) (Entered: 11/06/2006) |
| 12/04/2006 | <u>24</u> | CJA 30: Authorization to Pay William Odle in Death Penalty Proceedings Voucher # 060914000002.. Signed by Judge Rodney W. Sippel on 12/4/06. (LGK, ) (Entered: 12/21/2006) |
| 12/06/2006 | <u>21</u> | MOTION for Extension of: One day to file responsive pleadings by Respondent Donald Roper. (Spillane, Michael) (Entered: 12/06/2006) |
| 12/07/2006 | <u>22</u> | RESPONSE TO ORDER TO SHOW CAUSE re <u>21</u> MOTION for Extension of: One day to file responsive pleadings, Docket Text Order,, <u>13</u> Case Management Order,,, by Respondent Donald Roper. (Attachments: # <u>1</u>)(Spillane, Michael) (Entered: 12/07/2006) |
| 12/08/2006 | | Docket Text ORDER re <u>21</u> MOTION for Extension of One day to file responsive pleadings by Respondent Donald Roper; ORDERED GRANTED; Signed by Judge Rodney W. Sippel on 12/08/2006;(DJO) (Entered: 12/08/2006) |
| 12/08/2006 | 23 | EXHIBITS Received: Exhibits 1 – 38 by Respondent Donald Roper maintained in paper format in Clerks' Office;(DJO) (Entered: 12/12/2006) |
| 01/16/2007 | <u>25</u> | MOTION for Extension of Time to File *Traverse* ;Extension to file the following: Traverse ;Proposed extension date March 23, 2007 by Petitioner Marcellus Williams. (Leon, Lori) (Entered: 01/16/2007) |

| | | |
|---|---|---|
| 01/17/2007 | | Docket Text ORDER re 25 MOTION for Extension of Time to File Traverse; Extension to file the following: Traverse; Proposed extension date March 23, 2007 by Petitioner Marcellus Williams. (Leon, Lori) filed by Marcellus Williams, GRANTED Signed by Judge Rodney W. Sippel on 1/17/07. (LAH, ) (Entered: 01/17/2007) |
| 02/08/2007 | 26 | CJA 31: Authorization to Pay in Death Penalty Proceedings. (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 2/8/07. (ARL ) (Entered: 02/09/2007) |
| 02/08/2007 | 27 | CJA 31: Authorization to Pay in Death Penalty Proceedings. (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 2/8/07. (ARL) (Entered: 02/09/2007) |
| 02/08/2007 | 28 | CJA 31: Authorization to Pay in Death Penalty Proceedings. (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 2/8/07. (ARL) (Entered: 02/09/2007) |
| 02/08/2007 | 29 | CJA 31: Authorization to Pay in Death Penalty Proceedings. . (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 2/8/07. (ARL) (Entered: 02/09/2007) |
| 03/05/2007 | 30 | CJA 20: Authorization to Pay . (UNDER SEAL) Signed by Judge Rodney W. Sippel on 3//5/07. (ARL) (Entered: 03/08/2007) |
| 03/05/2007 | 31 | CJA 20: Authorization to Pay . (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 3/5/07. (ARL) (Entered: 03/08/2007) |
| 03/09/2007 | 32 | CJA 31: Authorization to Pay in Death Penalty Proceedings. (FILED UNDER SEAL) Signed by Judge Rodney W. Sippel on 2/27/07. (KJF, ) (Entered: 03/13/2007) |
| 03/20/2007 | 33 | MOTION for Extension of Time to File *Traverse* ;Extension to file the following: Traverse ;Proposed extension date May 22, 2007 by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 03/20/2007) |
| 03/27/2007 | | Docket Text ORDER: Re: 33 MOTION for Extension of Time to File *Traverse* ;Extension to file the following: Traverse ;Proposed extension date May 22, 2007 by Petitioner Marcellus Williams. (Gipson, Kent) filed by Marcellus Williams, ; ORDERED GRANTED. Signed by Judge Rodney W. Sippel on 3/27/07. (LGK, ) (Entered: 03/27/2007) |
| 03/30/2007 | 34 | MEMORANDUM AND ORDER – IT IS HEREBY ORDERED that Marcellus Williams' motions to conduct further DNA testing 10 , to authorize discovery 11 , and to hold an evidentiary hearing 16 are DENIED. Signed by Judge Rodney W. Sippel on 3/30/07. (LAH, ) (Entered: 03/30/2007) |
| 04/09/2007 | 35 | MOTION for Reconsideration re 34 Memorandum & Order, by Petitioner Marcellus Williams. (Attachments: # 1 Exhibit Exhibit 2# 2 Exhibit Exhibit 3# 3 Exhibit Exhibit 4# 4 Exhibit Exhibit 1)(Gipson, Kent) (Entered: 04/09/2007) |
| 04/23/2007 | 36 | ORDER IT IS HEREBY ORDERED that Marcellus Williams has until May 22, 2007 to file areply brief concerning his discovery motions and his request for an evidentiary hearing. Thereply brief shall be filed as an independent document separate from Williams' traverse. Signed by Judge Rodney W. Sippel on 4/23/07. (KXS, ) (Entered: 04/23/2007) |
| 05/22/2007 | 37 | MEMORANDUM in Support of Motion re 35 MOTION for Reconsideration re 34 Memorandum & Order, filed by Petitioner Marcellus Williams. (Attachments: # 1 Exhibit Forensic Lab Report 1# 2 Exhibit Forensic Lab Report 2# 3 Exhibit DNA 200 Article 5/20/07# 4 Exhibit DNA Testing Frees Man Imprisoned for Half His Life# 5 Exhibit Inmate Enters Guilty Plea in '89 Killing# 6 Exhibit Gov. Rick Perry Grants |

| | | |
|---|---|---|
| | | Two Pardons for Innocence# 7 Exhibit Informants/Snitches# 8 Exhibit Supplemental Investigative/Disposition Report# 9 Exhibit Order re: St. Louis Empowerment Center Records)(Gipson, Kent) (Entered: 05/22/2007) |
| 05/22/2007 | 38 | MOTION for Extension of: time in which to file traverse by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 05/22/2007) |
| 05/24/2007 | 39 | MEMORANDUM in Opposition re 35 MOTION for Reconsideration re 34 Memorandum & Order, filed by Respondent Donald Roper. (Spillane, Michael) (Entered: 05/24/2007) |
| 05/24/2007 | 40 | MOTION to Strike *Respondent's "?RESPONSE TO PETITIONER?S REPLY MEMORANDUM"* by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 05/24/2007) |
| 05/24/2007 | 41 | EXHIBITS Re: 37 Received: Color copy of last page of Exhibit 3 by Petitioner Marcellus Williams. (Maintained in paper format by the clerks office) (KJF, ) (Entered: 05/29/2007) |
| 07/12/2007 | 42 | ORDER denying 35 Motion for Reconsideration, granting 38 Motion for Extension : time to file a traverse ;Extension date: 8/17/07, denying 40 Motion to Strike Signed by Judge Rodney W. Sippel on 7/12/07. (LGK, ) (Entered: 07/12/2007) |
| 08/15/2007 | 43 | MOTION for Extension of: Time to File Traverse by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 08/15/2007) |
| 08/16/2007 | 44 | ORDER – IT IS HEREBY ORDERED that Marcellus Williams motion for an extension of time to file his traverse 43 is GRANTED. No further extensions of time will be granted absent truly extraordinary circumstances. Signed by Judge Rodney W. Sippel on 8/16/07. (LAH, ) (Entered: 08/16/2007) |
| 08/31/2007 | 45 | TRAVERSE re 9 PETITION for Writ of Habeas Corpus filed by Petitioner Marcellus Williams. (Attachments: # 1 Exhibit Exh. 15 to Traverse# 2 Exhibit Exh. 16 to Traverse# 3 Exhibit Exh. 17 pgs. 1–3# 4 Exhibit Exh,. 17 – pgs. 4–6# 5 Exhibit Exh. 17 – pgs. 7–9# 6 Exhibit Exh. 17 – pgs. 10–11# 7 Exhibit Exh. 17 – 12–13)(Gipson, Kent) (Entered: 08/31/2007) |
| 09/04/2007 | 46 | EXHIBIT Received: 15 by Petitioner Marcellus Williams. (CD filed and maintained by the clerks office) (KJF, ) (Entered: 09/04/2007) |
| 10/25/2007 | 47 | SEALED CJA 30: Authorization to Pay Lori Leon in Death Penalty Proceedings Voucher # 071010000009. Signed by Judge Rodney W. Sippel on 10/18/07. (KJF, ) (Entered: 10/30/2007) |
| 10/25/2007 | 48 | SEALED CJA 30: Authorization to Pay Kent E. Gipson in Death Penalty Proceedings Voucher # 071010000012. Signed by Judge Rodney W. Sippel on 10/25/07. (KJF, ) (Entered: 10/30/2007) |
| 11/02/2007 | 49 | CJA 31: Authorization to Pay in Death Penalty Proceedings. FILED UNDER SEAL.. Signed by Judge Rodney W. Sippel on 10/22/07. (LGK, ) (Entered: 11/07/2007) |
| 03/06/2008 | 50 | NOTICE of Change of Address filed by Lori Leon (Leon, Lori) (Entered: 03/06/2008) |
| 10/03/2008 | 51 | NOTICE of Change of Address filed by Kent E. Gipson (Gipson, Kent) (Entered: 10/03/2008) |
| 10/09/2008 | 52 | |

| | | |
|---|---|---|
| | | MOTION to Substitute Attorney/Law Firm ;attorney or firm Laurence E. Komp ;substituted for:Lori Leon by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 10/09/2008) |
| 10/31/2008 | 53 | CJA 30: Authorization to Pay Kent E. Gipson in Death Penalty Proceedings Voucher # 081022000013. Signed by Honorable Rodney W. Sippel on 10/23/08. (LAH, ) (Entered: 10/31/2008) |
| 01/05/2009 | 54 | ORDER granting 52 Motion to Substitute Attorney. Added attorney Laurence E. Komp for Marcellus Williams. Attorney Lori Leon terminated Signed by Honorable Rodney W. Sippel on 1/5/09. (LGK) (Entered: 01/05/2009) |
| 01/14/2009 | 55 | TRAVERSE re 9 PETITION for Writ of Habeas Corpus *Supplemental* filed by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 01/14/2009) |
| 02/05/2009 | 56 | SEALED ORDER . Signed by Honorable Rodney W. Sippel on 2/5/09. (LGK) (Entered: 02/12/2009) |
| 04/10/2009 | 57 | CJA 30: Authorization to Pay Laurence Komp in Death Penalty Proceedings Voucher # 090316000015.. Signed by Honorable Rodney W. Sippel on 3/19/09. (LGK) (Entered: 04/14/2009) |
| 03/26/2010 | 58 | ORDER: IT IS HEREBY ORDERED that Petitioner Marcellus Williams' Petition for Writ of Habeas Corpus [ 2 and 9] is GRANTED IN PART AND DENIED IN PART. Williams' claim for relief as to his underlying condition is DENIED. Williams' claim for relief from the penalty phase of his trial is GRANTED based on trial counsels constitutionally ineffective assistance for failing to investigate and present mitigating evidence of Williams' social and family history. IT IS FURTHER ORDERED that this case is remanded to the Circuit Court of the County of St. Louis, State of Missouri, for a new hearing of the penalty phase of Williams' trial. A separate Judgment in accordance with this Memorandum and Order is entered this same date. Signed by Honorable Rodney W. Sippel on 3/26/10. (LGK) (Entered: 03/26/2010) |
| 03/26/2010 | 59 | JUDGMENT: IT IS HEREBY ORDERED, ADJUDGED and DECREED that the petition of Marcellus Williams for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED as to the guilt phase of his trial and GRANTED as to the penalty phase of his trial.. Signed by Honorable Rodney W. Sippel on 3/26/10. (LGK) (Entered: 03/26/2010) |
| 03/26/2010 | | ***REMARK – certified copy of memorandum and order and judgment mailed to the Circuit Court of the County of St. Louis (LGK) (Entered: 03/26/2010) |
| 04/20/2010 | 60 | MOTION to Alter Judgment *with suggestions in support under Rule 59(e)* by Respondent Donald Roper. (Spillane, Michael) (Entered: 04/20/2010) |
| 04/26/2010 | 61 | MOTION for Extension of Time to File Response/Reply *to State's Rule 59(e) Motion* by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 04/26/2010) |
| 04/27/2010 | 62 | Docket Text ORDER: Re: 61 MOTION for Extension of Time to File Response/Reply *to State's Rule 59(e) Motion* by Petitioner Marcellus Williams. (Gipson, Kent) filed by Marcellus Williams ; ORDERED GRANTED. Signed by Honorable Rodney W. Sippel on 4/27/10. (ARL) (Entered: 04/27/2010) |
| 05/11/2010 | 63 | MEMORANDUM in Opposition re 60 MOTION to Alter Judgment *with suggestions in support under Rule 59(e)* filed by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 05/11/2010) |

| 05/17/2010 | 64 | CJA 30: Authorization to Pay in Death Penalty Proceedings Voucher # 100406000003. Signed by Honorable Rodney W. Sippel on 5/6/10. (ARL) (Entered: 05/17/2010) |
|---|---|---|
| 05/18/2010 | 65 | REPLY to Response to Motion re 60 MOTION to Alter Judgment *with suggestions in support under Rule 59(e)* filed by Respondent Donald Roper. (Spillane, Michael) (Entered: 05/18/2010) |
| 06/16/2010 | 66 | MEMORANDUM OPINION re: 60 MOTION to Alter Judgment *with suggestions in support under Rule 59(e)* filed by Respondent Donald Roper motion is DENIED. Signed by Honorable Rodney W. Sippel on 6/16/10. (LGK) (Entered: 06/16/2010) |
| 06/24/2010 | 67 | NOTICE of Change of Address filed by Kent E. Gipson (Gipson, Kent) (Entered: 06/24/2010) |
| 07/12/2010 | 68 | NOTICE OF APPEAL as to 66 Memorandum Opinion, 59 Judgment – (Case), Judgment – (Case), 58 Order on Motion/Petition for Writ of Habeas Corpus,,, by Respondent Donald Roper. Filing fee $ 455, receipt number 0865–2327719. (Entered: 07/12/2010) |
| 07/13/2010 | 69 | NOTIFICATION OF APPEAL AND NOA SUPPLEMENT by clerk to USCA regarding 68 Notice of Appeal. Notice of Appeal filed on 07/12/2010 by Respondent Donald Roper. NOTIFICATION TO COUNSEL AND PRO SE PARTY: FILE REQUEST FOR TRANSCRIPT WITH DISTRICT COURT CLERKS OFFICE. SUBMIT FORM A & B TO EIGHTH CIRCUIT CLERKS OFFICE(JMW) (Entered: 07/13/2010) |
| 07/15/2010 | 70 | Initial Notification from USCA for 68 Notice of Appeal filed by Donald Roper USCA Appeal Number: 10–2579(LGK) (Entered: 07/15/2010) |
| 07/23/2010 | 71 | NOTICE OF CROSS APPEAL by Petitioner Marcellus Williams. (Entered: 07/23/2010) |
| 07/23/2010 | 72 | MOTION for Leave to Appeal in forma pauperis by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 07/23/2010) |
| 07/23/2010 | 73 | MOTION for Certificate of Appealability by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 07/23/2010) |
| 07/26/2010 | 74 | NOTICE OF CROSS APPEAL by Petitioner Marcellus Williams. (Entered: 07/26/2010) |
| 07/26/2010 | 75 | ORDER: IT IS HEREBY ORDERED that Petitioner Marcellus Williams' motion to proceed on appeal informa pauperis 72 is GRANTED. IT IS FURTHER ORDERED that Petitioner Williams motion for a certificate of appealability 73 is DENIED as Williams has not made a substantial showing of the denial of a federal constitutional right in the claims raised in his motion. Signed by Honorable Rodney W. Sippel on 7/26/10. (ARL) (Entered: 07/26/2010) |
| 07/27/2010 | 76 | NOTIFICATION OF APPEAL AND NOA SUPPLEMENT by clerk to USCA regarding 71 Notice of Cross Appeal and 74 Notice of Cross Appeal. Notice of Cross Appeals filed on 07/23/2010 and 07/26/2010 by Petitioner Marcellus Williams. NOTIFICATION TO COUNSEL AND PRO SE PARTY: FILE REQUEST FOR TRANSCRIPT WITH DISTRICT COURT CLERKS OFFICE. SUBMIT FORM A & B TO EIGHTH CIRCUIT CLERKS OFFICE(JMW) (Entered: 07/27/2010) |

| 07/30/2010 | <u>77</u> | Initial Notification from USCA for <u>74</u> Notice of Cross Appeal filed by Marcellus Williams USCA Appeal Number: 10–2682 (LGK) (Entered: 07/30/2010) |
|---|---|---|
| 08/20/2010 | <u>78</u> | CJA 30: Authorization to Pay Kent Gipson in Death Penalty Proceedings Voucher # 100810000002.. Signed by Honorable Rodney W. Sippel on 8/16/10. (KCM) (Entered: 08/20/2010) |
| 08/20/2010 | <u>79</u> | CJA 30: Authorization to Pay Laurence E. Komp in Death Penalty Proceedings Voucher # 100810000003.. Signed by Honorable Rodney W. Sippel on 8/16/10. (KCM) (Entered: 08/20/2010) |
| 12/14/2010 | <u>80</u> | JUDGMENT of USCA. USCA Appeal #: 10–2579, 10–2682. These appeals come before the court on appellee/cross–appellant's application for a certificate of appealability. The court has carefully reviewed the original file of the district court, and the application for a certificate of appealability is denied. The appeals are dismissed.(ARL) (Entered: 12/14/2010) |
| 12/15/2010 | <u>81</u> | JUDGMENT of USCA as to <u>68</u> Notice of Appeal filed by Donald Roper Regarding: JUDGMENT–This appeal comes before the court on appellant's application for a certificate of appealability. The court has carefully reviewed the original file of the district court, and the application for a certificate of appealability is denied. The appeal is dismissed. USCA Appeal #: 10–2682 (KJS) (Entered: 12/15/2010) |
| 12/17/2010 | <u>82</u> | Initial Notification and or Briefing Schedule from USCA for <u>71</u> Notice of Cross Appeal filed by Marcellus Williams, <u>68</u> Notice of Appeal filed by Donald Roper, <u>74</u> Notice of Cross Appeal filed by Marcellus Williams USCA Appeal Number: 10–2579 Method of Appendix due: 14 days from today Designation of record due: 14 days from today– appellant; 10 days from service of apellant's designation – appellee Briefs due: appellant 1/26/11; appellee 30 days from the date the court issues the notice of docket activity; reply brief – 14 days from the date the court issues the notice of docket activity (LGK) (Entered: 12/17/2010) |
| 02/23/2011 | <u>83</u> | ORDER of USCA – USCA Appeal #: 10–2682 – The petition for rehearing en banc is denied. The petition for rehearing by the panel is also denied. Judge Duane Benton is disqualified from the consideration or decision of this matter.(LAH) (Entered: 02/23/2011) |
| 03/02/2011 | <u>84</u> | MANDATE of USCA as to <u>71</u> Notice of Cross Appeal filed by Marcellus Williams, <u>68</u> Notice of Appeal filed by Donald Roper, <u>74</u> Notice of Cross Appeal filed by Marcellus Williams USCA #:10–2682(BAK) (Entered: 03/02/2011) |
| 06/29/2011 | <u>85</u> | LETTER from USCA regarding writ of certiorari filed with the U.S. Supreme Court re <u>68</u> Notice of Appeal. The petition for a writ of certiorari in the above entitled case was filed on June 22, 2011 and placed on the docket June 28, 2011 as No. 11–5005. (ARL) (Entered: 06/29/2011) |
| 11/09/2011 | <u>86</u> | LETTER from USCA regarding writ of certiorari filed with the U.S. Supreme Court USCA Appeal #: 10–2682. The Court today entered the following order in the above–entitled case: The petition for a writ of certiorari is denied.(BAK) (Entered: 11/09/2011) |
| 09/18/2012 | <u>87</u> | OPINION from USCA re <u>68</u> , <u>71</u> , <u>74</u> Notice of Appeal. USCA Appeal #: 10–2579. Marcellus Williams was convicted by a jury in Missouri of the first–degree murder of Felicia Gayle and sentenced to death. The Supreme Court of Missouri affirmed the conviction and sentence on direct review, State v. Williams, 97 S.W.3d 462 (Mo. |

| | | |
|---|---|---|
| | | 2003) (Williams I), and subsequently affirmed the denial of his motion for postconviction relief. Williams v. State, 168 S.W.3d 433 (Mo. 2005) Williams petitioned for a writ of habeas corpus in the district court under 28 U.S.C. § 2254. The district court denied relief on twelve of Williams's claims, but granted relief on his claim of ineffective assistance of counsel at the penalty phase of trial. The State appeals the grant of relief, and we reverse. See Opinion for full details. (ARL) (Entered: 09/18/2012) |
| 09/18/2012 | 88 | USCA JUDGMENT (10–2579) as to 68 , 71 , 74 Notice of Appeal filed by Donald Roper. This appeal from the United States District Court was submitted on the record of the district court, briefs of the parties and was argued by counsel. After consideration, it is hereby ordered and adjudged that the judgment of the district court in this cause is reversed and the cause is remanded to the district court for proceedings consistent with the opinion of this court. (ARL) (Entered: 09/18/2012) |
| 09/21/2012 | 89 | OPINION from USCA re 74 Notice of Cross Appeal : USCA Appeal #: 10–2579 appeal opinion correction (LGK) (Entered: 09/21/2012) |
| 12/06/2012 | 90 | ORDER of USCA USCA Appeal #: 10–2579 – The petition for rehearing en banc is denied. The petition for rehearing by the panel is also denied. Judge Benton did not participate in the consideration or decision of this matter.(LAH) (Entered: 12/06/2012) |
| 12/13/2012 | 91 | MANDATE of USCA as to 74 Notice of Cross Appeal filed by Marcellus Williams USCA #:10–2579 Reversed and remanded.(LGK) (Entered: 12/13/2012) |
| 12/19/2012 | 92 | JUDGMENT: IT IS HEREBY ORDERED, ADJUDGED and DECREED that the petition of Marcellus Williams for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DISMISSED and JUDGMENT is entered in favor of Respondent Donald Roper.. Signed by District Judge Rodney W. Sippel on 12/19/12. (LGK) (Entered: 12/19/2012) |
| 02/04/2013 | 93 | Appeal Transmittal re 71 Notice of Cross Appeal, 68 Notice of Appeal, 74 Notice of Cross Appeal : USCA Appeal #: 10–2579 The following has been forwarded to USCA: 2 boxes of exhibits(LGK) (Entered: 02/04/2013) |
| 05/09/2013 | 94 | LETTER from USCA regarding writ of certiorari filed with the U.S. Supreme Court re 68 Notice of Appeal : USCA Appeal #: 10–2579. The petition for a writ of certiorari in the above entitled case was filed on May2, 2013 and placed on the docket May 7, 2013 as No. 12–10141.(ARL) (Entered: 05/09/2013) |
| 10/21/2013 | 97 | LETTER from USCA re : letter received from the United States Supreme Court stating that an order has been filed denying certiorari in the above case. USCA Appeal #: 10–2579. (LGK) (Entered: 10/21/2013) |
| 03/25/2015 | 98 | CJA 30: Authorization to Pay Kent Gipson in Death Penalty Proceedings Voucher # 150227000003.. Signed by District Judge Rodney W. Sippel on 3/13/15. (JWD) (Entered: 03/25/2015) |
| 07/21/2017 | 99 | ORDER APPOINTING ATTORNEY: WHEREFORE, it is ORDERED, that the CJA appointment of Mr. Komp is terminated effective immediately and the Capital Habeas Unit of the Federal Public Defender for the Western District of Missouri is hereby appointed.Signed by District Judge Rodney W. Sippel on 7/21/17. (ARL) (Entered: 07/21/2017) |
| 07/25/2017 | 100 | |

| | | ENTRY of Appearance by Laurence E. Komp for Petitioner Marcellus Williams. (Komp, Laurence) (Entered: 07/25/2017) |
|---|---|---|
| 07/31/2017 | 101 | MOTION for Relief *from* Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) by Petitioner Marcellus Williams. (Attachments: # 1 Exhibit Exhibits In Support of Motion for Relief from Judgment, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D)(Gipson, Kent) (Entered: 07/31/2017) |
| 07/31/2017 | 102 | MOTION to Stay *Execution* by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 07/31/2017) |
| 08/01/2017 | 103 | MEMORANDUM AND ORDER: IT IS HEREBY ORDERED that respondent must respond to the motions no later than August 8, 2017. Petitioner must file his reply brief no later than August 14, 2017. I will not extend the time for filing the briefs under any circumstance. Signed by District Judge Rodney W. Sippel on 8/1/17. (ARL) (Entered: 08/01/2017) |
| 08/02/2017 | 104 | RESPONSE in Opposition re 102 MOTION to Stay *Execution*, 101 MOTION for Relief *from* Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) *Suggestions in Opposition to Rule 60(b) Motion and to Motion to Stay Execution* filed by Respondent Donald Roper. (Attachments: # 1 Exhibit Exhibit 1 Docket Sheet, # 2 Exhibit Exhibit 2 Amended Petition, # 3 Exhibit Exhibit 3 Motion for DNA testing, # 4 Exhibit Exhibit 4 Motion for Evidentiary Hearing, # 5 Exhibit Exhibit 5 District Court Order Denying Motion for DNA testing and Evidentiary Hearing, # 6 Exhibit Exhibit 6 District Court Court Memorandum and Order, # 7 Exhibit Exhibit 7 Williams Section 1983 Complaint, # 8 Exhibit Exhibit 8 Order Denying 1983 Complaint, # 9 Exhibit Exhibit 9 Missouri Supreme Court Habeas Petition, # 10 Exhibit Exhibit 10 Warden's Prehearing Brief, # 11 Exhibit Exhibit 11 Williams Posthearing Brief, # 12 Exhibit Exhibit 12 Williams Reply Brief, # 13 Exhibit Exhibit 13Warden's Reply Brief, # 14 Exhibit Exhibit 14Missouri Supreme Ct Denying Habeas Petition, # 15 Exhibit Exhibit 15 Petition for Certiorari, # 16 Exhibit Exhibit 16 Brief in Opposition to Certiorari Petition, # 17 Exhibit Exhibit 17 Order List Showing the Certiorari Denial)(Spillane, Michael) (Entered: 08/02/2017) |
| 08/11/2017 | 105 | REPLY BRIEF IN SUPPORT of His Motion for Stay of Execution 102 by Petitioner Marcellus Williams. (Gipson, Kent) Document improperly filed as a motion modified on 8/15/2017 to correct entry (ARL). (Entered: 08/11/2017) |
| 08/11/2017 | 106 | REPLY to Response to Motion re 101 MOTION for Relief *from* Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) *Motion in Support of Relief of Judgment* filed by Petitioner Marcellus Williams. (Gipson, Kent) (Entered: 08/11/2017) |
| 08/15/2017 | 107 | ORDER: IT IS HEREBY ORDERED that Petitioner Marcellus Williams' motion for relief from judgment 101 is DENIED. IT IS FURTHER ORDERED that Petitioner Marcellus Williams' motion to stay 102 is DENIED as moot. Signed by District Judge Rodney W. Sippel on 8/15/17. (LGK) (Entered: 08/15/2017) |
| 08/16/2017 | 108 | NOTICE OF APPEAL by Petitioner Marcellus Williams. (Entered: 08/16/2017) |
| 08/17/2017 | 109 | Initial Notification from USCA for 108 Notice of Appeal filed by Marcellus Williams USCA Appeal Number: 17–2801(LGK) (Entered: 08/17/2017) |
| 08/17/2017 | 110 | NOTIFICATION OF APPEAL AND NOA SUPPLEMENT by clerk to USCA regarding 107 Order on Motion for Relief, Order on Motion to Stay,,. Notice of Appeal filed on 08/16/2017 by Petitioner Marcellus Williams. NOTIFICATION TO |

| | | |
|---|---|---|
| | | COUNSEL AND PRO SE PARTY: FILE REQUEST FOR TRANSCRIPT WITH DISTRICT COURT CLERKS OFFICE.(MFG) (Entered: 08/17/2017) |
| 08/17/2017 | 111 | USCA Order Appointing Federal Public Defender for the Western District of Missouri as to 108 Notice of Appeal filed by Marcellus Williams. USCA Appeal Number: 17–2801(LGK) (Entered: 08/17/2017) |
| 08/17/2017 | 112 | USCA Order Appointing Attorney Kent E. Gipson as to 108 Notice of Appeal filed by Marcellus Williams. USCA Appeal Number: 17–2801(LGK) (Entered: 08/17/2017) |
| 08/21/2017 | 113 | USCA JUDGMENT as to 108 Notice of Appeal filed by Marcellus Williams. (CAR) (Entered: 08/21/2017) |
| 08/24/2017 | 114 | LETTER from USCA with letter/order from U.S. Supreme Court attached. USCA Appeal #: 17–2801. Supreme Court #: 17–5642. The petition for a writ of certiorari in the above entitled case was filed on August 20, 2017 and placed on the docket August 21, 2017 as No. 17–5642.(ARL) (Entered: 08/24/2017) |
| 09/12/2017 | 115 | MANDATE of USCA as to 108 Notice of Appeal filed by Marcellus Williams; USCA #:17–2801. The application for certificate of appealability filed by Marcellus Williams has been considered by the court and is denied.(CAR) (Entered: 09/12/2017) |
| 10/05/2017 | 117 | LETTER from USCA with letter/order from U.S. Supreme Court attached. USCA Appeal #: 17–2801; Supreme Court #: 17–5642. The petition for writ of certiorari has been denied.(CAR) (Entered: 10/05/2017) |
| 09/17/2024 | 121 | MOTION for Relief FROM A JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b) by Petitioner Marcellus Williams. (Attachments: # 1 Appendix Appendix for Motion for Relief 60b)(Komp, Laurence) (Entered: 09/17/2024) |
| 09/17/2024 | 122 | RESPONSE to Motion re 121 MOTION for Relief FROM A JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b) *Suggestions in Opposition to Petitioner's Motion to Alter or Amend Judgment* filed by Respondent Donald Roper. (Attachments: # 1 Exhibit Respondent's Suggestions in Opposition Exhibit 1)(Spillane, Michael) (Entered: 09/17/2024) |
| 09/18/2024 | 123 | REPLY to Response to Motion re 121 MOTION for Relief FROM A JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b) filed by Petitioner Marcellus Williams. (Komp, Laurence) (Entered: 09/18/2024) |
| 09/19/2024 | 124 | ORDER... IT IS HEREBY ORDERED that Petitioner Marcellus Williams' motion for relief from judgment [ 121 ] is DENIED. IT IS FURTHER ORDERED that the Clerk of Court shall substitute David Vandergriff as the Respondent in this matter. Signed by Sr. District Judge Rodney W. Sippel on 9/19/2024. (NEP) (Entered: 09/19/2024) |
| 09/19/2024 | 125 | NOTICE Appeal: by Petitioner Marcellus Williams (Komp, Laurence) (Entered: 09/19/2024) |

IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-CV-1474-RWS |
| | ) | |
| DAVID VANDERGRIFF, | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| Respondent. | ) | 9/24/24 at 6:00 P.M. |

**PETITIONER'S MOTION FOR RELIEF FROM A
JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b)**

COMES NOW Marcellus Williams, Petitioner, by and through counsel, and hereby moves the Court, pursuant to FED. R. CIV. P. 60(b), for relief from its Judgment entered March 26, 2010. (R. 58).[1] That Judgment granted in part and denied in part Petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Petitioner Williams's request for relief is based on the recent disclosure by the State of Missouri of evidence demonstrating the Missouri Supreme Court unreasonably denied his *Batson* claim and the recent testimony of the trial prosecutor clearly and convincingly rebuts the state court's fact-finding. The evidence withheld by the State clearly demonstrates the trial prosecutor engaged in intentional racial discrimination in his peremptory strikes against otherwise qualified Black jurors in violation of Williams's constitutional rights.

---

[1] "R" refers to the CM/ECF docket before this Court. "HT1" and "HT2" refer to the evidentiary hearing which took place August 28, 2024. "8/21/24 Hrg. Tr." refers to transcript of proceedings before the state circuit court on that date. "Tr." refers to the original trial transcript.

1

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of criminal justice." *Rose v. Mitchell*, <u>443 U.S. 545, 555</u> (1979). The United States Supreme Court has emphasized that, when it comes to jurors, racial bias must be especially guarded against. "Racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado,* <u>580 U.S. 206, 224</u> (2017) (internal quotation marks omitted). "Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State." *Id.*

<u>Fed. R. Civ. P. 60(b)</u> provides this Court the procedural mechanism to consider the newly disclosed evidence and to grant appropriate relief to Williams. The Supreme Court issued its decision in *Buck v. Davis*, <u>580 U.S. 100</u> (2017), granting Texas death row inmate Duane Buck penalty phase relief under Rule 60(b)(6). The facts surrounding Mr. Buck's Rule 60(b)(6) litigation are similar to the circumstances of Petitioner's case. As in *Buck*, there were intervening legal developments that undermined the correctness of the prior judgment in the habeas proceeding. The Court in *Buck* also stressed that Mr. Buck's underlying claim, involving the injection of racial discrimination into the case, was an extraordinary circumstance that warranted relief, as was the concession of error. *See id.* at 113-14. The Court in *Buck* noted that claims of racial discrimination are particularly "pernicious in the administration of justice" and "poison[] public confidence in the judicial process." *Id.* at 124.

## MEMORANDUM IN SUPPORT

### I.    Introduction.

Petitioner's case comes to this Court in a posture where evidence uniquely in possession of the State of Missouri and relevant to this Court's consideration of Petitioner's *Batson* claim only came to light a few weeks ago – the trial prosecutor, finally and for the first time subjected to adversarial testing, testified under oath in a manner that demonstrates the Supreme Court of Missouri in 2003 unreasonably denied a *Batson* claim and that new evidence clearly and convincingly rebuts the state court's fact-finding. Specifically, the trial prosecutor admitted that "part of the reason" he struck a juror was that he was a young Black man with glasses. (HT2. 212).

Q. So you struck them because they were both young black men with glasses?

A. Wrong. **That's part of the reason**.

*Id.* (emphasis added).

This admission occurred immediately after the following exchange:

A. . . . I thought they looked like they were brothers.

Q. They looked like brothers?

A. Familial brothers.

Q. Okay.

3

A. I don't mean black people. I mean, like, you know, you got the same

mother, you got the same father. You know, you're brothers, you're both

men, you're brothers.

*Id.* Perhaps realizing his mistake, the trial prosecutor later backtracked and claimed that

race was not part of the reason for striking the jurors, *id.* p. 213 ("Q. And part of the

reason is that they were both black? A. No. Absolutely not. Absolutely not."); however,

this was after he once again repeated that the juror and Mr. Williams, both Black men,

"looked like they were brothers." *Id.* Further, Larner admitted that "[t]hey were both

young black men…[a]nd that's not necessarily the full reason that I thought they were so

similar." *Id.* p. 211.

In addition to admitting race was a factor in striking jurors, the trial prosecutor

admitted he took notes during voir dire and that he saved them in the file. *Id.* p. 217.

Incredibly (and suspiciously), those notes are now missing from the State's file. *Id.* p.

265-66.

Mr. Williams's circumstances are worse than that found troubling in *Amadeo v.

Zant*, 486 U.S. 214 (1988). In *Amadeo*, the Supreme Court faulted Georgia for

suppressing a memo related to the manipulation of the voir dire in a racially

discriminatory manner. *Id.* Here, Missouri has seemingly destroyed the evidence, the

notes, that would have supported a finding of racial discrimination in the jury selection

process.

The trial prosecutor's admission he considered the juror's race not only

establishes the unreasonable nature of the Supreme Court of Missouri's decision and

4

demonstrates that new evidence clearly and convincingly rebuts the state court's fact-finding—but also undermines this Court's earlier affirmance of the state court decision. The destruction of the prosecutor's voir dire notes—evidence that would underpin a *Batson* claim—raises a negative inference that such notes would support Petitioner's claim. The State maintained sole possession of their case file including the prosecutor's trial notes and they failed to disclose them to the defense, to the Missouri Supreme Court, or to this Court during consideration of Williams' *Batson* claim.

All of this takes place in a case where this Court previously granted penalty phase relief on Petitioner's Sixth Habeas Claim. However, the Eighth Circuit reversed, by a vote of 2-1. *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied,* 1345 S.Ct. 85 (U.S. 2013).

## II.    RELEVANT PROCEDURAL HISTORY.

On August 26, 2006, Petitioner filed a Petition for Writ of Habeas Corpus. R. 9. Relevant to the instant motion, Petitioner claimed as his Fifth Habeas Ground that the state violated the Supreme Court's decision in *Batson*. R. 9. p. 45-68. This Court denied the claim on the basis that Petitioner could not overcome AEDPA.

While this Court granted habeas relief on Petitioner's Sixth Claim for Habeas Relief, this Court denied relief on Petitioner's Fifth Claim. The Missouri Supreme Court, in *State v. Williams*, 97 S.W.3d 462, 472 (Mo. banc 2003), denied relief, holding: "Unlike *Johnson*, this case does not involve an *overt*, racially motivated reason for the strike. Instead, the prosecutor stated that the venireperson resembled Williams, had the same glasses, and had a similar demeanor. These reasons are not *inherently* race

5

based." (emphasis added). Applying AEDPA, this Court credited the now-rebutted factual basis. *See* R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence.")

Petitioner filed a notice of cross-appeal and sought a certificate of appealability on the *Batson* denial. On December 15, 2010, the Eighth Circuit denied Petitioner's request. Petitioner sought rehearing on that denial. On February 23, 2011, after ordering a response, the rehearing petition was denied *en banc* and before the original panel. Thereafter, the United States Supreme Court, on November 7, 2011, denied Petitioner a Writ of Certiorari.

After the Eighth Circuit reversed, by a vote of 2-1, this Court's order granting penalty phase relief, *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied,* 571 U.S. 839 (2013), the state requested an execution date. On December 17, 2014, the Missouri Supreme Court set Petitioner's execution date for January 28, 2015. On January 9, 2015, Petitioner filed a habeas petition in the Missouri Supreme Court related to actual innocence tied specifically to access to DNA testing. *State ex rel. Williams v. Steele*, Case No. SC94720.

While his state habeas was pending, on January 12, 2015, Petitioner filed a 42 U.S.C. § 1983 action before this Court. *See Williams v. McCulloch*, Case No. 4:15-cv-00070. On January 14, 2015, this Court denied this § 1983 action. R. 7 from *Williams v. McCulloch*, Case No. 4:15-cv-00070. Petitioner did not appeal that ruling.

6

On January 22, 2015, the Missouri Supreme Court stayed Petitioner's scheduled execution date. Thereafter, on May 26, 2015, the Missouri Supreme Court issued an Order referring the matter to a Special Master to supervise DNA testing. On January 5, 2017, after supervising the DNA testing but without conducting a hearing or making any findings, the Special Master sent Petitioner's case back the Missouri Supreme Court.

On January 31, 2017, the Missouri Supreme Court summarily denied Petitioner's habeas petition without briefing or oral argument. Petitioner filed a certiorari petition to the United States Supreme Court from that denial. The United States Supreme Court denied certiorari on June 26, 2017. *Williams v. Steele*, 582 U.S. 937 (2017).

 On April 26, 2017, the Missouri Supreme Court set Petitioner's execution for August 22, 2017. On August 22, 2017, then-Governor of Missouri Eric Greitens stayed Williams's execution and convened a Board of Inquiry ("BOI") to investigate Williams's claims, but the BOI was dissolved by Governor Mike Parson on June 29, 2023. It is unknown whether the BOI reached a conclusion or issued a report or recommendation prior to Governor Parson's interference.

Pursuant to Section 547.031 RSMo (2021), the Prosecuting Attorney for St. Louis County initiated proceedings by filing a Motion to Vacate or Set Aside Petitioner's judgment on January 26, 2024. On February 5, 2024, the Attorney General filed a Notice of Intent to Oppose the motion.

On June 4, 2024, the Missouri Supreme Court set Petitioner's execution date for September 24, 2024. On June 5, 2024, the Attorney General filed a Motion to Dismiss the Motion to Vacate or Set Aside in the circuit court, 121 days after filing the notice of

intent to oppose the Motion to Vacate. On July 2, 2024, the circuit court set an evidentiary hearing on the Prosecutor's petition for August 21, 2024.

On July 18, 2024, the Attorney General filed a petition for a Writ of Prohibition disputing the circuit court's setting of a hearing date under § 547.031 and its failure to grant the Attorney General's motion to dismiss. The Supreme Court of Missouri denied the writ on July 26, 2024.

On August 21, 2024, the prosecuting attorney and Petitioner presented a resolution to this civil matter in the form of a consent agreement. Petitioner agreed to enter a plea of guilty to the charged offense of murder in the first degree pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970) with a sentence of life without the possibility of parole. The consent order contained concessions from the prosecuting attorney that constitutional errors committed by the St. Louis County Prosecuting Attorney's Office occurred during Petitioner's trial.

As the Court described in open court without any objection:

> THE COURT: The Court also finds, following discussions between representatives of the victim's family both with the Prosecuting Attorney's Office and the Attorney General's Office regarding this consent judgment, the Court held a telephonic conference in chambers with that representative on August 21, 2024, wherein the representation expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality.

8/21/24 Tr. p. 23 (Attachment B). The Consent Order and Judgment from the August 21, 2024 proceedings reflected respect for Dr. Picus, the victim's husband, noting: "The Court finds that, following discussions between a representative of the victim's family and both the Prosecuting Attorney's Office and the Attorney General's Office . . . the

8

representative expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality." (Attachment A). The St. Louis County Prosecutor's Office also relied on the family's opposition to the death penalty in seeking the consent judgment: "We have discussed with the victim's husband, Dr. Daniel Picus, who has indicated he does not support the application of the death penalty to Mr. Williams. As the Court is aware, Dr. Picus expressed this sentiment to the Court and all counsel in chambers during a telephone call earlier today." 8/21/24 Tr. pp. 8-9 (Attachment B).

Contrary to the wishes of Ms. Gayle's family, the Attorney General filed a Petition for Writ of Prohibition, or in the Alternative, Mandamus, to prevent the consent judgment from taking effect. The Supreme Court of Missouri granted a preliminary writ on August 21, 2024. On August 22, 2024, in accordance with the Missouri Supreme Court's writ, the circuit court vacated the consent judgment and set an evidentiary hearing for August 28, 2024.

As a result of the Missouri Supreme Court's order, a hearing on the Motion to Vacate was held on August 28, 2024. The evidence relied on below is the only time in the course of this case that the trial prosecutor was put under oath and provided context for his statements regarding the exercise of peremptory challenges.

### III.    LEGAL STANDARD.

Under Article III of the United States Constitution, federal courts have inherent "power over [their] own judgments." *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957) (*per curiam*). A vehicle for exercise of this power is Fed. R. Civ. P. 60(b), which

9

"[i]n simple English … vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949). Under the rule, federal courts have "broad authority to relieve a party from a final judgment upon such terms as are just, provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988) (internal quotations omitted).

Rule 60(b) "does not provide a new remedy at all," but rather is "simply the recitation of pre-existing judicial power." *Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 234-235 (1995). That judicial power includes the inherent power to set aside judgments that are unfair: "Rule 60(b) … reflects and confirms the court's own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity." *Plaut*, 514 U.S. at 233-234 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)). "The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Thompson v. Bell,* 580 F.3d 423, 442 (6th Cir. 2009) (internal quote omitted).

While the factors a court may consider in assessing whether relief under Rule 60(b)(6) is necessary to accomplish justice are manifold and unparticularized, *Liljeberg*, 485 U.S. at 863–64, the Supreme Court has cautioned that the relief it affords is

warranted only in "extraordinary circumstances." *Ackerman v. United States*, 340 U.S.
193, 199–202 (1950). "In determining whether extraordinary circumstances are present,
a court may consider a wide range of factors. These may include, in an appropriate case,
the risk of injustice to the parties and the risk of undermining the public's confidence in
the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (internal quotations
omitted). The extraordinary circumstances present in Petitioner's case more than meet
this standard.

    As described further, *infra*, a district court may grant a 60(b) motion as long as
the motion does not present a "claim" that would contravene AEDPA strictures on
successive petitions. *Gonzalez v. Crosby*, 545 U.S. 524, 529, 531 (2005). A claim is *not*
presented by a motion which "merely asserts that a previous ruling which precluded a
merits determination was in error -- for example, a denial for such reasons as failure to
exhaust, procedural default, or statute-of-limitations bar."

    That limitation poses no barrier here. This Court never addressed the
constitutional question. Rather, this Court addressed whether AEDPA imposed a bar to
relief. R. 58 p. 25 ("This decision is supported by the record and Williams has
failed to overcome the presumption that this determination was correct by clear and
convincing evidence."). By definition, it is a denial that *precluded* a merits
determination. Section 2254(d) prohibits a federal court from granting relief on any
habeas corpus claim "that was adjudicated on the merits in state court proceedings"
unless the state court's adjudication of the claim "(1) resulted in a decision that was
contrary to, or involved an unreasonable application of, clearly established Federal law,

11

as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." § 2254(d). "By its terms § 2254(d) bars

relitigation of any claim 'adjudicated on the merits' in state court, subject only to the

exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Section 2254(d) thus restricts a federal court's ability to conduct de novo review of

federal claims adjudicated on the merits by state courts unless the provisions of

subsections (1) and (2) are overcome.

On the *Batson* claim, this Court never went past the initial 2254(d) question.

Because the application of § 2254(d)'s standard is non-merits-based, *see Medellin v.*

*Dretke*, 544 U.S. 660, 664–65 (2005) (per curiam) (including § 2254(d) among "several

threshold issues that could independently preclude habeas relief"), this Court never

considered the merits of the *Batson* claim. Rather, this Court merely conducted an

inquiry into its own power to grant relief irrespective of whether Petitioner is in custody

in violation of the United States Constitution under § 2254(a). The new evidence

developed at the August 28, 2024 hearing clearly and convincingly rebuts the state

court's fact-finding--and this Court indicated the precise basis of affirmance was the

previous lack of such evidence. *See* R. 58 p. 25 ("This decision is supported by the record

and Williams has failed to overcome the presumption that this determination was

correct by clear and convincing evidence.").

That Petitioner is here challenging a procedural—rather than substantive—basis

for the Court's denial of habeas relief is confirmed by the Supreme Court's reminders

that a finding that § 2254(d) precludes the federal habeas remedy does not mean that, as a matter of substantive law, a person's custody is constitutional. *See, e.g.*, *Glebe v. Frost*, 574 U.S. 21, 23–24 (2014) (per curiam) (finding that § 2254(d) may preclude relief even "[a]ssuming for argument's sake that the trial court violated the Constitution"); *Lopez v. Smith*, 574 U.S. 1, 5–7 (2014) (per curiam) (assuming *arguendo* that a constitutional violation occurred while concluding that § 2254(d) precluded de novo merits review).

For this reason, a motion such as the instant one, challenging a Court's assessment under AEDPA of a now-changed record, is a proper subject of a 60(b) application in a habeas proceeding. *Id.* at 532 n.4. Indeed, "Rule 60(b) allows a court to grant relief from a final judgment or order." *Cornell v. Nix*, 119 F.3d 1329, 1332 (8th Cir. 1997); *see also Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989) (habeas corpus proceeding). "[Rule 60(b)] is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell*, 119 F.3d at 1332 (quotation omitted).

A Rule 60(b) motion is appropriate here because the judgment entered on Petitioner's § 2254 Petition makes clear that the denial of the *Batson* claim is premised on a fact that is no longer supported by the full record, and indeed the record clearly and convincingly rebuts it. Further, the suspicious destruction of voir dire notes supporting the *Batson* claim precluded a genuine consideration of the merits of Petitioner's Fifth Claim. Such an allegation is a "true" 60(b), as envisioned by *Gonzalez,* 545 U.S. 524, and cannot be construed as a successive petition pursuant to § 2244(b)(2).

13

## IV. New testimony from the trial prosecutor expressly admitting to racially-based peremptory strikes warrants 60(b) relief.

### A. Part of the reason a juror was struck is because he looked like a "brother" to Petitioner, and because the juror and Petitioner were both young Black men with glasses.

During jury selection in Petitioner's trial, the State utilized six of its nine peremptory strikes (67% of the available strikes) against six of the seven (86%) Black venirepersons. (Tr. 1568-69). Petitioner's jury was comprised of eleven white jurors and only one Black juror.

The trial prosecutor inaccurately admitted to using three of his nine peremptory strikes to strike Black jurors and six strikes to strike white jurors. (HT2 at 201-02). The hearing transcript demonstrates that the trial prosecutor sought to minimize his use of the peremptory against the qualified Black jurors ("No. I think you have them reversed, actually" HT2 at 201 (Attachment D)); in reality, he used six of his nine peremptory strikes to strike qualified Black jurors and three strikes to strike white jurors. He admitted that part of the reason he struck Juror 64, a Black juror, was because he looked very similar to the defendant, a Black man, that he reminded him of the defendant, and had the same "piercing eyes" as Petitioner. (*Id.* at 208). The trial prosecutor testified that when he said he looked very similar to the defendant, he meant they were both young Black men. (*Id.* at 210-11). The trial prosecutor further testified that he thought they looked like they were "brothers." (*Id.* at 212). He testified that "part of the reason" he struck Juror No. 64 was because he was a young Black man with glasses. (*Id.* at 213; *see also id.* at 211 ("Q. And by that, they were both young black men, right? A. They were

14

both young black men. Q. Okay. A. And that's not necessarily the full reason that I thought they were so similar.")).

The venireperson at issue, Henry Gooden, stated that he could he impose the death penalty, favored the death penalty in some cases, and he could also sign a death verdict. (Tr. 762-63). The State nevertheless struck Gooden, claiming that he was "weak" on the death penalty. (Tr. 1586). The State also reasoned that Gooden also "looked very similar to the defendant" and "reminded [the State] of the defendant." (*Id.*). In the original trial transcript, the trial prosecutor does not specifically call out Gooden's race as the basis of that similarity.

During the evidentiary hearing on August 28, 2024, the trial prosecutor admitted that "part of the reason" he struck Gooden was that he was a young Black man with glasses. (HT2 212-13). The trial prosecutor, in a very troubling manner, foundered at the hearing after using the term "brother" to describe both men, and then offered an unsolicited plaintive race neutral explanation to explain his comments at the hearing. (*See* HT2. 212).

Venireperson William Singleton, another qualified Black man, was also struck because the State claimed he was "weak" on the death penalty, even though he stated he could vote for a death sentence, keep an open mind throughout the trial and deliberation process, make a decision based on the evidence and the law, and could abide by the State's burden of proof beyond-a-reasonable-doubt. (Tr. 762-63, 768, 775-76, 778). Singleton elaborated that he did not believe a sentence of life imprisonment to be more lenient than the death penalty, because "[e]ither way, [the defendant]'s gone for

the rest of his life." (Tr. 766). Three white jurors who gave similar answers regarding their belief that a life sentence was of equivalent magnitude to the death penalty were not struck. (Tr. 564-65, 663-64, 666-67, 789, 1611). The State also argued for Singleton to be struck because he had been court martialed in 1988. (Tr. 1420-21). But Singleton had been honorably discharged and in 2001, at the time of voir dire, was still serving in the reserves. White venirepersons who had been convicted of various other crimes, including receiving stolen property and indecent exposure, were not struck. (Tr. 1413-14, 1425, 1427, 1611).

In a disparate line of questioning as compared to white jurors, the trial prosecutor did not reassure a single Black juror that all 12 people had to agree on the verdict when he questioned them individually and instead reassured white jurors 11, 18, 21, 22, 26, 27, 29, 30, 32, 34, 35, 41, 43, 50, 63, 67, 70, 71, 106, and 126, that 12 people needed to agree. The trial prosecutor had no response when confronted with this disparate treatment at the August 28, 2024, hearing. This failure to respond when faced with disparate and a lack of comparative treatment of jurors based on their race clearly and convincingly demonstrates this Court's barrier to merits review should be lifted.

St. Louis County's practice of striking Black venirepersons based on their race continued after Petitioner's trial. In 2006 and 2007, the Missouri Supreme Court reversed two death sentences imposed in St. Louis County for *Batson* violations. *State v. McFadden*, 216 S.W.3d 673, 674-77 (Mo. banc 2007); *State v. McFadden*, 191 S.W.3d 648, 656, 657 (Mo. banc 2006). The Missouri Supreme Court and other state appellate courts have also reversed a number of convictions on *Batson* grounds. *See State v.*

16

*Hampton*, 163 S.W.3d 903, 904-05 (Mo. banc 2005); *State v. Hopkins*, 140 S.W.3d 143, 157 (Mo. Ct. App. 2004).

At first, the trial prosecutor sought to minimize that history. When asked, "Have you ever been found to have violated *Batson v. Kentucky* in another case?" he retorted, "Now let me say this perfectly clear. Never." HT2 at 218. However, when asked, "So no judge has ever found that you have failed to provide a race neutral reason for using a peremptory strike on a black juror?" he backpedaled, claiming, "I thought you said have I ever been reversed." *Id.* He then conceded that in the "McFadden case," the trial judge found him to have failed to provide race neutral reasons for excluding three Black jurors. *Id.* at 218-19. The trial prosecutor insisted:

> I disagreed with him, but he's the judge. And we put those jurors back on the jury. And they were on that case, and they voted death. They were put back on that jury. But yes, I was wrong on that. But it was not by a -- I've never been reversed on Batson. And that's what I thought you were asking. I tried all those cases. Most of them I won, almost all. And they were all appealed on Batson. If any black was struck, they appealed on Batson.
>
> In all those cases, and I'd say there's probably 25 to 50 that were appealed on Batson, none of those by any court, appellate court, reversed me on Batson. On that one case Judge Ross, he thought I didn't have sufficient reasons. He actually, he told me that, he says, before I even struck them he said, if you strike them, I'm going to put them
> back on. And I struck them anyway because I thought I was right. And you know what? He put them back on, and they stayed on, and they voted for death.

*Id.* at 219-20. Larner again sought to minimize his previous misconduct; he failed to mention that regarding the one juror in *McFadden* where a *Batson* challenge was overruled, the trial court found Larner's first reason to be pretextual for race.

"Racial discrimination in jury selection compromises the defendant's right to a trial by an impartial jury." *State v. McFadden*, 191 S.W.3d 648, 651 n.2 (Mo. banc 2006). "The right to sit before a jury of one's peers, chosen not because of race, but because of their standing as citizens doing their civic duty, is essential to a fair trial." *Id.* at 657 (*quoting Miller-El v. Dretke*, 545 U.S. 231 (2005)).

Furthermore, "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Id.* at 86 (*quoting Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)). "In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law [is] strengthened if we ensure that no citizen is disqualified from jury service because of his race." *Id.* at 99.

As a result, "[t]he State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause." *Id.* at 89. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019).

*Batson* provides a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in

18

> question; and third, in light of the parties' submissions, the
> trial court must determine whether the defendant has shown
> purposeful discrimination.

*Foster v. Chatman*, 578 U.S. 488, 499-500 (2016) (*quoting Snyder v. Louisiana*, 552 U.S. 572, 476-77 (2008)).

"The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 588 U.S. at 303 (*quoting Foster*, 578 U.S. at 303). Once purposeful discrimination is shown, the prosecution cannot rely on other non-discriminatory reasons to justify the strike. *See McFadden*, 191 S.W.3d at 657 ("To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection Batson provides against discrimination in jury selection.").

While the Missouri Supreme Court addressed a *Batson* claim on direct appeal in 2003 in favor of the State, neither that court nor this Court had available the express admission of racial animus on the part of the trial prosecutor. No testimonial evidence was before the Supreme Court of Missouri in 2003, only a self-serving colloquy with the trial court, which is clearly and convincingly rebutted by the sworn testimony from 2024.

During the trial prosecutor's testimony on August 28, 2024, he volunteered that race ***was*** a consideration in exercising a peremptory strike of Juror No. 64, and that he struck that juror in part because he was Black. (HT2 at 212) ("Q. So you struck them because they were both young black men with glasses? A. Wrong. ***That's part of the reason***. And not just glasses. I said the same type glasses. And I said they had the same

piercing eyes.") (emphasis added). Further, Larner admitted that "[t]hey were both young black men…[a]nd that's not necessarily the ***full reason*** that I thought they were so similar." *Id.* p. 211 (emphasis added).

At the original trial and before the Missouri Supreme Court, the State had taken the position that Juror 64 and Petitioner looked similar and had a similar demeanor without specifying that the juror's ***race*** was a part of this similarity, meaning those courts had a limited record. (*See* Tr. 1585-1587 (no mention of race by State in describing resemblance); *Williams*, 97 S.W.3d at 472 ("Unlike *Johnson*, this case does not involve an *overt*, racially motivated reason for the strike. Instead, the prosecutor stated that the venireperson resembled Williams, had the same glasses, and had a similar demeanor. These reasons are not *inherently* race based.") (emphasis added). Applying AEDPA, this Court credited those now clearly and convincingly rebutted findings. *See* R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence.").

The new testimony reveals that there was in fact an "overt" race-based reason for the strikes. During his testimony, the trial prosecutor clarified that the juror's race ***was*** part of his considerations. (HT2 at 210) ("Q. Okay. And so these were both young black men, right? … A. So he did look very similar to the defendant, yes. Q. (By Mr. Potts) And by that, they were both young black men; right? A. They were both young black men. Q. Okay. A. But that's not necessarily the ***full*** reason that I thought they were so similar.")

20

(emphasis added). K.L. continued to make it clear that, in fact, he believed they "looked like brothers." (HT2. 212).

The evidentiary record recently developed demonstrates that the alleged resemblance between Petitioner and Juror No. 64 can no longer be treated as a "race-neutral basis" for the strike. *Foster*, 578 U.S. at 499-500 (emphasis added); *see Williams*, 97 S.W.3d at 471 ("The state's reasons for strike need only be facially race-neutral unless discriminatory intent is inherent within the explanation."). The trial prosecutor's testimony shows that race ***was*** a factor, which is impermissible. "A person's race simply 'is unrelated to his fitness as a juror.'" *Batson*, 476 U.S. at 87 (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)). Larner now admits it was "part of" but not the "full" reason.

Because the prosecution exercised a peremptory strike based even partially on race, the prosecutor's other supposedly race-neutral reasons have become irrelevant. *McFadden*, 191 S.W.3d at 657 ("To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection Batson provides against discrimination in jury selection."). At minimum, it clearly and convincingly rebuts Larner's self-serving colloquy relied upon by the Missouri Supreme Court.

Although the trial prosecutor's admission is sufficient, this Court "must examine the whole picture." *Flowers*, 588 U.S. at 314. "[A] court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*,

21

429 U.S. 252 266 (1977)). The more fully developed record demonstrates that AEDPA is satisfied and the impediment to addressing the merits has been removed.

The testimony on August 28, 2024 showed that the juror who "resembled" Petitioner was, unlike Petitioner, wearing a shirt with an orange dragon and "Chinese or Arabic letters," a large gold cross, two gold earrings in his left ear, and shiny gray pants. (HT2 at 213-215). Beyond their race and age, the only similarities were the type of glasses, and, according to the trial prosecutor, "piercing eyes." It seems only one person among the over 130 venirepersons had piercing eyes like Petitioner—and that person just happened to be Black.

The trial prosecutor's testimony made clear that he was aware of the risk of reversal if he had openly told the trial court that race was a reason, which explains why he did not previously volunteer this information during his original self-serving colloquy with the trial court. (HT2 at 211 ("I mean, if the juror, potential juror was black and the defendant was black and I struck him, that would have been kicked out by the Supreme Court in a second. That would have come back for a complete retrial."); *id*. at 219 ("If any black was struck, they appealed on Batson.")).

"'[T]he prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.'" *Flowers*, 588 U.S. at 308 (*quoting Batson*, 476 U.S. at 97). In this respect, Juror No. 64 only gave favorable answers to the prosecution's questions:

> Juror Number 64. In the proper case, under the law and the evidence, could you seriously and legitimately consider imposing the death penalty?

22

> VENIREMAN GOODEN: I believe I could.
>
> MR. LARNER: Okay. Could you also give serious legitimate
> consideration to the punishment of life without the
> possibility of probation or parole?
>
> VENIREMAN GOODEN: Yes.
>
> MR. LARNER: If you were the foreman of the jury, could you
> sign the verdict of death?
>
> VENIREMAN GOODEN: Yes, I could.
>
> MR. LARNER: You could? Okay. Have you thought about
> this issue before?
>
> VENIREMAN GOODEN: No, not really.
>
> MR. LARNER: Okay. Have you been in favor of the death
> penalty in the past, in certain cases?
>
> VENIREMAN GOODEN: In certain cases.
>
> MR. LARNER: Do you think in some cases it might be
> appropriate, in others, it might not?
>
> VENIREMAN GOODEN: Yes.
>
> MR. LARNER: Okay.

(Tr. 762-763).

The above represents the full extent of the prosecution's questioning of Juror No.

64 about his willingness to impose the death penalty. Juror No. 64 "should have been an

ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutor's

explanation for the strike cannot reasonably be accepted." *Miller-El,* 545 U.S. at 247.

Despite his pro-death-penalty answers, to survive the *Batson* challenge, the

prosecution stated that he was potentially "liberal" based on his earrings. But any

"liberal" leaning is something that the prosecution should have explored during voir dire, not assumed based on earrings. (Tr. 1585). "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *McFadden*, 191 S.W.3d at 653-54 (*quoting Miller-El*, 125 S. Ct. at 2328). This is further evidence of discriminatory intent.

A Court also looks at the sheer number of peremptory challenges used against the few black members of the venire. *See Flowers*, 588 U.S. at 288 (it was a "critical fact" was that "the State exercised peremptory strikes against five of the six black prospective jurors"); *see also McFadden*, 191 S.W.3d at 650 ("At trial, the State exercised five of its nine peremptory challenge to remove African-American venirepersons, leaving only one African-American to serve on the jury."). "Simple math shows ... the number of peremptory strikes available to the prosecutor exceeded the number of black prospective jurors." *Flowers*, 588 U.S. at 296. Here, the prosecution had nine peremptory strikes, which it exercised on six of seven black prospective jurors. (Tr. 1568, 1569-70). Even the trial prosecutor had trouble believing that he had exercised peremptory strikes on this many black jurors, minimizing the reality and insisting that he only struck three instead of six. (HT2 at 201-02).

The sheer number of Black prospective jurors stricken by the prosecution via peremptory strikes—six of seven, or 86%—speaks for itself. *See Miller-El*, 545 U.S. at 241 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members.... Happenstance is unlikely to produce this

disparity."); *McFadden*, 191 S.W.3d at 657 n.27 ("Happenstance also fails the prosecutor

in this instance, where 83% of the eligible African-American venire members were

stricken using pretextual reasons."). There were 30 eligible members of the venire at

that point, consisting of seven Black members and 23 non-black members. This means

that the prosecution eliminated 86% (6/7) of Black prospective jurors with peremptory

strikes, and only 13% (3/23) of non-Black prospective jurors with peremptory strikes.

*Cf. Miller-El*, 545 U.S. at 266 ("By the time a jury was chosen, the State had

peremptorily challenged 12% of the qualified nonblack panel members, but eliminated

91% of the black ones."). It is insufficient to point to the fact that one Black member of

the venire was seated on the jury. The Supreme Court "skeptically view[s] the State's

decision to accept one black juror," because "a prosecutor might do so in an attempt 'to

obscure the otherwise consistent pattern of opposition to' seating black jurors." *Flowers*,

588 U.S. at 307 (*quoting Miller-El*, 545 U.S. at 250).

 Furthermore, "[t]he lopsidedness of the prosecutor's questioning and inquiry can

itself be evidence of the prosecutor's objective as much as it is of the actual qualifications

of the black and white prospective jurors who are struck or seated." *Flowers*, 588 U.S. at

310. Specifically, "disparate questioning can be probative of discriminatory intent." *Id.*

at 308. As the Supreme Court has explained:

> [T]his Court's cases explain that disparate questioning and
> investigation of prospective jurors on the basis of race can
> arm a prosecutor with seemingly race-neutral reasons to
> strike the prospective jurors of a particular race. In other
> words, by asking a lot of questions of the black prospective
> jurors or conducting additional inquiry into their
> backgrounds, a prosecutor can try to find some pretextual
> reason—any reason—that the prosecutor can later articulate

> to justify what is in reality a racially motivated strike. And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently.... Prosecutors can decline to seek what they do not want to find about white prospective jurors.

*Id.* at 310 (internal citation omitted).

The record demonstrates several ways in which the prosecution engaged in disparate questioning for Black and non-Black jurors. First, the prosecution tended to ask Black jurors open-ended questions that could have led to Black jurors providing answers that disqualified themselves, while asking non-Black jurors closed-ended, leading questions. For example, the prosecution questioned a non-Black prospective juror (who was later seated on the jury) as follows:

> MR. LARNER: All right Juror Number 30. In a proper case, under the evidence and the law, can you legitimately and seriously consider imposing the death sentence?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: You can?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: Are you sure?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: You would not automatically -- can you also consider life without parole, without the possibility of probation and parole?
>
> VENIREMAN STORMS: Yes.
>
> ...[Brief questioning of another juror]...

26

MR. LARNER: I didn't mean to forget to do that with you. I like to do that with everyone. And I assume that I have on the first row. Okay. Now, the judge has already asked you if you could consider both. I'm going into it a little deeper. Now, Number 30, you understand that the burden of proof is on the State?

VENIREMAN STORMS: Yes.

MR. LARNER: And you won't automatically go from guilt to the death penalty, will you?

VENIREMAN STORMS: No.

MR. LARNER: You'll wait to hear the aggravating circumstances, or circumstance, and see if it exists, right?

VENIREMAN STORMS: Yes.

MR. LARNER: I have to prove it exists?

VENIREMAN STORMS: Right.

MR. LARNER: Beyond a reasonable doubt?

VENIREMAN STORMS: Absolutely.

MR. LARNER: And if it exists, all twelve have to agree it exists. Okay?

VENIREMAN STORMS: Right.

MR. LARNER: To get through that second door. Okay?

VENIREMAN STORMS: Yes.

MR. LARNER: Any question about any of this?

VENIREMAN STORMS: Absolutely not.

MR. LARNER: Okay. And then when you start weighing it, it's a matter of quality, not quantity. Okay? Otherwise, it would just be getting out your calculator. And then, even then, you still don't have to do the death penalty. You don't

have to. Do you have a problem with that, or question about
that?
VENIREMAN STORMS: No.

MR. LARNER: Now, but you will be able to legitimately
consider it, and if it's appropriate, vote for it. Is that right?

VENIREMAN STORMS: Yes.

(Tr. 401-03)

In stark contrast, here is the prosecution's questioning of Juror No. 65 (a Black

juror who was not seated):

MR. LARNER: Juror Number 65, in the proper case under
the evidence and the law, could you seriously and
legitimately vote for the death penalty?

VENIREMAN SINGLETON: I think I could.

MR. LARNER: Could you *see yourself in that position
actually voting*, if the evidence and the law was there, for the
death penalty?

VENIREMAN SINGLETON: Yes.

MR. LARNER: You've *considered this in the past*, this issue?

VENIREMAN SINGLETON: I've never really thought about
it.

MR. LARNER: Do you think that some crimes are *deserving*
of that and others are not?

MR. GREEN: Judge, I'm going to object to the relevance of
whether other crimes are deserving of that or not.

MR. LARNER: Well, I'll rephrase that. Do you think that you
could also consider life in prison without the possibility of
probation or parole?

VENIREMAN SINGLETON: Yes, I could.

28

MR. LARNER: Would that be *easier* for you?

VENIREMAN SINGLETON: I can't say. Both, either way, you know, when you think about it, life in prison without parole, or death. You know, you put a person away for the rest of their life. So I can't see any differences in it. Therefore, I can't see any difference in how you judge or weigh those. In other C.W.s, what I'm saying is, I could, you know, -- if I could vote for death, I could vote for life in prison without parole.

MR. LARNER: Do you think that *one is more harsh than the other*?

MR. GREEN: Judge, I'm going to object. You're implying that they lean one way or the other, to one punishment over the other.

THE COURT: The objection is sustained. Please rephrase your question.

MR. LARNER: Do you think that *one punishment is a worse punishment* than the other? I'm not asking you which one you favor, whether you lean towards this one or lean towards that one. I just would like to know, since you said that both of them are -- you didn't see any difference, I think you said. You didn't see any –

VENIREMAN SINGLETON: What I –

MR. GREEN: Judge, I have to object to it, that there's no question before the juror.

THE COURT: Well, the question was, you didn't see any difference. Is that correct?

MR. LARNER: Yes.

MR. GREEN: Okay.

VENIREMAN SINGLETON: I don't think one is any more lenient than the other.

MR. LARNER: Okay. Do you think they are equal?

MR. GREEN: Judge, I would object. That implies a leniency
of one over the other.

THE COURT: The objection will be sustained.

MR. LARNER: What do you mean by, *you don't think one is
any more lenient than the other*?

MR. GREEN: Judge, that's another form of the same
question.

THE COURT: The objection is overruled.

MR. LARNER: Okay.

THE COURT: It's a followup to what the venireperson stated.

MR. LARNER: Yes.

VENIREMAN SINGLETON: Well, basically once the person
is convicted, then they are put away for the rest of their life.
If there's life without parole, or probation, that means until
the day he dies. The death penalty means he's put away until
the State puts him to death. Either way, he's gone for the rest
of his life.

MR. LARNER: Okay. But do you see that -- well, what you've
said is not, I'm not arguing with what you said at all. I'm just
trying to see if you *feel* that one punishment is as bad as the
other, or is as harsh is the other.

(Tr. 763-66) (emphasis added).

By comparison, the prosecution used a different script for non-black jurors, as

shown below:

MR. LARNER: All right Juror Number 67, in the proper case,
could you seriously and legitimately, under the law and the
evidence, consider the death penalty?

VENIREPERSON NO. 67: Yes.

MR. LARNER: All right. Can you also seriously and

30

legitimately consider life without parole?

VENIREPERSON NO. 67: Yes.

MR. LARNER: You would make the State prove that special aggravating circumstance?

VENIREPERSON NO. 67: Yes.

MR. LARNER: You wouldn't go from door one, which is the guilt, right, to door three, would you?

VENIREPERSON NO. 67: No.

MR. LARNER: You would make us prove that special, that aggravating circumstance?

VENIREPERSON NO. 67: Yes.

MR. LARNER: Beyond a reasonable doubt? To the twelve people?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And then you would weigh the one or more aggravating circumstances against the one or more mitigating?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And then at that point, you could still consider both punishments?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And if, in this hypothetical case, if there was no mitigation evidence in favor of the defendant in this hypothetical case, there was only aggravating circumstances and no mitigating, so that, of course, the aggravating would outweigh the mitigating, if there wasn't any mitigation, you could still consider both, seriously consider both punishments at that point?

VENIREPERSON NO. 67: Yes.

MR. LARNER: If that's what the law says?

31

VENIREPERSON NO. 67: Yes.

(Tr. 769-71) (emphasis added).

The prosecution in this case also engaged in differential types of questioning regarding the verdict process for Black and non-Black jurors, systematically isolating Black jurors. (Tr. 206) ("MR. LARNER: And you could stand up in open court and announce your verdict, if it was the death penalty? VENIREMAN LINDA JONES: Yes."); *id.* at 762 ("MR. LARNER: If you were the foreman of the jury, could you sign the verdict of death? VENIREMAN GOODEN: Yes, I could."); *id.* at 878-79 ("MR. LARNER: I noticed you were sort of like Number 76, in that you had your hand up at first and then when I said about signing the verdict as the foreperson and announcing that in court, that kind of hit home a little bit? VENIREMAN RANDLE: That would be difficult."). The prosecution, by contrast, sought to reassure non-Black jurors that twelve votes were required, so they would not have to be alone:

- Tr. 249 ("And all twelve jurors would have to agree on that aggravating circumstance beyond a reasonable doubt before the second door is opened. Does that help? VENIREMAN HEIDBRINK: I think so.");

- Tr. 342 ("MR. LARNER: Okay. If you were the foreman of the jury, could you sign the death verdict? VENIREMAN TERRILL: If I felt that was the correct decision. MR. LARNER: Okay. If all twelve agreed? VENIREMAN TERRILL: Yeah. MR. LARNER: And you would be one of those twelve? VENIREMAN TERRILL: Yeah.");

- Tr. 344 ("MR. LARNER: And all twelve have to agree that I proved an aggravating circumstance beyond a reasonable doubt. Okay? VENIREMAN RABACK: Yes. MR. LARNER: Are you with me?");

- Tr. 355 ("MR. LARNER: And if all twelve don't agree to that aggravating circumstance, all twelve, then you have to go with life

32

without parole? VENIREMAN KAMMER: Yes. MR. LARNER: It's
only if all twelve agree that that aggravating circumstance exists,
that you then weigh the mitigating. And if all twelve agree that the
aggravating is heavier than the mitigating, you're at door three.
Okay? VENIREMAN KAMMER: Yes.");

- Tr. 393 ("MR. LARNER: And just because you find aggravating
  circumstances, or the twelve people find an aggravating
  circumstance beyond a reasonable doubt, you wouldn't then
  automatically vote for the death penalty, would you? If the
  instructions tell you there's more to be done? 7 VENIREMAN
  CASBY: No, I wouldn't.");

- Tr. 397 ("MR. LARNER: Aggravating circumstances, all twelve have
  to agree. If there's nothing in mitigation, you'll still consider life
  without parole? VENIREMAN BALDES: (Nods).");

- Tr. 399-400 ("MR. LARNER: And if the defense -- if there's more
  aggravating than mitigating, you understand all twelve have to
  agree that there's more aggravating than mitigating? VENIREMAN
  VORST: Yes. MR. LARNER: And all twelve, even before that, have
  to agree that we have aggravating circumstances, okay?
  VENIREMAN VORST: Correct.");

- Tr. 402-03 ("MR. LARNER: And if it exists, all twelve have to agree
  it exists. Okay? VENIREMAN STORMS: Right.");

- Tr. 404-05 ("MR. LARNER: And if I don't prove that aggravating
  circumstance to your satisfaction beyond a reasonable doubt, to the
  twelve jurors, what's the punishment? If I don't prove that
  aggravating circumstance, what's the punishment? VENIREMAN
  VINYARD: Life imprisonment." ... MR. LARNER: That's the law.
  And if I do, then you start -- then the twelve, if they agree, then you
  start looking at mitigating. And if that mitigating outweighs that
  aggravating, if twelve people don't think that that aggravating --
  twelve people have to agree the aggravating is heavier. If they don't,
  you stop there. You don't get -- you're not quite at that third door.
  You are not at that third door until aggravating is heavier than
  mitigating, and all twelve agree to that. Okay? Any question about
  that, Juror Number 32? VENIREMAN VINYARD: No, sir."[2]

---

[2] Similar questioning was also provided for prospective jurors 34, 35, 41, 43, 50, 63, 67,
70, 71, 106, and 126. (Tr. 533, 535, 538, 542-43, 653, 761, 770, 779, 781, 1239-40, and
1245-246).

Appellate Case: 24-2907    Page: 45    Date Filed: 09/19/2024 Entry ID: 5435571 Sep 19 2024 p45

The prosecution did not engage in this type of reassurance with a single Black prospective juror. *Cf. Miller-El*, 545 U.S. at 255 ("If the graphic script is given to a higher proportion of blacks than whites, this is evidence that prosecutors more often wanted blacks off the jury, absent some neutral and extenuating explanation."); *id.* at 256 ("Only 6% of the white venire panelists, but 53% of those who were black, heard a different description of the death penalty before being asked their feelings about it.").

In fact, the only time the topic of twelve jurors came up with a Black prospective juror, the prosecution returned to the theme of placing pressure on the juror of having to stand up and announce the verdict in open court. (Tr. 879-80) ("VENIREMAN RANDLE: I would do it under the law and the evidence. But it would really be difficult for me to be a foreperson, and to sign, and stand up and say it. MR. LARNER: Well, I think all twelve jurors will probably have to stand up and say that that's their verdict. Not just the foreperson. The foreperson would sign the verdict. But all twelve would have to get up and announce their verdict in open court. So there's no getting around that, in that type of case."). "A court confronting that kind of pattern cannot ignore it." *Flowers*, 588 U.S. at 310. The prosecution engaged in disparate questioning of jurors based on their race.

A court properly "consider[s] historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction." *Flowers*, 588 U.S. at 304. The trial prosecutor admitted that, in a prior case (in fact, the *McFadden* case), the Honorable John Ross had found that he had exercised peremptory strikes on Black jurors in violation of *Batson*. (HT2 at 218-20). But the trial prosecutor was devious in

34

this regard, first indicating that he had never violated *Batson* before admitting that Hon. Ross found he did. *Id.* This is further evidence that the trial prosecutor violated *Batson* in this case.

The new *Batson* evidence from Petitioner's case, relevant to a claim that was previously denied on procedural grounds, provides additional compelling evidence that Petitioner's *Batson* claim survives 2254(d) because the new evidence clearly and convincingly rebuts the factual basis for the denial. Therefore, the impediment to considering the merits of the claim can be satisfied and *de novo* review may occur in a case where the county prosecutor has conceded error on a claim related to improper racial considerations.

### B. Petitioner's 60(b) motion only attacks a "defect in the integrity of the federal habeas proceedings" and thus this Court is not prevented from granting the relief he seeks.

AEDPA's restrictions on successive petitions apply only to "applications" for habeas corpus. *See Gonzalez,* <u>545 U.S. at 530</u>. An "application" is "a filing that contains one or more *claims.*" *Id.* (internal quotation marks omitted and emphasis added). A motion brings a claim when it: (1) seeks to add a new ground for relief that was previously omitted due to "excusable neglect," "newly discovered evidence," or a "subsequent change in substantive law," or (2) attacks the federal court's previous resolution of the same claim on the merits. *See id.* at 530-32. A motion should not be treated as a successive habeas petition when a Rule 60(b) motion challenges not the substance of the federal court's resolution of a claim on the merits, but "some defect in the integrity of the federal habeas proceedings." *Id.* at 532.

Petitioner's Rule 60(b) motion meets the *Gonzalez* criteria. The subject of this Rule 60(b) motion relates to the denial of a claim under the auspices of AEDPA – which was not a merits review. *See supra*. Petitioner was denied the opportunity to have his claim reviewed on the merits, but the new evidence and concession of error reopen the threshold AEDPA question. The Rule 60(b) motion does not present a new claim. Rather, it seeks to overcome a defect in the § 2254 proceeding, the denial of a full merits review of Petitioner's claim. Because of this, no court has ever reviewed the full merits of Petitioner's claim including the concession of error and the admitted-to racial animus by the prosecution.

Mr. Williams's case reflects the same perniciousness the Supreme Court considered in *Buck*. Racial discrimination, and what obviously occurred here now that Larner was finally tested under oath, undermines the public confidence in the judicial process. Further, Larner's testimony establishes that there is a substantial risk of racial injustice in Mr. Williams's case. *See Buck*, 580 U.S. at 123.

Petitioner challenges the process used in denying his § 2254 motion via an application of 2254(d). Thus, *Gonzalez* authorizes the instant motion, as it "merely asserts that a previous ruling which precluded a merits determination was in error... ." *Gonzalez*, 545 U.S. at 532 n.4.

### C. Extraordinary circumstances justify reopening the judgment pursuant to rule 60(b)(6).

Rule 60(b)(6) is properly invoked in extraordinary circumstances much like we have in this case. "Clause (6) is a residual clause used to cover unforeseen contingencies; that is, it is a means for accomplishing justice in exceptional circumstances, [not

36

covered by the other five provisions of Rule 60]." *Stipelcovich v. Sand Dollar Marine, Inc.,* 805 F.2d 599, 604–05 (5th Cir.1986) (citing 7 J. Lucas & J. Moore, Moore's Federal Practice ¶ 60.27[2] at 274 (2d ed.1985)). A motion under subsection (b)(6) must be brought "within a reasonable time," Fed. R. Civ. P. 60(c)(1), and requires a showing of "extraordinary circumstances" to justify the reopening of a final judgment. A consideration of extraordinary circumstances under Rule 60(b)(6) relies on a variety of factors, all of which this case meets. Applying *Buck*, there can be no question regarding extraordinary circumstances here.

### 1. The new evidence of racial discrimination in the exercise of a peremptory strike presents an extraordinary circumstance sufficient for Rule 60(b)(6) relief.

The Hon. E. Richard Webber of the Eastern District of Missouri in *Barnett v. Roper*, 941 F.Supp.2d 1099 (E.D. Mo. 2013), found 60(b)(6) to be satisfied in a capital § 2254 proceeding. Critical to his analysis was an examination of a number of equitable factors that led to a conclusion that: "This Court finds the equitable consideration of factors to be appropriate in light of the capital nature of this case, and the competing interests of finality and justice." *Id.* at 1118. As in *Barnett,* a number of extraordinary circumstances exist in Petitioner's case.

### a. Petitioner's evidence was only recently available.

Petitioner's evidence is "new" in the literal sense and as a legal term of art. It is less than 21 days old. It is thus "new."

While Petitioner has at all times been diligent, he only gained access to the trial prosecutor's testimony in the last few weeks. Similarly, he only learned of the

destruction of evidence that would have supported a *Batson* claim in a similar time period. Finally, the confession of error by the county prosecutor also occurred less than 30 days ago.

Under Eighth Circuit authority, a habeas petitioner must first come forward with "new" evidence. *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001), *cert. denied*, 534 U.S. 963 (2001). Evidence is only "new" if it was "not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1029. The trial prosecutor was finally forced to answer questions under oath just weeks ago – it could not have occurred anytime earlier. Thus, the confession that race was a factor in exercising peremptory strikes, which rebuts the self-serving trial colloquy, did not exist at the time of trial. Indeed, the trial prosecutor seemingly was trying to throw the trial court off the scent of what was really going on when he responded to the *Batson* challenge during trial. It is unknown when the prosecutor's office purged the voir dire notes, but it was clearly subsequent to the trial proceedings. Thus, Petitioner has satisfied *Amrine*.

### b. Petitioner has acted with diligence and has acted within a reasonable time.

Without the county prosecuting attorney's 2024 filing, the evidence and expression of racial animus would never have been uncovered. Nor would the destruction of the voir dire notes—the cover-up—have been known.

Petitioner has been diligent. The St. Louis County Circuit Court denied the county prosecutor's petition on September 12, 2024. Yesterday evening, on September 16, 2024, a notice of appeal was filed. Petitioner has filed the instant motion within four

38

days of the circuit court denial. Applying *Barnett*, where a petitioner filing within three months of an intervening change in law was found to have "expeditiously filed" his 60(b) motion, *Barnett*, 941 F.Supp.2d at 1119, Petitioner has expeditiously pursued this remedy in 4 days from the denial and within 21 days of the testimony.

### c. The nature of the new facts demonstrates that the discovery denial precluded a full and fair merits review.

As noted above, racism is anathema to justice. It has reared its ugly head here. Additionally, the prosecutor's confession of error supports reopening Petitioner's claim. Mr. Williams's case reflects the same perniciousness the Supreme Court considered in *Buck*, 580 U.S. at 123.

### d. Ms. Gayle's family's finality interest supports Petitioner.

Finality of the judgment, which the State of Missouri always asserts, is not a factor to be given great weight in the context of a Rule 60(b) Motion. Indeed, the Supreme Court explicitly discounted finality as a basis for denying Rule 60(b) relief in *Gonzalez* precisely because the very purpose of Rule 60(b) is to make exceptions to finality. *See Gonzalez*, 545 U.S. at 529 ("[The Court gives] little weight to the respondent's appeal to the virtues of finality" as "[t]hat policy consideration, standing alone, is unpersuasive in the interpretation of a provision [Rule 60(b)] whose sole purpose is to make an exception to finality."). Here, there is no prejudice to Missouri beyond the lack of finality. Rather, Missouri pursues finality at the cost of harm to its judicial system due to the perniciousness of racial prejudice.

Setting this aside, any such potential prejudice, however, must be weighed against the more irreversible finality of Petitioner's execution, as well as the serious

39

concern that Petitioner's death sentence is imposed unconstitutionally—a claim that has never been fully heard on the merits due to AEDPA. In light of the fact that "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and that capital cases require a greater need for reliability, consistency and fairness, this factor is supportive of Petitioner.

If finality is to be considered, Petitioner respectfully points this Court to the manner in which Ms. Gayle's family defines finality, as described by the Circuit Court: In initially granting the consent judgment, the court considered "the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality." 8/21/24 Tr. p. 23. (Attachment B).

### e. Significant *Batson* Error.

As noted above, the trial prosecutor now admits that race was "part of" but not the "full reason" for a peremptory used against a Black man, who could have been Mr. Williams's "brother." The new, clear and convincing evidence of racial discrimination establishes a violation of *Batson* herein, and provides a basis to reopen the procedural barrier previously imposed to deny a merits ruling.

### f. Greater Need for Reliability and Fairness.

Petitioner has been sentenced to death. Death is different. As in *Barnett*, where the court undertook a more equitable consideration in that case given its capital nature which required a greater need for reliability, consistency, and fairness, 941 F. Supp. 2d 1099 at 1120, this Court should likewise find those requirements to be factors

40

demonstrating an extraordinary circumstance herein. As in *Barnett*, the claim has never been fully and fairly considered and directly impacts both the conviction and sentence.

The court in *Buck* noted that claims of racial discrimination are particularly "pernicious in the administration of justice" and "poisons public confidence in the judicial process." *Id*. at 124. As in *Buck*, this case presents a conceded claim of racial discrimination in a capital case. As a result, based upon the importance of the substantive claim for relief, coupled with the intervening events that occurred in Petitioner's state court litigation, sufficient extraordinary circumstances exist to establish petitioner's right to 60(b)(6) relief.

**g. State's Interests Are Not Harmed.**

The State is not harmed by ensuring that race did not play a factor in jury selection. The State is sworn to uphold the constitution, not to subvert it. The granting of a 60(b) motion does not represent a substantial harm to the State. This is particularly true in this case, where there is an admission that race was a factor (and thus, the state court decision is unreasonably based on a self-serving, untrue colloquy); evidence supporting the *Batson* claim was destroyed; the county prosecutor conceded error; and the victim's family wanted the case closed based on the confession of error, rather than an execution. Thus, the State cannot credibly claim it would be harmed by allowing the merits of the *Batson* claim to be considered before it carries out an irrevocable execution.

41

## CONCLUSION

For the above stated reasons, this Court should GRANT Petitioner's request, reopen proceedings, ORDER an immediate conference for purposes of scheduling, and grant otherwise appropriate relief.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, #40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Mike Spillane, Assistant Attorney General, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 17th day of September 2024.

/s/Laurence E. Komp
Attorney for Petitioner

Capital Case – Execution September 24, 2024, at 6:00 p.m. Central.

---

**IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF MISSOURI**

**Case No. 4:05-CV-1474-RWS**

---

**PETITIONER'S MOTION FOR RELIEF FROM A
JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b)**

---

**Appendix**

---

## T<span>ABLE OF</span> C<span>ONTENTS</span>

**Consent Order and Judgment** ……………………..………………...Attachment A

**August 21 Hearing Transcript**............................................................Attachment B

**August 28 Volume 1 Transcript** .........................................Attachment C

**August 28 Volume 2 Transcript** ..........................................Attachment D

# Attachment A

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

**FILED**

**AUG 2 1 2024**

JOAN M. GILMER
~~CIRCUIT CLERK, ST LOUIS COUN~~

In Re:  Prosecuting Attorney, 21st Judicial )
Circuit, ex rel. Marcellus Williams,         )
                                             )
      Movant/Petitioner,               )
                                             )
v.                                           )    Case No. 24SL-CC00422
                                             )
State of Missouri,                           )    Division 13
                                             )
      Respondent.                      )

### CONSENT ORDER AND JUDGMENT

Marcellus Williams was charged and convicted in St. Louis County Cause No. 99CR-5297 with one count of murder in the first degree (Count II), one count of first-degree burglary (Count I), one count of first-degree robbery (Count IV), and two counts of armed criminal action (Counts III and V), and was subsequently sentenced to death on Count II on August 27, 2001 along with consecutive terms of 30 years (Count I), 30 years (Count III), Life (Count IV), and 30 years (Count V).

On January 26, 2024, the State of Missouri filed a Motion to Vacate or Set Aside Judgment and Suggestions in Support pursuant to Section 547.031, RSMo.

This Court set a hearing on this motion for August 21, 2024.

The Court has been informed the State of Missouri, through the St. Louis County Prosecuting Attorney, and Williams, have agreed to settle this matter as follows: that the conviction and sentence as to Count II only shall be vacated, conditional upon Williams pleading to the charged offense of murder in the first degree pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), with a negotiated sentence of **life without the possibility of**

1

**parole** for the charge of murder in the first degree, with the other counts, upon which Williams was found guilty after a trial and subsequently sentenced, remaining unchanged.

The Court finds that the State of Missouri, through the St. Louis County Prosecuting Attorney, concedes that constitutional errors did occur in the original trial that undermine confidence in the original judgment.

The Court finds that, following discussions between a representative of the victim's family and both the Prosecuting Attorney's Office and the Attorney General's Office regarding this Consent Judgment, the Court held a telephonic conference in chambers with that representative on August 21, 2024, wherein the representative expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality.

The Court has been informed that Williams acknowledges, understands, and agrees that by being resentenced pursuant to this Judgment, he waives his right to appeal or collaterally attack the judgment resentencing him following the entry of this Judgment, except on grounds of newly discovered evidence or changes in the law made retroactive to cases on collateral review.

The Court finds that the State of Missouri, through the St. Louis County Prosecuting Attorney, and Williams are the proper parties to this negotiated settlement of this matter pursuant to Section 547.031.

The Court finds a consent judgment is a proper remedy in this case.

The Court further finds, in accordance with RSMo. § 547.031(2) the Attorney General has been given notice of the Motion to Vacate previously filed, has entered its

2

appearance and has participated in all proceedings to date, including providing its objections to the instant Consent Order and Judgment.

The Court, after taking judicial notice of the Motion to Vacate, the evidence presented at the original trial, direct appeal, and post-conviction proceedings, including all state or federal habeas actions, finds this Consent Order and Judgment is supported by the record.

The Court further finds that all other pending matters or motions before the Court in this proceeding are hereby denied.

WHEREFORE, the Court vacates the conviction of Marcellus Williams for murder in the first degree (Count II) on the condition that Marcellus Williams accepts a plea of murder in the first degree and a sentence of life without the possibility of parole be imposed.

IT IS SO ORDERED.

_8/21/2024_
Date

_Div. 13_
Bruce Hilton, Circuit Judge

Marcellus Williams, Relator

3

# Attachment B

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT
Division No. 13
The Honorable Bruce F. Hilton, Presiding

```
IN RE:                          )
PROSECUTING ATTORNEY,           )
21ST JUDICIAL CIRCUIT,          )
ex rel. MARCELLUS WILLIAMS,     )
                                )
       MOVANT/PETITIONER,        )
                                )
       vs.                      )CAUSE NO. 24SL-CC00422
                                )
STATE OF MISSOURI,              )
                                )
       RESPONDENT.              )
```

ON BEHALF OF STATE OF MISSOURI:
MISSOURI ATTORNEY GENERAL'S OFFICE
MR. ANDREW J. CLARKE
Assistant Attorney General
PO Box 899
Jefferson City MO  65102


SPECIAL COUNSEL FOR INNOCENCE OF ST. LOUIS COUNTY
PROSECUTING ATTORNEY'S OFFICE:
LATHROP GPM
MR. MATTHEW JACOBER
190 Carondelet Plaza
Clayton MO 63105

MS. JESSICA HATHAWAY
Assistant Prosecuting Attorney
100 S. Central Avenue
St. Louis MO 63105

ON BEHALF OF MARCELLUS WILLIAMS:
MS. ALANA MCMULLIN
4731 Wyoming Street
Kansas City, MO 64112

TRANSCRIPT OF HEARING

AUGUST 21, 2024

Reported By:
Rhonda J. Laurentius, CCR, RPR
Official Court Reporter
Twenty-First Judicial Circuit

1          THE COURT:  We're on the record in

2     Cause Number 24SL-CC00422, in re:  The Prosecuting

3     Attorney for the Twenty-First Judicial Circuit, ex

4     rel. Marcellus Williams vs State of Missouri.

5          Let the record reflect this matter was

6     set for an evidentiary hearing this date,

7     August 21, 2024.

8          On or about January 26, 2024, the

9     Prosecuting Attorney's Office filed a motion to

10    vacate or set aside judgment and suggestions in

11    support pursuant to Section 547.031 RSMo.

12         Let the record further reflect that the

13    Court's interpretation of the statute is that there

14    must be a hearing on this matter, and the Court

15    scheduled this for a hearing this date.

16         Is there an announcement?

17         MR. JACOBER:  Good afternoon, Your

18    Honor.  Matthew Jacober.  I, along with my

19    colleagues, Alana McMullin and Teresa Hurla, are

20    special counsel for Innocence for St. Louis

21    County's Prosecuting Attorney's Office.  In

22    addition, Jessica Hathaway from the St. Louis

23    County Prosecuting Attorney's Office is with us.

24         There is an announcement, Your Honor.

25    There has been a resolution of the case.  The Court

2

1  has been presented with a consent order and

2  judgment signed by Mr. Williams.  And I would like

3  to make a record at this time, after all counsel

4  have entered their appearance for the record,

5  regarding the circumstances of this consent order

6  and judgment.

7          THE COURT:  Thank you.  And that's an

8  oversight on my part.

9          Let the record further reflect that the

10  Attorney General is here and represented by Michael

11  Spillane.  And if there are any other attorneys

12  that want to be acknowledged on the record I'll so

13  note that.

14          MR. CLARK:  Your Honor, I will be

15  arguing today.  Andrew Clark, assistant attorney

16  general on behalf of the State of Missouri.

17          THE COURT:  Thank you.

18          The Court has been presented with a

19  consent order and judgment purportedly signed by

20  Mr. Williams as relator to resolve all issues

21  pertaining to this motion, which the Court actually

22  has very little direction due to the fact that it's

23  only been in existence since 2021.  And this

24  consent order and judgment has been furnished to

25  the Court by the Prosecuting Attorney's Office and

3

1   by Mr. Williams.  It's my understanding that the

2   Attorney General believes that I don't have

3   jurisdiction to enter this consent order and

4   judgment and appropriate remedies will be pursued

5   in obviously a different proceeding.

6            Let the record further reflect that in

7   anticipation of this hearing today the following

8   facts are not disputed.  Following a jury trial the

9   Circuit Court sentenced Mr. Williams to death for

10  first degree murder.  The Court affirmed

11  Mr. Williams' conviction and affirmed the judgment,

12  denying any post-conviction relief.

13            In December of 2014 the Court issued a

14  warrant of execution setting a January 28, 2015,

15  execution date.  Mr. Williams then filed a petition

16  for writ of habeas corpus in the Court alleging

17  that he was entitled to initial DNA testing to

18  demonstrate actual innocence.  The Court vacated

19  Mr. Williams' execution date and appointed a

20  Special Master to ensure complete DNA testing and

21  report the results of the additional DNA testing.

22  The Special Master provided the Supreme Court with

23  the results of additional DNA testing conducted on

24  hair and fingernail samples from the crime scene

25  and the knife used in the murder.

4

1           The parties fully briefed their

2    arguments to the Special Master.  After reviewing

3    the Master's files, the Court denied Mr. Williams'

4    habeas petition because the additional DNA testing

5    did not demonstrate Mr. Williams' actual innocence.

6           In 2017 Mr. Williams filed another

7    petition for writ of habeas corpus again alleging

8    DNA testing demonstrated his actual innocence by

9    excluding him as a contributor of DNA found on the

10   knife used in the murder.  The Court denied said

11   relief.

12          In 2023 Mr. Williams filed a petition

13   for declaratory judgment alleging that the governor

14   lacked authority to rescind an execution order

15   appointing a board of inquiry pursuant to

16   Section 552.070 and staying Mr. Williams' execution

17   until a final clemency determination.

18          On June 4, 2024, the Supreme Court

19   issued a permanent writ of prohibition barring the

20   Circuit Court from taking further action other than

21   granting the governor's motion for judgment on the

22   pleadings and denying Mr. Williams' petition for

23   declaratory judgment.

24          Prior to the Court's order and warrant,

25   the Prosecuting Attorney for the Twenty-First

1    Judicial Circuit filed a motion to vacate

2    Mr. Williams' first degree murder conviction and

3    death sentence pursuant to Section 547.031

4    authorizing the Prosecuting Attorney or Circuit

5    Attorney to file a motion to vacate or set aside

6    the judgment at any time upon information the

7    convicted person may be innocent or may have been

8    erroneously convicted.

9            This Court has reviewed probably close

10   to 8,000 pages, which I am guided to do so under

11   the statute, including the original trial

12   transcript which lasted some 14 days, the

13   post-conviction relief proceedings, and all the

14   cases that have been decided previously by courts

15   that are higher than this.

16           The Court finds that this statute is

17   civil in nature.  It is not post-conviction relief.

18   The Court has been provided no authority to suggest

19   that I cannot enter this consent order and

20   judgment.  And the Court is going to enter this

21   consent order and judgment.

22           And further, Mr. Jacober, you may make

23   a record with respect to this consent order and

24   judgment.

25           MR. JACOBER:  Thank you, Your Honor.

6

1    Is it okay if I stand here?

2                    THE COURT:  You can stand, sit,

3    whatever is your preference.

4                    MR. JACOBER:  I'll stand.

5                    Your Honor, just by way of record,

6    again Matthew Jacober on behalf of the St. Louis

7    County Prosecuting Attorney's Office.

8                    The DNA evidence developed did not

9    fully support our initial conclusions.  Additional

10   investigation and testing demonstrated the evidence

11   was not handled in accordance with proper

12   procedures at the time of Mr. Williams' charge and

13   conviction.  As a result, the additional testing

14   was inconclusive and did not allow the St. Louis

15   County Prosecuting Attorney's Office to rely on its

16   theory Mr. Williams' exclusion as a contributor to

17   the DNA on the murder weapon as a significant

18   factor supporting his innocence.

19                    It is clear, based on testing,

20   Mr. Williams' DNA is not on the murder weapon which

21   was tested in 2016, long after the crime occurred,

22   and long after the trial was concluded.  The murder

23   weapon was handled without proper procedures then

24   in place.  As a result DNA was likely removed and

25   added during the investigation and prosecution of

7

1  Mr. Williams during the time span of 1998 through

2  2001.  The St. Louis County Prosecuting Attorney's

3  Office regrets its failure to maintain proper

4  protocols surrounding the key physical evidence in

5  this heinous crime, the murder weapon.

6           The majority of the additional

7  investigation was conducted in the last 60 days and

8  promptly provided to Mr. Williams and the Attorney

9  General's Office.  As a result of this evidence and

10 concerns regarding the investigation and trial of

11 Mr. Williams impacting his rights as a charged

12 individual, St. Louis County Prosecuting Attorney

13 determined there were constitutional errors

14 undermining our confidence in the judgment.

15          St. Louis County Prosecuting Attorney's

16 Office engaged in settlement discussions with

17 Mr. Williams and his counsel.  These discussions

18 began on August 20, 2024, and culminated on

19 August 21, 2024, in which Mr. Williams is agreeing

20 to plead pursuant to North Carolina vs. Alford in

21 exchange for a sentence of life without the

22 possibility of parole.

23          We have discussed with the victim's

24 husband, Dr. Daniel Picus, who has indicated he

25 does not support the application of the death

8

1    penalty to Mr. Williams.  As the Court is aware,

2    Dr. Picus expressed this sentiment to the Court and

3    all counsel in chambers during a telephone call

4    earlier today.  Mr. Williams is further waiving all

5    appellate and post-conviction remedies except those

6    afforded via newly discovered evidence or a

7    retroactively adopted and applied law.  This brings

8    much needed and deserved finality to this case and

9    Mrs. Gayle's family.

10                Despite the above, it's our

11    understanding the Attorney General's Office objects

12    to this resolution.  Taking the above record and

13    everything that the Court has reviewed to date,

14    which includes all of the documents in this matter

15    and all of Mr. Williams' direct and indirect

16    appeals to his conviction, the St. Louis County

17    Prosecuting Attorney's Office requests the Court

18    accept the consent order and judgment, accept

19    Mr. Williams' plea pursuant to North Carolina vs

20    Alford, and resentence Mr. Williams on Count II of

21    the underlying indictment to life without the

22    possibility of parole.

23                Ms. Hathaway will proceed forward with

24    the allocution and the plea proceedings.

25                THE COURT:  Thank you.

```
 1              MR. JACOBER:  Thank you, Your Honor.
 2              THE COURT:  Mr. Williams.
 3              MARCELLUS WILLIAMS:  Yes, sir.
 4              THE COURT:  Can you rise and raise your
 5      right hand.
 6                   MARCELLUS WILLIAMS,
 7      having been sworn, testified as follows:
 8              THE COURT:  You may.
 9              MS. HATHAWAY:  Your Honor, as a
10      preliminary matter, I prepared a memorandum that
11      would withdraw the State of Missouri's previously
12      filed notice of intent to seek the death penalty.
13              THE COURT:  Thank you.
14              Mr. Williams, I have before me, which I
15      guess we can mark as Circuit Attorney's Exhibit 1,
16      a consent order and judgment.  Circuit Attorney's
17      Exhibit 1 references a signature signed by
18      Marcellus Williams, relator.  Did you sign this
19      document?
20              MARCELLUS WILLIAMS:  I did.
21              THE COURT:  I'm going to ask you a
22      series of questions.  If at any time you don't
23      understand any of my questions please get my
24      attention and I'll rephrase.
25              MARCELLUS WILLIAMS: (Nods head.)
```

10

1          THE COURT:  Can you please state your

2    full legal name for the record?

3          MARCELLUS WILLIAMS:  Marcellus Scott

4    Williams.

5          THE COURT:  Thank you.  And how young a

6    man are you?

7          MARCELLUS WILLIAMS:  Fifty-five.

8          THE COURT:  Highest level of education

9    you've achieved?

10          MARCELLUS WILLIAMS:  GED.

11          THE COURT:  With that GED you're

12    capable of reading, writing, and understanding the

13    English language?

14          MARCELLUS WILLIAMS:  I am.

15          THE COURT:  You just heard the Circuit

16    Attorney announce that you would like to enter an

17    Alford plea with respect to the agreement that has

18    been reached between you and the Circuit Attorney,

19    is that accurate?

20          MARCELLUS WILLIAMS:  Yes.

21          THE COURT:  Any problems with your

22    hearing today?

23          MARCELLUS WILLIAMS:  None.

24          THE COURT:  You are a U.S. citizen?

25          MARCELLUS WILLIAMS:  Yes.

11

```
 1                    THE COURT:  Are you under the influence
 2    of any drugs or alcohol today?
 3                    MARCELLUS WILLIAMS:  No.
 4                    THE COURT:  You understand that
 5    pursuant to this consent order and judgment you are
 6    agreeing to plead guilty to the charge of first
 7    degree murder pursuant to North Carolina vs Alford
 8    with the negotiated sentence of life without the
 9    possibility of parole?
10                    MARCELLUS WILLIAMS:  I understand.
11                    THE COURT:  Did you have enough time to
12    review this consent order and judgment before you
13    signed it?
14                    MARCELLUS WILLIAMS:  Yes.
15                    THE COURT:  Have any threats or
16    promises been made to you to get you to go ahead
17    and sign this?
18                    MARCELLUS WILLIAMS:  No.
19                    THE COURT:  Have any threats or
20    promises been made to your family to entice you or
21    intimidate you into signing this agreement?
22                    MARCELLUS WILLIAMS:  No.
23                    THE COURT:  You understand,
24    Mr. Williams, that your agreement with the
25    Prosecuting Attorney's Office will become the
```

```
 1   sentence and judgment of the Court if I accept this
 2   consent order and judgment?
 3              MARCELLUS WILLIAMS:  I do.
 4              THE COURT:  You heard the prosecutor's
 5   statement regarding the issue of the sentence
 6   ordering the death penalty is being withdrawn by
 7   the Prosecuting Attorney --
 8              MARCELLUS WILLIAMS:  Yes.
 9              THE COURT:  -- in exchange for your
10   agreement to plead under North Carolina vs. Alford
11   to life without parole?
12              MARCELLUS WILLIAMS:  Yes.
13              THE COURT:  The additional counts
14   remain unchanged.
15              MARCELLUS WILLIAMS:  Yes.
16              THE COURT:  Based upon the prosecutor's
17   statement, do you believe that you will be found
18   guilty by a jury or the trial court if you went to
19   trial since you've already been found guilty?
20              MARCELLUS WILLIAMS:  State that again,
21   Your Honor.
22              THE COURT:  You've already been found
23   guilty, correct?
24              MARCELLUS WILLIAMS:  Right.
25              THE COURT:  And this was back in
```

13

```
 1    2000 --
 2                MARCELLUS WILLIAMS:  -- 1.
 3                THE COURT:  2001.  And you've exhausted
 4    all of your remedies available under the law --
 5                MARCELLUS WILLIAMS:  Yes.
 6                THE COURT:  -- correct?
 7                MARCELLUS WILLIAMS:  (Nods head.)
 8                THE COURT:  Do you believe that it's in
 9    your best interest, given the evidence, to enter a
10    plea of guilty pursuant to the case of North
11    Carolina vs Alford?
12                MARCELLUS WILLIAMS:  Yes, I do.
13                THE COURT:  Have your attorneys
14    explained to you the effect of your plea of guilty
15    pursuant to the case of North Carolina vs. Alford?
16                MARCELLUS WILLIAMS:  Yes.
17                THE COURT:  What is your understanding
18    of that case?
19                MARCELLUS WILLIAMS:  My understanding
20    of the case is that it's a no contest, I plead to
21    no contest to the charge.
22                THE COURT:  You understand that it has
23    the same legal effect as a guilty plea?
24                MARCELLUS WILLIAMS:  Yes.
25                THE COURT:  Is the consent order and
```

14

1    judgment part of your reason for the Alford plea?

2              MARCELLUS WILLIAMS:  Yes.

3              THE COURT:  Do you have any questions

4    about your Alford plea before we proceed?

5              MARCELLUS WILLIAMS:  I don't.

6              THE COURT:  Is it your desire under the

7    effect of the Alford plea to continue this

8    proceeding and accept the agreement -- the consent

9    order and the agreement contained within the

10   consent order and judgment?

11             MARCELLUS WILLIAMS:  Yes.

12             THE COURT:  You heard the Prosecuting

13   Attorney through Mr. Jacober, that you understand

14   that there is no DNA evidence that affects your

15   claim of innocence?

16             MARCELLUS WILLIAMS:  Yes.

17             THE COURT:  Knowing all that do you

18   wish to continue?

19             MARCELLUS WILLIAMS:  Yes.

20             THE COURT:  Mr. Williams, how do you

21   plead to Count II, the charge of first degree

22   murder?

23             MR. CLARK:  Your Honor, sorry.  At this

24   point we would object that this Court has no

25   authority in its civil case, in the 547 case to

15

1    take this plea.  And in the criminal case it has no

2    authority or jurisdiction to unsettle the previous

3    conviction.  These are the same arguments we raised

4    in chambers.

5              Just for the record, Your Honor, as to

6    the civil case, State ex rel. Bailey vs.

7    Sengheiser, 2024, Westlaw 358 8726, indicates this

8    Court has no authority in this case to resentence

9    anyone.  That in the criminal case, State ex rel.

10   Zahnd vs. Van Amburg, 533 S.W.3d 227 Mo. 2017,

11   State ex rel. Fike vs. Johnson, 530 S.W.3d 508, and

12   State ex rel. Poucher vs. Vincent, 258 S.W.3d 62.

13   Those are all Missouri Supreme Court cases that

14   indicate that when a criminal court sentences

15   someone like Mr. Williams for the first time in

16   2001 it's exhausted of its jurisdiction and

17   authority to act over the criminal judgment.

18             Here that jurisdictional authority has

19   not been reinvigorated.  This Court does not have

20   the authority to first - These are wrapped together

21   - to first to enter the consent judgment in this

22   case and then to use that consent judgment to

23   unravel the sentencing of the first case, of the

24   criminal case.

25             As for whether the civil case, the

```
 1    post-conviction remedy, State ex rel. Bailey vs.
 2    Fulton, 659 S.W.3d 909, says that 547 actions are
 3    civil remedies in the nature of post-conviction and
 4    that this Court has the obligation and
 5    responsibility to enforce the post-conviction
 6    rules, the mandatory post-conviction rules to
 7    enforce the finality and the orderly administration
 8    of justice.
 9             Now I have a record about the consent
10    judgment.  I don't know if you want me to make it
11    now or make it later.
12             THE COURT:  You can.
13             MR. CLARK:  All right, Your Honor.
14             THE COURT:  This goes to your issue
15    that I raised earlier as to whether or not you even
16    have standing to object, correct?
17             MR. CLARK:  Well both.  I think, Your
18    Honor, we'd like to make a record about the DNA
19    evidence and to make a record about who the parties
20    are, which I think is the standing question.  So
21    with the Court's indulgence...
22             THE COURT:  You may proceed.
23             MR. CLARK:  As to the party question,
24    civil cases are litigated by the parties in
25    interest.  No matter how they're captioned, no
```

17

1    matter how they're titled, no matter what the

2    parties think they are, they are governed by the

3    parties in interest, who has an interest in the

4    case.  And here it's clear who has an interest in

5    the case; Marcellus Williams and the State of

6    Missouri.

7              Now in enacting 547.031 the legislature

8    gave the Prosecuting Attorney the authority to the

9    representational capacity of Marcellus Williams to

10   raise claims as he saw fit.  It does not give him

11   the authority to raise that claim and then concede

12   it on the other side.  547 does not allow that.

13   And in fact in the case of State vs. Planned

14   Parenthood of Kansas, 66 S.W.3d 16, it says for one

15   attorney to give instruction to both sides of

16   litigation as to the claims and the remedies in the

17   case may ensure a predictable outcome but it will

18   not ensure a just outcome.  And the Supreme Court

19   said, to put it bluntly, the Attorney General there

20   but here the Prosecuting Attorney, must choose a

21   side regarding the legality of the contracts there

22   - Here Marcellus Williams' conviction - and act

23   consistently with that position in the Courts.

24              So here the Prosecuting Attorney cannot

25   raise a claim on behalf of Marcellus Williams and

18

1   then put its prosecutor hat on and concede the

2   claim.  He's on both sides of the V at that point.

3   So it is our position that the 547 action the

4   parties are Marcellus Williams represented by the

5   Prosecuting Attorney, not as his friend, not as,

6   you know, his attorney, but he's been given

7   representational capacity.  Like I told you in

8   chambers, under Randall Aluminum, that used to

9   occur in employment discrimination cases.

10              Now the question is who is the judgment

11  against.  The State of Missouri.  It has to be.

12  Because this Court could not vacate a conviction if

13  it wasn't -- or vacate the conviction if the

14  judgment wasn't entered against the State.  And

15  here the Prosecuting Attorney can't represent both

16  sides of the V.  So that falls to the Attorney

17  General.  So whether this Court can enter a consent

18  judgment or not, it can't under 547.031 both on

19  authority here and jurisdiction and authority in

20  the criminal case.

21              Now as for the DNA evidence, just to be

22  clear about what happened in this case, what's been

23  marked as Respondent's Exhibit FF is a supplemental

24  DNA case report from BODE Technology dated

25  August 19, 2024.  And in that report provided by

1    Mr. Williams' counsel BODE was asked to consider an

2    analysis of Short Tandem Repeat loci on the Y

3    chromosome - Y-STR - for two individuals, Keith

4    Larner, the individual who prosecuted this case,

5    and Edward Magee, the chief investigator at the

6    time.  And they returned that, those standards with

7    the information, and when I believe the parties

8    compared that BODE Technology report to the reports

9    of Fienup from the Special Master report and from

10   Dr. Rudin, which was the Prosecuting Attorney's

11   witness both in this action and Marcellus Williams'

12   witness in other actions.  When he compared there,

13   Dr. Fienup, 15 of 15 loci are Edward Magee, the

14   chief investigator.  And when you compare it to Dr.

15   Rudin's it's even worse; 21.

16           So what happened here is the

17   Prosecuting Attorney made an allegation about the

18   DNA evidence.  They made an allegation that the DNA

19   evidence exonerated or may exonerate Marcellus

20   Williams.  After investigating that they found out

21   that the DNA on the knife swab is consistent with

22   Edward Magee.  And rather than do the right thing

23   and dismiss the case they asked this Court to do

24   something by consent that it can't do by consent

25   and couldn't do after a hearing.

20

1           As the Missouri Supreme Court said in

2    its opinion on the motion to recall the mandate --

3    or recall the warrant filed by Mr. Williams, it

4    said this Court is equally aware prosecutor's

5    motion is based on claims this Court previously

6    rejected in Williams' unsuccessful direct appeal,

7    unsuccessful Rule 29.15 motion for post-conviction

8    relief, and its unsuccessful petitions for writ of

9    habeas corpus.  Moreover, there is no allegation of

10   additional DNA testing conducted since the Master

11   oversaw DNA testing and this Court denied Williams'

12   habeas petitions.

13           What happened here is that the

14   Prosecuting Attorney's raised claims have been

15   denied many times, again and again and again.  And

16   they raised a DNA claim that upon further

17   investigation didn't pan out, and rather than

18   dismiss it because it didn't exonerate Mr. Williams

19   they asked this Court to do it by consent.  It

20   can't.  And it violates Article 5, Section 2 of the

21   Missouri Constitution which makes the Supreme Court

22   the Supreme Court of Missouri.  That court has

23   denied these claims many times.

24           And on that, Your Honor, we'd ask both

25   that the consent judgment not be entered and that

1    Mr. Williams not be resentenced because this Court

2    lacks authority in the civil case, authority and

3    jurisdiction - I'm sorry - authority in the civil

4    case, authority and jurisdiction in the criminal

5    case, and the actions of this Court violate Article

6    5, Section 2 of Missouri's constitution.

7                    THE COURT:  Thank you, Mr. Clark.

8    You're not suggesting the Court upon a hearing and

9    obviously by stipulation of counsel couldn't make a

10   finding that there may be error in the original

11   trial?

12                   MR. CLARK:  Yes, well, the Court could

13   by stipulation find an error.  Well, not by

14   stipulation of two parties on the same side of the

15   v.

16                   THE COURT:  Okay.  Thank you.  Any

17   response?

18                   MS. HATHAWAY:  State of Missouri would

19   take issue with the characterization that we do not

20   represent the interest of the State of Missouri in

21   this matter.

22                   I would also suggest to the Court that

23   the consent order has the effect of reopening the

24   original criminal case.  So for purposes of the

25   record the Court might want to at least -- or note

22

1    that.  And when we proceed with the plea the State

2    of Missouri is prepared to make a factual basis for

3    the plea as would, you know, happen normally in a

4    plea.

5              THE COURT:  So it's my understanding

6    that, and pursuant to the consent judgment, you are

7    asking me to make findings that the Prosecuting

8    Attorney concedes that constitutional errors did

9    occur in the original trial that undermine

10   confidence in the original judgment?

11             MS. HATHAWAY:  Yes, Your Honor.

12             THE COURT:  The Court also finds,

13   following discussions between representatives of

14   the victim's family both with the Prosecuting

15   Attorney's Office and the Attorney General's Office

16   regarding this consent judgment, the Court held a

17   telephonic conference in chambers with that

18   representative on August 21, 2024, wherein the

19   representation expressed to the Court the family's

20   desire that the death penalty not be carried out in

21   this case, as well as the family's desire for

22   finality.

23             The Court having been informed that

24   Mr. Williams acknowledges, understands, and agrees

25   that being resentenced pursuant to this judgment he

23

1    voluntarily waives the right to appeal or

2    collaterally attack the judgment sentencing him

3    following the entry of this judgment except on

4    grounds of newly discovered evidence or changes in

5    the law made retroactive to the cases on collateral

6    review.

7              The Court further finds that the State

8    of Missouri through the St. Louis County

9    Prosecuting Attorney and Mr. Williams are the

10   proper parties to this negotiated settlement of

11   this matter pursuant to Section 547.031, noting

12   your objection for the record.  The Court finds the

13   consent judgment is a proper remedy in this case.

14             The Court further finds in accordance

15   with Section 547.031(2) the Attorney General has

16   been given notice of the motion to vacate

17   previously filed and enters their appearance and

18   has participated in all proceedings to date,

19   including providing its objections to the consent

20   order and judgment.

21             The Court has taken judicial notice of

22   the entire consents of its files and notes that the

23   Attorney General filed a very well written and

24   argued motion to dismiss which the Court took with

25   this case.

24

```
 1              The Court, after taking judicial notice
 2   of the motion to vacate the evidence presented in
 3   the original trial, direct appeal, and
 4   post-conviction proceedings, including all state or
 5   federal habeas actions, finds the consent order and
 6   judgment is supported by the record.
 7              The Court further finds that other
 8   pending matters or motions before the Court in this
 9   proceeding are hereby denied.
10              The Court will defer sentencing of
11   Mr. Williams until 8:30 a.m. tomorrow so we can
12   hear from the victim's family.
13              Any additional record need to be made?
14              MR. CLARK:  For the record, Your Honor,
15   as discussed in your chambers, I request at this
16   time a stay of the consent judgment.  The Attorney
17   General demonstrated all four database factors that
18   a stay is necessary and needed; namely, that the
19   likelihood of success on any appeal or writ is high
20   and that this Court should issue a stay.
21              THE COURT:  The Court will grant your
22   request.  Obviously the dilemma the Court has been
23   under since the inception of this matter being
24   assigned to me is the timing of all of this.  So
25   that's why I'll grant your stay.  And I hope this
```

1    is expedited by the Supreme Court.

2              It's also this Court's opinion that the

3    Supreme Court should have original jurisdiction on

4    all these matters.  But of course that's not what

5    the statute says.  Subject to anything further?

6              MS. HATHAWAY:  Your Honor, was it Your

7    Honor's intention that Mr. Williams plead guilty to

8    murder in the first degree?

9              THE COURT:  It is.

10             MS. HATHAWAY:  Do you believe there

11   needs to be an additional record made more like a

12   standard plea of guilty since the original

13   conviction and sentence has been vacated?

14             THE COURT:  Well I think in order to

15   make the record clear and Mr. Williams' rights are

16   protected I believe that he's already indicated to

17   the Court that he does plead guilty.

18             MS. HATHAWAY:  Your Honor, some of the

19   other lawyers are mentioning that we think it could

20   have been interrupted by an objection.

21             THE COURT:  Oh.

22             MS. HATHAWAY:  Maybe just to make the

23   record extra clear.

24             MS. HURLA:  Your Honor, if I may, I

25   believe also in addition to what the Attorney

26

1  General is arguing, at this moment in this

2  proceeding, in the civil proceeding the Court is

3  vacating the conviction, but I believe we may then

4  have to end this proceeding and call up the

5  original criminal case in order to take a plea.

6         THE COURT:  That's my understanding.

7         MS. HURLA:  So we are not currently in

8  the criminal case so the plea would have to be

9  taken.

10         THE COURT:  In that case, that's

11  correct.

12         MR. CLARK:  Just procedurally, Your

13  Honor - I'm sorry - you granted the stay.  The

14  effect of granting the stay would mean that the

15  Court cannot take up the plea because the civil

16  consent judgment doesn't take effect under the

17  stay, unless that's not the intent of the stay.

18         THE COURT:  That's not the intent of

19  the stay.

20         MR. CLARK:  Okay.  Just so the record

21  is clear, the stay is denied as to resentencing and

22  conviction?

23         THE COURT:  Correct.  So I guess with

24  that said, I guess you'll present to me tomorrow

25  the criminal file so that I can resentence and take

27

```
 1    the plea?  Or you want to do that now?
 2              MS. HATHAWAY:  I think what we
 3    envisioned is we would do the guilty plea today and
 4    defer sentencing until tomorrow.
 5              THE COURT:  All right.
 6              MS. HURLA:  Your Honor, I do just want
 7    to clarify that we been hearing the words guilty
 8    plea but this is an Alford plea, a no contest plea,
 9    and that is what Mr. Williams has agreed to.
10              THE COURT:  Right.  Let me pull that
11    up.
12              In Cause 99CR-5297 - Again I'll remind
13    you, Mr. Williams, you're under oath - how do you
14    plead to the charge of first degree murder under
15    North Carolina vs. Alford.
16              MARCELLUS WILLIAMS:  No contest.
17              THE COURT:  Anything further?
18              MR. CLARK:  Your Honor, we've switched
19    case numbers here.  The Attorney General would just
20    reassert its prior objection in full.  I won't
21    restate it, but the prior objection in the civil
22    case and stipulate this Court has no jurisdiction
23    or authority in the criminal case.
24              THE COURT:  I appreciate that, Mr.
25    Clark.  We'll go ahead and do sentencing first
```

28

1    thing in the morning after I hear from the victim.

2    At that time I'll also do my examination under

3    Rule 24.035.

4               MS. HATHAWAY:  Thank you, Your Honor.

5               THE COURT:  Anything further from

6    anyone?

7               MR. CLARK:  Your Honor, just to make

8    the record clear, I would ask that Exhibit FF be

9    admitted in these proceedings.

10              THE COURT:  Any objection?

11              MS. HATHAWAY:  No, Your Honor.

12              THE COURT:  Exhibit FF will be

13   received.  Any objection to I guess Exhibit 1 being

14   received, which is the consent?

15              MR. CLARK:  Other than the objection we

16   raised, no.

17              THE COURT:  Thank you.  That will also

18   be received.  That will conclude the record.

19   Anything further?  Thank you.  Court will be in

20   recess until tomorrow morning at 8:30.

21                         ***

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I, Rhonda J. Laurentius, a Certified Court
   Reporter and Registered Professional Reporter, hereby
3  certify that I am the official court reporter for
   Division 13 of the Circuit Court of the County of St.
4  Louis, State of Missouri; that on the 21st day of
   August, 2024, I was present and reported all the
5  proceedings had in the case of IN RE:  PROSECUTING
   ATTORNEY, 21ST JUDICIAL CIRCUIT, ex rel. MARCELLUS
6  WILLIAMS, MOVANT/PETITIONER, VS. STATE OF MISSOURI,
   RESPONDENT, CAUSE NO. 24SL-CC00422.

7

8          I further certify that the foregoing pages
   contain a true and accurate reproduction of the
   proceedings had that day.

9

10         I further certify that this transcript contains
   pages 1 through 30 inclusive and that this reporter
   takes no responsibility for missing or damaged pages of
11 this transcript when same transcript is copied by any
   party other than this reporter.

12

13

14

15

16

17         /s/ Rhonda J. Laurentius, CCR #0419
           Official Court Reporter
           Twenty-First Judicial Circuit
18         (314) 615-8070

19

20

21

22

23

24

25

                              30

# Attachment C

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT
Division No. 13
The Honorable Bruce F. Hilton, Presiding

IN RE:                          )
PROSECUTING ATTORNEY,           )
21ST JUDICIAL CIRCUIT,          )
ex rel. MARCELLUS WILLIAMS,     )
                                )
      MOVANT/PETITIONER,         )
                                )
      vs.                       )CAUSE NO. 24SL-CC00422
                                )
STATE OF MISSOURI,              )
                                )
      RESPONDENT.               )


TRANSCRIPT OF HEARING

Volume 1 of 2

AUGUST 28, 2024


Reported By:
Rhonda J. Laurentius, CCR, RPR
Official Court Reporter
Twenty-First Judicial Circuit

1                    A P P E A R A N C E S

2

   ON BEHALF OF THE MOVANT/PETITIONER:
3  SPECIAL COUNSEL FOR ST. LOUIS COUNTY
   PROSECUTING ATTORNEY'S OFFICE:
4  LATHROP GPM
   MR. MATTHEW JACOBER
5  190 Carondelet Plaza
   Clayton, MO 63105

6

7  ON BEHALF OF MOVANT/PETITIONER MARCELLUS WILLIAMS:
   MIDWEST INNOCENCE PROJECT
8  MS. TRICIA J. ROJO BUSHNELL
   MS. ALANA MCMULLIN
9  MR. JONATHAN B. POTTS
   300 East 39th Street
10 Kansas City, MO 64111

11

   ON BEHALF OF RESPONDENT:
12 MISSOURI ATTORNEY GENERAL'S OFFICE
   MR. MICHAEL J. SPILLANE
13 MR. ANDREW J. CLARKE
   MS. KIRSTEN PRYDE
14 MS. KELLY L. SNYDER
   Assistant Attorney Generals
15 PO Box 899
   Jefferson City, MO 65102
16

17

18

19

20

21

22

23

24

25

2

1                         I N D E X

                                                        Page

2

3   Preliminary Matters..........................   4

4   Opening Statement on behalf of Movant (waived)   17

5   Opening Statement on behalf of Respondent.....   18

6   MOVANT'S EVIDENCE:
         DAVID THOMPSON
7        Direct Examination by Ms. McMullin........   25
         Cross Examination by Mr. Clarke...........   48
8        Redirect Examination by Ms. McMullin......   61
         Recross Examination by Mr. Clarke.........   62

9
         JUDGE JOSEPH GREEN
10       Direct Examination by Mr. Jacober.........   64
         Cross Examination by Ms. Snyder...........   83
11       Cross Examination by Mr. Potts............   90

12       DR. CHARLOTTE WORD
         Direct Examination by Mr. Jacober.........   98
13       Cross Examination by Ms. Pryde............  129
         Cross Examination by Mr. Potts............  152

14
    Reporter's Certificate.......................  155
15

16

17

18

19

20

21

22

23

24

25

                              3

1          THE COURT:  Good morning.  Welcome to
2    Division 13.
3          We're on the record in Cause
4    Number 24SL-CC00422, Prosecuting Attorney for the
5    Twenty-First Judicial Circuit, ex rel. Marcellus
6    Williams, Movant/Petitioner vs State of Missouri.
7          Let the record reflect this matter was
8    previously set last Wednesday and rescheduled for
9    today on the prosecutor's motion to vacate Mr.
10   Williams' first degree murder conviction and death
11   sentence pursuant to Section 547.031 RSMo.  Sub
12   2021.
13         Let the record further reflect that
14   Prosecuting Attorney appears through lead counsel
15   Matthew Jacober.  Mr. Williams appears by lead
16   counsel Ms. Trisha Jessica Bushnell.  State of
17   Missouri appears through lead counsel Michael
18   Joseph Spillane.
19         A couple of administrative procedures.
20   Pursuant to my earlier orders, it is strictly
21   prohibited pursuant to our local rule that any
22   recording of these proceedings do not take place to
23   maintain the integrity of these proceedings given
24   the sensitive nature of these proceedings.  In the
25   event that it is brought to my attention that

4

1    anyone is recording these proceedings without my

2    permission you will be asked to leave.

3              In addition, pursuant to pretrial

4    conferences with counsel, I have limited this

5    proceeding to six hours.  I have allocated two

6    hours to the Prosecuting Attorney, two hours to

7    Mr. Williams' counsel, and two hours to the State

8    of Missouri.

9              With that said, Mr. Jacober, you may

10   proceed, unless there's any proceedings that need

11   to take place prior to the start of the

12   proceedings.

13             MR. SPILLANE:  I have a couple of

14   objections, Your Honor.

15             First of all, I would object to any

16   evidence being heard or considered under actual

17   innocence on the basis of judicial estoppel.  And I

18   have a case if I may approach.

19             THE COURT:  You may.

20             MR. SPILLANE:  The line is at page 235

21   in Vacca.  What it says in Missouri judicial

22   estoppel the only requirement is taking

23   inconsistent positions.  There isn't a four part

24   test like there is in other states.  If you take

25   inconsistent positions you're stuck because of the

5

1    dignity of the Court.  It is impugned.  The Supreme

2    Court says no playing fast and loose with the

3    Court.

4           I can't imagine any more inconsistent

5    positions than last week saying there's a factual

6    basis for a plea and then coming in this week if

7    they want to and saying no clear and convincing

8    evidence shows his actual innocence.  So I believe

9    under Vacca that's out by judicial estoppel.

10           THE COURT:  Thank you.  That request

11    will be denied.

12           MR. SPILLANE:  Okay.  The other thing I

13    have is they have new witnesses that were not on

14    the original list.  I would ask that they be

15    limited to testifying on the new claim because they

16    were announced to us well after the time for

17    witnesses were closed.  So if they have something

18    to say about the supplemental claim five that's

19    fine, but I don't think they can bring in new

20    witnesses two days before to testify about the

21    other claims.  So I would object to them testifying

22    to anything except claim five, and I believe that

23    would be Judge Green, Judge McGraugh, and Mr.

24    Henson.

25           THE COURT:  And I'll take up your

6

1    objection at the time those witnesses may or may

2    not be called.

3              MR. SPILLANE:  And the other two things

4    I have.  They have a report from Dr. Budowle and

5    from Dr. Napatoff, and as far as I know those were

6    never in the record anyplace so I don't think they

7    are before this Court by affidavit or report alone.

8    I don't know if you have any thoughts on that.

9              THE COURT:  Well as I indicated

10   previously, it's the Court's position that this

11   statute has created unchartered waters.  Nowhere in

12   the statute is there a definition for information

13   and that is what this Court is struggling with.  So

14   having said that, I'll go ahead and rule

15   accordingly when the proffered evidence is

16   attempted to be introduced.

17             MR. SPILLANE:  Thank you, Your Honor.

18   And I think all of our exhibits are in except for

19   Dr. Picus which they objected to because they're

20   already in the record.  And I think their exhibits

21   are in except for what I just talked about.  Is

22   that fair?

23             MR. JACOBER:  I believe that's an

24   accurate representation.

25             THE COURT:  Thank you, Mr. Jacober.  So

7

1    can you just identify just for the record the

2    exhibits that are being received without objection.

3                 MR. SPILLANE:  Someone got the list

4    here?  I can read it, Your Honor, or I can just

5    tell you if you've got a list.  But I can read it

6    in the record if you want.

7                 THE COURT:  Please.

8                 MR. SPILLANE:  A is the trial

9    transcript.  B is trial transcripts exhibits.  C is

10   the direct appeal legal file.  C-1 being the direct

11   appeal legal file.  C-2 being the supplemental

12   legal file.  C-3 being the supplemental transcript

13   on appeal.  C-4 being Appellant's brief.  C-5 being

14   the Respondent's brief.  C-6, Appellant's brief.

15   C-7, the direct appeal opinion.

16                 D is the post-conviction legal file,

17   with D-1 being the evidentiary hearing transcript,

18   D-2 being the post-conviction relief legal file,

19   D-3 being Appellant's brief, D-4 being Appellant's

20   appendix, D-5 being Respondent's brief, D-6 being

21   Respondent's appendix, D-17 being Appellant's reply

22   brief, D-8 being the post-conviction appeal

23   opinion.

24                 E is the federal habeas petition file.

25   E-1 is the docket sheet.  E-2 is the petition.  E-3

8

1    is Petitioner's motion for discovery.  E-4 is

2    Petitioner's motion for evidentiary hearing.  E-5

3    is Respondent's reply.  E-6 is Petitioner's

4    traverse.  E-7 is order denying evidentiary

5    hearing.  E-8 is Petitioner's supplemental

6    traverse.  E-9 is response to the show cause order.

7    E-10 is the memorandum and order.  E-11 is the

8    judgment.  E-12 is the motion to alter or amend.

9    E-13 is the suggestions in opposition to the motion

10   to alter or amend.  E-14 is the reply to the

11   suggestions in opposition to the motion to alter or

12   amend.  E-15 is the order denying the motion to

13   alter or amend.  E-16 is the notice of appeal.

14   E-17 is the order of dismissal after remand.

15              F is the federal habeas appeal file.

16   F-1 is the application for certificate of

17   appealability.  F-2 is the suggestions in

18   opposition to the certificate of appealability.

19   F-3 is the order dismissing the application.  F-4

20   is Petitioner's petition for rehearing en banc.

21   F-5 is Respondent's suggestion in opposition to

22   rehearing en banc.  F-6 is the order denying

23   rehearing en banc.  F-7 is petition for writ of

24   certiorari.  F-8 is a brief in opposition to

25   petition for certiorari.  F-9 is an order denying

9

1    petition for certiorari.

2              G is the federal habeas appeal file.

3    G-1 is the Appellant's brief.  G-2 is Appellee's

4    brief.  G-3 is Appellant's reply brief.  G-4 is the

5    opinion.  G-5 is the judgment.  G-6 is the petition

6    for certiorari.  G-7 is the brief in opposition to

7    petition for certiorari.  G-8 is the Petitioner's

8    reply brief.  G-9 is the order denying certiorari.

9              H is execution proceedings in case

10   SC83934.  H-1 is motion to set execution date.  H-2

11   is suggestions in opposition to motion to set

12   execution date.  H-3 is the order setting an

13   execution date.  H-4 is the warrant of execution.

14             I is the habeas file from SC94720.  I-1

15   is the petition for habeas corpus.  I-2 is the

16   motion for stay of execution.  I-3 is exhibits in

17   support of petition.  I-4 is suggestions in

18   opposition to petition for habeas corpus.  I-5 is

19   the reply suggestions.  I-6 is exhibits in support

20   of Petitioner's reply.  I-7 is an order vacating an

21   execution order.  I-8 is an order for stay.  I-9 is

22   suggestions in opposition to petition for writ of

23   habeas corpus.  I-10 is Petitioner's reply.  I-11

24   is a letter to the Special Master.  I-12 is the

25   oath of the Special Master.  I-13 is the file

1   before the Special Master.  I-13.1 is the docket

2   sheet.  I-13.2 is a status report.  I-13.3 is a

3   status report.  I-13.4 is a joint proposed

4   protocol.  I-13.5 is a status report.  I-13.6 is a

5   status report.  I-13.7 is a status report.  I-13.8

6   is a status report.  I-13.9 is a status report.

7   I-13.10 is a joint status report.  I-13.11 is a

8   joint status report.  I-13.12 is a joint timeline.

9   I-13.13 is the BODE forensic case report.  I-13.14

10  is the April 18, 2016, status report.  And

11  Petitioner's response to a show cause order is

12  I-13.15.  I-13.16 is a joint status report.

13  I-13.17 is a joint status report.  I-13.18 is a

14  status report.  I-13.19 is a forensic case report.

15  I-13.20 is a status report and motion for

16  scheduling conference.  I-13.21 is suggestions in

17  opposition to the scheduling conference.  I-13.22

18  is a status report.  I-13.23 is a status report.

19  I-13.24 is a prehearing brief.  I-13.25 is the

20  deposition of the expert Jennifer Fienup.  I-13.26

21  is a Deposition Exhibit 1.  I-13.27 is Deposition

22  Exhibit 2.  I-13.28 is Deposition Exhibit 3.

23  I-13.29 is Petitioner's post-hearing brief.

24  I-13.30 is Respondent's post-hearing brief.

25  I-13.31 is a post-hearing order.  I-13.32 is the

11

1    docket entry of dismissal.  I-15 is the order

2    denying petition for the writ of habeas corpus.

3                K is state habeas certiorari file.

4    Petition for certiorari is J-1.  Appendix is J-2.

5    Motion for stay of execution is J-3.  Brief in

6    opposition to certiorari is J-4.  Supplemental

7    appendix is J-5.  And order denying certiorari is

8    J-6.

9                K is the 2017 execution proceedings.

10   K-1 is the renewed motion to set execution date.

11   K-2 is suggestions in opposition.  K-3 is the order

12   and warrant of execution.

13               L is a federal habeas motion file.

14   L-1, motion for relief from judgment.  L-2,

15   suggestions in opposition to motion for relief from

16   judgment.  L-3, reply in support of motion for

17   relief from judgment.  L-4, order denying motion

18   for relief from judgment.

19               M is a federal habeas appeal on that

20   motion.  M-1 is the notice of appeal.  M-2 is the

21   application for certificate of appealability.  M-3

22   is a motion for stay.  M-4 is suggestions in

23   opposition.  M-5 is Petitioner's reply in support.

24   M-6 is judgment.  M-7 is mandate.  M-8 is petition

25   for certiorari.  M-9 is petition for stay.  M-10 is

12

1   brief in opposition to petition for certiorari.

2   M-11 is Respondent's supplemental appendix.  M-12

3   is Petitioner's reply.  M-13 is order denying

4   certiorari.

5              N is the file -- state habeas file in

6   SC96625.  N-1 is the petition for certiorari.  N-2

7   is the exhibits in support of the petition.  N-3 is

8   the motion for stay.  N-4 is suggestions in

9   opposition to the habeas corpus petition and motion

10  for stay.  N-5 is order denying petition for writ

11  of habeas corpus and motion for stay.

12             O, state habeas certiorari file in case

13  number 17-5641.  O-1, petition for certiorari.

14  O-2, appendix.  O-3, brief in opposition to

15  certiorari.  O-4, supplemental appendix.  O-5,

16  order denying certiorari.

17             2023 execution proceedings, P.  P-1 is

18  the motion to set execution date.  P-2 is

19  suggestions in opposition.  P-3 is reply in support

20  of motion to set execution date.  P-4 is notice of

21  proceedings.  P-5 is suggestions in opposition to

22  notice of proceedings and attached exhibits.  P-6

23  is reply suggestions in support of notice of

24  proceedings.  P-7 is an order and warrant of

25  execution.  P-8 is a motion to withdraw warrant of

13

1   execution.  P-9 is suggestions in opposition to the
2   motion to withdraw.  P-10 is reply in support of
3   the motion to withdraw.  P-11 is supplemental
4   suggestions in support of motion to withdraw
5   execution warrant.  P-12 is opinion overruling
6   motion to withdraw execution warrant.  P-13 is
7   counter motion for rehearing.  P-14 is order for
8   overruling motion for rehearing.
9                   Q, declaratory judgment file.  Q-1,
10  petition for declaratory judgment.  Q-2,
11  Petitioner's Exhibit 1.  Q-3, Petitioner's
12  Exhibit 2.  Q-4, answer.  Q-5, motion to dismiss by
13  Attorney General.  Q-6, defendant's motion for
14  judgment on the pleadings.  Q-7, defendant's motion
15  to stay discovery.  Q-8, suggestions in opposition
16  to motion to dismiss Attorney General.  Q-9,
17  suggestions in opposition to motion for judgment on
18  the pleadings.  Q-10, suggestions in opposition to
19  motion to stay discovery.  Q-11, order dismissing
20  Attorney General.  Q-12, order denying motion for
21  judgment on the pleadings.  Sub-file of proceedings
22  before the Missouri Court of Appeals, Western
23  District is Q-13.  Q-13.1 is the writ summary.
24  13.2 is the petition for writ of prohibition.  13.3
25  is -- Q-13.3 is suggestions in opposition in

14

1    support of petition.  Q-13.4 is Relator's exhibit

2    index.  Q-13.5 is Relator's exhibits.  Q-13.6 is

3    Relator's certificate of service.  Q-13.7 is order

4    denying writ of prohibition or mandamus.  The next

5    thing is sub-file of writ of proceedings before the

6    Missouri Supreme Court, Q-14.  Q-14.1 is writ

7    summary.  Q-14.2 is petition for writ of

8    prohibition or mandamus.  Q-14.3 is suggestions in

9    support of petition.  Q-14.4 is Relator's exhibit

10   index.  Q-14.5 is Relator's exhibits.  Q-14.6 is

11   certificate of service.  Q-14.7 is a preliminary

12   writ.  Q-14.8 is an order to show cause.  Q-14.9 is

13   a return.  Q-14.10 is Relator's brief.  Q-14.11 is

14   Relator's appendix.  Q-14.12 is Relator's Exhibit

15   W.  Q-14.13 is Respondent's brief.  Q-14.4 is

16   Respondent's - 14 - I'm sorry - is Respondent's

17   appendix.  Q-14.15 is Relator's reply brief.

18   Q-14.16 is docket entries setting oral argument.

19   Q-14.17 is opinion granting the petition for writ

20   of prohibition.  Q-14.18 is Respondent's motion for

21   rehearing.  Q-14.19 is order overruling the motion

22   for rehearing.  Q-14.20 is writ of prohibition made

23   permanent.  Q-14 -- Excuse me.

24              R is the Daniel Picus affidavit which

25   has not been accepted by the Court.  S is the Mr.

15

1    Magee affidavit.  T is the Mr. Larner affidavit.  U

2    is Mr. Williams' criminal priors.  V is

3    Mr. Williams' DOC conduct violations.  That's V.  W

4    is Johnifer Griffen criminal priors.  X is Ronnie

5    Cole criminal priors.  Y is Durwin Cole criminal

6    priors.  Z is a map which is a demonstrative

7    exhibit.  P-8 is the -- I think that's it.

8             Last page.  AA is the Brentwood Police

9    Department report and attachments.  BB is a Kansas

10   City Police Department investigative report and

11   attachments.  CC is St. Louis Metropolitan Police

12   Department report and attachment.  DD is the

13   prosecutor's file excerpts.  And EE is prosecutor's

14   file excerpts.  And FF is the BODE supplement that

15   I believe Mr. Clarke put in last Friday.  And we're

16   done.

17             THE COURT:  Thank you.  Mr. Spillane,

18   the Attorney General has previously provided in an

19   app I think called The App Box most of those

20   exhibits, is that an accurate statement?

21             MR. SPILLANE:  Yeah, I think everything

22   is in there.  Am I accurate?

23             MS. PRYDE:  Yes, Your Honor.

24             THE COURT:  I don't think I had FF

25   until last Wednesday.

1          MS. PRYDE:  That's correct.  Nor did

2    we.

3          THE COURT:  With that notation, do you

4    have any idea of the number of pages that you have

5    submitted to this court for review?

6          MS. PRYDE:  Yes, Your Honor.  It is

7    12,000 pages is one copy of the record.

8          THE COURT:  Thank you.  Anything

9    further, Mr. Spillane?

10         MR. SPILLANE:  No, Your Honor.  I think

11   we're ready for opening if they're ready.

12         THE COURT:  An opening is not necessary

13   but if you would like to make one that's fine.

14         MR. JACOBER:  Your Honor, we would not

15   like to take our time by making an opening

16   statement but would ask the Court to invoke the

17   rule and exclude any witnesses from the courtroom

18   who may testify today.

19         THE COURT:  I don't believe there are

20   any witnesses present except Mr. Williams and he

21   has a right to be here.

22         MR. SPILLANE:  The only thing, Your

23   Honor, is they're going to call the evidence

24   custodian, so I'm not sure he can custode the

25   evidence and be a witness at the same time here

17

1    unless someone else can watch it.

2              THE COURT:  That's part of your

3    opening?

4              MR. SPILLANE:  No, that's just you

5    asking about excluding witnesses.

6              THE COURT:  Right.  I'll go ahead and

7    invoke the local rule and any witnesses that are

8    going to be called will be excluded during opening,

9    unless you want to go ahead and not make an

10   opening, Mr. Spillane.

11             MR. SPILLANE:  No, I will make an

12   opening, Your Honor.

13             I will talk about the evidence, but

14   this case is about the rule of law.  And every

15   claim except the new claim, which is claim five

16   that was raised earlier this week about bad faith

17   destruction of evidence, has already been rejected

18   by the Missouri Supreme Court.

19             The first thing I want to say about the

20   new claim on bad faith destruction of evidence is

21   that Missouri law requires there actually be bad

22   faith.  Here this happened in 2001.  I suspect

23   you're going to hear testimony from Mr. Larner and

24   from Mr. Magee that in 2001 they had no idea what

25   touch DNA was.  I know it existed someplace in the

18

1   world but it wasn't in St. Louis where they knew

2   about it.  So they did absolutely nothing wrong.

3   There's no bad faith, there's no negligence.  And

4   we can talk a little bit about how they handled the

5   evidence and how the transcript shows that.

6           The transcript shows - I believe it's

7   2203 - that whoever broke in and committed the

8   murder wore gloves because they left glove marks on

9   both sides of the pane that was removed.  So it's a

10  reasonable inference, even if anybody knew about

11  touch DNA, which they didn't, that the killer

12  wouldn't have taken off their gloves after breaking

13  in and then killed someone.

14          We also know that there were no

15  fingerprints on the knife.  That was Detective

16  Krull's testimony.  And there's a new complaint

17  about fingerprints being destroyed.  But if you

18  look at both page 95 and 96 in the opening, those

19  were prints that were useless.  And if you look at

20  Detective Krull's testimony about when he destroyed

21  prints he said, We destroyed prints that we

22  couldn't use, that's what we do, that's our normal

23  practice.  Under Missouri case law if they're

24  following the normal practice that's not a bad

25  faith violation.

19

1                   The next thing I want to talk about is

2    other evidence that was handled.  The fingernail

3    clippings were tested, were in a plastic case, and

4    Prosecutor Larner, if you look at the transcript

5    there, he said, I'm not going to open these because

6    I'm not wearing gloves and I don't want to

7    contaminate them.  He had no reason to believe he

8    could contaminate the handle of the knife.  I'm not

9    even sure if he could if the fella wore gloves and

10   if they weren't set up to do touch DNA in 2001.

11   But he did nothing wrong and nothing in bad faith.

12                  You're also going to hear evidence that

13   the stuff did come in sealed containers which I

14   think is inconsistent with what Mr. Larner first

15   remembered, that the handle was sticking out.  But

16   I think since then he's read the transcript and

17   looked at the evidence this morning and he now

18   recalls it was in a sealed container.  So there's

19   no problem there.

20                  He handed the knife, according to the

21   transcript, to Detective Wunderlich and then to

22   fingerprint examiner Krull and he said on the

23   record, I'm holding the knife in my hand.  Nobody

24   thought there was anything wrong with that.

25   Defense counsel didn't jump up and down and say,

20

1    You're holding the knife, because there was nothing

2    wrong with holding the knife.  There's not even

3    negligence there.  And I think both Larner and

4    Magee, if I'm not mistaken, will likely testify

5    that they've done many dozens of cases where after

6    evidence was tested and everything that could be

7    done to it was done they handled the knife all the

8    time.  That was normal practice.  I believe that

9    will be their testimony.

10              I'm going to talk a little bit about

11   the Batson because at page 55 of their motion they

12   allege that Mr. Larner was involved in Batson

13   violations in McFadden.  That's not true.  There

14   were four McFadden cases in the trial court.  Two

15   were overturned for Batson and two weren't.  The

16   two that Mr. Larner worked on there were no Batson

17   violations.  As far as I know he's never had a

18   Batson violation sustained all the way up in his

19   career.  My belief is that he had one violation in

20   Purkett vs Elem that wasn't a violation at all, and

21   the U.S. Supreme Court issued a writ overturning it

22   and saying he did nothing wrong.

23              So I don't like him being accused of

24   Batson violations because he didn't.  And the

25   Missouri Supreme Court found he did not in this

21

1    case in the direct appeal.  And I don't like him

2    being accused of sloppy evidence practices because

3    he didn't.

4              Something else that's important is both

5    Larner and Magee are going to testify that Laura

6    Asaro never asked for a reward.  And if it comes in

7    Mr. Magee will testify that she gave it away after

8    she got it.  So I don't like her character being

9    attacked for supposedly testifying based on a

10   reward.

11             That's essentially it.  Every claim

12   they have made except the new one has already been

13   rejected by the Missouri Supreme Court.

14             I'll talk a little bit about their

15   original witnesses.  Marcellus Williams already

16   testified by deposition.  I'm sure you read the PCR

17   legal file, end of Volume 3, beginning of Volume 4.

18   At that point he admitted to lying under oath to

19   get what he wanted in a court proceeding.  And then

20   he was asked, Are you lying in this case, and he

21   said, You would know that better than I do.  So

22   that's not a real credible thing there.  And I

23   think you have to look at that in accord with

24   whatever he says today.

25             Also, if you look at Judge McGraugh's

22

1    testimony back in the PCR hearing it was I think

2    five or six times he said, That was too long ago, I

3    don't remember.  And that was 20 years ago.  If you

4    look at Judge Green's testimony he said, I had a

5    strategy for penalty phase which was residual doubt

6    as well as saying he was well involved with his

7    family and he was a benefit to his children and was

8    staying in contact with them even in prison.  So

9    that testimony is in.  And the Missouri Supreme

10   Court found there was no ineffectiveness either on

11   prejudice or on reasonable conduct in not putting

12   in the different strategy that he now alleges he

13   should have put in which was one of an abusive

14   childhood strategy, 180 degrees from what he

15   alleged before.

16            So I think that's about all I have to

17   say in opening is to say that Mr. Larner and Mr.

18   Magee did absolutely nothing wrong.  And it's not a

19   nice thing to say that they did when there's no

20   evidence to support it.  And they'll testify that

21   Ms. Asaro didn't want a reward.  So I think that's

22   what I have to say, Your Honor.

23            THE COURT:  Thank you, Mr. Spillane.

24   In reference to the direct appeal and the PCR, it's

25   my understanding those opinions were written by

23

1   Judge Richard Teitelman.

2            MR. SPILLANE:  I think so.  I have it

3   in my pile here, but I don't remember.

4            THE COURT:  That's my recollection.

5   Thank you.

6            Wish to proceed, prosecuting attorney?

7            MS. MCMULLIN:  Yes.  Our first

8   witness -- the prosecution's first witness is David

9   Thompson.  For the record, he'll be appearing via

10  Webex.

11           THE COURT:  Great.  Is there any

12  objection to him appearing by Webex?

13           MR. CLARKE:  Your Honor, at this point

14  there would be two objections, one to the Webex

15  appearance, Your Honor, and the second to, as I

16  understand it Mr. Thompson's testimony will go

17  solely to the credibility of other witnesses and

18  that sort of testimony is categorically

19  inadmissible.  It's this Court's job to determine

20  the credibility of witnesses, not experts.

21           THE COURT:  So what is your legal

22  objection to him appearing by Webex?

23           MR. CLARKE:  That the rule allows for

24  him to appear by Webex with the consent of the

25  parties, and this case, Your Honor, is a very

24

1    serious case and that Mr. Thompson should appear in

2    person.

3              THE COURT:  Out of the abundance of

4    fairness I'm going to overrule your objection.

5              Will you please raise your right hand.

6                   DAVID THOMPSON,

7    having been sworn, testified via Webex as follows:

8              THE COURT:  You may inquire.

9                   DIRECT EXAMINATION

10   BY MS. MCMULLIN:

11        Q.   Will you please introduce yourself?

12        A.   Yes.  The name is Dave Thompson.  I'm a

13   certified forensic interviewer and president of a

14   training firm Wicklander-Zuwalski & Associates.

15        Q.   And what is a certified forensic

16   interviewer?

17        A.   A certified forensic interviewer is a

18   designation that I've earned over a decade ago

19   where you pass a test that qualifies your knowledge

20   in the field of investigative interviewing,

21   requires continuing education credits to complete

22   such designation, and that's part of my

23   qualifications that I currently have at

24   Wicklander-Zuwalski.

25        Q.   Besides the certification you just

                          25

1    talked about and the test, do you have any other

2    qualifications that would allow you to be a

3    certified forensic interviewer?

4         A.   Sure.  A combination of both practical

5    experience and academic experience.  So my formal

6    education, my undergrad, my bachelor's degree is in

7    psychology in criminal justice.  And I received a

8    secondary degree, a master's in forensic

9    psychology.  And over the last over ten years

10   working at Wicklander-Zuwalski in that capacity I

11   routinely work with the academic communities,

12   either contribute to their studies, consult on

13   their studies, or have also brought them into our

14   firm to be a part and recipient of training for

15   continuing education.

16        Q.   Mr. Thompson, do you have what I'm

17   marking now as State's Exhibit 18A?  Which is at

18   Tab 3 in your binder, Judge.  Do you have your CV

19   in front of you?

20        A.   Yes, I have an electronic version of

21   that in front of me.

22        Q.   Okay.  And can you take a look at it.

23   Does it have in the lower right-hand corner a Bate

24   stamp that says STLCPA30?

25        A.   Yes, it does.

26

1        Q.   Can you take a look through that and

2   let us know if this is your -- an accurate and true

3   copy of your CV?

4        A.   Yes, it appears to be.  Yes.

5             MS. MCMULLIN:  Judge, we offer

6   Exhibit 18A.

7             MR. CLARKE:  No objection.

8             THE COURT:  That will be received.

9        Q.   Mr. Thompson, are you being paid for

10  your time here today?

11       A.   I been retained by The Innocence

12  Project and paid an hourly rate for my time that I

13  contribute to this case.

14       Q.   Do you typically get paid for your time

15  when you're an expert in cases like this?

16       A.   Yes, I do.

17       Q.   And how much are you being paid?

18       A.   I have an hourly rate of $300 per hour.

19       Q.   Briefly can you explain what training

20  you have involving investigative interviews and if

21  you do any training as a forensic interviewer?

22       A.   Yes.  My training outside of my formal

23  education as I mentioned and my master's program I

24  had a capstone in false confessions --

25       Q.   You have to slow down for the court

27

1    reporter.

2            A.    Sure.    Sorry about that.

3            Q.    So you were talking about your training

4    that you have.

5            A.    Yes.    To recap the last part of that

6    answer, in the completion of my master's degree I

7    did a capstone project on false confessions which

8    was a focus on investigative interviewing.    In

9    addition to that I'm a member of several

10   associations and attend several conferences

11   including the Academy of Criminal Justice Sciences,

12   the International Investigative Interviewing

13   Research Group, and, as I mentioned earlier,

14   routinely bring in the academic community on a

15   monthly basis to train myself and my other

16   instructors specifically on evidence-based

17   investigative interviewing.

18           Q.    And you said that you train others on

19   investigative interviewing.    Do you train law

20   enforcement?

21           A.    I do, and we do collectively as an

22   organization as well.    My primary full-time job is

23   leading a training firm that teaches both

24   benefactor organizations and law enforcement

25   professionals across the globe.    We've trained

28

1    groups like the Chicago Police Department's
2    criminal investigations divisions, some agencies in
3    the State of Missouri specifically on investigative
4    interviewing techniques in a variety of types
5    within them.
6              MS. MCMULLIN:  Judge, at this time we
7    move to enter David Thompson an expert in evidence
8    based investigative interview practices.
9              MR. CLARKE:  Judge, we would just ask
10   that the objection to the categorical
11   inadmissibility be continuing.  But besides that,
12   no objection, Your Honor.
13             THE COURT:  Thank you.  He will be
14   received as an expert based upon his training and
15   expertise on investigative based interviewing.
16   BY MS. MCMULLIN:
17        Q.   Dr. Thompson, did you write a report in
18   this case?
19        A.   I did write a report, yes.
20        Q.   And do you have that report in front of
21   you?
22        A.   I do.
23        Q.   Okay.  I'm marking it as Prosecutor's
24   Exhibit 18B.
25             That's also at Tab 3 in your binder,

29

1    Judge.

2              Can you take a look at this report and

3    make sure it's complete.  It starts with Bate stamp

4    STLCPA75.

5         A.   Yes, this looks complete.

6         Q.   What were you asked to do in this

7    specific case?

8         A.   I was asked to review statements

9    obtained through investigative interviews of Henry

10   Cole and Laura Asaro and opine on the reliability

11   of the information gained based off of my

12   experience and expertise.

13        Q.   And why is the reliability of witnesses

14   important in criminal cases?

15        A.   The reliability of information gained

16   can be instrumental in identifying further steps to

17   take in an investigation.  That process, the

18   evaluation process of an interview is something

19   that we focus primarily on when we teach

20   evidence-based interview practices is assessing the

21   reliability of statements obtained through those

22   conversations or the investigation.

23        Q.   And how do you typically go about

24   analyzing the reliability of a witness statement?

25        A.   As I mentioned, part of our process is

30

1   what we call an evaluation stage.  At the end of

2   the investigative interview or the interaction with

3   that witness one of the first things that we would

4   look at is any potential incentive or reason that

5   the witness or subject interviewee may come forward

6   with information.  An incentive does not

7   necessarily mean that information is untruthful but

8   it would be something that we would want to

9   consider as to the reliability of that information.

10          We would also look at the details

11  provided throughout that engagement with the

12  investigator, were those details verifiable, were

13  they consistent with potential evidence, consistent

14  with their own story, and then was there any

15  contamination present in advance of those details

16  being shared by the interviewer themselves.

17          Q.   And through those factors that you

18  mention that you analyze reliability through did

19  you come to conclusions in this case about Henry

20  Cole and Laura Asaro?

21          A.   I did.  I found both witnesses appear

22  to have an incentive to provide information, which

23  again does not immediately render it as untruthful

24  but something I would consider in the totality of

25  the reliability.

31

1                 I also determined that there were

2       several assertions made by both Cole and Asaro that

3       either conflicted with each other, conflicted with

4       evidence if it was available, or were assertions

5       made that I could not verify and, therefore, it

6       didn't add any weight on its reliability.

7                 And lastly found that the majority of

8       the information that both Cole and Asaro provided

9       was susceptible to contaminating factors, meaning

10      it was maybe either available publicly or

11      previously known to law enforcement before it was

12      disclosed by either witness.

13           Q.   We'll get into that in a second.  But

14      are your conclusions contained in your report?

15           A.   Yes, they are.

16                MS. MCMULLIN:  Judge, we offer

17      Exhibit 18B, Mr. Thompson's expert report.

18                MR. CLARKE:  Your Honor, objection.

19      Cumulative.  Mr. Thompson is here, he can testify

20      about the findings of his report.

21                THE COURT:  Thank you.  It will be

22      received.

23      BY MS. MCMULLIN:

24           Q.   Let's talk about reliability.  So you

25      mentioned four different factors, but is body

32

1    language, physical behavior or demeanor affecting

2    reliability as well?

3            A.    Body language is something that is I

4    would say amiss in the investigative world that is

5    often used improperly to classify somebody's

6    statement as being truthful or untruthful.  The

7    research shows us there were actually about

8    54 percent accurate in identifying truth versus a

9    lie based on physical behavior.

10           The problem with that, however, to your

11   question of reliability is often on the surface

12   people might observe body language and assume truth

13   or guilt based off of these kind of gut feelings

14   which may not necessarily be accurate.

15           Q.    Let's start with the first factor in

16   your report and that you mention, incentive to

17   cooperate.  Can you describe this factor and how it

18   would affect reliability?

19           A.    Incentive to cooperate could be

20   something that we see, whether it's a witness

21   interview or even maybe the interview or

22   interrogation of a suspect.  If somebody has an

23   incentive, meaning it could be a financial reward,

24   it could be avoiding of, you know, perceived

25   consequences, an incentive could even be a person

33

1    who is in custody has an incentive to escape that

2    situation.

3              And so what the research has shown us

4    is that when there is an incentive to provide

5    information it could undermine the reliability of

6    the information that is obtained.

7        Q.    And from the documents that you

8    reviewed in this case, including the statements of

9    Henry Cole and Laura Asaro, did Henry Cole have an

10   incentive to cooperate in your opinion?

11       A.    Yes, in my opinion, and what I reviewed

12   in Mr. Cole's deposition and his statements is that

13   he was very persistent on obtaining a financial

14   reward throughout this process and seemed to weigh

15   heavily on his decision to cooperate.

16       Q.    Does timing play a role in the

17   reliability and incentive to cooperate in your

18   analysis, the timing of the statement?

19       A.    Yeah, I might need you to clarify if

20   I'm not answering correctly what you're...

21       Q.    That's a good point.  If a witness were

22   to bring up an incentive before providing

23   information would that affect your analysis about

24   reliability of their statement?

25       A.    Yes.  I would say obviously the

34

1    knowledge of the incentive or the immediacy of

2    needing such incentive creates desperation for

3    somebody to provide information.  We see the same

4    thing in false confession research is that a

5    person, an interviewee who is in custody has a more

6    immediate need, whether it's to escape the room or

7    to obtain some type of deal, it increases the

8    likelihood they're going to provide information.

9        Q.   And did you find that incentive to

10   cooperate here with Henry Cole?

11       A.   Yes, I did.  With Henry Cole I believe

12   there was multiple times in which he requested or

13   asked about the reward money.  And then I was also

14   made aware through what I reviewed that in advance

15   of I believe it was a deposition that he provided

16   that he requested half the reward money at that

17   time or was potentially refusing or not going to be

18   available to testify.

19       Q.   What about Laura Asaro, what did you

20   conclude as to her potential incentive to

21   cooperate?

22       A.   Yes, Laura Asaro also was aware of the

23   reward money.  And it also appeared from what I

24   reviewed that Laura had multiple times in which she

25   was engaged with law enforcement and was questioned

35

1    about her knowledge about this case and provided

2    little to no details until I believe it was over a

3    year later.  I may have the exact time wrong.  But

4    at that time the incentive appeared to be avoiding

5    perceived consequences or other charges unrelated

6    to this case.

7           And then I believe there was also a few

8    witness statements that I was made aware of through

9    what I reviewed that Laura Asaro had a history of

10   being an informant or providing information in lieu

11   of preventing other consequences, which was similar

12   here.  And the other incentive again potentially is

13   that there was another statement that a key piece

14   of evidence, a laptop, is something that Laura

15   Asaro was implicated in having either possession or

16   prior knowledge of which would also give her

17   incentive to implicate somebody else.

18        Q.   Does this factor alone, the incentive

19   to cooperate, necessarily mean a witness statement

20   is untruthful or unreliable?

21        A.   No.  No, it does not.

22        Q.   What's the next step in your analysis?

23        A.   Once we identify what type of

24   incentives or the context of the situation then

25   we're going to look at the specific details or

1    assertions that were provided by the witness or the

2    interviewee, and then we can measure those against

3    if they're reliable - I'm sorry - if they're

4    verifiable, if there are things that we can even

5    substantiate to prove or disprove, if they're

6    consistent with known evidence or with each other,

7    if there's any contaminating factors present in

8    those specific assertions.

9         Q.   Let's talk about verifiability first.

10   In your analysis did you determine whether any

11   facts provided by Henry Cole to the police -- that

12   Henry Cole provided to the police were facts that

13   the police or the public did not already know?

14        A.   Umm, the only information -- No, the

15   facts that the police or public did not know, no, I

16   did not.  The information that Henry Cole provided

17   was either publicly available, whether it was

18   through media reports, newspaper, or news coverage,

19   or was information that was known to investigators

20   prior to their interaction with Mr. Cole.

21        Q.   Did you determine whether there were

22   any facts provided by Henry Cole that were

23   unverifiable?

24        A.   Yes, there's a variety of assertions.

25   For example, I believe Mr. Cole alleged that the

37

1  victim made some verbal remarks to the intruder,

2  what are you doing, who's down there, things to

3  that nature that I have no way to verify if that

4  was true or untrue.  So there's a variety of

5  assertions in that capacity that again could be

6  truthful, could be untruthful, but without the

7  ability to substantiate it it's unverifiable and

8  doesn't impact the reliability in my opinion.

9       Q.   Let's move onto Laura Asaro and

10  verifiability.  In your analysis did you determine

11  whether there were any facts provided by Asaro to

12  police that the police or the public did not

13  already know?

14       A.   Yes.  I believe the sole fact that I

15  identified was the location of a stolen or missing

16  laptop that I believe police were then able to

17  chase down or further investigate that lead.

18       Q.   If the location of the laptop was

19  provided by Asaro does that automatically make her

20  statements reliable in your opinion?

21       A.   No.  On the surface it could.  And on

22  its surface in my review of that information she's

23  providing something that was previously unknown to

24  police which would suggest reliability.  On review

25  of all the documents I was provided it also

38

1  appeared that there is conflicting statements from

2  other witnesses that suggest Laura Asaro may have

3  had prior knowledge or even possession of that

4  laptop outside of implicating directly

5  Mr. Williams.  And so I take that into account

6  that, yes, she had that information, that

7  information could have come from other sources and

8  potentially even given her an incentive to falsely

9  implicate somebody else.

10      Q.  Next let's talk about consistency with

11  evidence and potential contamination.  Do you have

12  the chart from your report handy, Mr. Thompson?

13      A.  Yeah, I do.

14          MS. MCMULLIN:  Judge, the chart is at

15  Tab 4 if you want to look.

16      Q.  Mr. Thompson, can you briefly describe

17  what you mean by consistency in the context of

18  reliability?

19      A.  Yes.  When I put consistency in the

20  chart which you'll see is a change in story.  So

21  what I'm looking for kind of between the second and

22  third column there is the change in the story,

23  meaning did a witness or interviewee have an

24  evolution of their statements whether it was

25  between an interview and a deposition or further

39

1   conversations with law enforcement.  And then that

2   third column, again to consistency, is was it

3   consistent with either known evidence if there was

4   any forensic evidence to match it up against or

5   even consistent with other witness testimony.

6        Q.   We won't go through all of these, but

7   let's take a look at the first one for Henry Cole.

8   Williams told Cole about the murder after reading

9   the article in the St. Louis Post-Dispatch.  So is

10  that a verifiable fact?

11       A.   The way for that to be verifiable is if

12  you interviewed any other parties that were

13  involved.  But to my ability, no.

14       Q.   Then you have in the second column,

15  Change in story:  Cole testified that this

16  discussion happened after he and Williams watched

17  news coverage of the story.  So does that go to

18  your opinion that there are potential

19  inconsistencies with his own statements?

20       A.   Correct.

21       Q.   Let's go to the bottom of the -- or the

22  middle of the chart there where it says -- Or I'm

23  sorry.  Yes, the bottom.  Williams went upstairs in

24  the Gayle residence during the incident.  Is that a

25  verifiable fact?

1          A.   Again, it could be if there was

2    forensic evidence that either supported or

3    disproved that, but without that ability then, no,

4    I wouldn't have the ability to verify that.

5          Q.   And then the third column you have

6    Conflict with evidence/Asaro and you have:  Asaro

7    claims that Williams never went upstairs.  What

8    does that mean for your reliability analysis?

9          A.   Again, when you don't have any other

10   either forensic evidence or video surveillance when

11   comparing witness statements against each other

12   what happens often is investigators may have

13   confirmation bias or may fall kind of victim to the

14   believability of one person over another for a

15   variety of reasons.  So looking at this objectively

16   we have two different witnesses providing two

17   conflicting statements, and so it undermines the

18   reliability of each.  We don't know what's truthful

19   or untruthful in that capacity.

20         Q.   When it comes to this chart did you put

21   every single fact that Henry Cole or Laura Asaro

22   had in their statements in these charts?

23         A.   No, I did not.  There was a variety of

24   assertions or facts that I thought were either

25   duplicative to what was already in the report,

41

1    ambiguous, unverifiable.  You know, for example, I

2    know Mr. Cole described some of the layout of the

3    property, including the landing and the floors were

4    squeaky.  And so I felt like those types of

5    statements were again, in the totality of my

6    review, either previously known to investigators or

7    potentially unverifiable or from other sources.

8    And so I did not provide every assertion within

9    either chart but wanted to give a visual to the

10   Court of the totality of my review.

11       Q.   Next let's move on to the chart of

12   Laura Asaro.  So if we go down to the third box you

13   have:  Williams entered the Gayle residence through

14   the back door.  Now what is your analysis of

15   consistency with that statement?

16       A.   In this specific statement, as you see

17   in the chart, we have both the conflict with the

18   potential forensic or actual crime scene evidence

19   that looked like forced entry was through the front

20   door.  And we also have a conflicting statement

21   with Mr. Cole's opinion or assertion asserting or

22   alleging that Mr. Williams entered through the

23   front door.  So we've got multiple conflicts here

24   in the story.

25       Q.   You also mention potential sources of

42

1  contamination and that's on your chart here as well

2  in the fourth column.  What do you mean by that?

3          A.   Contamination is -- When you are trying

4  to determine reliability the most reliable of

5  information is something that a interviewee

6  provides an investigator that was completely

7  unknown to investigators, such as the location of a

8  murder weapon, that they were then able to go out

9  and investigate and discover.

10              Contamination would be, or potential

11  sources of contamination could be news reports,

12  revealing of crime scene photos, witnesses talking

13  to each other, which happens in the leap of time.

14  Contamination can also be unintentional by good

15  investigators, and there's a history of that

16  occurring across the country where investigators,

17  just through simple questioning, story-telling, or

18  interactions with subjects may reveal details about

19  the crime that are then simply regurgitated or

20  assumed by the interviewee as a truthful piece of

21  information.

22          Q.   In this case in the time since Henry

23  Cole and Laura Asaro gave their statements from

24  when the murder happened can we know all the

25  potential sources of contamination that could have

43

1   occurred?

2        A.   No.  And to my knowledge I believe this

3   case was covered publicly in some news coverage and

4   I had the opportunity to review a few news

5   articles.  So between the public release of

6   information, between unknowing who was involved or

7   not involved in the situation that could have

8   discussed it, witnesses engaging with each other,

9   multiple investigators involved, it's hard to keep

10  track of what information was intentionally

11  withheld from the public.

12       Q.   You mentioned multiple witnesses

13  talking to each other.  What's your understanding

14  of that happening in this case?

15       A.   Specific to what I reviewed I know in

16  the interaction that law enforcement had with Mr.

17  Cole and in their pursuit of the investigation was

18  hopeful that Mr. Cole could potentially leverage a

19  relationship or connection with Ms. Asaro and tried

20  to obtain any type of evidence to substantiate the

21  story.  So whether it was -- I believe they even

22  quoted a backpack, it was a $10,000 backpack, and

23  kind of reasserting that there's an incentive tied

24  to if you're able to retrieve this information.  So

25  I believe Mr. Cole had attempted contact.  I don't

44

1    know what the extent of those conversations were.

2          Q.   Were you also aware or made aware of

3    contact between law enforcement and Henry Cole

4    prior to his statement in this case?

5          A.   Yes.  I reviewed -- I believe the

6    origination of that was a letter written by Mr.

7    Cole that suggested he had information about the

8    case and inquiring about next steps.  I don't have

9    again the knowledge.  If there's information or if

10   there's interactions that are not recorded or fully

11   documented I don't know what those interactions

12   look like.  But I know there was some type of

13   interaction between that point and the first

14   recording I believe in June of '99 of the interview

15   of Mr. Cole with law enforcement.

16         Q.   That was my next question.  Do you know

17   if -- To your knowledge was the statements or the

18   calls between Henry Cole and Laura Asaro, the two

19   witnesses in this case, recorded by law

20   enforcement?

21         A.   I reviewed transcripts and recordings

22   of engagements that they had with both Cole and

23   Asaro, but to my knowledge not every engagement was

24   recorded or fully documented so I'm unable to make

25   an opinion on what happened during those

45

1    conversations.

2          Q.   And I should clarify.  What I meant was

3    the conversations between Laura Asaro and Henry

4    Cole, were those recorded to your knowledge?

5          A.   Sorry if I misheard you there.  No, I

6    don't believe so.  I wasn't given any report of

7    what those conversations would have looked like or

8    what information was shared.

9          Q.   So in terms of the reliability of Henry

10   Cole's statements in this case what did you

11   conclude?

12         A.   I concluded again, based off of the

13   main objective of looking for actionable, reliable

14   information that could be independently

15   corroborated, meaning he provided information that

16   investigators did not know, was consistent with

17   evidence they were to investigate, I did not see

18   that in the statement provided by Mr. Cole, and so

19   I felt like the information he provided and the way

20   in which it was provided undermines the reliability

21   of that information.

22         Q.   And in terms of reliability for Laura

23   Asaro and her statements in this case, what was

24   your conclusion about the reliability of those

25   statements?

46

1          A.   Same context for that response.  And I

2    did not find that Laura Asaro was able to provide

3    any information other than location of the laptop

4    that was independently verifiable by investigators.

5    And then that piece of information, as I mentioned

6    earlier, has some conflicting statements as to

7    maybe what the source of that information actually

8    was.  So again, I believe her statement, based on

9    the qualifications I looked at or the criteria I

10   looked at, undermines the reliability of it in its

11   totality.

12         Q.   When it comes to inconsistent and

13   potentially unreliable statements like you said

14   that there might be in this case, as a trainer of

15   law enforcement what would you have recommended the

16   investigators in this case do?

17         A.   Umm, further investigate, which I know

18   sounds like a very superficial and simple answer.

19   But often witness statements or circumstantial

20   evidence should require investigators to further

21   investigate to either substantiate, disprove, or

22   perform the same type of evaluation I did to

23   determine the reliability of that information.

24         Q.   Thank you, Mr. Thompson.

25         A.   Yes.

47

1                THE COURT:  Mr. Spillane, Mr. Clarke.

2                MR. CLARKE:  Yes, Your Honor.

3                     CROSS EXAMINATION

4    BY MR. CLARKE:

5         Q.   Mr. Thompson, can you hear me?

6              Mr. Thompson, can you hear me?

7         A.   Yes, I can.

8         Q.   Okay.  If you can't hear me just tell

9    me to stop and we'll ask you again.  All right.

10             So Mr. Thompson, in this case I want to

11   talk to you about what you reviewed.  You reviewed

12   interviews of Henry Cole and related transcripts,

13   is that right?

14        A.   Correct.

15        Q.   And your report didn't identify which

16   interviews or how many interviews.  Do you know how

17   many you reviewed?

18        A.   They were broken down into a handful of

19   video segments.  I don't have the number of those

20   interviews.

21        Q.   Okay, they were broken down into a

22   handful of video segments.  How did you receive

23   those video segments?

24        A.   I believe it was through either a

25   Dropbox file or some type of electronic sharing.

48

1          Q.   And that was given to you by

2    Mr. Williams' counsel?

3          A.   Correct.

4          Q.   Okay.  And same goes for the interviews

5    of Laura Asaro?

6          A.   Correct.

7          Q.   And your report says you reviewed

8    Exhibit 5, Henry Cole letter; Exhibit 6, Henry Cole

9    deposition 4/2/01; Exhibit 7, Henry Cole deposition

10   4/12/01; Exhibit 9, Laura Asaro's deposition

11   4/11/01, is that right?

12         A.   Yeah, that's correct.

13         Q.   And you reviewed those documents?

14         A.   Yes, correct.

15         Q.   And you also reviewed Exhibit 10,

16   interview Laura Asaro notes?

17         A.   Correct.

18         Q.   And Exhibit 12, Laura Asaro 11/17/99

19   transcript?

20         A.   Yes, correct.

21         Q.   And a Henry Cole deposition from 4/3 of

22   2001?

23         A.   Correct.

24         Q.   You reviewed the prosecuting attorney's

25   motion to vacate filed --

49

```
 1            A.   I did.

 2            Q.   -- 1/26/2024?

 3            A.   Yes.

 4            Q.   And you identified unidentified Henry

 5   Cole handwritten notes, is that right?

 6            A.   Yes, correct.

 7            Q.   How many notes?

 8            A.   I believe it was one page of a note

 9   with a number of bullet points on that note.

10            Q.   So that's the entirety of what you

11   reviewed in this case?

12            A.   The only other information that's not

13   listed here was three or four articles from I think

14   it was St. Louis Post-Dispatch that I requested

15   from counsel as potential sources of contamination.

16            Q.   Okay, from which counsel did you

17   request that?

18            A.   Umm, from Mr. Williams' counsel, from

19   Alana or Mr. Adnan Sultan.

20            Q.   Okay, and you said three or four

21   newspaper reports?

22            A.   Correct.

23            Q.   Were those contemporaneous newspaper

24   reports or reports from the day?  What were those

25   reports?
```

1          A.   They were copies of the St. Louis

2    Post-Dispatch articles relating specifically to

3    this case.  I believe they were referenced or cited

4    within the motion to vacate.

5          Q.   Okay.  So with those three or four

6    newspaper reports and everything I just listed

7    that's the entirety of what you reviewed in this

8    case, is that right?

9          A.   Yes.  From what I recall, yes, I

10   believe so.

11         Q.   Okay.  So when you're doing your review

12   do you find it worthwhile to speak to individuals

13   who were involved in cases?

14         A.   It can depend on the type of review.

15         Q.   So would you normally want to talk to

16   the police officer who did the investigation?

17         A.   No, normally I'm not.

18         Q.   You don't want to talk to the police

19   officer at all?

20         A.   The request that I was given to review

21   these statements was not to have engagement with

22   the police officer about their opinion about the

23   statements.

24         Q.   Okay.  So you were -- just obtained

25   these things that Williams' counsel gave you,

51

1    right?  And to give an answer, is that right?

2         A.   Yeah, I was asked to review the

3    information that was given to me and look

4    objectively at the reliability based on the factors

5    I mentioned earlier.

6         Q.   So you spoke to no police officer who

7    interviewed Williams' case, correct?

8         A.   Correct.

9         Q.   Okay.  You spoke to no witness in

10   Williams' case, is that right?

11        A.   That's correct.

12        Q.   You didn't speak to Henry Cole?

13        A.   Correct.

14        Q.   Or Laura Asaro?

15        A.   Correct.

16        Q.   Do you know if you could have spoken to

17   Henry Cole?

18        A.   No, I don't believe so.

19        Q.   So you know nothing about Henry Cole at

20   all except what you were given?

21        A.   I don't -- I'm not sure if Henry Cole

22   is still with us, but I don't have any other

23   information about Mr. Cole.

24        Q.   Okay.  So do you have an idea about how

25   many pages approximately you reviewed when you did

1    your report?

2          A.   No, I don't have an approximate number.

3          Q.   Would it be a thousand, would that be

4    fair?

5          A.   Probably less than a thousand.

6          Q.   Less than a thousand.  Okay.  So if I

7    were to tell you that there are more than 12,000

8    pages in the state court record, or approximately

9    12,000 pages in the state court record, you

10   reviewed less than a thousand of those, is that

11   right?

12         A.   Yeah, approximately.  I don't have a

13   specific page count but --

14         Q.   Okay.  So do you know that Mr. Williams

15   went to trial?

16         A.   Yes.

17         Q.   Then you know that there were witnesses

18   who testified in that case?

19         A.   Yes.

20         Q.   And that those witnesses were police

21   officers and other people?

22         A.   Yes, I would assume.

23         Q.   Okay.  But you didn't review the trial

24   transcript in this case?

25         A.   Correct.

1          Q.   So if the police officers talked about
2    the interview of Henry Cole or Laura Asaro you
3    wouldn't know, is that right?
4          A.   Right, outside of the depositions I
5    reviewed.
6          Q.   And those are depositions of Henry Cole
7    and Laura Asaro, is that right?
8          A.   Correct, yes, sir.
9          Q.   And those are the ones that Williams'
10   counsel gave you?
11         A.   Correct.
12         Q.   So you didn't do any independent
13   investigation in this case?
14         A.   No.
15         Q.   Okay.
16         A.   Not outside of what I was provided.
17         Q.   All right.  So if the trial transcript
18   shows that an individual -- that the defense,
19   Mr. Williams' counsel called a contamination
20   witness from the St. Louis Post-Dispatch you would
21   have no idea?
22         A.   Correct.
23         Q.   Okay.  And if that witness made similar
24   arguments to what you're making today about
25   contamination in the media you wouldn't know would

54

1   you?

2           A.   Not outside of what I reviewed.

3           Q.   And you didn't review the trial

4   transcript, right?

5           A.   Correct.

6           Q.   Okay.  So if that testimony was

7   presented at trial -- Do you know Mr. Williams was

8   convicted, right?

9           A.   Correct.

10          Q.   So the jury didn't believe the

11  contamination witness, is that correct?

12          A.   I don't know.  I can't speak to the

13  mind of the jury.

14          Q.   Okay.  So now you spoke about what the

15  investigators may have done when you talked about

16  contamination, about what they may have said or may

17  have done.  You didn't speak to any investigator,

18  correct?  You said that many times now, right?

19          A.   Correct.

20          Q.   So you don't know what the

21  investigators knew at the time?

22          A.   I knew investigators -- it was clear

23  what information investigators did know, such as

24  there was a victim who was stabbed in the house and

25  what the crime scene would have looked like would

55

1    be general knowledge investigators would have had.

2         Q.   Okay.  So I'm looking at your report

3    here on the first page of what you reviewed.  You

4    did not include police reports, is that right?

5         A.   Correct.

6         Q.   So you didn't review any of the police

7    reports in this case beside the interviews?

8         A.   Correct.  And the -- wouldn't be a

9    police report but interview Laura Asaro notes were

10   I believe notes prepared by investigators in

11   preparation of engagement with Laura Asaro.

12        Q.   But if there were other police reports

13   you have no idea what they say?

14        A.   Correct.

15        Q.   Okay.  Because Mr. Williams didn't give

16   them to you?

17        A.   That's correct.

18        Q.   Okay.  Now you said that Laura Asaro

19   was aware of the reward money.  Did she request the

20   reward money?

21        A.   If I may just go back to my chart that

22   you're referring to?

23        Q.   Sure.

24        A.   I believe there was -- Ms. Asaro was

25   aware of the reward money at the time it was made.

56

1    It was public knowledge at the time.

2         Q.   Okay.  Did she request the reward

3    money?

4         A.   Not that I can recall or that's within

5    my report.

6         Q.   Okay.  So your recommendation -- When

7    you were asked about a recommendation about what

8    the investigator should have done and you said

9    further investigate, but you hadn't reviewed the

10   police reports, is that right, in this case?

11        A.   Correct.

12        Q.   So you don't know what the police did?

13        A.   Umm, not the full extent of their

14   investigation.

15        Q.   Or what they didn't do?

16        A.   Correct.

17        Q.   You've never spoken to a police officer

18   about Marcellus Williams?

19        A.   That's correct.

20        Q.   You've never spoken to any witness

21   about Marcellus Williams, is that right?

22        A.   That is correct.

23        Q.   The only people you've spoken to are

24   Mr. Williams' counsel, is that right?

25        A.   Correct.

1          Q.   Okay.  So your report is based on what
2   Mr. Williams' counsel gave you entirely, is that
3   correct?
4          A.   My report is based on the information
5   that I listed that was provided to me and then my
6   opinion on that information.
7          Q.   So Mr. Williams has paid you in this
8   case, is that right?
9          A.   I been retained by The Innocence
10  Project.
11         Q.   Okay.  And I have a number that as of
12  7/22 you made $1,200, is that correct?
13         A.   I haven't collected any funds at this
14  point.  That was probably the approximate number of
15  hours spent at that time.
16         Q.   How many hours do you think you spent
17  through today?
18         A.   Roughly 20 I would say.
19         Q.   Okay.  And what's your hourly rate?
20         A.   $300 an hour.
21         Q.   So 20 times 300 is what you're going to
22  be paid by The Innocence Project, is that right?
23         A.   Yes, correct.
24         Q.   Any other payments coming your way from
25  The Innocence Project?

58

1          A.   Not relative to this case, no.

2          Q.   Relative to other cases?

3          A.   I been retained on cases in the past or

4    other legislative work with The Innocence Project.

5          Q.   How many cases?

6          A.   I believe I can recall one case I was

7    retained by The Innocence Project in which there

8    was billing involved.

9          Q.   Okay.  Now how many cases when there

10   weren't billing involved?

11         A.   I don't recall any off the top of my

12   head.  I've been called to discuss cases and

13   sometimes I'm not retained.  So there was only one

14   case that I can recall that I was retained on by

15   The Innocence Project out of New York in which I

16   invoiced for.

17         Q.   To date how much do you think that you

18   are either owed or have been paid by The Innocence

19   Project?

20         A.   Just to clarify, when you say Innocence

21   Project, there's a variety of innocence projects

22   across the country so a variety of jurisdictions

23   that are not necessarily connected together.  So I

24   just want to clarify when I answer your questions.

25         Q.   Okay.  Earlier you said The Innocence

1    Project and you said New York Innocence Project.

2    So how much has The Innocence Project, the New York

3    Innocence Project paid you?

4         A.   I believe the only other case I had

5    invoiced and worked with that innocence project was

6    a case out of Texas and that would have been

7    invoiced probably two or three years ago.

8         Q.   Okay.  So it's fair to say you've

9    worked with The Innocence Project before?

10        A.   Yes, correct.

11        Q.   All right.

12             MR. CLARKE:  One moment, Your Honor.

13        Q.   Now if witnesses gave statements about

14   the victim's ID in this case and a type font ruler,

15   do you know anything about that?

16        A.   Umm, I know that there was -- there

17   were statements made by Mr. Cole I believe that

18   there was an assertion that Mr. Williams took an ID

19   and pocketbook and few other things if that's what

20   you're referring to.

21        Q.   Do you know anything about a type font

22   ruler, about a ruler that an editor would use for a

23   paper?

24        A.   I don't recall that.

25        Q.   So you have no idea about that?

60

1          A.    I don't recall that.

2          Q.    Okay.

3                MR. CLARKE:  Nothing further, Your

4    Honor.

5                THE COURT:  Thank you.

6                MS. MCMULLIN:  Just a brief couple of

7    questions.

8                THE COURT:  Redirect.

9                    REDIRECT EXAMINATION

10   BY MS. MCMULLIN:

11         Q.    Mr. Thompson, just to clarify a couple

12   of things that you just went through with the

13   Attorney General's Office.  Did you review the

14   motion to vacate that was filed in this case as

15   part of your analysis?

16         A.    Yes, I did, correct.

17         Q.    In that motion did you see quotes and

18   citations to other documents in the record

19   including police reports?

20         A.    Correct.  That's where I sourced a lot

21   of information from, including the request for the

22   St. Louis Post-Dispatch articles, from those

23   citations.

24         Q.    And for purposes of your analysis you

25   assumed that those quotes and citations to the

61

1    record documents were accurate, right?

2         A.   Yes, correct.

3              MS. MCMULLIN:  Nothing further, Judge.

4                   RECROSS EXAMINATION

5    BY MR. CLARKE:

6         Q.   Mr. Thompson, so you're going on faith

7    that the prosecuting attorney's office and

8    Marcellus Williams' counsel accurately summarized

9    the exhibits and trial transcripts in this case?

10        A.   In reviewing quotes directly from the

11   motion to vacate I would assume those quotes were

12   directly taken from the trial transcript or other

13   respective sources.

14        Q.   Didn't want to read it yourself?

15        A.   I assume that information was accurate

16   and true and was enough information for me to

17   provide the opinion I provided.  I'd be open to

18   review contradictory information to those direct

19   quotes that were in the motion to vacate if that's

20   the case.

21             MR. CLARKE:  Nothing further.

22             THE COURT:  Thank you.  Can this

23   witness stand down?  Oh.

24             MR. POTTS:  Yes, Your Honor.  I just

25   was going to stand up for the record.  No questions

62

1    on behalf of Mr. Williams.

2              THE COURT:  Thank you.

3              MS. MCMULLIN:  Thank you, Mr. Thompson.

4              THE COURT:  The witness can stand down.

5    You can go ahead and log out of Webex.

6              THE WITNESS:  Thank you.  Thank you for

7    the Court allowing me to testify remotely.

8    Appreciate that.  Thank you.

9              THE COURT:  Next witness.

10             MR. JACOBER:  Your Honor, at this time

11   the State would call Judge Joseph Green.

12             THE COURT:  Judge Green, you're an

13   officer of the Court, I don't think it's necessary

14   for me to swear you in but I will for the sake of

15   this record.

16                  JUDGE JOSEPH GREEN,

17   having been sworn, testified as follows:

18             THE COURT:  Would you please have a

19   seat in the witness chair.  When the witness is

20   comfortable you may inquire.

21             THE WITNESS:  Judge Hilton, is it okay

22   if I have this (indicating)?

23             THE COURT:  As long as there's nothing

24   illicit in there.

25             THE WITNESS:  There isn't.

1                   MR. JACOBER:  Your Honor, may I stand

2    here instead of sitting at counsel table?

3                   THE COURT:  The problem with that is we

4    have an overflow room and they can't hear you

5    without the microphone.  You're more than welcome

6    to keep your voice up.  I can move the podium over

7    if you would prefer.  Would you prefer the podium?

8                   MR. JACOBER:  I would prefer the podium

9    if possible, Judge, if it's not too much trouble.

10                  THE COURT:  Mr. Jacobs.

11                  (Podium positioned.)

12                  THE COURT:  You may inquire.

13                  MR. JACOBER:  Thank you, Your Honor.

14   Is that picking me up?

15                  THE COURT:  Yes.

16                  MR. JACOBER:  Okay.

17                       DIRECT EXAMINATION

18   BY MR. JACOBER:

19        Q.   Good morning.  Could you state your

20   name for the record, please?

21        A.   Joseph Green.

22        Q.   And you're an attorney, correct?

23        A.   I am.

24        Q.   You're licensed to practice law in the

25   State of Missouri?

64

1          A.    I am.

2          Q.    Anywhere else?

3          A.    United States Supreme Court, multiple

4    federal jurisdictions.

5          Q.    No other states besides Missouri?

6          A.    No.

7          Q.    How long have you been an attorney?

8          A.    Since 1988.

9          Q.    And presently you're employed as an

10   associate circuit court judge in St. Louis County,

11   Missouri, correct?

12         A.    I am.

13         Q.    How long have you been on the bench?

14         A.    Eight years.

15         Q.    Prior to taking the bench what type of

16   law did you practice?

17         A.    My practice had several different

18   areas.  About 50 percent of my practice was made up

19   of federal capital litigation, I did employment

20   law, and then I represented professionals such as

21   judges and attorneys and doctors and nurses and

22   accountants before various licensing boards when

23   complaints were filed against them.

24         Q.    And you've referenced that at some

25   point early in your career you were on the capital

65

 1    litigation unit for the Eastern Division of
 2    Missouri, is that correct?
 3              A.   That's correct.
 4              Q.   And you were also a public defender for
 5    a period of time?
 6              A.   Couple years before that, yes.
 7              Q.   During your time on the capital
 8    litigation team how many capital murders did you
 9    handle?
10              A.   Handle?
11              Q.   Yes.
12              A.   Somewhere between 30 to 40 I think.  We
13    were overwhelmed at that time.
14              Q.   And for purposes of the record, a
15    capital murder case is one in which the government
16    has to plead certain elements and the only
17    available punishment under Missouri law is either
18    life without the possibility of parole or
19    execution, is that correct?
20              A.   Yes.
21              Q.   While you were on the capital
22    litigation team did you represent Marcellus
23    Williams?
24              A.   No.
25              Q.   That was outside of the capital

1    litigation team?

2         A.   I had already left the capital

3    litigation office, was in private practice with my

4    own firm in St. Charles, and Chris McGraugh was a

5    member of another firm called Leritz, Plunkert &

6    Bruning.

7         Q.   How is it that you came to represent

8    Mr. Williams?

9         A.   Some conflict that I'm unaware of

10   occurred in the public defender system and then we

11   were called by, I'm not sure, I think it was

12   Barbara Hoppe but I'm not sure, to see if we would

13   take it as a contract case.

14        Q.   So you were paid by the State of

15   Missouri, not by Mr. Williams?

16        A.   That's correct.

17        Q.   And Mr. Williams had appointed counsel

18   because, to the best of your knowledge, he wasn't

19   able to retain his own counsel?

20        A.   He was indigent, yes.

21        Q.   During this period of time while you

22   were representing Mr. Williams did you have any

23   other capital murder cases that you were --

24             MS. SNYDER:  Your Honor, at this time

25   I'm going to object.  I don't believe this witness

67

1    should be permitted to testify to anything other

2    than claim five because this witness was not

3    disclosed prior to the addition of claim five and

4    that's what he's trying to testify to now.

5              MR. JACOBER:  Your Honor, Judge Green

6    was always on our witness list.

7              THE COURT:  I appreciate that, counsel.

8    Your objection is overruled.  Let's go ahead and

9    limit the inquiry.  You know how much time you

10   have.

11             MR. JACOBER:  I do, Judge, and I'm just

12   trying to lay the groundwork here.

13   BY MR. JACOBER:

14        Q.   Do you need me to repeat the question?

15        A.   No.  I had several death penalty cases

16   pending.

17        Q.   Did you have any that were pending

18   right around the same time where you were in trial

19   near in time to Mr. Williams' case?

20        A.   Yes, the Ken Baumruk case.

21        Q.   Tell us briefly what the Ken Baumruk

22   case was.

23        A.   Ken Baumruk was the gentleman who was

24   -- during divorce proceedings brought two weapons

25   into the courthouse, executed his wife, shot a

68

1    couple of bailiffs and the attorneys, took shots,

2    tried to kill the Judge, a shootout occurred on the

3    second floor I believe of this courthouse.  And

4    again, I was in private practice and because there

5    were public defenders in the courthouse they were

6    conflicted out so it was a contract case from the

7    Public Defender's Office.

8         Q.   Did that case take a significant amount

9    of your time?

10        A.   Of course it did.

11        Q.   Was it finished -- The Baumruk matter,

12   was it finished when you started the Marcellus

13   Williams matter?

14        A.   No.

15        Q.   Had a verdict been reached?

16        A.   A jury had returned a verdict of death

17   -- of not only guilt but also death.

18        Q.   When was the death sentence reached by

19   the jury?

20        A.   The month before we started Marcellus's

21   trial or a couple weeks.  I don't know, somewhere

22   between 30 days and three weeks.

23        Q.   During the Marcellus Williams trial

24   there was a recess wasn't there?

25        A.   There was.

69

1           Q.   And what was that recess for?

2           A.   Judge Seigel had asked Judge O'Brien if

3    he could borrow me for half a day so we could

4    finish the judgment and sentence in the Baumruk

5    case.

6           Q.   And did that require time for you to

7    prepare for that case as well?

8           A.   Yes.  Judge O'Brien suspended the

9    proceedings in Marcellus's case and then I had to

10   attend the proceedings in the Baumruk case.

11          Q.   Thank you.  So I want to make sure the

12   record is clear.  During Mr. Williams' trial you

13   were required to take a break and presumably

14   prepare at some point in time for a hearing in

15   another capital murder case, leave Mr. Williams'

16   case, and go deal with a hearing in another capital

17   murder case?

18          A.   Yes.

19          Q.   Did that make your time even more

20   precious than what it already was?

21          A.   Of course it did.

22          Q.   Did it prohibit you from preparing

23   Mr. Williams' trial in your typical fashion?

24          A.   Of course it did.

25          Q.   And I know it's been some time, Judge,

70

1    but if we could, kind of explain to the Court your

2    normal approach to defend a capital murder case.

3    How would you approach those cases?

4            A.   That's a --

5            THE COURT:  Mr. Jacober, you are well

6    aware that I have reviewed the entire contents of

7    the file, including Judge Green's verified motion

8    with respect to his testimony here today, in

9    addition to the PCR file and the testimony there,

10   so don't belabor this.

11           MR. JACOBER:  Okay.  Thank you, Judge.

12           A.   Am I to answer?

13           THE COURT:  No.  I'm sorry.  I just...

14   BY MR. JACOBER:

15           Q.   You don't have to answer that question.

16   I'll move on to something else.

17           There were two primary witnesses in

18   this case who weren't law enforcement, correct?

19           A.   Correct.

20           Q.   Henry Cole and Laura Asaro?

21           A.   Yes.

22           Q.   I want to focus a little bit on Henry

23   Cole.  Do you recall when you first received

24   handwritten notes that Henry Cole prepared in this

25   case?

71

1          A.   I don't recall independently but I've

2     been provided transcripts that helped refresh my

3     memory on that, and it appears that we received

4     them in April, the April before the June trial.

5          Q.   So pretty close in time?

6          A.   Yes.

7          Q.   Were you able to approach those notes

8     and do what you would normally do with notes from a

9     witness in preparation for the trial?

10         A.   No.

11         Q.   And what would you normally do?

12         A.   When we represent a client, or when I

13    say we I mean Chris McGraugh and I but also when I

14    had cases without Chris, every available defense as

15    is professional is available to my client, even

16    regardless of what conversations I may have with my

17    client.  Otherwise the client should be

18    representing themselves.  I'm the professional.  So

19    I let the evidence through my investigation dictate

20    what is the most credible defense to put before a

21    fact-finder.

22         Q.   And in this case were you able to

23    evaluate Mr. Cole's notes against what he had

24    previously provided in statements, what he

25    testified to in his deposition, and --

72

 1          A.   No, because I was also preparing for

 2     the Baumruk trial.

 3          Q.   We've now learned that there were

 4     bloody fingerprints at the crime scene that were --

 5               MS. SNYDER:  Objection, Your Honor.

 6     That misstates the record.  Nowhere in the record

 7     does it show there were bloody fingerprints

 8     anywhere.

 9               MR. JACOBER:  I believe Mr. Spillane

10     argued that this morning.

11               THE COURT:  Partial prints.  Just so

12     the record is accurate.

13               MR. JACOBER:  I'll correct my

14     statement.

15               THE COURT:  Thank you.

16     BY MR. JACOBER:

17          Q.   We've now learned that there were

18     partial bloody fingerprints --

19               MS. SNYDER:  Your Honor, objection.

20     No, we did not.  There are not bloody fingerprints

21     present in the record or the photographs at all.

22               THE COURT:  Yeah, the opening statement

23     was that there was glove smudges or something I

24     recall.  Is that what you're referring to?

25               MR. JACOBER:  That's what I'm referring

                              73

1  to.

2         MS. SNYDER:  Which is different than

3  blood of course.

4         THE COURT:  Correct.

5         MS. SNYDER:  Thank you, Judge.

6         THE COURT:  Sustained.

7  BY MR. JACOBER:

8     Q.  Judge Green, we've now learned that

9  there were smudges from a glove that were left

10 somewhere on the second floor of the victim's home.

11        MS. SNYDER:  Your Honor, I'm gonna

12 object.  I think there's a misunderstanding here

13 about how fingerprints are collected and not

14 smudges from a glove, as smudges being dusted for

15 prints.  The testimony about the glove would be

16 from the glass from the front door that was taken

17 out.

18        THE COURT:  Overruled.  I'll allow it.

19 Let's move on.

20    Q.  Were you aware of that during your

21 representation of Mr. Williams?

22    A.  About a glove print on a piece of

23 glass, no, I was not.  This is the first I'm

24 hearing of it.

25    Q.  Okay.  I'm sorry, I think I've confused

74

1    it and I didn't get a chance to finish my question

2    before it was objected to by the State.

3              We've now learned that there were

4    smudges allegedly from a glove on the second floor

5    of the victim's home.

6         A.   Okay.

7         Q.   Were you aware of those?

8         A.   No.  The information I had at the time

9    of trial that we received less than 60 days before

10   trial was that there were fingerprints that were

11   obtained from the second floor, and I wanted our

12   forensic examiner to have an opportunity to look at

13   them but they couldn't produce any record to that.

14   I also wanted to know what the procedure was for

15   destroying such evidence that was seized.

16        Q.   So whatever they were - And we don't

17   know 'cause they've been destroyed - they were

18   destroyed before they were provided to the defense?

19        A.   Right.  So all we have is the word of

20   whoever gave us that information.

21        Q.   In addition to that, those points of

22   evidence, there were other burglaries in this area

23   of St. Louis right around this time, is that

24   correct?

25        A.   Yes.

75

1          Q.   Did you have time to investigate those

2    burglaries?

3          A.   No.

4          Q.   Why not?

5          A.   There's only so many hours in a day.  I

6    had multiple cases I was working at the time,

7    including the Baumruk case.

8          Q.   I want to shift your focus a little

9    bit, Judge, and talk to you about the penalty phase

10   for Mr. Williams.

11              Were Marcellus Williams' prison records

12   used by the State of Missouri in the penalty phase,

13   at least in part to support the death penalty?

14         A.   Yes.

15         Q.   Did you attempt to get those prison

16   records in advance of the penalty phase?

17         A.   Yes.

18         Q.   In advance of the trial?

19         A.   Yes.

20         Q.   Were you able to do so?

21         A.   No.

22         Q.   Why not?

23         A.   Different reasons were given at

24   different times.  At first I believe the Department

25   of Corrections had said that they were sent to the

76

1    Justice Center here in St. Louis County.  I believe

2    - And I'm -- this is based in part on some of the

3    testimony that I just read in preparing for this

4    testimony - that Keith Larner had told me that --

5    'cause they at one time told me Keith -- that they

6    were assigned out to Keith and that Keith said he

7    had sent them back.  But while all that was going

8    on we were never given access to them.

9             Q.   Did Mr. Larner ever give you a copy of

10   them if he had checked them out?

11            A.   No.

12            Q.   Did you at some point in time -- I'm

13   sorry, let me back up.

14                 Based on your recollection of the trial

15   and the penalty phase, were those incarceration

16   records impactful to the jury in reaching a

17   sentence of death?

18            A.   Well I can't -- I don't know what was

19   in the minds of the jurors so I can't speak to

20   that.  But were they impactful to the case,

21   absolutely.

22            Q.   And why is that?

23            A.   Well it's a standard procedure,

24   especially for any -- when the government is

25   seeking death that they are going to -- in order to

77

1    obtain death they have to put on what are called

2    aggravating circumstances.  And the State in this

3    case was using the behavior of Marcellus in the

4    penitentiary as aggravating factors that would

5    promote an argument for future dangerousness.

6            From the defense standpoint what you

7    want to do is look at the underlying facts that

8    they're relying upon or the underlying incident

9    that they're relying upon for the future

10   dangerousness to see who was the initial aggressor

11   if there was an assault or what were the

12   surrounding circumstances that could be mitigating

13   with respect to the incident they are putting forth

14   before the jury.

15        Q.   So, in other words, you needed the

16   records to put them into context?

17        A.   Correct.

18        Q.   And you did not have the records in

19   advance of the penalty phase?

20        A.   Correct.

21        Q.   Or in advance of the trial at all?

22        A.   Correct.

23        Q.   Now at some point in time did you file

24   a motion and then an amended motion for

25   continuance?

78

1          A.   I did.

2               MR. JACOBER:  And, Your Honor, these

3    are at Tab 31 which contain the verified motion for

4    continuance, order denying the motion for

5    continuance, supplemental verified motion for

6    continuance, and order denying the supplemental

7    motion for continuance.

8          Q.   I'm going to show you --

9               MS. SNYDER:  Your Honor, at this point

10   can I have a continuing objection to this witness

11   testifying to anything outside of claim five so I

12   don't have to stand up every time?

13              THE COURT:  You may.  And just for the

14   record, the Court has taken judicial notice of the

15   entire contents of the underlying file, including

16   the records that you just handed Judge Green which

17   are part of that court file.

18              MR. JACOBER:  I just have one question

19   that I need to ask on this point, Judge.

20   BY MR. JACOBER:

21         Q.   During the argument on these motions

22   the record reflects that you made reference, as you

23   do in the motion, to your inability to get the

24   incarceration records of Mr. Williams, is that

25   correct?

79

1          A.   Correct.

2          Q.   Do you recall if Mr. Larner at that

3    time said, I have them, you can -- here they are?

4          A.   I don't have a recollection of that.

5          Q.   And, in fact, you know you didn't get

6    them before trial?

7          A.   That I do know.

8          Q.   Were you shocked to learn at the

9    sentencing hearing that the State actually had

10   those records and used them as evidence?

11              MS. SNYDER:   Objection, relevance, as

12   to the witness's state of mind.

13              THE COURT:   Sustained.   Can you turn

14   your microphone on though, please.

15         Q.   When the State used those records at

16   the sentencing hearing were you able to effectively

17   put those records into context?

18         A.   No.

19         Q.   Is there anything else that was going

20   on at this time that impacted your ability to

21   provide Mr. Williams with a defense?

22         A.   There was a lot going on during that

23   period of time.   Are you talking professionally,

24   personally?

25         Q.   Well let's break them down.

1    Professionally first.

2            A.   Yeah.  As I say, and as I made the

3    Court aware at the time, this murder had happened

4    several years beforehand but there was a flurry of

5    activity that was occurring just months before the

6    trial with -- especially in the forensic area that

7    we were just learning for the first time even

8    though the investigation had supposedly been

9    concluded years ago.  And so given all that new

10   information, especially the forensic information

11   that late in the game, while I'm also preparing for

12   another death penalty case in the same courthouse

13   that had a national impact on how we run security

14   in courthouses, now limited the amount of time to

15   dedicate to this case.

16           Q.   How much did it limit your time?

17           A.   I can't quantify it.  I just know

18   there's only so many hours in a day, there's only

19   so many days in the week, and if I -- especially

20   during April and May when all this was occurring,

21   and I was trying the Baumruk in May, I'm preparing

22   for that one also while also trying to, you know,

23   raise a family and take care of day-to-day

24   activities, you know.  So no matter what I did some

25   aspect of either case was going to suffer because

81

1   of the time.

2          Q.   And did Mr. Williams' case suffer as a

3   result of that timing?

4          A.   I believe it did.

5          Q.   Do you believe that you were able to

6   effectively represent him in this case?

7          A.   I don't believe he got our best.

8          Q.   Do you believe he got what you would

9   think is a constitutionally sufficient defense?

10              MS. SNYDER:  Objection, Your Honor.

11   Calls for a legal conclusion.

12              THE COURT:  Sustained.

13         Q.   Are you satisfied that the job you

14   performed for Mr. Williams was the best you could

15   do?

16              MS. SNYDER:  Objection.  Relevance.

17              THE COURT:  Sustained.

18              MR. JACOBER:  One second, Your Honor.

19   BY MR. JACOBER:

20         Q.   I do want to go back to one issue.

21   During the trial do you recall anyone touching the

22   murder weapon, the knife, without wearing proper

23   protective gloves?

24         A.   I don't.

25         Q.   You don't recall that one way or the

82

1    other?

2          A.   I don't.

3          Q.   Do you recall if gloves were used

4    during the trial?

5          A.   I don't.

6               MR. JACOBER:  That's all I have, Judge.

7               THE COURT:  Thank you.  Cross.

8               MS. SNYDER:  Yes, Your Honor.

9                    CROSS EXAMINATION

10   BY MS. SNYDER:

11         Q.   Judge Green, I think it's fair to say

12   that you were a very experienced criminal defense

13   attorney, is that right?

14         A.   I have my good days and bad days.

15         Q.   I know you said you handled 30 to 40

16   capital cases while you were with the capital unit

17   in the public defender system.  But overall,

18   regardless of what system you were with, how many

19   capital cases did you try?

20         A.   About 25 I think.

21         Q.   And for this particular case for

22   Mr. Williams, you were there, you filed pretrial

23   motions, you made objections, you had the trial, is

24   that right?

25         A.   Well, yeah, all that's right.

1           Q.   And the defense also called witnesses
2     and had hired experts, is that right?
3           A.   We called witnesses, we hired experts,
4     but we didn't call our expert.
5           Q.   Okay.  And this trial happened of
6     course over 20 years ago?
7           A.   Yes, over half -- or a quarter century.
8           Q.   So if there are things in the trial
9     transcript or in your testimony from the PCR or in
10    your affidavit that are different than what you
11    remember today would your memory then have been
12    more accurate?
13          A.   Yes, it would have been.
14          Q.   You were asked a number of questions
15    about your investigation into this case, and one of
16    those was about whether you had time to investigate
17    other burglaries in the University City area.  Do
18    you remember that?
19          A.   Yes.
20          Q.   Do you also remember that witness Henry
21    Cole had said that your client, Mr. Williams, had
22    committed several burglaries in that area?
23          A.   I just read the transcripts.  Umm, I
24    remember the robbery.  I don't remember -- Oh, I
25    think I do remember burglaries, yes.  Yes.  Okay,

84

1  yes.

2      Q.  Okay.  You were also asked some

3  statements about what happened during trial, very

4  few, but let me ask you this as a trial attorney.

5  There's things you read on paper and that can be

6  different than how a person appears on the stand,

7  is that fair to say?

8      A.  Sure.  We as judges, all the time we

9  have to -- if we're determining the credibility of

10  a witness we have to take into account their

11  demeanor.

12      Q.  So I want you to assume that everything

13  that Henry Cole and Laura Asaro said is true.  I

14  know you probably don't agree with that but we're

15  going to assume that for right now, okay?

16      A.  Okay.

17      Q.  For the things that Henry Cole was

18  testifying to, most of what he said came from

19  Marcellus Williams, right?

20          MR. JACOBER:  I'm going to object to

21  the form of the question.  It's a hypothetical

22  question.

23          MS. SNYDER:  Your Honor, this

24  particular one is not a hypothetical.

25          THE COURT:  Overruled.

1        Q.   Most of the things that Henry Cole said

2   he attributed to hearing directly from Marcellus

3   Williams, is that right?

4        A.   I don't know how you define most, but

5   his position was, and why he wanted the reward

6   money was because of what he said Marcellus told

7   him.

8        Q.   So if Henry Cole says something on the

9   witness stand, like calls something a sweater that

10  maybe someone else would call a zip-up hoodie,

11  that's information that Marcellus Williams would

12  have told him, assuming Henry Cole is telling the

13  truth, right?

14       A.   Say that again.  I don't understand the

15  question.

16       Q.   In other words, any discrepancies that

17  might have come out of Henry Cole's mouth --

18       A.   Okay.

19       Q.   -- if he's telling the truth would be

20  discrepancies that really came from Marcellus

21  Williams?

22       A.   Not necessarily.

23       Q.   Okay.  Now for Laura Asaro, a number of

24  things that she testified to were actually her

25  direct observations, right?

86

1        A.   Not necessarily.

2        Q.   Well, like when she claimed that she

3   saw the purse that had the victim's ID inside the

4   defendant's car, that's something she said that she

5   saw herself, right?

6        A.   Well that's in the record, yes.

7        Q.   Okay.  And sometimes Laura Asaro would

8   testify to things that she claimed Marcellus

9   Williams had told her, right?

10       A.   Yes, she did do that.

11       Q.   Okay, same point there.

12            You were asked questions about Missouri

13   Department of Corrections records.  Do you remember

14   those questions?

15       A.   Um-hum.

16       Q.   Is that a yes?

17       A.   I'm sorry.  Yes.  Broke my own rule.

18   Yes.

19       Q.   So my understanding of the record is

20   that there were two binders that the Missouri

21   Department of Corrections said they sent to St.

22   Louis County Justice Center.  Do you remember that

23   detail?

24       A.   Yeah, I do remember -- I think I read

25   that in one of the transcripts, yes.

87

1         Q.   And that ultimately Mr. Larner, the
2    prosecutor, had received some of those records, one
3    binder full, do you remember that?
4         A.   That I do not remember.
5         Q.   But if it's in the transcript it's in
6    the transcript, right?
7         A.   Yeah.  I'm not going to dispute the
8    transcript.
9         Q.   And ultimately what Mr. Larner himself
10   had received was disclosed to the defense, right?
11        A.   No, 'cause there's a lot of things that
12   was not disclosed to defense during that trial by
13   Mr. Larner.
14        Q.   But you again will defer to the
15   transcript?
16        A.   I will.
17        Q.   And you understand that these
18   ineffective assistance of counsel claims that are
19   being discussed, it's already been denied during
20   the PCR hearing for this case years ago, right?
21        A.   Right, I understand that.
22        Q.   And the Supreme Court has already
23   affirmed that denial, is that fair to say?
24        A.   They did.
25        Q.   Do you also recall saying at all during

88

1    trial - And this would be outside of the presence

2    of the jury - I'm not criticizing the State for the

3    late production of these things.  In fact, Keith

4    came to the case late and I'm not criticizing them,

5    we got them at this time, I'm just laying it out as

6    a fact.  If anything, they should be commended for

7    being so thorough.  That would be on page 93.  Do

8    you remember saying that at all?

9         A.   I do not.

10        Q.   You were asked questions about

11   fingerprints and fingerprint samples from the

12   residence, do you remember that?

13        A.   Yes.

14        Q.   Okay.  Do you have any independent

15   recollection at all of bloody fingerprints anywhere

16   in this case?

17        A.   Bloody?  Independent, no.  Independent,

18   no.

19        Q.   So it's possible -- Well you know that

20   the house was dusted for fingerprints in some

21   locations, right?

22        A.   Yes.

23        Q.   And you know that there were partial

24   lifts found in certain locations, right?

25        A.   Yes.

1          Q.   All right.  And then isn't it also true

2     that you wanted Laura Asaro's prints to be compared

3     to that, right?

4          A.   Right.

5          Q.   And Mr. Larner represented on the

6     record that he had taken Ms. Asaro's prints and had

7     that done, right?

8          A.   He may have.  I don't recall that.

9          Q.   During trial you weren't the one who

10    cross-examined Ms. Asaro or Mr. Cole, is that

11    correct?

12         A.   At trial Chris McGraugh cross examined

13    Mr. Cole, that's correct.

14         Q.   I have no further questions.

15         THE COURT:  Thank you.  How do you want

16    to play this?  You've also listed him as a witness.

17         MR. POTTS:  I'm happy to jump in right

18    now and I'm happy to go round-robin, if that makes

19    sense, Your Honor.

20         THE COURT:  It does.

21         MR. POTTS:  I just have a few

22    questions.

23         THE COURT:  You may proceed.

24                    CROSS EXAMINATION

25    BY MR. POTTS:

90

1          Q.    Good morning, Judge Green.

2          A.    Morning.

3          Q.    The Baumruk case was a pretty notorious

4    case at the time wasn't it?

5          A.    All capital murder cases are notorious.

6          Q.    Yeah, but especially in this

7    courthouse.  It would be hard to find someone who

8    was working in this courthouse who wasn't aware of

9    it, right?

10         A.    We were appointed because all the

11   public defenders were excused.

12         Q.    Before Mr. Williams' trial you made the

13   prosecution aware that you were essentially double

14   booked between the Baumruk case and the Williams

15   case, right?

16         A.    Yeah.

17         Q.    When you decided to ask for a

18   continuance did you approach the prosecution before

19   you filed your motion?

20         A.    Typically that would be my practice.

21         Q.    Yeah.  Did the prosecution voluntarily

22   agree to that continuance?

23               MS. SNYDER:  Your Honor, at this point

24   I'm going to object to relevance as to what's in

25   the motion.

91

1            THE COURT:  Sustained.

2        Q.  As you were barrelling towards trial in

3    those last few months was the prosecution providing

4    the information you needed in a cooperative and

5    timely fashion?

6            MS. SNYDER:  Objection to the

7    characterization.  Calls for improper conclusion.

8            THE COURT:  I'll allow it.  Overruled.

9        A.  As I said in the motion for the

10   continuance, there was a flurry of activity.  And

11   if the record says -- You know, I wasn't there to

12   criticize the actions of my adversaries.  I just

13   wanted to make sure that Mr. Marcellus was given a

14   fair trial consistent with his constitutional

15   rights under Missouri and the United States.

16           The prosecution always doesn't have

17   control over how they receive evidence.  There's

18   other law enforcement agencies that are involved

19   and I recognize that.  But it still prevented us I

20   believe, the defense team, from being adequately

21   prepared to defend him like we typically could do.

22       Q.  A few minutes ago I think you testified

23   - And I wrote this down - that there were a lot of

24   things that weren't disclosed to the defense by

25   Mr. Larner.  Could you explain that, please?

92

1           A.   Well, for example, the medical records,

2    the medical records of Cole that there -- was in

3    the depositions, and we were arguing over that, we

4    were making motions for that.  That goes obviously

5    to his credibility, his ability to remember,

6    whether or not he was suffering delusions or

7    whatever.  But we were never able to investigate

8    that.

9           The forensic evidence with respect to

10   -- We may have been told by Mr. Larner what things

11   happened, but that's not how it's done.  We're

12   allowed to do our own independent investigation

13   when it comes to forensic evidence.  We didn't have

14   that opportunity in this case.

15          There was news statements that Mr. Cole

16   made after we did the depositions that Mr. Larner

17   tried to get in that he didn't disclose to us until

18   at trial.  That's not even an exhaustive list.

19          I just know that we were doing our best

20   in trying to meet the evidence in the late time

21   period it was being given to us.

22          Q.   Thank you.  And during this -- Just

23   very roughly speaking, at this point in your career

24   how experienced were you with forensic evidence,

25   using it at trials?

93

1        A.   Pretty experienced.  Marcellus's case

2    was probably my -- As I said, I had already handled

3    30 or 40 death penalty cases before his.  At that

4    time I believe I was going around the country

5    giving seminars with a doctor from Emory University

6    called Diane Lavett in DNA evidence.  But what they

7    used back then is completely different than what

8    they use today.  I was giving seminars in front of

9    the Florida Criminal Bar Association, the Colorado

10   Criminal Bar Association, Missouri Public

11   Defender's Office.

12        Q.   And at that time were you aware of the

13   risk of contamination of forensic evidence as a

14   defense attorney?

15             MS. SNYDER:  Objection.  Relevance.

16             THE COURT:  Counsel?

17             MR. POTTS:  This goes to the ungloved

18   claim, Your Honor.

19             THE COURT:  I'm sorry?

20             MR. POTTS:  This is going directly to

21   the ungloved claim.  If you give me little bit of

22   leeway here I promise it will make sense.

23             THE COURT:  Sustained.

24   BY MR. POTTS:

25        Q.   Judge Green, at any time before this

1    trial did the prosecution tell you that they had

2    been handling the murder weapon without gloves?

3           A.   No.

4           Q.   At any time before this trial did the

5    prosecution tell you that investigators had been

6    handling the murder weapon without gloves?

7           A.   No.

8           Q.   As an experienced defense attorney were

9    you aware of Arizona vs Youngblood?

10          A.   Yes.

11          Q.   If you had learned that the prosecution

12   was handling the murder weapon without gloves is

13   that the type of argument that you would have

14   raised on behalf of your client?

15               MS. SNYDER:  Objection.  Relevance and

16   speculation.

17               THE COURT:  Sustained.

18               MR. POTTS:  No further questions.

19               THE COURT:  Thank you.  Recross.

20               MS. SNYDER:  No, Your Honor.

21               THE COURT:  No cross?

22               MS. SNYDER:  No.

23               THE COURT:  Any redirect?

24               MR. JACOBER:  No redirect, Your Honor.

25               THE COURT:  Judge Green, I have one

95

 1   question.  Difficult question.

 2                       EXAMINATION

 3   BY THE COURT:

 4        Q.   You were a contract attorney through

 5   the Public Defender's Office.  Knowing that you had

 6   another high profile case that you had to get

 7   prepared for, could you have rejected or not

 8   accepted that contract?

 9        A.   Not -- I didn't know the trial setting

10   at the time that I took the contract.  So I had no

11   way of knowing that the two would be scheduled

12   right behind each other like that at the time I

13   took the contracts.

14        Q.   Okay.  And just so that I'm clear, upon

15   your entry of appearance you didn't file a motion

16   for continuance at that time.  Did you know when

17   the Baumruk case was set when you accepted this?

18        A.   I don't remember.

19        Q.   Okay.  That's all.

20             THE COURT:  Any questions based upon

21   mine?

22             MR. POTTS:  No, Your Honor.

23             MS. SNYDER:  No, Your Honor.

24             THE COURT:  Thank you.  Can this

25   witness stand down?

                          96

1          MR. JACOBER:  Yes, Your Honor.

2          THE COURT:  Thank you.  This is

3  probably a great time to take our morning recess.

4  It is 11:45ish.  So let's come back at five after.

5          (A recess was taken.)

6                        ***

7          (The proceedings returned to open

8  court.)

9          THE COURT:  We're back on the record in

10  Cause Number 24SL-CC00422.

11          Again, I apologize, I sound like a

12  broken record.  Several members of the public have

13  come in and come out.  I just want to make sure

14  that everybody understands the Court's ruling with

15  respect to recording these proceedings or taking

16  photographs.  I know that it may seem onerous, but

17  for the integrity of these proceedings that is the

18  ruling of the Court.  So please refrain from

19  recording or taking photographs with those

20  marvelous little computers that we all own.  If

21  someone sees you from this office or otherwise you

22  will be asked to leave.  So please make sure you

23  turn your phones off, there's no recording allowed.

24          With that said, Mr. Jacober, you want

25  to call your next witness.

97

1               MS. SNYDER:  Judge, if I may, I would

2    like to ask the Court to please take judicial

3    notice of the CaseNet docket entries in State v.

4    Kenneth Baumruk, 2198R01736.

5               THE COURT:  Any objection?

6               MR. JACOBER:  No objection, Your Honor.

7               THE COURT:  The Court will take

8    judicial notice of the Kenneth Baumruk case.

9               MR. JACOBER:  Your Honor, at this time

10   the State would call Dr. Charlotte Word.

11              THE COURT:  Dr. Word, good morning.

12   Could you raise your right hand for me.

13                    DR. CHARLOTTE WORD,

14   having been sworn, testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. JACOBER:

17       Q.   Good morning, Dr. Word.

18       A.   Good morning.

19       Q.   How are you currently employed?

20       A.   I'm currently self-employed as a

21   consultant.

22       Q.   And what is your educational

23   background?

24       A.   I have a bachelor's of science in

25   biology from the college of William & Mary in

98

1   Virginia.  I have a Ph.D. in molecular biology with
2   specialities in immunology and -- Sorry.  I said
3   that wrong.  A Ph.D. in microbiology with
4   specialties in molecular biology and immunology
5   from the University of Virginia.  I did
6   post-graduate fellowship work at the University of
7   Texas Southwestern Medical School in Dallas, Texas
8   for approximately three and a half years, again in
9   the areas of molecular biology and immunology.  And
10  I was on the faculty of the University of New
11  Mexico School of Medicine for approximately five
12  and a half years.
13          Q.   Thank you, Dr. Word.  I'd like to
14  briefly go through your work history as well.
15  After you left the faculty at University of New
16  Mexico School of Medicine where did you go next?
17          A.   I moved to Germantown, Maryland and I
18  was employed by a new private lab doing DNA testing
19  called Cellmark - C-E-L-L-M-A-R-K - Diagnostics.
20          Q.   And I think you've already kind of
21  answered this, but what did Cellmark Diagnostics
22  do?
23          A.   It was a company that was doing DNA
24  testing for paternity, biological relationship, and
25  for criminal cases, so any forensic application of

99

1    DNA.

2              Q.    And what did you do while you were

3    employed at Cellmark Diagnostics?

4              A.    One of my major responsibilities was to

5    review the work that was being done by the analysts

6    in the laboratory, review their testing, review

7    their data, and see that things were done according

8    to our standard operating procedures and co-sign

9    the reports with them stating the results and

10   conclusions of the testing.  I was also responsible

11   for going to court and testifying to those

12   findings.

13             I was responsible for some of the

14   training in the laboratory, for managing a number

15   of contracts that we had for doing testing in

16   various types of situations.  I was responsible for

17   some of the validation studies that we did bringing

18   on new DNA tests and whatever other job

19   responsibilities that were necessitated.

20             Q.    Thank you.  Are you being paid to be

21   here today?

22             A.    I charge a consulting fee, yes.

23             Q.    And what is your hourly rate?

24             A.    $300 an hour.

25             Q.    who's paying you for your appearance in

100

1    this matter and your work in this matter?

2         A.   The Innocence Project I believe.

3         Q.   Do you have an estimate of how much

4    time you've already billed in this matter?

5         A.   I don't recall.  I certainly have it on

6    a computer, but I have no idea.

7         Q.   Have you testified -- You mentioned

8    that one of your job duties at Cellmark was to

9    testify in court.  Have you testified before before

10   a court?

11        A.   Yes, I have.

12        Q.   If you could estimate the number of

13   times?

14        A.   Well over 300.

15        Q.   And in those well over 300 - I'm not

16   asking for a breakdown of cases - but can you

17   generally break down between your testimony for the

18   prosecution or for the defendant in a criminal

19   case?

20        A.   The bulk of my testimony in criminal

21   cases was while I was working at Cellmark

22   Diagnostics and most of that was for the

23   prosecution.

24        Q.   And have you also done -- Have you also

25   testified in other exoneration cases?

1          A.   Yes.  I've testified in other

2     post-conviction cases and in civil cases that have

3     resulted after the exonerations in those cases as

4     well.

5          Q.   Do you have an estimate of how many of

6     those cases you testified in?

7          A.   I actually haven't thought about it.  I

8     don't know, 10, 20 maybe.  I don't know.

9          Q.   In all of those -- Strike that.

10              In those cases did you testify for the

11     -- either the person seeking an exoneration,

12     seeking post-conviction review, or who had been

13     exonerated, or did you testify for the government?

14          A.   I believe most of those times it's been

15     on behalf of the defendant or the former defendant.

16     I don't track this because who I work for is

17     negligible.  I work for the science.  So I don't

18     keep those numbers.  I don't know the answers.

19          Q.   Thank you.  Separate from your work as

20     an expert who's testified in court, have you ever

21     done work on any forensic DNA commissions or

22     national studies or anything of that nature?

23          A.   Yes, sir.

24          Q.   Could you tell us about that?

25          A.   Yes.  In the late nineties I was on a

1    working group under Janet Reno's National

2    Commission of the Future of DNA that met to go over

3    issues on post-conviction DNA testing and was one

4    of the co-authors of a publication that came out of

5    the National Institute of Justice regarding

6    post-conviction testing recommendations for the

7    community.

8             And then in, I guess it was right

9    before COVID, so the 2016, '17, '18, '19, somewhere

10   in there, there was another national commission on

11   forensic sciences that I also participated in

12   several of those working groups writing documents

13   to provide recommendations and advisory to the

14   Attorney General of the United States regarding DNA

15   testing in federal labs and was on a number of

16   those panels.  The group I was in I believe was

17   called Reporting and Testimony working group.

18        Q.   And The National Commission on the

19   Future of DNA Evidence, that ran from 1998 to 2000?

20        A.   Yes, sir.

21        Q.   The work was completed in 2000?

22        A.   That's my recollection, yes.

23        Q.   And it resulted in multiple

24   publications?

25        A.   Yes.  There were a number of working

103

1    groups each working on their own project and

2    publication.

3        Q.   What was the purpose of this

4    commission?

5        A.   My understanding it was formed by

6    Attorney General Janet Reno under the Bill Clinton

7    administration to look at what was going on in the

8    world of DNA and how it impacted the judicial

9    system based on the number of exonerations that had

10   come out in the early to mid 1990's.

11       Q.   And the working group that you

12   referenced, was it called The Post-Conviction DNA

13   Testing:  Recommendations for Handling Requests?

14       A.   That was the name of the publication

15   that came out of our working group.  I think we

16   were just called a post-conviction working group.

17       Q.   But that's the publication?

18       A.   Yes, sir.

19       Q.   And you were a co-author of that

20   publication?

21       A.   I was.  I was the DNA expert on that

22   and the laboratory representative on that working

23   group.

24            MR. JACOBER:  May I approach the

25   witness, Your Honor?

104

1                    THE COURT:  You may.

2          Q.   Dr. Word, I'm handing you a document

3    that is captioned Post-Conviction DNA Testing:

4    Recommendations for Handling Requests.  Are you

5    familiar with that document?

6          A.   Yes, I am.  This is the document that I

7    was one of the co-authors of.

8          Q.   And was this document published by the

9    National Institute of Justice?

10         A.   Yes, sir, it was.

11         Q.   And distributed nationally as far as

12   you're aware?

13         A.   It is on their website.  You can

14   download it any day.

15         Q.   Now referencing Attorney General Janet

16   Reno.  In the foreword there's a message from the

17   attorney general and at least in part it says --

18                    MS. PRYDE:  Objection.  Hearsay, Your

19   Honor.  Mr. Jacober hasn't entered this into the

20   record.

21                    THE COURT:  Sustained.

22                    MR. JACOBER:  Your Honor, we would move

23   for admission of the Post-Conviction DNA Testing:

24   Recommendations for Handling Requests as

25   Exhibit 80, Your Honor.

                              105

1                      THE COURT:  Any objection?

2                      MS. PRYDE:  No objection to its being

3      entered into the record, Your Honor.

4                      THE COURT:  Thank you.  Exhibit 80 will

5      be part of the record.

6      BY MR. JACOBER:

7            Q.   And actually, while we're dealing with

8      exhibits, Dr. Word, you provided an affidavit in

9      this matter, is that correct?

10           A.   Uh, yes.

11           Q.   And your affidavit is dated May 31st of

12     2018, is that correct?

13           A.   I know it's 2018.  I don't recall the

14     date but...

15           Q.   Attached to your affidavit is Exhibit

16     A, that being your curriculum vitae?

17           A.   Yes, sir.

18           Q.   And at least as of the time that you

19     signed your affidavit was that CV a true and

20     correct copy of your CV?

21           A.   Yes, sir.

22                     MR. JACOBER:  Judge, we would also move

23     for admission of the affidavit of Dr. Word and the

24     CV which is attached.  That is in the record

25     already as Exhibit 1.

106

 1                THE COURT:  Tab 1, Exhibit 13, the CV

 2    will be received.

 3                MS. PRYDE:  Your Honor, for

 4    clarification, does this also include her updated

 5    report from August 15th?

 6                MR. JACOBER:  Not yet.

 7                MS. PRYDE:  Thank you.

 8    BY MR. JACOBER:

 9        Q.   Now there were other -- As you

10    reference, there were other working groups and

11    other reports prepared as part of this commission

12    formed by Attorney General Reno, correct?

13        A.   Yes, sir.

14                MR. JACOBER:  May I approach the

15    witness, Your Honor?

16                THE COURT:  You may.

17                MR. JACOBER:  Thank you.

18                THE COURT:  Is this 81?

19                MR. JACOBER:  It will be 81, Your

20    Honor.

21    BY MR. JACOBER:

22        Q.   Dr. Word, I've handed you a document

23    captioned The Future of Forensic DNA Testing.  Was

24    this prepared by the working group that you were

25    on?

                            107

 1          A.   No, it was not.  It was prepared, as

 2     the title says, by the research and development

 3     working group.

 4          Q.   And have you reviewed this document?

 5          A.   I have briefly, yes.

 6          Q.   Do you agree with the statements that

 7     are made in this document?

 8          A.   Certainly to the extent that they were

 9     making predictions of what was going to likely

10     happen in the next two to ten years in DNA testing

11     they were certainly appropriate.

12          MR. JACOBER:  Judge, we would move for

13     admission of The Future of Forensic DNA Testing as

14     Exhibit 81.

15          MS. PRYDE:  Your Honor, we have several

16     objections.

17          THE COURT:  Okay.

18          MS. PRYDE:  The first is a lack of

19     foundation.  The second is a lack of authenticity.

20     The third is relevance.  The fourth is hearsay.  As

21     the witness has testified, she had nothing to do

22     with these experts, and they don't meet the

23     definition of a learned treatise.

24          THE COURT:  Did the witness rely on

25     this information in forming her opinions?

1          MR. JACOBER:  I thought I asked her

2     that but I think I missed that question on my

3     outline.

4          MS. PRYDE:  That was not disclosed to

5     the State, Your Honor.

6          THE COURT:  Objection as to lack of

7     foundation sustained.

8          MR. JACOBER:  We'll move forward.

9          MS. PRYDE:  Thank you, Your Honor.

10          MR. JACOBER:  Your Honor, at this time

11     we would move for Dr. Word to be recognized as an

12     expert and to be allowed to provide her expert

13     testimony in this matter.

14          MS. PRYDE:  Your Honor, we would just

15     request that Mr. Jacober confirm what she's being

16     certified as an expert in.

17          THE COURT:  I can't predict what

18     questions Mr. Jacober is going to ask, but I will

19     find that she is qualified to testify as an expert

20     in these proceedings.

21          MR. JACOBER:  Thank you, Your Honor.

22     BY MR. JACOBER:

23          Q.  And Dr. Word, to address that last

24     issue, are you an expert in the forensic handling

25     of biological samples in DNA testing?

109

1        A.    Certainly as it applies to any testing

2    of biological fluids and generating DNA, yes.

3            MR. JACOBER:  To make the record clear,

4    Judge, we would move for her to be admitted as an

5    expert in forensic handling of biological samples

6    in DNA testing.

7            MS. PRYDE:  And, Your Honor, we would

8    object to the instance of -- the term handling.  It

9    was -- It's our understanding that Dr. Word does

10    DNA testing in the lab, in laboratory conditions,

11    as in she has a sample, she tests it, and not

12    necessarily handling, which might confuse the

13    issue, because one of the issues in this case, as

14    Your Honor is well aware, is the use and -- the use

15    and handling of evidence in the field.

16            In addition -- So strike that.  I'm

17    sorry.  We just request that handling be clarified

18    for the sake of the record.

19            THE COURT:  Mr. Jacober, I agree.

20    Could you clarify.

21    BY MR. JACOBER:

22        Q.    Yes.  Dr. Word, are you an expert in

23    how the forensic handling -- Strike that.

24            Are you an expert in how evidence

25    should be collected and maintained --

110

 1              MS. PRYDE:  Objection, Your Honor.

 2              MR. JACOBER:  -- throughout --

 3              THE COURT:  Let him finish his

 4     question.

 5              MR. JACOBER:  Your Honor, I can't even

 6     finish my question without an objection.

 7              THE COURT:  Thank you.

 8        Q.   Are you an expert in how evidence

 9     should be collected in criminal cases to maintain

10     the integrity of the DNA evidence that may be on

11     that evidence?

12        A.   Yes.

13              MR. JACOBER:  Judge, we would move for

14     her to be admitted as an expert in that area.

15              MS. PRYDE:  Objection, Your Honor.

16     There's been no foundation for that series of

17     expertise.  We've heard from Dr. Word.  She clearly

18     has extensive knowledge and expertise in the use

19     and delineation of DNA testing and how that process

20     is taken through in the lab.  We've heard no

21     testimony from Dr. Word about whether or not she

22     has any experience or qualification in the

23     preparation of samples for being taken into the

24     lab, whether or not she's ever talked to law

25     enforcement agencies about these sorts of issues as

111

1    far as trainings, et cetera.  We would just object

2    that we're putting the cart before the horse, Your

3    Honor.

4              THE COURT:  And that will be subject to

5    cross-examination.  I'll allow some leeway here,

6    counsel.

7              MR. JACOBER:  Thank you.

8              THE COURT:  Objection is overruled.

9              MR. JACOBER:  I'm sorry?

10             THE COURT:  I'm making the record clear

11   that the objection is overruled.

12             MR. JACOBER:  Thank you, Judge.

13   BY MR. JACOBER:

14        Q.   And Dr. Word, have you testified as an

15   expert across the country in forensic DNA testing?

16        A.   I have, yes.

17        Q.   In fact, have you ever not been

18   qualified as an expert when you been presented as

19   one?

20        A.   I have not.

21        Q.   As part of your testimony through these

22   300-plus cases did you provide testimony as to the

23   preservation of biological samples for DNA testing?

24        A.   In many cases, yes.

25        Q.   Now I think we should start kind of at

112

1    the beginning and not deal with the preservation

2    just yet just to get a background for the Court.

3    What is DNA?

4            A.    DNA stands for Deoxyribonucleic Acid.

5    It's the genetic material that's present in each of

6    the nucleated cells of our body.  It makes us

7    human, gives us all of our characteristics.  It's

8    inherited from our parents.  Half of our DNA comes

9    from our mother, half comes from our father.  And

10   there are portions of the DNA that are highly

11   variable in the population, and these are regions

12   that we focus in on for forensic DNA testing

13   because they allow us to differentiate the DNA from

14   one individual to another.

15           Q.    Where can you find DNA on an

16   individual?  I think you answered but I want to

17   make sure we're clear.

18           A.    Pretty much any bodily fluid or any

19   tissue.  So saliva, semen, blood, perhaps sweat,

20   tissue, fingernail, skin cells, bone.  Any portion

21   of our body.

22           Q.    I want to focus specifically on skin

23   cells.  Do we have DNA on our hands?

24           A.    Yes, we do.

25           Q.    Would my DNA on my hand as I stand here

113

1    right now be just my DNA?

2           A.    It depends.  It might be just yours or

3    it may be DNA from other individuals that you been

4    in contact with or items that you have handled that

5    other individuals have been in contact with.

6           Q.    So if I pick up this pen and someone

7    else had used this pen I could have their DNA on my

8    hand as well as my DNA and maybe DNA that they got

9    from touching something else?

10          A.    Certainly.  Research studies have shown

11   any of those variables are possible and have been

12   demonstrated.

13          Q.    Now is this kind of DNA commonly called

14   touch DNA?

15          A.    Yes.

16          Q.    Is that a nomenclature or designation

17   that you necessarily agree with?

18          A.    I agree with the use of the term that

19   the type of DNA recovered from a handled item is a

20   little bit different than the type of DNA we get

21   from nucleated cells and in that context it's

22   appropriate to call it touch DNA.

23                There is a movement to stop using that

24   word in the field because the word touch implies an

25   activity that would get associated with the DNA

114

1    that may not necessarily be associated with that

2    DNA.  I don't have to touch something to deposit

3    DNA on an item.  And so the mixing of the DNA

4    results with the possible activity that allowed to

5    the deposition of that gets complicated with the

6    use of that term and can be misleading.

7         Q.   To make sure we're clear though, when

8    you touch something you could be leaving your DNA

9    behind or leaving other DNA that's on your hands

10   behind.  Could you also be taking DNA off of the

11   item that you're touching?

12        A.   Yes, sir, that's correct, that's been

13   demonstrated in research studies as well.

14        Q.   If you -- So if you touch a piece of

15   evidence without wearing proper protection or

16   attempting to not disturb the DNA could you be

17   destroying the DNA that's on that piece of

18   evidence?

19        A.   It's possible it could be removed or

20   certainly contaminated with that individual's DNA

21   that isn't directly associated with the crime.

22        Q.   I want to direct your attention to kind

23   of a specific period of time in history and it's

24   the late 90's to the early 2000's.  Were there

25   policies and protocols that were in existence at

115

1    that period in time regarding the collection,

2    preservation, and handling of forensic evidence in

3    law enforcement?

4              MS. PRYDE:  Objection, Your Honor.

5    Vague.

6              THE COURT:  Can you lay a better

7    foundation for her to give that opinion?

8              MR. JACOBER:  I can attempt to, yes,

9    Judge.

10             THE COURT:  Thank you.

11   BY MR. JACOBER:

12        Q.  As part of your work as a scientist is

13   it important for - I'm sorry - as a scientist

14   focusing on DNA evidence and DNA analysis, is it

15   important for you to understand how that evidence

16   is collected?

17        A.  To do the testing the answer is no.

18   But to understand the test results that are

19   generated and the meaning of those results the

20   whole prior chain of custody and information about

21   who may have knowingly or unknowingly handled those

22   items or been involved in those items becomes very,

23   very important to know what the meaning of the DNA

24   test results are.  So because of that it is

25   critical to know every individual that's come in

116

1    contact with a particular item, when it was

2    collected, how it was collected, what method was

3    used, was it collected individually by an

4    individual wearing gloves, wearing a face mask and

5    not talking over it or sneezing over it, was it

6    properly labeled and sealed in a tamper evidence

7    envelope with evidence tape, was it stored properly

8    in the appropriate dried room temperature or frozen

9    conditions for that type of biological sample.  All

10   of that occurs before it comes into the DNA lab.

11            So any issues or problems with the

12   manner of collection, contamination, mislabeling,

13   improper storage under the wrong conditions all is

14   going to impact what comes out of those DNA results

15   and the ability for us to get usable, interpretable

16   profiles and be able to evaluate and provide any

17   meaning regarding the DNA data that are obtained.

18            MS. PRYDE:  Objection, Your Honor.  Mr.

19   Jacober has not laid a foundation for this

20   individual's expertise as to these before-the-lab

21   policies.

22            THE COURT:  That's my concern.

23            MR. JACOBER:  And I was --

24            THE COURT:  And that wasn't responsive

25   to the question that you asked.

117

1               MR. JACOBER:  It was a long answer.

2    BY MR. JACOBER:

3         Q.   I want to back up a little bit, Dr.

4    Word.  As a DNA scientist I think you answered more

5    of why the policies and procedures that we want to

6    talk about are important.  What I want to focus on

7    first as opposed to the why is are scientists such

8    as yourself -- Actually let me ask it more

9    specifically.

10              Were you involved in helping to develop

11   policies and procedures that would be used for the

12   collection of DNA evidence?

13        A.   Not directly, no.

14        Q.   Were other scientists involved in the

15   development of policies and procedures for the

16   collection of DNA evidence?

17        A.   Certainly, yes.

18        Q.   Did you have occasion to review those

19   policies and procedures as part of your work as a

20   DNA scientist?

21        A.   Yes.

22        Q.   And was that part of how you would

23   eventually analyze DNA evidence as a scientist?

24        A.   To some degree, yes.

25        Q.   Did you come to rely on those policies

1    and procedures as part of what you were doing in

2    analyzing DNA evidence?

3         A.   Yes.

4              MR. JACOBER:  Your Honor, I think this

5    addresses the foundational aspects that these are

6    things developed by other scientists, Dr. Word

7    relied on them in part of her work as a DNA

8    scientist.

9              THE COURT:  The objection is sustained.

10             MR. JACOBER:  Your Honor, if I could,

11   on what basis?  I want to make sure I can address

12   the Court's concern.

13             THE COURT:  I don't think the proper

14   foundation has been laid for this witness to opine,

15   despite her area of expertise, as to what the

16   protocols were in the late 90's, early 2000's.

17             MR. JACOBER:  Thank you, Judge.  I'll

18   continue to inquire and try to satisfy the Court.

19             THE COURT:  Thank you.

20   BY MR. JACOBER:

21        Q.   During this period of the late 90's or

22   early 2000's as part of your work as a DNA

23   scientist were you -- did you actively review and

24   take into consideration the policies and procedures

25   that were being developed regarding the handling of

119

1    DNA?

2                MS. PRYDE:  Objection.  Vague, Your

3    Honor.

4                THE COURT:  Overruled.

5         A.   Well I know Cellmark Diagnostics had a

6    multipage document that we sent out to offices or

7    individuals interested in sending evidence to us

8    that documented what we advise as procedures that

9    should be followed for collection, packaging,

10   labeling, storage, and then mailing the evidence to

11   us.  So we had a document that I wasn't a part of

12   writing but it was from our company that certainly

13   was written by scientists documenting the proper

14   way to handle all of those different procedures.

15                And as part of my interaction with

16   various individuals in the field throughout my

17   career I've been to meetings, I've met with police

18   officers, crime scene investigators who have talked

19   to me about the policies and the procedures they

20   use.  Some in the early 90's and mid 90's had very

21   detailed policies.  They would wear, you know, the

22   full body suit and masks and head gear and

23   everything because they were aware that they could

24   be leaving evidence behind.

25                So throughout the 90's there were

120

1    certainly agencies that were well-informed on

2    procedures that needed to be followed and had those

3    in place for the preservation and risk of

4    contamination of evidence at that time.

5         Q.   And Dr. Word, the document that you

6    were a co-author on, the Post-Conviction DNA

7    Testing:  Recommendations for Handling Requests,

8    does this have any -- does this include any

9    discussion about the policies and procedures, or

10   policies and protocols rather for the DNA evidence

11   collection and handling?

12        A.   I don't think directly.  It does

13   comment in multiple situations about the proper

14   preservation of evidence that has been collected,

15   that it be stored appropriately to preserve the

16   integrity of that evidence.

17        Q.   So it doesn't lay out specific steps

18   but it does reference that it's important that DNA

19   be preserved in a way to maintain its integrity?

20        A.   That's correct.  The collection of

21   evidence was not a part of the focus for that

22   particular working group.  But I think there were

23   clearly procedures in laboratories, in all

24   laboratories about how evidence had to be handled.

25   And in many jurisdictions many crime laboratory

121

1    personnel were training the police officers and the

2    crime scene investigators in those different

3    procedures.  And this would be not just for DNA but

4    for fingerprint collection, guns, ballistics,

5    cartridges.  Any other type of evidence that was

6    being collected the laboratory personnel were

7    training individuals based on the policies they

8    used in the laboratory on how to do those

9    procedures correctly to maintain the integrity of

10   the evidence.

11        Q.   If the evidence isn't maintained in a

12   way that maintains its integrity what are the

13   results from a scientific perspective?

14        A.   They may be impacted in a way that the

15   information obtained is useless or it may -- in the

16   case of DNA it may lead to a presence of a mixture

17   of DNA that becomes more complicated to interpret

18   and evaluate.  So knowing what happened and knowing

19   some of that information may help with the

20   evaluation of the data, but depending on what

21   occurred it may invalidate the use of those results

22   in any way.

23             Certainly if an item has been stored

24   inappropriately such as the DNA is totally degraded

25   or contaminated to an extent that the original DNA

1    can't be observed, that significantly impacts the

2    testing outcome because no results can be observed

3    from whomever's DNA was on that original item.  So

4    it depends on, you know, whatever the scenario is.

5         Q.   So you again focused on the integrity

6    of the DNA.  What are the best ways to ensure that

7    the DNA evidence that is on an item of evidence is

8    preserved for future testing?

9              MS. PRYDE:  Objection.  Lack of

10   foundation.

11             THE COURT:  Overruled.

12        A.   So in the lab the procedures that we

13   follow are very similar to the procedures that

14   would need to be followed in the field as well.

15             THE COURT:  Doctor, I appreciate your

16   narrative response, but if you could just answer

17   the question that was posed by Mr. Jacober, please.

18        A.   So each item should be handled singly,

19   one at a time and wearing gloves, and if not

20   wearing a face mask no one should be talking over

21   that item so that DNA won't be deposited on that

22   item.  Gloves should be changed in between the

23   handling of each of those items.  Each item should

24   be individually packaged in the appropriate

25   container depending on what that item is.  If the

123

 1   item has blood or semen or saliva and it's wet that

 2   needs to be dried first and then stored in a dried

 3   manner.

 4          Generally paper bags or boxes are the

 5   best way to preserve evidence.  Storing wet items

 6   in plastic promotes bacterial and other

 7   micro-organism growth which will destroy the DNA.

 8   The items need to be individually labeled - I think

 9   I already mentioned this - with tamper evidence

10   tape stored properly.

11          And then, you know, in the lab the same

12   procedure happens.  They have to be opened

13   individually, handled one at a time, changing

14   gloves in between.  If we use scissors or a knife

15   or a cutting tool to cut a swab off, for instance,

16   that's a one-time use instrument, that all gets

17   thrown away and we start fresh with a new item of

18   evidence.

19          THE COURT:  Thank you.

20      Q.   Now you mentioned gloves several times

21   in that answer, Dr. Word.  If you touch an item of

22   evidence without gloves does it impact the

23   integrity of the DNA for future testing?

24      A.   It can.  It can remove DNA from that

25   item as well.  So individuals handling an item with

124

1    gloves need to be very careful of where they touch.

2    The same concept of, you know, touching an item

3    that might have fingerprints on it.  You want to be

4    very careful that you don't handle it in an area

5    that may have fingerprints or biological materials.

6    If the gloves are contaminated or haven't been

7    changed from the last item there may be DNA from

8    the person wearing those gloves or from a previous

9    handled item that now gets deposited on the next

10   item.

11          Q.   Thank you.  And at least as of 1999

12   when Attorney General Reno formed this commission

13   it was recognized by law enforcement that DNA

14   testing could become -- already was and could

15   become even more of part of future exoneration

16   matters, correct?

17          A.   Oh absolutely, yes.

18          Q.   So if the evidence is not handled at

19   the time of the crime in a way that preserves that

20   DNA that takes away a future exoneration chance --

21   or it could take away a future exoneration chance,

22   correct?

23          A.   Potentially, yes.

24          Q.   In the 1990's and going forward was

25   there anything happening that would caution people

125

1    against touching items of evidence that had blood

2    on them?

3         A.   Well certainly in the early 90's the

4    discovery of the HIV virus and its resulting AIDS

5    epidemic put everyone on note about touching items

6    that had blood on them.  And, you know, by the very

7    early 90's all law enforcement, hospitals, first

8    responders, medical individuals --

9              MS. PRYDE:  Objection, Your Honor.

10   Lack of foundation.  We're talking about

11   something --

12             THE COURT:  How is this helping me, Mr.

13   Jacober?

14             MR. JACOBER:  I'll move forward, Judge.

15             THE COURT:  Thank you.

16   BY MR. JACOBER:

17        Q.   We've learned in this case that the

18   prosecutor and the special investigator for the

19   prosecutor's office have now testified to or have

20   signed an affidavit indicating that they touched

21   the murder weapon in this case without any evidence

22   preservation techniques, is that correct?

23        A.   That's -- I been informed of that, yes.

24        Q.   And further DNA testing has shown that

25   the DNA that was left on the knife could be matched

126

1    to either of those two gentlemen, is that correct?

2         A.    The results can be explained by their

3    profiles, yes.

4         Q.    Based on the results that you reviewed

5    are you able to determine if Mr. Williams --

6    Marcellus Williams' DNA is on that knife?

7         A.    He's excluded as the DNA that was

8    detected from the knife.  He cannot be a source.

9         Q.    Because of what we've learned now can

10   you make a definitive determination though as to

11   Mr. Williams and the DNA that's on that knife?

12        A.    For the DNA that was recovered it is

13   not his DNA.  No DNA recovered and tested includes

14   him as a possible source.  He's excluded as either

15   of the two sources.

16        Q.    You don't know though if that means his

17   DNA was never on the knife because of what we've

18   now learned, is that correct?

19        A.    That's correct.

20              MR. JACOBER:  And, Your Honor, in

21   support of that I would -- Your Honor, I misspoke

22   earlier.  I didn't realize that the August 19, 2024

23   test results from BODE Technology were also part of

24   Exhibit 1, and we would move for that to be

25   admitted into evidence as well.  That's Exhibit B

1    of Exhibit 1.

2              THE COURT:  Is that the same as FF?

3              MR. JACOBER:  Yes.  Yes, Your Honor.

4              MS. PRYDE:  Just for clarification, Mr.

5    Jacober, you said Exhibit 1.  Are you talking about

6    Tab 1, Exhibit 16?

7              MR. JACOBER:  Tab 1.  Tab 1.  I'm

8    sorry.

9              MS. PRYDE:  Great.  Just want to be

10   sure.  Thank you.

11             THE COURT:  The Court's confused too.

12   Tab 1 and then it's got exhibit numbers on there.

13   I've already received -- Is this under Exhibit B?

14             MR. JACOBER:  Yes, Your Honor.

15             THE COURT:  Any objection?

16             MS. PRYDE:  No objection, Your Honor.

17             THE COURT:  So Exhibit B will be

18   received.

19             MR. JACOBER:  One second, Your Honor.

20             (Pause.)

21             Judge, at this point I have no further

22   questions.

23             THE COURT:  Thank you.  Does someone

24   mind checking the halls.

25             MR. JACOBER:  We're supposed to be

1    getting a text message when he shows up.

2              THE COURT:  Very good.  I appreciate

3    that.  Cross.

4              MR. JACOBER:  Judge, when Judge

5    McGraugh is here I'll just give you a sign.

6              THE COURT:  Thank you.  You may

7    inquire.

8              MS. PRYDE:  Thank you, Your Honor.  I'm

9    just going to get set up for a moment if that's

10   okay with the Court.

11                   CROSS EXAMINATION

12   BY MS. PRYDE:

13        Q.   Good morning, Dr. Word.

14        A.   Good morning.

15        Q.   You have an extensive history and an

16   extensive scientific background, would you agree

17   with that?  Not to toot your own horn.

18        A.   It's relative, yeah.  I have a

19   background.

20              THE COURT:  She got her Ph.D. when she

21   was 21.

22        A.   Not.

23        Q.   And as part of that history you have

24   become very familiar with the grunt work of

25   obtaining data, would you agree?

129

1          A.   I don't actually know what that even

2     means.

3          Q.   Okay, I'll rephrase.  When you are

4     doing your scientific testing I notice that in your

5     CV you do -- your early work appears to be in

6     immunoglobulin, if that's correct.

7          A.   Yes.

8          Q.   It's been awhile since I took biology.

9               So when you were doing those tests were

10    you -- were you producing data to support the

11    conclusions that you were hypothesizing about?

12         A.   Well the molecular biology aspect of

13    what I was doing at that point was actually

14    generating DNA sequences, so we didn't really have

15    a hypothesis under the classical biology; you know,

16    form a hypothesis, do the testing.  We were simply

17    isolating DNA from organisms and sequencing that

18    DNA to determine what the sequence of the DNA was

19    for the immunoglobulin genes at that time.

20         Q.   And when you isolated those genes did

21    you use just one sample or did you replicate it?

22         A.   Well for that particular project some

23    of it was replicated.  We tried to get overlapping

24    sequences but not always.

25         Q.   Fair enough.  Would you agree that

130

1    during the scientific process your result can only

2    be just as good as what you have to determine that

3    result?

4         A.   Absolutely, yes.

5         Q.   And in this case you were hired as an

6    expert witness, would you agree?

7         A.   Well as a consultant.  I wasn't part of

8    the process at that point.  I was consulting on the

9    data.

10        Q.   Thank you for the clarification.

11             And you were approached by The

12   Innocence Project, is that correct.

13        A.   Yes, I believe so.

14        Q.   And so The Innocence Project hired you

15   in this case?

16        A.   Yes.

17        Q.   And at least in my experience with

18   experts, experts are often asked to answer a

19   question.  We heard it in earlier testimony with an

20   earlier expert today, he was answering a particular

21   question by The Innocence Project.  Were you also

22   asked to answer a particular question?

23        A.   I was -- I don't know if I was asked a

24   question per se.  I was asked to review the case

25   file and form my independent conclusions based on

131

1   the results they obtained.

2         Q.   And what was involved in that case

3   file?

4         A.   I got the entire case file from the

5   BODE laboratory.  So all of their testing notes,

6   the data, their reports, anything that they had in

7   their file.

8         Q.   And would you agree that that's what's

9   been described as the BODE supplemental report?  It

10  was those bench notes, is that correct?

11        A.   Well the bench notes and the report are

12  independent.  The bench notes are the whole file

13  that contains all the documentation from the lab;

14  you know, what evidence they received, what testing

15  procedures they followed, how much of the material

16  they used for testing, so their whole testing

17  process.  The original report and the supplemental

18  report are the reporting of their findings and

19  their conclusions based on the data that they

20  obtained.  And those - I believe there were two

21  reports - were part of that case file.

22        Q.   Thank you, Dr. Word.  If you don't mind

23  my moving around a bit.  I'm so sorry, there's so

24  much paper.  I'm going to hand you a really big

25  binder but I'm going to try to put it on your

132

1    surface.

2              I just handed you what's been previously

3    marked as Respondent's Exhibit I-13.27.  Does that

4    look accurate to you?  It's under the 27 tab in

5    that binder.

6         A.   Yes.

7         Q.   Great.  And does that look like the

8    notes that you reviewed in this case?

9         A.   Oh, I just looked at the report.  The

10   report, yes.

11              THE WITNESS:  May I stand up --

12              THE COURT:  Yeah, whatever makes you

13   comfortable.

14              THE WITNESS:  -- so I can look at this

15   easier?

16              THE COURT:  Sure.

17   BY MS. PRYDE:

18        Q.   And please take all the time that you

19   need.

20        A.   I'm just going to flip through it.

21        Q.   Of course.

22        A.   Yes, this looks like the materials that

23   I received.  I'm sorry.

24        Q.   Thank you very much.  And was that the

25   only data that you were given with this case?

133

1        A.   No.  There was a subsequent submission

2   to the evidence -- of evidence from Mr. Williams'

3   known reference sample.

4        Q.   Okay.  So that wasn't contained in the

5   bench notes that you're looking at there?

6        A.   Oh.  Well I didn't see the second

7   report in the second part of that.  Because for me

8   it came as a separate file so I was expecting it to

9   be in a separate place.

10        Q.   Fair enough.

11        A.   Is it in this Tab 27?

12        Q.   So there were two reports in this case.

13   The first one was the case forensic report which

14   has been previously marked as I-13  --

15              THE COURT:  Counsel, can we have a

16   stipulation that both those reports --

17        A.   Oh, here it is.  Yeah, it's under tab

18   -- As I suspected, it's under Tab 28 is the

19   supplemental report.

20        Q.   Great.  So you reviewed that as well?

21        A.   Yes.

22        Q.   So you reviewed Respondent's Exhibit

23   I-13.27 and I-13.28, would you agree?

24        A.   To the best of my knowledge, yes.

25        Q.   And were you given any other

134

1   information about this case?

2          A.   At the time I did the first review?

3          Q.   Um-hum.

4          A.   No.  I was given no information about

5   the case.  They were very careful to make sure I

6   knew nothing about it; just look at the case file,

7   look at the data, and we'll talk later.  Which is

8   how I handle pretty much all of my cases.

9          Q.   And when you talked later what sorts of

10  questions were you asked about this particular

11  data?

12         A.   Oh, I have no idea.  I was certainly

13  asked what my opinion was and could I make any

14  conclusions regarding Mr. Williams and the knife

15  handle, Item O3B.

16         Q.   And while you were talking to Mr.

17  Jacober - And I realize I gave you a bit of guff

18  and I apologize - you talked a lot about how the

19  protocols that are used to collect the evidence

20  that you're talking about matter, correct?

21         A.   Certainly, yes.

22         Q.   And here were you told any of those

23  sorts of protocols from the St. Louis County Police

24  Department or the University City Police

25  Department?  Were you told any of those sorts of

135

1    protocols?

2            A.    At some point -- No, not for

3    collection, no.

4            Q.    And were you told whether or not that

5    evidence was handled before by any other

6    individuals or -- Were you told whether or not that

7    evidence was, specifically the knife, whether it

8    was handled by individuals with or without gloves?

9            A.    I don't believe in 2018, which is when

10   I was first involved in this case, that I knew

11   anything about that.  I just -- I simply don't

12   recall.  It was way too long ago.

13           Q.    Understandable.  So initially you just

14   were given these bench notes, these reports, and

15   asked to come to a conclusion about Mr. Williams,

16   correct?

17           A.    I was given the case file to review to

18   come to an independent conclusion.  Then I looked

19   at the reports.  And then I talked to the

20   attorneys.  But I formed -- I didn't look at the

21   reports prior to doing any of my review.  I formed

22   my independent evaluation of the information

23   without knowing what BODE had done and reported.

24           Q.    And the reports don't make it entirely

25   clear, but were you made aware that the case itself

136

1    had occurred -- the murder itself had occurred not

2    in 2016 when this testing, when all the reports

3    were dated but much earlier?

4         A.   May or may not have known that, I don't

5    know.  To me it doesn't -- In terms of what I was

6    asked to do that doesn't directly impact my initial

7    review of the file.

8         Q.   But it might impact a later review, is

9    that what you're implying?

10        A.   Well it may impact understanding of the

11   information about the test results.

12        Q.   Understood.  And when you were

13   evaluating this data and these notes and this file

14   you also -- you supplied a little bit of data as

15   well in the form of assumptions, is that correct?

16        A.   Well data are not assumptions.  I made

17   assumptions to evaluate the data which is required.

18   For any type of DNA testing one of the first things

19   that has to be done is to make decisions about what

20   allele peaks are going to be interpreted, what data

21   are there, and then based on that data assumptions

22   have to be made regarding whether there's DNA from

23   one individual, two individuals, three individuals.

24   Then the comparisons can be done to state what the

25   meaning of those results might be.

137

 1          Q.   Understandable.  Now I'm going to hand
 2    you what's previously been marked as Petitioner's
 3    Exhibit 16A is what we're calling the original
 4    report, is that correct?  16A.  And I would like
 5    you to turn to page 5 of that report, paragraph
 6    specifically 12 and 13.  I'm sorry, 13 and 14.
 7          A.   Page 5 is my CV.
 8          Q.   I'm sorry.  Page 5 of the affidavit if
 9    that helps you.  I believe it's the end of the --
10    your initial -- or it's at the end.
11          A.   Page 5 of the affidavit?
12          Q.   Yes, page 5 of the affidavit.
13          A.   I have that.  Thank you.
14          Q.   Can you turn to page -- And so the
15    paragraphs 13 and 14.  So paragraph 13 starts:
16    Under the assumption that the DNA profile from
17    sample EO3B1 is from a single contributor.  Did I
18    read that correctly?
19          A.   Yes.
20          Q.   And so when you made that assumption
21    was that something that you introduced into this
22    interpretation method or were you told that by
23    someone from The Innocence Project or otherwise?
24          A.   No, that's a normal part of any DNA
25    analyst's first thing they do is this profile; does

                              138

1   it look like it's from a single individual or does

2   it look like it's a mixture and if so what are the

3   number of individuals.

4           So based on the DNA profile that was

5   obtained I independently said this could be a

6   single source profile with some artifacts present

7   or it might be a mixture, and I can interpret it

8   under both of those two starting assumptions.  And

9   this is done in every single DNA case.

10          Q.  Of course.  And when you said it looked

11  like a single sample, what sorts of factors are you

12  looking at when you determine whether or not it

13  looks like a single sample or more?

14          A.  So it might be helpful to start with

15  what a mixture looks like because a single sample

16  doesn't have those characteristics.  But for a

17  single sample for y-str testing which was done here

18  we expect to see only one peak at each of the loci

19  that are tested.  Once we see two peaks that

20  suggests that there may be a mixture in that

21  sample, with the exception of one locus that

22  complicates everything because it gives two peaks.

23  So I have to qualify that.

24          The y-str testing, however, does have a

25  higher propensity for introducing some artifacts.

139

1    And so when smaller peaks are occasionally seen,

2    particularly in certain positions, it has to be

3    considered whether those are in fact artifacts of

4    the testing and aren't contributing to the sample

5    being a mixture and therefore it's a single source

6    profile, or if they might be true alleles from a

7    second individual.

8              So looking for a single peak at each

9    locus would be consistent with a single source

10   profile.  A single peak at each locus with one or

11   two peaks that we call stutter are common and we

12   expect those to be there in single source samples.

13   But those extra peaks may also be indicative of

14   mixture from a second individual.  Because that

15   wasn't clear in this sample I chose to evaluate it

16   under both of those starting assumptions, if it's a

17   single source or if it's a mixture of two

18   individuals.

19        Q.   And before we get to the -- I do want

20   to come back to the peaks in just a moment.  But

21   now you're talking about this as if it's only one

22   or two individuals.  Is there ever an instance

23   where there might be three or more profiles in a

24   mixture?

25        A.   Oh, certainly.

140

1          Q.   And how would you tell if there are

2    three people or four people?

3          A.   To know definitive there are three or

4    four people I would have to see indication in the

5    DNA of each of those individuals.

6          Q.   And what counts as an indication?  I

7    don't --

8          A.   So for y-str testing to know that there

9    were four individuals I would have to see four

10   peaks at at least one, if not multiple locations.

11   That would tell me I know there are DNA from at

12   least four males in this sample.  And we only ever

13   know what the minimum number is.  There could be

14   more individuals, but their profile isn't

15   distinguishable enough from the other individuals.

16         Q.   Great.  And so when you're talking

17   about these peaks it's my understanding that there

18   are about three different thresholds that are

19   applicable in DNA testing; the analytical

20   threshold - I'm sorry - the peak detection

21   threshold - Let's start out with that first - would

22   you agree?

23         A.   If you're talking about BODE's

24   procedures, yes.

25         Q.   Okay.

```
 1            A.   What they do is not common.  So
 2    following their procedures, yes, they have three
 3    thresholds.
 4            Q.   Okay.  And those are the peak detection
 5    threshold at 30RFU or relative reactive
 6    fluorescence units, is that correct?
 7            A.   I think theirs is 35.
 8            Q.   Thank you for the clarification.  And
 9    then the analytical threshold and that's at 70,
10    correct?
11            A.   I think it was 75.
12            Q.   Okay.  And then there's the --
13                 (Reporter asks for clarification.)
14            A.   Wrong word.
15            Q.   Oh, I'm sorry.  In the BODE procedures
16    it appears they call it a --
17            A.   Stochastic, S-T-O-C-H-A-S-T-I-C,
18    threshold.
19            Q.   And at stochastic threshold that's
20    where we know that there's no DNA missing, is that
21    correct?  There's nothing missing from the sample?
22            A.   No.
23            Q.   Okay.
24            A.   Well, no.
25            Q.   Okay.  Fair enough.
```

1          A.   I can explain if you'd like.

2          Q.   So at the analytical threshold that

3    just means that there's something there, would you

4    agree?

5          A.   The analytical threshold is used to say

6    anything we see above this level we have pretty

7    high confidence this is real data, this is probably

8    a true allele, or it could be an artifact.  It's

9    separating background noise from what we think are

10   true data that can be interpreted.

11         Q.   And the analytical threshold in this

12   case is set by BODE, correct?

13         A.   Yes, for their procedures they set what

14   they use to interpret their data.

15         Q.   And they set that based on what you

16   were calling earlier validation studies, is that

17   correct?

18         A.   That's correct.

19         Q.   And those are unique to the lab,

20   correct?

21         A.   Each lab does their own validation

22   studies and based on those sets their own

23   protocols, yes.

24         Q.   Great.  So using the data that you were

25   given and these assumptions that are a normal part

1    of your process you came to a result in this case,

2    is that correct?

3             A.   I stated some conclusions.

4             Q.   Okay.  And you concluded that according

5    to the evidence that you reviewed and the data that

6    you reviewed you believe that Mr. Williams could be

7    excluded as a source of this DNA mixture or

8    profile, is that correct?

9             A.   That's correct.

10             Q.   And that's under your assumption --

11   Let's throw out the single contributor for the

12   moment.  That's under the assumption that there are

13   only two people who touched who were DNA

14   contributors to this knife, is that correct?

15             A.   Under the assumption that there are

16   only two DNA contributors, which is all the data

17   support, he is not either of those two

18   contributors.

19             Q.   And at this point in time the

20   contributors to a DNA is a little bit hard to

21   define in practical -- in practicality.  So if an

22   individual were to touch something, if I were to

23   hold this pen am I a contributor to this DNA?  If

24   this pen is later DNA tested would I be a

25   contributor?

144

1          A.   If your DNA is detected and it matches

2    to your profile, yes, that would be consistent with

3    you being a contributor to the DNA detected.

4          Q.   But there might be plenty of other

5    people that have touched this pen, would you agree?

6          A.   I have no idea.  Under the assumption

7    that other people touched it, yes.

8          Q.   And other people -- Just by touching

9    something other people can also leave DNA, is that

10   correct?

11         A.   Certainly.

12         Q.   Great.

13         A.   Or not.  I mean, it's variable.

14         Q.   Fair enough.  There are lots of

15   factors, and sometimes these results are just

16   inconclusive, would you agree?  When you are

17   looking at DNA results and you're evaluating all of

18   the data that you're given sometimes the answer is

19   just inconclusive, is that right?

20         A.   In some limited situations the quality

21   of the data are so inadequate and/or the limited

22   information available makes it either impossible to

23   make any conclusions or it's inconclusive for

24   certain individuals in the comparison to certain

25   individuals.

1          Q.   And does the effort that an individual

2    interpreter will go to to not result in any

3    conclusive results, does that depend on the

4    interpreter or is that industry standard.

5               (The reporter requests that the

6    question be restated.)

7          Q.   When you are determining what is

8    inconclusive do you -- is there a point when you

9    stop looking for data, when you stop seeing data as

10   being important even if there's data there, or do

11   you just keep looking; as long as it was detected

12   it's not inconclusive?

13         A.   I don't think I understand your

14   question.  To me all data are important.

15         Q.   Okay.

16         A.   Whether they are useful and sufficient

17   to make the type of comparison that we need to do

18   is what determines whether a conclusion can be made

19   or whether no conclusion can be made and,

20   therefore, inconclusive.  If we do testing and we

21   get absolutely no data there's no conclusion that

22   can be made because there's nothing for comparison.

23              If only a single allele is recovered

24   many labs call that inconclusive.  My position is,

25   well, if you've got one allele and you think it's

146

1    true data you could use that to say, This is an 11;

2    the person I'm comparing it to doesn't have an 11

3    so therefore they are excluded as the source of

4    that single allele.

5              Whereas, another individual who has

6    that 11 technically isn't excluded but that

7    "inclusion" really has no meaning because you're

8    only looking at a single allele, and for that

9    reason many labs will call that an inconclusive

10   finding.  And it varies from lab to lab and data to

11   data.

12        Q.   And that might be based on their

13   validation studies, would you agree?

14        A.   Well in theory they -- all

15   interpretations should be based on their validation

16   studies.  Unfortunately BODE and other labs leave

17   this analyst discretion where the analyst get to

18   decide what they want to do and the procedures are

19   not sufficiently detailed such that everyone in the

20   lab would be assured of getting the same results.

21        Q.   And --

22        A.   Sorry, reaching the same conclusion off

23   of the same results.

24        Q.   Did you review anything in this case

25   that indicates that these results were not reviewed

147

1    or signed off on by multiple people in BODE?

2        A.   No.  There's a requirement for a

3    technical review on each of the reports and that's

4    documented.

5        Q.   So multiple people do sign off on, you

6    know, whether or not that data should be

7    interpreted in that particular way?

8        A.   That's correct.  In theory, assuming

9    the policies were followed, yes.  If the

10   appropriate technical review was done it should

11   mean that a second individual agreed with what was

12   in that report.

13       Q.   Great.  And in this instance just

14   matching up one allele to the next, that's how you

15   do inclusion exclusion, is that correct?  In just

16   basic, basic terms, yes or no?

17       A.   Basic terms you compare the data at one

18   locus from the evidence to the data at that same

19   locus from a known individual and then you step

20   down each locus of the data.

21       Q.   And in 2024 you did that with Ed Magee

22   and Keith Larner as compared to the sample that was

23   produced back in 2016, is that correct?

24       A.   I did, yes.

25       Q.   And at every site where there's data --

148

1              (The reporter asks for repeat of

2    question.)

3              THE WITNESS:  I'm missing it too.

4         Q.   At every point, at every locus where

5    there was data from the original sample, that

6    allele number matches Ed Magee, is that correct?

7         A.   I don't recall.  It matched one of the

8    individuals.  The primary data I'm calling either

9    the single source or the major contributor did

10   match one of those individuals.  I don't remember

11   who it was.

12        Q.   Okay.

13        A.   But I need to clarify.  That doesn't

14   mean he's the source.

15             THE COURT:  There's no question.

16        Q.   Now let's move on to the DNA, the

17   transfer situation.  So you talked about with Mr.

18   Jacober there's a lot of factors --

19        A.   Can you -- I'm having a really hard

20   time following you.  You're flying and I'm -- I

21   can't hear and process and think.  Thank you.

22        Q.   When you're talking about DNA transfer

23   on an object after years or any period of time

24   there are factors that you discussed with Mr.

25   Jacober that affect how -- what DNA is left behind

149

1  and how much of that DNA is left behind, would you

2  agree?

3          A.   I think -- I'm not sure I understand

4  the question.  But, yes, transfer is the process of

5  moving DNA from one area to another either by

6  putting it on or removing or both.

7          Q.   And that depends on things like

8  storage.  You talked a lot about storage with Mr.

9  Jacober, is that correct?  Storage could affect how

10  DNA is preserved over time?

11          A.   How DNA is preserved, not how it's

12  transferred, unless it's stored in close contact

13  with some material that the DNA then gets

14  transferred off of that original item onto the

15  storage packaging for instance.  But storage and

16  transfer are two --

17          Q.   Just yes or no on the storage.  Where

18  it's stored could affect what DNA is preserved?

19  Just yes --

20          A.   Yes.

21          Q.   And in this case were you told how the

22  St. Louis County Prosecuting Attorney's Office or

23  any other individual stored this sample?

24          A.   Not to my recollection.  I don't know.

25          Q.   And were you told where it was kept?

150

1            A.   Again, if I was I don't remember.  I
2    don't know.
3            Q.   And you mentioned before you didn't
4    note the timeline so you didn't know the time
5    between the depositing the DNA and the collection
6    of the DNA, is that correct?
7            A.   When I did the analysis of the data?
8            Q.   Um-hum.
9            A.   I don't recall whether I knew any of
10   that or not.  I don't know.
11           Q.   So there were a lot of factors that you
12   talked about being important with Mr. Jacober that
13   you didn't know about in this case, would you
14   agree?
15           A.   Well I think your question is
16   misleading, but the answer is yes.
17           Q.   Okay.  Were you told anything in this
18   case about the St. Louis County Prosecuting
19   Attorney's Office protocol with regard to evidence
20   handling or testing?
21           A.   I don't believe so.  I'm not aware they
22   have a protocol.  If I knew about it I don't recall
23   it at this point.
24           Q.   And were you told anything about the
25   St. Louis County crime lab, what protocols they had

151

1    for keeping evidence?

2            A.   I don't recall.  I don't believe so.

3                 MS. PRYDE:  No further questions, Your

4    Honor.

5                 THE COURT:  Thank you.  You may

6    inquire.

7                 MR. POTTS:  Thank you, Your Honor.

8                      CROSS EXAMINATION

9    BY MR. POTTS:

10           Q.   Good afternoon, Dr. Word.

11           A.   Good afternoon.

12           Q.   Quick reset.  The DNA profiles that

13   were just found on the knife can be explained by

14   two people - Keith Larner and Ed Magee, right?

15           A.   That's correct.

16           Q.   When you were -- I don't want to close

17   the loop on this.  When you were speaking with Mr.

18   Jacober a few minutes ago I think one of the

19   concepts that came out was that we don't know if

20   Mr. Williams' DNA was on the knife because it may

21   have been removed by those men handling the knife

22   without gloves, right?

23           A.   I don't know anything about whose DNA

24   was on it.  I can only tell you who might be the

25   sources based on the data that were obtained by

152

 1   BODE.
 2          Q.   And I think you're jumping right in
 3   front of me.  And here's all I want to ask.
 4   Whoever committed this murder we don't know if
 5   their DNA was on the knife because it may have
 6   gotten removed by their handling of the evidence,
 7   right?
 8          A.   That's certainly a possibility.  I
 9   don't know.
10          Q.   Thank you.
11               MR. JACOBER:  No redirect, Your Honor.
12               THE COURT:  Thank you.
13               MS. PRYDE:  Nothing.
14               THE COURT:  Thank you.  Can this
15   witness stand down?
16               MR. JACOBER:  Yes, Your Honor.
17               THE COURT:  Safe travels.
18               MR. JACOBER:  Your Honor, I'm going to
19   step out to see if one of the witnesses is
20   available.
21               (Pause.)
22               MR. JACOBER:  Judge McGraugh is parking
23   right now, so we expect him to be here momentarily.
24               THE COURT:  We're switching out court
25   reporters, so we'll be in temporary recess.

                          153

```
1                    (A recess was taken.)

2                              ***
```

154

1                        REPORTER'S CERTIFICATE

2              I, Rhonda J. Laurentius, a Certified Court
   Reporter and Registered Professional Reporter,
3  hereby certify that I am the official court
   reporter for Division 13 of the Circuit Court of
4  the County of St. Louis, State of Missouri; that on
   the 28th day of August, 2024, I was present and
5  reported all the proceedings had in the case of IN
   RE:  PROSECUTING ATTORNEY, 21ST JUDICIAL CIRCUIT,
6  ex rel. MARCELLUS WILLIAMS, MOVANT/PETITIONER, VS.
   STATE OF MISSOURI, RESPONDENT, CAUSE NO.
7  24SL-CC00422.

8              I further certify that the foregoing 154
   pages contain a true and accurate reproduction of
9  the proceedings had that day.

10             I further certify that this transcript
   contains pages 1 through 155 inclusive and that
11 this reporter takes no responsibility for missing
   or damaged pages of this transcript when same
12 transcript is copied by any party other than this
   reporter.

13

14

15

16

17
             /s/ Rhonda J. Laurentius, CCR #0419
18           Official Court Reporter
             Twenty-First Judicial Circuit
19           (314) 615-8070

20

21

22

23

24

25

                            155

# Attachment D

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT
Division No. 13
**The Honorable Bruce F. Hilton, Presiding**

**IN RE:**
PROSECUTING ATTORNEY,                )
21ST JUDICIAL CIRCUIT                 )
ex rel, MARCELLUS WILLIAMS            )  **Cause #24SL-CC00422**
                                      )
                                      )
**MOVANT/PETITIONER,**                )
                                      )
vs.                                   )

**STATE OF MISSOURI,**

                        RESPONDENT.
==================================================

**TRANSCRIPT OF HEARING**

Volume 2 of 2

AUGUST 28, 2024

**Susan Lucht, CCR#332**
**Official Court Reporter**
**Twenty-First Judicial Circuit**
**St. Louis, Missouri**

1                         INDEX

2                       VOLUME 2

3

4    MOVANT'S EVIDENCE

5

6        Judge Christopher McGraugh

7            Direct Examination---------------158
             Cross-examination----------------164
8

9        Keith Larner

10
             Direct Examination---------------166
11           Cross-examination----------------238
             Cross-Examination----------------251
12

13       Patrick Henson

14
             Direct Examination---------------263
15           Cross-examination----------------266

16
     Closing Argument by Mr. Jacober---------275
17
     Closing Argument by Mr. Potts-----------282
18
     Closing Argument by Mr. Clarke----------297
19
     Reporter's Certificate Page-------------306
20

21

22

23

24

25

```
 1                        VOLUME II

 2        (The Court reconvened at 12:35 on August 28,

 3   2024, and the further following proceedings were

 4   had:)

 5             THE COURT:  We're back on the record in

 6   Cause Number 24SL-CC00422.  Let the record reflect

 7   we took a brief recess in order to take a witness.

 8             Again, I need to remind everyone here

 9   and in the overflow room about the prohibition

10   against any recording or photographing any of

11   these proceedings.

12             If it happens, you will be asked to

13   leave.  Just a reminder.

14             Mr. Jacober, with that you may call your

15   next witness.

16             MR. JACOBER:  Thank you, Your Honor.

17   The State would call Judge Christopher McGraugh.

18             THE COURT:  You're an officer of the

19   Court.  I don't think it's necessary, but for the

20   record...  (Witness sworn.)

21             JUDGE CHRISTOPHER MCGRAUGH,

22   Having been sworn, testified as follows:

23                  DIRECT EXAMINATION

24   BY MR. JACOBER:

25        Q.   Thank you, Judge McGraugh.  You're an
```

158

1    attorney licensed in the State of Missouri,

2    correct?

3        A.    I am.

4        Q.    Are you licensed in any other state or

5    jurisdiction?

6        A.    I'm licensed in a number of federal

7    jurisdictions, but no other state.

8        Q.    Thank you.  You're presently a circuit

9    court judge for the City of St. Louis, correct?

10       A.    I am.

11       Q.    How long have you been on the bench?

12       A.    I was appointed November of 2012.

13       Q.    Prior to your appointment in 2012 what

14    type of law did you practice?

15       A.    Right before I was appointed I had a

16    general criminal, civil, appellate practice in

17    private practice.  I was in private practice.

18       Q.    Thank you.  At some point in your career

19    you were on the Capital Litigation Unit for the

20    Eastern Division of Missouri, is that correct?

21       A.    I was from 1990 to 1992.

22       Q.    Once you were off the Capital Litigation

23    Unit did you take capital cases from a capital

24    unit when they would have a conflict or some other

25    reason why they couldn't handle it?

159

```
 1          A.    I would.

 2          Q.    And was one of those cases Marcellus

 3    Williams?

 4          A.    It was.

 5          Q.    I want to direct your attention,

 6    Judge McGraugh, to the trial in this case.

 7    Specifically the handling of the evidence.

 8               The record will reflect what the record

 9    will reflect, but do you recall at any time during

10    the trial anyone touching the murder weapon

11    without wearing gloves?

12          A.    Outside the container or the bag, the

13    evidence bag?  No.

14          Q.    If you had seen that, what would you

15    have done?

16               MS. SNYDER:  Objection.  Speculation.

17               THE COURT:  Sustained.

18          Q.    (By Mr. Jacober)  Would someone touching

19    the knife without wearing gloves have stuck out in

20    your mind?

21               MS. SNYDER:  Objection.  Relevance.

22               THE COURT:  I'm sorry?

23               MS. SNYDER:  Objection.  Relevance.

24               MR. JACOBER:  Well, Judge, I would ask

25    for a little bit of leeway because I think
```

160

1    Judge McGraugh was an experienced trial attorney

2    at that time who had tried a lot of these types of

3    cases, and handling of evidence is something that

4    trial lawyers would keep in mind as they were

5    going through the trial.

6              THE COURT:  This case was tried how many

7    years ago?

8              MR. JACOBER:  Twenty-four years ago,

9    give or take.

10             THE COURT:  Judge McGraugh's memory is

11   better than mine.  Sustained.

12        Q.   (By Mr. Jacober)  Specifically do you

13   recall if Keith Larner or Ed Magee touched the

14   murder weapon without wearing gloves?

15        A.   Not outside the evidence bag.

16        Q.   Based on your knowledge at the time was

17   it important to maintain the integrity of the

18   evidence so any future testing could be done for

19   DNA evidence on the murder weapon?

20        A.   Yes.

21             MS. SNYDER:  Objection.  Calls for

22   improper conclusion.

23             THE COURT:  I will allow it.  Overruled.

24        A.   Yes, it would.

25        Q.   (By Mr. Jacober)  Why is that?

161

1          A.    Well, not only particularly for

2    biological evidence, it was always sort of

3    protocol that --

4                MS. SNYDER:  Objection as to any

5    protocol is hearsay and lack of foundation.

6                THE COURT:  Nonresponsive.  Sustained.

7    Rephrase.

8          Q.    (By Mr. Jacober)  Was it your

9    understanding at the time that touching the knife

10   without wearing gloves would contaminate it?

11         A.    Yes.

12         Q.    Would it surprise you to learn, Judge,

13   that Revised Statute of Missouri 547.035, the

14   Missouri statute that allows for post-conviction

15   DNA testing, became effective on August 28th,

16   2001?

17               MS. SNYDER:  Your Honor, at this time

18   I'm going to object to the relevance of this

19   witness' emotional response to that statute.

20               THE COURT:  Counsel?  Sustained.

21               MR. JACOBER:  I'll rephrase the

22   question.

23         Q.    (By Mr. Jacober)  Are you aware that

24   Revised Statute of Missouri 547.035 became --

25   that's the statute allowing for post-conviction

162

1    DNA testing -- became effective on August 28th,

2    2001?

3                MS. SNYDER:  Objection.  Relevance.

4                THE COURT:  Court will take judicial

5    notice of the statute.

6        Q.    (By Mr. Jacober)  Are you aware of that?

7        A.    I was aware it was enacted, but I

8    couldn't give you the date in which it was

9    enacted.

10       Q.    And that's right around the time of the

11   Marcellus Williams trial, isn't it?

12       A.    I believe it was the summer of 2001.

13       Q.    Based on your understanding that

14   touching the murder weapon without wearing gloves

15   would contaminate the DNA, was that option taken

16   away by what we have now learned was the touching

17   of the murder weapon by Mr. Larner and Mr. Magee

18   prior to trial?

19                MS. SNYDER:  Objection.  Speculation and

20   improper opinion from this witness.

21                THE COURT:  Sustained.

22                MR. JACOBER:  One second, Your Honor.

23       Q.    (By Mr. Jacober)  When you reviewed the

24   physical evidence in this case, were you required

25   to wear gloves?

163

```
1              MS. SNYDER:  Objection.  Relevance.
2              THE COURT:  I'll allow it.  Overruled.
3     A.    Yes.
4     Q.    (By Mr. Jacober)  And did you?
5     A.    Yes.
6              MR. JACOBER:  Judge, I have no further
7     questions.
8              THE COURT:  Thank you.
9              MS. SNYDER:  No cross-examination.
10              THE COURT:  Thank you.
11    CROSS-EXAMINATION BY MR. POTTS:
12    Q.    Good afternoon, Judge McGraugh.
13    A.    Good afternoon.
14    Q.    At any time prior to trial did the
15    prosecution ever inform you that they had been
16    handling the murder weapon without gloves?
17    A.    No.
18    Q.    At any time prior to trial did the
19    prosecution inform you that investigators had been
20    handling the murder weapon without gloves?
21    A.    No.
22              MR. POTTS:  Thank you.
23              MS. SNYDER:  Nothing further.
24              THE COURT:  Mr. Jacober?
25              MR. JACOBER:  Nothing further.
```

164

 1                THE COURT:  Thank you.  Can this witness

 2      stand down?

 3                MR. JACOBER:  Yes, Your Honor.

 4                THE COURT:  Thank you, Judge McGraugh.

 5      Get back to your jury trial.

 6                JUDGE MCGRAUGH:  Thank you, Judge

 7      Hilton.

 8                THE COURT:  Given the hour and so that

 9      everyone can reenergize, or not, by having some

10      lunch, the Court is going to be in recess for

11      lunch.

12                It is almost 12:45.  Let's come back,

13      would that be 1:45, an hour?  Is an hour enough

14      time to get Mr. Williams something to eat and

15      everything?  Will that be okay with DOC?  Okay.

16      So the Court will stand in recess until 1:45.

17                (A recess was taken at 12:45 p.m.  The

18      court reconvened at 1:50 p.m., and the further

19      following proceedings were had:)

20                THE COURT:  Again, I'd like to remind

21      any new members of the gallery against the

22      prohibition of recording any of these proceedings

23      or taking photographs.  That also is germane to

24      the overflow room.  And I appreciate you complying

25      with that order.

                              165

1              With that said, let's go back on the

2    record.  We're back on the record in Cause

3    24SL-CC00422.  According to the clock on my

4    computer it's approximately 1:50 p.m. this 28th

5    day of August 2024.  With that said, Mr. Jacober.

6              MR. JACOBER:  Your Honor, at this time

7    the State would call Keith Larner.  Mr. Potts will

8    be taking the lead on that examination.

9              THE COURT:  Thank you.

10                   STATE'S EVIDENCE

11                   KEITH LARNER,

12   Having been sworn, testified:

13   DIRECT EXAMINATION BY MR. POTTS:

14        Q.   Good afternoon.

15        A.   Good afternoon.

16        Q.   One last time, would you mind stating

17   your name for the record?

18        A.   Keith Larner.

19        Q.   Mr. Larner, you're a former assistant

20   prosecuting attorney for St. Louis County;

21   correct?

22        A.   That's correct.

23        Q.   What years were you an assistant

24   prosecutor?

25        A.   June 7th, 1982, until May 1st, 2014.

                           166

1          Q.    You were also the trial prosecutor in

2    the Marcellus Williams case when he was tried for

3    the murder of Felicia Gayle?

4          A.    Correct.

5          Q.    Ms. Gayle was murdered in August of

6    1998.  Does that sound right?

7          A.    August 11th.

8          Q.    When were you first assigned on this

9    case?

10         A.    After the case was indicted in 1999.

11   I'm guessing November or December of '99.

12   Whenever the indictment occurred.  I was not

13   involved prior to that time.

14         Q.    So by November or December of 1999 how

15   many murder cases have you tried in your career?

16         A.    Between two and three dozen.

17         Q.    By that point in your career how many

18   felony cases had you tried?

19         A.    Well, I tried between 95 and 100.  Back

20   then I would have tried probably more than half of

21   those trials.  So 50 or more.

22         Q.    Let's talk about Laura Asaro and

23   Henry Cole.  As you have been preparing to testify

24   today have you gone back and looked through any of

25   your records?

167

1        A.    I have looked at the trial transcript

2    for Henry Cole.  I have not looked at the trial

3    transcript for Laura Asaro.

4        Q.    Beyond the trial transcript have you

5    reviewed anything to prepare for your testimony

6    today?

7        A.    I read Ed Magee's statement that he made

8    back in two thousand -- I don't know when he made

9    it -- 2015, 2018.  2018 he made it.

10       Q.    Anything else?

11       A.    No.  Just the trial transcript and that.

12       Q.    Ms. Asaro and Mr. Cole weren't the two

13   strongest witnesses you've ever had in a murder

14   case, right?

15       A.    I think they were probably the two

16   strongest witnesses I've ever had in a murder

17   case.  Yes, they were.

18       Q.    They were?

19       A.    And I'll tell you why if you want to

20   know.  Whenever you want.

21       Q.    We'll get there.  Now, Ms. Asaro was a

22   crack cocaine addict, right?

23       A.    Yes.

24       Q.    And Ms. Asaro was also a sex worker?

25       A.    She was a prostitute.

168

1    Q.    Mr. Cole had about 12 criminal

2    convictions?

3    A.    I'd say that's a fair amount.  True.

4    Q.    Those convictions included robberies,

5    possession of stolen property, and carrying

6    concealed weapons?

7    A.    I don't think he had any robbery first

8    degrees.  I don't think he was one that would

9    carry knives and guns.  Robbery second degree

10   maybe.  He had a drug problem.  He did crimes to

11   pay for his drug addiction.  Lots of them, like

12   you said.

13   Q.    Lots of them.  Right.  And he was facing

14   a robbery charge when he was released in June of

15   1999 right before he went to the police department

16   about this case, right?

17   A.    What kind of robbery are you talking

18   about?  Robbery what, first or second?

19   Q.    Well, it was a robbery charge.  Right?

20   A.    Well, I told you it wasn't a robbery

21   first.  I wasn't aware that he was facing any

22   charges.  I knew he had been in the city jail and

23   he had been released on June 4th, 1999.  He

24   immediately went to the police with his story.  I

25   don't know what the crimes he was charged with.

169

1    Somehow he got out on bond that day or he was

2    released that day for different reasons.

3         Q.    Okay.  And Mr. Cole also had a history

4    of drug addiction, correct?

5              MR. SPILLANE:  I'm going to object to

6    asked and answered.

7              THE COURT:  Overruled.

8         A.    Yes.

9         Q.    (By Mr. Potts)  Both of the witnesses

10    expressed interest in the family's monetary

11    reward?

12         A.    At some point -- not Laura Asaro at the

13    beginning.  Then she found out about the reward.

14    And when she found out about it, yes, she was

15    interested.  But that's not why she came forward.

16    Henry Cole on the other hand came forward

17    predominantly for the reward.

18         Q.    Yeah.

19         A.    And to tell the truth.

20         Q.    And he was promised $5,000 for his

21    deposition testimony in April of 2001, right?

22         A.    After he did his deposition in New York,

23    he had to come back -- that was a deposition

24    conducted by the defense.  And then we were going

25    to do a deposition to preserve testimony in

170

1    St. Louis, which was going to be video recorded.

2    And we did do that.  And he was promised the 5,000

3    after he did that.

4        Q.    And so he did get the $5,000?

5        A.    After the trial.

6        Q.    Okay.  And you actually approached

7    Dr. Picus, the victim's husband?

8        A.    I'm sorry.  I think he got it before the

9    trial.

10       Q.    Oh, he got it before the trial?

11       A.    I think he got it after the deposition

12   that he did in St. Louis a month or so prior to

13   the trial.  We gave him the $5,000.  That was a

14   promise we made to him.  And we said, please come

15   back for the trial.

16       Q.    Yeah.

17       A.    We've given you the money.  Please come

18   back.  And he did.

19       Q.    So he had that $5,000 in his pocket

20   before he showed up to testify?

21       A.    No.  He testified under oath twice, but

22   not testified at trial.  He had the money before

23   he testified at trial.  That's correct.

24       Q.    And you approached Dr. Picus about

25   giving that portion of reward money to Mr. Cole

171

1    about four to six weeks before the deposition?

2       A.    Probably so.  I had to get his

3    permission.  It was his money, I believe.

4       Q.    Yeah.  And Dr. Picus actually met with

5    Mr. Cole at the St. Louis Prosecuting Attorney's

6    Office to physically hand him that $5,000 in cash,

7    right?

8       A.    That's true.

9       Q.    And those were the two strongest

10   witnesses you've ever had in a murder trial?

11      A.    Informants?  Absolutely.

12      Q.    Now, there were no eyewitnesses --

13   Excuse me.  Strike that.  There were no

14   eyewitnesses to the murder, right?

15      A.    That's correct.  That's correct.

16      Q.    The murder weapon in the Gayle case was

17   a knife.  Right?

18      A.    Yes.  It was a butcher knife.

19      Q.    It was a violent murder, right?

20      A.    The most violent murder I've ever seen

21   in 40 years.  That is correct.

22      Q.    And that knife was examined and tested

23   by the St. Louis County Laboratory personnel for

24   fingerprints and other evidence before you were

25   involved in the case.  Right?

1          A.    That's correct.  It was tested by

2    Detective Krull for fingerprints one day after the

3    murder.  It was brought there from the autopsy by

4    Dr. Wunderlich.  He seized it from the body.

5    Dr. Nanduri took the knife out of Ms. Gayle's

6    neck, handed it to Detective Wunderlich.

7    Detective Wunderlich put it in an envelope, sealed

8    it, and signed his name.  He hand carried that

9    over to Detective Krull, who is the fingerprint

10   expert for St. Louis County.  And Detective Krull

11   looked at that knife handle, and he found no

12   fingerprints whatsoever on that knife handle.  The

13   knife blade had blood on it.

14          It was then sent over to the County Lab

15   to test for blood.  It tested positive for blood.

16   It was Ms. Gayle's blood.  The knife was all the

17   way into her neck.

18          Then that knife was packaged by the

19   St. Louis County Lab in a box, and it was sent

20   then over to U City to wait until they found

21   someone that committed the crime.

22          So this was all within two or three

23   days.  That knife had been fully forensically

24   tested.  Sufficient for me and sufficient for the

25   defense attorneys.  We were all satisfied with the

173

1    testing.  Neither side asked for any additional

2    testing at any time prior to that trial.

3         Q.    You said that was all within three days?

4         A.    I know the fingerprints was within one

5    day.  And I know that it went from there to the --

6    to the lab to test for blood.  And I don't know

7    for sure that it was within three days.

8              If you show me the box that it was in,

9    it's probably labeled and dated by the lady or the

10   man that tested it at the lab.  I'm guessing

11   between within three days.  I'm pretty darn sure

12   it was within a week.  There was a rush on this.

13   This was not something to sit and wait.

14        Q.    And so that would have been back in

15   when?  What month and year?

16        A.    August of two thousand -- I'm sorry,

17   August of 1998.

18        Q.    So as far as you were concerned the

19   forensics were finished in August of 1998?

20        A.    I wasn't going to ask for any more

21   forensic testing.  The St. Louis County Lab are

22   the experts, and they did what they could do.  I

23   was satisfied with that.  I was not going to ask

24   for any more testing.

25              However, I always knew that the other

174

1    side, whoever they may be, and they were appointed

2    shortly after indictment too, may want to test it.

3    And so I kept it pristine.  I had not taken it out

4    of that box.  It was sealed.  That box was sealed

5    from the St. Louis County Lab with tape.  And I

6    waited until I knew that they were not going to

7    ask for any further testing, that they were

8    satisfied with the tests that were done.  Yes, I

9    knew that to be the case before I touched the

10   knife.

11        Q.    When did you touch the knife?

12        A.    Well, I got the evidence, I'm guessing,

13   I said in my affidavit about a year before the

14   trial.  The trial occurred two years and ten

15   months after the murder.  So you can do the math.

16   But I would like to see the evidence receipt which

17   is State's Exhibit 91 to see what date my

18   investigator brought that from U City Police

19   Department to the prosecutor's office.  I'm

20   thinking it was sometime approximately a year

21   before the trial I had possession of that knife,

22   enclosed in the box from the lab, sealed.

23   Completely.  One hundred percent enclosed in that

24   box.  Not sticking out of the box in any way,

25   shape, or form.

175

1        Q.    Okay.  Mr. Larner, who is Ed Magee?

2        A.    My investigator at the time.

3        Q.    When you say your investigator, what do

4    you mean?

5        A.    He was assigned to help me on this case.

6        Q.    What does an investigator -- so who

7    employed Mr. Magee?

8        A.    St. Louis County Prosecuting Attorney's

9    Office.

10        Q.    So he wasn't a police detective, right?

11        A.    I don't know if they were licensed

12    police officers.  I know he carried a gun.  I

13    don't know if he was licensed by St. Louis County.

14    He came from the City where he had a career in the

15    City as a lieutenant with the Metropolitan Police

16    Department.  Then he came out to the prosecutor's

17    office to work until he retired.

18        Q.    So what are the types of duties that an

19    investigator had with the St. Louis County

20    Prosecuting Attorney's Office?

21        A.    Basically anything I asked him to do.

22    Talk to witnesses, locate witnesses, handle

23    evidence, discuss strategy with me.  Anything that

24    could help me, he was going to do, within the law.

25        Q.    Was it you or Mr. Magee who originally

176

1    took possession of the knife?

2        A.    I think it was Magee.  He got it from

3    the U City Police Department.  Brought it to me in

4    the prosecutor's office.  We lock it in a room

5    right down the hall from my office.  I had a key

6    and Magee had a key, and I believe that's all.

7        Q.    All right.  So let's back this up a

8    little bit.  So Mr. Magee took possession of the

9    evidence from University City Police Department?

10        A.    I believe that's correct.

11        Q.    And then he brought it directly to the

12    St. Louis County Prosecuting Attorney's Office?

13        A.    That's what I asked him to do, yes.

14        Q.    All right.  And would Mr. Magee have

15    been the one who walked it into the building

16    personally?

17        A.    Yes.

18        Q.    Okay.  And then Mr. Magee would have

19    taken it to this locked room that you're

20    describing, right?

21        A.    That's right.

22        Q.    And you said that both you and Mr. Magee

23    had keys to that room?

24        A.    Mr. Magee gave me a key, and so I had a

25    key.  He was the chief investigator.  Although, at

                            177

1   that time he was probably not the chief

2   investigator in the prosecuting attorney's office.

3   Maybe he was.  I don't recall when he became the

4   chief.

5        Q.    So that was a locked room?

6        A.    It was.

7        Q.    There were only two keys?

8        A.    That I knew of, yes.

9        Q.    One key for you, and one key for

10  Mr. Magee?

11       A.    I believe that's true.

12       Q.    Now everything that we're talking about,

13  you've already disclosed this in an affidavit.

14  Correct?

15       A.    Not everything.  Are you kidding?  We're

16  going to talk for an hour.  My affidavit is a page

17  and a half.

18       Q.    Well, what I'm saying is you've at least

19  previewed these issues for everyone in your

20  affidavit, correct?

21       A.    Some of them.  I don't know which issues

22  you're talking about.  Could you be more specific?

23       Q.    Yeah.  Well, I mean, we were talking

24  about how the evidence actually made its way to

25  the St. Louis County Prosecuting Attorney's

178

1    Office, right?  Talked about that in your

2    affidavit?

3          A.    Well, I know I didn't get it from

4    U City.  I believe it was Mr. Magee.

5          Q.    And you were truthful in your affidavit,

6    correct?

7          A.    With regard to what point?  I made a

8    mistake in there, and I'm willing to admit it

9    right now.  Let's talk about it.

10         Q.    Are you aware of any subsequent DNA

11   testing on the knife?

12         A.    Yes.  I think testing was done by, I

13   don't know, the defendant's -- I say, the

14   defendant.  I mean Mr. Williams, his attorneys, in

15   around 2015.

16         Q.    Okay.

17         A.    Approximately.

18         Q.    Are you aware of additional testing that

19   came out last week?

20         A.    I was told that Mr. Magee's DNA is on

21   the knife handle, and that's all I know.

22         Q.    What did you learn about your DNA?

23         A.    I don't know if my DNA is on there or

24   not.  I would like to know.  Was it?  I'd love to

25   know.  I touched the knife.  I touched the knife

179

1    at some point before two thousand -- before the

2    trial.

3         Q.    And when you touched the knife before

4    trial, you touched it without gloves?

5         A.    Yes.

6         Q.    How many times before trial did you

7    touch the knife without gloves?

8         A.    I touched it when I put the Exhibit 90

9    sticker on there.  I touched it when I showed it

10   to State's witnesses before they testified.

11   That's about all I can recall, touching it

12   twice -- or not twice, but there were many

13   witnesses that I showed it to and touched it in

14   preparation for their testimony a month or two

15   before trial.

16        Q.    Okay.  So you're saying that there are

17   two different categories of occasions when you

18   were handling the murder weapon without gloves.

19   The first is when you were affixing the exhibit

20   sticker, and the second is when you were

21   discussing the weapon with witnesses.  Correct?

22        A.    Yes.

23        Q.    And that process started approximately

24   two months before the trial?

25        A.    Hard to say.  I just don't want to be so

180

1  definite.  I know I met with witnesses before

2  trial.  Several times I met with each witness, I

3  would say, in the case.  I would have showed the

4  knife to Detective Krull.  I would have shown it

5  to Dr. Picus.  I would have shown it to

6  Detective Wunderlich, and I would have showed it

7  to Dr. Nanduri, the medical examiner.  I would

8  have showed it to them.  Whether I handed it to

9  them at that time, I can't say for sure.  I know I

10  touched it at that time, and I'm sitting across

11  the table from them, and I'm holding the knife.

12  Did I hand it to them at that time?  I do not

13  recall.

14      Q.   So I want to make sure I got this list

15  correct.  So I heard that you handled the knife

16  without gloves when you were with Detective Krull,

17  Dr. Picus, Detective Wunderlich, and Dr. Nanduri.

18  Is that right, those four people?

19      A.   That's right.

20      Q.   All right.  How many times did you meet

21  with Detective Krull when you were handling the

22  knife?

23      A.   Just the one time to show him the knife.

24  I met with him several times about his testimony.

25      Q.   How many times did you meet with

181

1    Dr. Picus when you were handling the knife without

2    gloves?

3         A.   One time, and I did not have him touch

4    the knife.  It would have been too painful to have

5    him touch his wife's murder weapon.  I showed it

6    to him because I wanted him to identify it in

7    court, if he could.

8         Q.   And how many times when you met with

9    Detective Wunderlich did you handle the knife

10   without gloves?

11        A.   Once.  Again, with Krull and Wunderlich

12   I was going to have them identify it if they could

13   at court in trial.  So I wanted to show it to them

14   before they testified.

15        Q.   And then how many times did you meet

16   with Dr. Nanduri when you were handling the knife

17   without gloves?

18        A.   One time.

19        Q.   So I want you to --

20        A.   She also identified the knife in court.

21   I wanted her to be able to do that.  And so I met

22   with her and showed her the knife.  I don't

23   remember if I handed it to her or not.

24        Q.   Okay.  So I just want to make sure I got

25   this right.  I've got five different occasions

1    where you handled the knife without gloves.  Once

2    with Detective Krull, once with Dr. Picus, once

3    with Detective Wunderlich, once with Dr. Nanduri,

4    and once when you were affixing the exhibit

5    sticker.  Is that correct?

6         A.    Yes.

7         Q.    Can you think of any other times when

8    you were handling the knife without gloves?

9         A.    Not until the trial.

10        Q.    Okay.

11        A.    Again, the defense attorneys at that

12   point had said they didn't want any testing on the

13   knife.  The knife was fully tested.  I also knew

14   at that time that the killer wore gloves.  So

15   whether -- I knew the killer's DNA and the

16   killer's fingerprints would never be found on the

17   knife because the killer wore gloves.  And I knew

18   the killer wore gloves before I touched the knife.

19   So I knew that that knife was irrelevant in that

20   regard.

21        Q.    That's really interesting.

22        A.    In my opinion.  In my opinion.

23        Q.    So you knew or it was your opinion that

24   the killer wore gloves?

25        A.    Oh, I knew because I had talked to

183

```
 1   Detective Creach.  He laid it out in his trial
 2   testimony.  And I met with him before trial.  On
 3   Page 2001, 2002, 2003, and 2004 of the trial
 4   transcript Detective Creach tells you exactly how
 5   he knew that the person that broke into the house
 6   wore gloves.  And you let me know when you want me
 7   to tell you what he said.
 8        Q.    So you say you knew --
 9        A.    I also knew --
10        Q.    Excuse me.
11        A.    -- for other reasons.
12        Q.    Excuse me one second.  We'll get there.
13        A.    Okay.
14        Q.    You weren't an eyewitness to the murder?
15        A.    I beg your pardon?
16        Q.    You were not an eyewitness to the
17   murder, correct?
18        A.    Correct.
19        Q.    You did not see what happened inside
20   that house?  Correct?
21        A.    No.  Not when it happened I didn't.  No.
22        Q.    So what you're saying is, you just
23   decided that your opinion gave you the right to
24   handle the knife?
25        A.    You know --
```

184

1          MR. SPILLANE:  I'm going to object to

2    that.  That's misstating his testimony.

3          A.    Detective Creach --

4          Q.    (By Mr. Potts)  Fair question --

5          THE COURT:  Hold on.  Hold on.  Let me

6    rule.  Overruled.

7          A.    Detective Creach is the one that told me

8    that the killer wore gloves.  He was a crime scene

9    investigator for the St. Louis County Police

10   Department.  On the day of the crime he did the

11   crime scene investigation on this case along with

12   other crime scene investigators.  But he looked at

13   the window that was broken out, the glass pane of

14   window, which was the point of entry.  He looked

15   at the glass that was broken, and he found no

16   fingerprints on the glass whatsoever.

17         He did find two clear marks on -- if

18   this phone was a piece of glass.  There was a

19   piece of glass -- you mind if I go into this now?

20         Q.    (By Mr. Potts)  Let's stop right there.

21         MR. SPILLANE:  Your Honor, can he answer

22   the question?

23         MR. POTTS:  It was not responsive.

24         MR. SPILLANE:  He's been stopped twice

25   from explaining why he believed that the killer

185

1    wore gloves.  Each time he tries to answer he's

2    stopped.

3            MR. POTTS:  That wasn't the question.

4            THE COURT:  You can rehabilitate him.

5    Next question.

6        Q.   (By Mr. Potts)  I want to go back to

7    when you were handling the knife without gloves

8    prior to trial.

9            Now, I can tell you the knife is right

10   there.  I'm not going to get it out because I

11   don't think we need to do that.

12           What I'm interested in is --

13           MR. POTTS:  You mind if I -- may I

14   approach the witness?  May I approach the witness,

15   Your Honor?

16           THE COURT:  For what purpose?

17           MR. POTTS:  I was going to have him show

18   how he was handling the knife.

19           THE COURT:  I'm sorry?

20           MR. POTTS:  I was going to have him show

21   us how he handled the knife.

22           THE COURT:  All right.

23       Q.   (By Mr. Potts)  Just, will you show me,

24   when you were handling -- I'm just going to hand

25   you this.

186

1          A.    I touched the knife handle.  I did not
2    touch the knife blade.
3          Q.    Okay.
4          A.    How did I touch it?  I don't even have
5    any idea how I touched it.  But I touched it
6    enough to be able to hold it.
7          Q.    Did you lift it up?
8          A.    To show, yes.
9          Q.    How long would you hold it for in your
10   hand?
11         A.    Well, when I took it to put the State's
12   Exhibit 90 sticker on there, I pulled it out of
13   the box.  That would have been the first time I
14   took it out of the box.
15         Q.    Okay.
16         A.    And I probably set it down on the table.
17         Q.    Okay.
18         A.    I got out State's Exhibit Number 90,
19   wrote the word -- numbers 90 on it, and I stuck
20   that sticker onto the knife handle.  And I did see
21   the knife this morning.  I know exactly what it
22   looks like just from today.
23         Q.    And what about with Detective Krull,
24   would you hold it up again?
25         A.    About the same.

187

1          Q.    Yeah.  Hold it up?  With Dr. Picus did
2     you hold it up?
3          A.    That's correct.
4          Q.    With Detective Wunderlich you picked it
5     up, held it in your hand by the handle?
6          A.    Correct, before he testified at trial.
7          Q.    With Dr. Nanduri, picked it up, held it
8     in your hands with the handle?
9          A.    Same way, same place, on the end, on the
10    handle end.
11         Q.    And for each of those people you were
12    also open to them handling the knife if they
13    wanted to?
14         A.    At that point in time, yes, I was open
15    to it.  I didn't give it to Dr. Picus for the
16    reason I stated.  I didn't let him touch it.
17         Q.    You didn't make them wear gloves?
18         A.    Not that I recall.
19         Q.    Did you ever see anyone handle the knife
20    with gloves?
21         A.    I did handle it with gloves with a
22    witness during the trial.
23         Q.    During trial?
24         A.    During the trial.  One of the witnesses
25    I did.  That would have been Dr. -- I'm sorry,

188

1  would have been Detective Wunderlich.  I gave him

2  gloves not to handle the knife, but because after

3  he handled the knife he was going to handle the

4  State's Exhibit 93, which was the bloody purple

5  shirt that the victim was wearing.  That had dried

6  blood on it, and I thought he wouldn't want to

7  touch that, and neither did I.  So we both put on

8  gloves for his testimony.  And I state that in the

9  record when I say "put these on".  I'm saying

10  gloves, in case you didn't know.

11       Q.   Now, by the time of the Williams trial

12  you had been a prosecutor for about 17 years,

13  right?

14       A.   That's the math.

15       Q.   Okay.  Before then have you ever had a

16  trial that resulted in a hung jury?

17       A.   Yes.

18       Q.   Had you ever had a judge declare a

19  mistrial for any other reason?

20       A.   I think the very first case I ever tried

21  was a misdemeanor DWI.  And I asked the defendant,

22  because he said he didn't drink, and I said, well,

23  you just got out of inpatient treatment for

24  alcoholism.  He was trying to imply that he never

25  drank.  And I said that.  And the judge said,

189

1    that's a mistrial.  And you know what?  I retried

2    it and won.  That's the way it goes.  That's the

3    only time other than hung juries.

4         Q.   Have you ever had a case reversed on

5    appeal?

6         A.   Not for anything that I did personally,

7    but yes, I've had two.

8         Q.   Okay.

9         A.   I recall two.  One of them we didn't

10   instruct down to voluntary manslaughter.  I

11   convicted him of murder second.  The Supreme Court

12   said you should have instructed down one more time

13   to voluntary manslaughter, and they reversed it

14   for that.

15            The second one was a case where the

16   judge -- I won the motion to suppress regarding

17   the defendant's statement.  And the Court -- the

18   Supreme Court said the judge -- you should have

19   lost that motion to suppress.

20            By the way, I didn't try that motion to

21   suppress.  That was another prosecutor in the

22   office that did that.  I didn't get on the case

23   until after that.  That prosecutor left the

24   office.  Then I got on the case.  But that was the

25   case I was involved with that was reversed.

190

1          Q.    In all those instances the end result is
2     you have to go retry the case, right?
3          A.    That's right.
4          Q.    You ever had a defendant seek
5     post-conviction or habeas corpus relief after one
6     of your trials?
7          A.    I'm sorry.  What was that?
8          Q.    Have you ever had a defendant seek
9     post-conviction --
10         A.    Seek it?
11         Q.    Yeah.
12         A.    Yes.  They all do.
13         Q.    Yeah.  They all do?
14         A.    They all do, yeah.
15         Q.    Have you ever had defense counsel ask
16    for a trial continuance?
17         A.    Of course.
18         Q.    All the time, right?
19         A.    Not all the time, but sometimes.
20         Q.    Yeah.  And sometimes those are granted,
21    right?
22         A.    Not in this case they weren't.  They
23    asked for a continuance.  They didn't get it.  So
24    no, it was not in this case.  In some other
25    case -- I mean, I tried a hundred cases so I'm

191

1    sure.

2         Q.    But in other cases they are granted,

3    right?

4         A.    They can be, and they have.

5         Q.    So at what exact point of these

6    proceedings did you believe that it was

7    appropriate for you to contaminate the murder

8    weapon?

9              MR. SPILLANE:  I'm going to object to

10   the form of the question, Your Honor.  There's

11   been no foundation he contaminated the murder

12   weapon.  He said he held it after it was tested.

13             THE COURT:  Sustained.

14        Q.    (By Mr. Potts)  So what exact point of

15   these proceedings did you believe that it became

16   appropriate for you to handle the murder weapon

17   without gloves?

18        A.    When I knew that I wanted no more

19   testing of this knife.  I thought all the

20   testing -- I didn't even know of any other tests

21   that could be done.  I didn't.  And I assumed the

22   lab did the most thorough job that they could.  So

23   I didn't ask for any, and I knew I wasn't going to

24   ask for any tests.  There were no fingerprints on

25   there.  There was nothing to link anybody to the

192

1    crime on that knife.

2            And I also knew before I touched that

3    knife that Detective Creach gave his opinion to

4    me.  And why -- what formulated his opinion, what

5    facts were there for him to conclude, not me, but

6    for him to conclude that the person that entered

7    the home wore gloves.

8            Second, Henry Cole testified at the

9    trial that the defendant, Mr. Williams, told

10   Henry Cole -- they were cellmates in the city

11   jail.  That's how Henry Cole got all the

12   information.  They were cellmates.  He --

13   Henry Cole testified that the defendant told

14   Henry Cole that the defendant wore gloves when he

15   committed the crime so that he would not leave

16   fingerprints in the house.  Those were -- that's

17   how Henry Cole testified at trial.  And I knew he

18   was going to testify that way in trial.

19           And the third reason I felt I could

20   touch the knife was because there were no prints

21   on it.  There was nothing there.  There was

22   nothing to link anybody to the crime.  It was

23   worthless in my view at that time.

24       Q.   And so I think that what you just said,

25   though, is that it would have been within seven

193

1    days of this murder being committed that forensic
2    evidence testing had been finished, right?

3         A.   I mean, if you're going to hold me to
4    seven, it could have been two, three days.  It
5    could have been ten days.  If you give me that box
6    that I looked at this morning, there's a date on
7    it, I'm sure.

8         Q.   Let's just say that roughly three- to
9    ten-day window.  Any time after that three- to
10   ten-day window had elapsed that's when it became
11   appropriate for you to handle the knife without
12   gloves?

13        A.   No.  I didn't even get involved in the
14   case until 15 months later.  And I told you, it
15   wasn't until I talked to Detective Creach and he
16   told me his opinion, that based on his knowledge,
17   his training, and what he saw that night that the
18   person wore gloves.  And that was real close to
19   the trial.  That was closer to the trial.  Not
20   closer to the murder.  Closer to the trial.

21        Q.   In this case the defense counsel was
22   specifically requesting continuances of the trial
23   date, right?

24        A.   I know that they requested a continuance
25   at some point.  I don't know when they asked for

194

1    it.  Maybe they asked for more than once.  But I

2    don't think the judge gave it to them, is my

3    recollection.

4        Q.    And they were asking for continuances

5    because they wanted to conduct further forensic

6    testing, right?

7        A.    Wrong.

8        Q.    Wrong?

9        A.    Wrong.

10       Q.    Okay.  Why do you think that's wrong?

11       A.    Because they never asked for any

12   forensic testing.  If they had asked me for

13   forensic testing, I would have said, sure.  And if

14   I didn't say sure, the judge would have said yes,

15   they may do it.

16       Q.    Did you oppose the continuance in this

17   case?

18       A.    I don't remember.  I probably did.  I

19   was ready to go.

20       Q.    So you didn't -- when you told them that

21   you wouldn't agree to the continuance, did you

22   tell them that you had been handling the evidence

23   without gloves?

24       A.    I said I probably opposed it.  I know

25   the judge would have none of it.  Judge O'Brien

195

1    would have none of it.

2        Q.    And so you took that position to oppose

3    the continuance after you had already

4    contaminated -- I'm sorry.  I want to strike that.

5    I don't want an objection here.  You took that

6    position that you were going to oppose the

7    continuance after you had already been handling

8    the knife without gloves?

9        A.    Well, you tell me when I opposed the

10   continuance.  It should be in the Court record.

11       Q.    Does around early May sound right?

12       A.    May of what year?

13       Q.    Well, it was right before trial, wasn't

14   it?  You said --

15       A.    The trial was in June.  I think it

16   started on June 4th of 2001.  So May.  That

17   sounds -- that could -- if you say I opposed it,

18   it very well could have been in May.

19       Q.    Yeah.  And, in fact, they filed a

20   supplemental request for continuance on May 25th,

21   right?

22       A.    I don't know.  If it's in the record,

23   then it was.

24       Q.    Yeah.  And when they filed that

25   supplement, you still opposed the continuance?

1          A.    If the record says that, then I did.

2          Q.    In seeking the continuance, defense

3    counsel was also trying to get copies of

4    Mr. Williams' incarceration records from the

5    Department of Corrections, right?

6          A.    I have no idea what the reasons were for

7    their continuance.

8          Q.    Well, was that one of the -- Okay.  You

9    had those records, didn't you?

10         A.    Incarceration records?

11         Q.    Yes.

12         A.    I wanted to prove that he was in jail,

13   the same cell as the informant.  I wanted to show

14   that they were together in jail so that the

15   information could have been transferred as the

16   informant said it was.

17         Q.    I appreciate that.  That's not quite the

18   question.  I'm saying, you had possession of those

19   records, didn't you?

20         A.    Was that an exhibit that I used in the

21   case?  If it was, I had possession of them.  I

22   don't know when I got possession of them.  I might

23   have got -- I don't know when I got possession of

24   those records.  They're probably dated by the

25   person that made those records at the jail.

197

1    They're official records.  They're dated.

2        Q.    Now, this case involved a stolen laptop,

3    right?

4        A.    That was one of the things stolen, yes.

5        Q.    Yeah.  And Dr. Picus had to also look at

6    the laptop that was recovered, correct?

7        A.    That's correct.

8        Q.    And Dr. Picus had to wear gloves when he

9    was handling the laptop, right?

10       A.    I don't recall that one way or the

11   other.  The laptop was never forensically tested

12   like the knife was.  I don't believe the laptop

13   was ever -- any testing was done on it.  I don't

14   recall any being done.  I don't see any reason to

15   have used gloves on that if it wasn't going to be

16   tested.  And I don't know whether gloves were

17   used.  I just don't remember.

18       Q.    Now, did you allow the jurors to handle

19   the knife at trial?

20       A.    Absolutely not.

21       Q.    Why not?

22       A.    The judge wouldn't have allowed that.

23       Q.    Okay.  But I mean, would you have had a

24   problem with the jurors handling the knife at

25   trial?

1        A.    That calls for speculation on my part,

2    and I guess I don't really know.  I do not want

3    the jurors touching any piece of evidence other

4    than maybe a photograph or something that they

5    would need to touch.  So I don't think in any case

6    a juror should touch a knife or a gun.  After all,

7    they might stab each other.  Who knows.

8        Q.    You said that doctor -- I mean,

9    Detective Wunderlich was wearing gloves when he

10   handled the knife at trial?

11       A.    I handed him gloves, yes.  I said, Put

12   these on.  Those were my exact words.

13       Q.    But you didn't hand them to him when he

14   was handling the purple shirt.  You handed them to

15   him when he was handling the knife.  Correct?

16       A.    I handed him those gloves before he

17   touched any exhibit.  It was right at the

18   beginning of his testimony.  I thought, why not

19   start him with gloves.  Why interrupt his

20   testimony with putting on gloves right in the

21   beginning.  And the beginning was the knife.

22   That's when I started talking about the knife.

23   And then from the knife I went into the bloody

24   purple shirt he seized at the autopsy.  He seized

25   the knife and the purple shirt.  And those were

199

1    the items that I was going to talk to him about

2    when he testified.  That's when I gave him the

3    gloves, and that's why I put them on too.

4         Q.    And that's because evidence with blood

5    on it should be handled wearing gloves, right?

6         A.    That's a matter of personal opinion.  I

7    just thought, you know, I don't know if I

8    discussed it with him in advance, but the purple

9    shirt was just loaded, drenched in blood.  You

10   could imagine.  It was dried blood.  And I didn't

11   really care to touch it, and I knew or figured he

12   didn't either.

13        Q.    Let's talk about jury selection.

14        A.    All right.

15        Q.    There were over 100 potential jurors who

16   responded to their summonses and showed up for

17   this case, right?

18        A.    Probably so.  In fact, I think you're

19   right.  Had to have been a hundred.  It was a

20   death penalty case.

21        Q.    Exactly.  I'll tell you, does 131 sound

22   right for a death penalty case?

23        A.    Yeah.

24        Q.    Okay.  Of more than a hundred potential

25   jurors, only a handful of them were black?

1          A.    I don't know how many were black.

2          Q.    You don't?

3          A.    You tell me.

4          Q.    Through alternates who went through

5    selection of seven black members of the veneer.

6    Did that sound right?

7          A.    I know how many I struck.  I had nine

8    peremptory strikes.  I struck three.  Three of

9    nine blacks -- not three of nine blacks.  Three of

10   nine people were black.  Six of nine people were

11   white.  I struck six whites, three blacks.

12   Leaving one black on the jury is the way it came

13   out.

14         Q.    We'll get to that, but I think you have

15   those numbers reversed.

16         A.    No.  I think you have them reversed,

17   actually.

18         Q.    Okay.  All right.

19         A.    I know for a fact -- I read the Supreme

20   Court opinion.  I struck Juror Number 64, 65, and

21   72.  Those were my peremptory strikes.  And you

22   know what a peremptory is?

23         Q.    Yes.

24         A.    Okay.  I have nine strikes I can use.

25   Okay?  I got to strike nine.  And I struck three

201

1    African Americans, and I struck six whites,

2    leaving one African American on the jury.

3             And the Supreme Court has outlined my

4    strikes.  And they said that my strikes were

5    lawful, the Missouri Supreme Court.

6        Q.   So would it bother you if the numbers

7    were reversed and you struck six black instead

8    of --

9        A.   Peremptory?

10       Q.   Yeah.

11       A.   I read the Supreme Court case.  I think

12   I have it with me right here.

13       Q.   Okay.

14       A.   And it's three.  It's Number 64, 65, and

15   72.  Now, were other blacks struck along the way

16   because they couldn't consider -- for example, if

17   you couldn't consider the death penalty as one of

18   the options in the case, then you were

19   automatically struck by -- whether you're black or

20   white because you couldn't follow the law.  The

21   law was you had to be able to consider both

22   penalties.

23             If someone said, I would only vote for

24   death, they were struck by the court.  If someone

25   said, I can only consider life without parole,

202

1    then they were struck by the court.

2            Then after that's all done, if they

3    couldn't follow the law for any reason, then

4    they're struck by the court.

5            I don't know how many of them -- people,

6    black or white, were struck on that basis.  But

7    once we got everyone that was qualified, there

8    were apparently there were four left.  I struck

9    three of the four.  And I gave my reasons to the

10   Supreme Court, or the Attorney General represented

11   those reasons -- well, the record showed what the

12   reasons were, the three that I struck.  And the

13   Supreme Court affirmed the case and said there was

14   no constitutional error.  I struck properly.

15           In other words, I had race neutral

16   reasons to strike the African Americans, which is

17   required by the Kentucky v. Batson 19 -- I

18   believe -- 84 case.

19      Q.    Now, that was a very long answer, but I

20   want to circle back to what my actual question

21   was.  And that was, would it be a problem if you

22   had used six of the nine strikes on black jurors

23   instead of white jurors?

24      A.    You didn't say peremptory, did you?

25      Q.    Would it have been a problem if you had

203

1    used six of your nine peremptory strikes on black

2    jurors instead of white jurors?

3         A.    Would it have been a problem?  Well, if

4    I did it, which I didn't, but if I did and the

5    Supreme Court says it was lawful, then no, that's

6    not a problem.

7         Q.    Okay.  Does that sound like a high

8    number to you?

9         A.    I struck three.  Number 64, 65, and 72,

10   and I have the case right here.

11        Q.    Let's talk about those potential black

12   jurors that you struck.  You struck one of those

13   jurors because she was an unwed mother, right?

14        A.    Wait a minute.  I struck -- why I struck

15   them?  Okay.  Why I struck, I don't know.  Look at

16   the Supreme Court case.  It outlines my -- it

17   quotes me, I believe.

18        Q.    Yeah.

19        A.    Read it.

20        Q.    Did you read the Supreme Court case?

21        A.    Let me look at it now.

22        Q.    No, no.  I don't want you to read it

23   right now.  We'll do the questions.  Did you read

24   the Supreme Court case before you came in today?

25        A.    Not today I didn't read it.

1          Q.    Well, I mean as you prepared for today
2      did you reread the case?
3          A.    I read it last week.  And that's how I
4      remember that 64, 65, and 72, those numbers.  You
5      know, there's a 133.  You said a 131.  Each juror
6      has a number, one, two, three, four, five.  Well,
7      we were already up to, you know, we used a lot of
8      those jurors.
9          Q.    All right.  So one of the ones you
10     remember was Juror Number 64?
11         A.    I don't remember why I struck Juror
12     Number 64.  Nor do I remember why I struck 65.
13     Nor do I remember why I struck 72.  It's right
14     there in the opinion, and it's in the record.
15     It's in the record of the trial.
16         Q.    Do you remember telling the Court that
17     you struck Juror Number 64 because he looked very
18     similar --
19             MR. SPILLANE:  I'm going to object.
20         Q.    (By Mr. Potts)  -- to the defendant?
21             MR. SPILLANE:  Objection.
22         Q.    (By Mr. Potts)  He reminded you of the
23     defendant?
24             THE COURT:  Let him finish his question.
25     Then you can object.

205

1              MR. POTTS:  I will say it again so we

2      can get it on the record.

3              THE COURT:  Thank you.

4         Q.   (By Mr. Potts)  Do you remember that you

5      struck Juror Number 64 because he looked very

6      similar to the defendant and reminded you of the

7      defendant?

8              MR. SPILLANE:  Are you done with your

9      question?

10             MR. POTTS:  Yes.

11             MR. SPILLANE:  I'm going to object.  The

12     reasons are in the trial transcript.  They're in

13     the Missouri Supreme Court opinion.  They're in

14     the 8th Circuit opinion, and the witness has

15     already said he doesn't remember.

16             THE COURT:  Maybe he's using it to

17     refresh his recollection.

18        A.   If you show me the case, it will refresh

19     my recollection.  Show me that Supreme Court case,

20     and I'll read it.  It will tell you exactly why I

21     did.  Whatever I did, the Supreme Court said it

22     was lawful.  Not a violation of the defendant's

23     constitutional rights.  On all three jurors.  And

24     you know what?  If one of them was messed up, if I

25     made a mistake on one of those three, this case

206

1    would have been reversed in 2003.

2              THE COURT:  Mr. Larner, wait for a

3    question, please.

4              MR. POTTS:  May I approach the witness,

5    Your Honor?

6              THE COURT:  You may.

7         Q.   (By Mr. Potts)  So I'm going to hand

8    you -- this is just an excerpt from the trial

9    transcript which is already in the record.  This

10   is Page 1586.  I'm going to direct you to Lines 12

11   through 20.  And you can read that quietly.

12        A.   Are you talking about Juror Number 64?

13        Q.   I am indeed.

14        A.   Well, it starts on the previous page,

15   actually.  So I'm not going to read part of what I

16   said.

17        Q.   Well, you're more than welcome to read

18   all of it.  I was just directing you to the part

19   where --

20        A.   No.  I'm going to read it all.

21             THE COURT:  Let's not have a

22   conversation.  Let's have a question and an

23   answer.

24             MR. POTTS:  No problem, Your Honor.

25        Q.   (By Mr. Potts)  You're more than welcome

207

1    to read all of that.

2         A.   Can I read it out loud?

3         Q.   No.

4         A.   I give many reasons, many reasons for

5    striking that juror.

6         Q.   Yes.  And so one of those reasons,

7    though, that you gave was that Juror Number 64

8    looked very similar to the defendant.  Right?

9         A.   Wrong.  I want to read what I said on

10   that one reason.  You stated like part of it, you

11   know, just like half of it or not even half of it.

12   I know what it says.  I see it right here.  So

13   you're wrong.

14            I said -- that's part of what I said.  I

15   said, He also to my view looked very similar to

16   the defendant.  He reminded me of the defendant,

17   in fact.  He had the very similar type glasses as

18   the defendant.  He had the same piercing eyes as

19   the defendant.  And I went on and on with

20   additional reasons.  That was one reason.  But I

21   gave many other reasons why I didn't like that

22   juror and why I struck that juror.  And the

23   Supreme Court said, No problem.

24        Q.   So when you said that he looked very

25   similar to the defendant, these were two younger

208

1    black guys who looked alike.  Right?

2              MR. SPILLANE:  I'm going to object to

3    mischaracterization of the testimony.  He said

4    that he had the same glasses and he had basically

5    the same demeanor.  Not that they were black guys

6    that looked alike.  He's mischaracterizing the

7    testimony.

8              THE COURT:  Thank you.  Overruled.  The

9    transcript is the best evidence of what was said

10   at trial.  So I would prefer, Mr. Potts, if you

11   could identify the page number and the line

12   numbers of that transcript so the record is clear.

13             MR. POTTS:  All right.  Thank you, Your

14   Honor.  So right now I am talking about Page 1586

15   Lines 12 and 13.

16             Do you see where you say, He also in my

17   view looked very similar to the defendant?  Do you

18   see that.

19        A.   Read the rest of Line 13.  You said you

20   were going to read 12 and 13.  You haven't done

21   that.

22        Q.   I promise we'll get there.  I'm just

23   going one sentence at a time.

24        A.   Okay.  One sentence at a time?

25        Q.   Yeah.

209

1          A.    To my view, he also to my view looked

2    very similar to the defendant.  That is a sentence

3    I said.

4          Q.    Okay.  And so these were both young

5    black men, right?

6                MR. SPILLANE:  I'm going to object

7    again.  He said he was going to get there.  He

8    didn't get there.  He started talking about both

9    young black men.

10               MR. POTTS:  How can I not explore what

11   he meant by that statement, Your Honor?

12               THE COURT:  We can't have a stipulation

13   that they were both young black men at the time of

14   the trial?

15               MR. SPILLANE:  Yeah, I think that's

16   fine.

17               THE COURT:  I mean, I don't know how

18   it's relevant but --

19               MR. SPILLANE:  Yeah.

20               THE COURT:  Okay.  So why are we

21   objecting?  You may answer.

22               MR. SPILLANE:  He's saying that's the

23   reason why he struck him, and he's never said

24   that.

25         A.    So he did look very similar to the

                              210

1    defendant, yes.

2         Q.    (By Mr. Potts)  And by that, they were

3    both young black men; right?

4         A.    They were both young black men.

5         Q.    Okay.

6         A.    But that's not necessarily the full

7    reason that I thought they were so similar.  Not

8    because he was black and the defendant was black.

9    I mean, if the juror, potential juror was black

10   and the defendant was black and I struck him, that

11   would have been kicked out by the Supreme Court in

12   a second.  That would have come back for a

13   complete retrial.

14        Q.    They both wore glasses?

15        A.    Similar type glasses.  Not just glasses.

16   They looked to me like they were identical.  They

17   were similar type glasses, yes.  That was the

18   second reason.

19        Q.    So they liked the same brand of glasses

20   potentially.  Is that right?

21        A.    I don't know what they liked.  All I

22   know is the glasses were very similar.  And I said

23   something more about their similarities, several

24   things.

25        Q.    And they both had goatees, is that

211

1    right?

2         A.    I don't know what page you're referring

3    to on that.  I said he reminded me of the

4    defendant.  Had similar type glasses.  He had the

5    same piercing eyes as the defendant.  I said that

6    juror had piercing eyes, and so did the defendant.

7    I thought they looked like they were brothers.

8         Q.    They looked like brothers?

9         A.    Familial brothers.

10        Q.    Okay.

11        A.    I don't mean black people.  I mean,

12   like, you know, you got the same mother, you got

13   the same father.  You know, you're brothers,

14   you're both men, you're brothers.

15        Q.    So you struck them because they were

16   both young black men with glasses?

17        A.    Wrong.  That's part of the reason.  And

18   not just glasses.  I said the same type glasses.

19   And I said they had the same piercing eyes.

20        Q.    So part of the reason was that they had

21   piercing eyes, right?

22        A.    The same piercing eyes.

23        Q.    Same piercing eyes.  Part of the reason

24   was they had the same piercing eyes?  Right?

25        A.    Yes, part of the reason.

1          Q.    Part of the reason was that they both

2     had the same type of glasses, right?

3          A.    That's part of the reason.

4          Q.    Part of the reason is that they were

5     both young.  Right?

6          A.    I didn't say about the age.  I said in

7     my view he looked very similar to the defendant.

8     I didn't talk about age.  But I think they were

9     about the same age, they looked to me.  They

10    looked like they were brothers.

11         Q.    And part of the reason is that they were

12    both black?

13         A.    No.  Absolutely not.  Absolutely not.

14    If I strike someone because they're black, under

15    the Supreme Court of the United States Batson and

16    other cases, then the case gets sent back for a

17    new trial.  It gets reversed if I do that.

18         Q.    Now I want to direct you to the same

19    page, 1586.  Do you see Lines 8 through 11?  And

20    I'll let you read those.

21         A.    Yes.

22         Q.    So that juror was wearing a shirt with

23    an orange dragon and Chinese or Arabic letters on

24    it.  Right?

25         A.    That's right.

```
1          Q.   All right.  Was the defendant also
2     wearing that type of shirt at trial?
3          A.   No.
4          Q.   No.  Okay.  Now, I want to now direct
5     you to Page 1586.  Let's look at Lines 9 through
6     11.  I'm going to let you read those.
7          A.   To myself or out loud?
8          Q.   You can read it to yourself.
9          A.   All right.  I see it.
10         Q.   Okay.  The juror was wearing a large
11    gold cross outside of his shirt.  Right?
12         A.   That's part of the sentence.  But you
13    got to read it all.  You're taking it out of
14    context.
15         Q.   No.  No.
16         A.   He had a large gold cross very prominent
17    outside his shirt, which I thought was
18    ostentatious looking.
19         Q.   Yeah.
20         A.   That was my reason.  That was another
21    reason why I didn't like him.
22         Q.   Was Mr. Williams wearing a large gold
23    cross outside of his shirt?
24         A.   No.
25         Q.   Okay.  Now, let's also look at Lines 18
```

214

1    through 20.  The juror was wearing gray shiny

2    pants, right?

3          A.    With that wild shirt, yes.

4          Q.    Yeah, with the wild shirt.  Was the

5    defendant wearing gray shiny pants at trial?

6          A.    No.  But the juror was similar in the

7    other ways that I said.

8          Q.    Okay.

9          A.    Not every single way.  Didn't have the

10   same shoes on.  It's not every single way were

11   they the same.

12         Q.    And let's actually go back to Page 1585,

13   and let's look at Lines 22 through 25.  Juror

14   Number 64 also had two earrings in his ear.

15   Right?

16         A.    In his left ear.

17         Q.    Yeah?

18         A.    Which I went on to describe why I don't

19   like that.

20         Q.    Did Mr. Williams have two -- let's see.

21   I want to make sure -- two earrings in his left

22   ear?

23         A.    I don't think so.  I don't have any

24   reason to believe that.  If he did, I would have

25   said they both had two earrings.

215

1          Q.    Okay.  So to summarize, this was a young

2    black man --

3          A.    I'm sorry, but you didn't finish the

4    sentence about the earrings.  You cut it off right

5    in the middle.

6          Q.    You can have the State ask you some more

7    questions.

8               MR. SPILLANE:  I ask he be allowed to

9    finish his answer, Your Honor.

10              THE COURT:  He answered the question.

11   Overruled.

12              MR. POTTS:  To summarize, Juror

13   Number 64 was a young black man who was wearing a

14   shirt with an orange dragon and either Chinese or

15   Arabic letters with a large gold cross on his

16   chest, gray shiny pants, glasses and had a goatee,

17   and he reminded you of the defendant.

18         A.    There was more than that.  You haven't

19   hit all the reasons.  I told you about the

20   piercing eyes the same as the defendant.  I said

21   the glasses were similar-type glasses as the

22   defendant.  I said that the cross, the large gold

23   cross, very prominent, which I thought was

24   ostentatious.  And I also said that -- I gave a

25   lot more reasons, actually.  A lot more.

216

```
 1          Q.    Now, during voir dire in this case did
 2    you take notes?
 3          A.    Very few notes.  Very few, but yes, I
 4    took a few.  I was busy talking to people.  It's
 5    hard to write and talk, but I took a few.
 6          Q.    You did?  Okay.  I mean, at the same
 7    time, you have a 131 people potentially whose
 8    answers you have to be managing to these
 9    questions.  Right?
10          A.    As best you can, yeah.
11          Q.    Best you can.  What did you do with
12    those notes?
13          A.    Saved them.  You probably have them.
14          Q.    Would you be surprised if the
15    prosecuting attorney's office could not find those
16    notes in their box?
17          A.    I haven't been with the prosecutor's
18    office in ten years.  Since then you've done DNA.
19    I wasn't involved in any of that DNA in 2015.  I
20    have no idea what happened to that file since
21    May 1st, 2014.  I have been gone, retired.  That's
22    over ten years.  I have no idea what happened to
23    that.  I would like to see it, though.  I'm
24    curious myself about those notes.  Actually, the
25    prosecutor's office is the one trying to overthrow
```

217

1    the conviction.  You guys should have the notes.

2         Q.    Have you ever been found to have

3    violated Batson v. Kentucky in another case?

4         A.    Now let me say this perfectly clear.

5    Never.

6         Q.    Never?

7         A.    Never.

8         Q.    So no judge has ever found that you have

9    failed to provide a race neutral reason for using

10   a peremptory strike on a black juror?

11        A.    I thought you said have I ever been

12   reversed.

13        Q.    I said, Has any judge ever found you

14   have violated Batson in another case?

15        A.    Oh, okay.  Okay.

16        Q.    So different answer?

17        A.    Yeah.

18        Q.    Okay.  So you have been found to have

19   violated Batson?

20        A.    Yes and no.  It depends what -- can you

21   be more specific?

22        Q.    Well, you were the trial prosecutor in

23   McFadden case, right?

24        A.    Yes.

25        Q.    Judge Ross was the trial judge in that

218

1    case, right?

2          A.    That's right.

3          Q.    And Judge Ross found that you had failed

4    to provide race neutral reasons for exercising

5    peremptory strikes on black jurors, correct?

6          A.    On three black jurors, that's right.  I

7    disagreed with him, but he's the judge.  And we

8    put those jurors back on the jury.  And they were

9    on that case, and they voted death.  They were put

10   back on that jury.  But yes, I was wrong on that.

11   But it was not by a -- I've never been reversed on

12   Batson.  And that's what I thought you were

13   asking.  I tried all those cases.  Most of them I

14   won, almost all.  And they were all appealed on

15   Batson.  If any black was struck, they appealed on

16   Batson.

17              In all those cases, and I'd say there's

18   probably 25 to 50 that were appealed on Batson,

19   none of those by any court, appellate court,

20   reversed me on Batson.

21              On that one case Judge Ross, he thought

22   I didn't have sufficient reasons.  He actually, he

23   told me that, he says, before I even struck them

24   he said, if you strike them, I'm going to put them

25   back on.  And I struck them anyway because I

219

1    thought I was right.  And you know what?  He put

2    them back on, and they stayed on, and they voted

3    for death.

4         Q.    You struck them anyway?

5         A.    Yeah, because I thought he was wrong.

6    But he's the judge, and he ruled that I was wrong.

7    And I don't have a problem with his ruling at all.

8    I mean, I did at the moment, but it is what it is.

9         Q.    So as we have been sitting here talking,

10   you know, is it still your memory that you only

11   used six of your nine peremptory strikes on black

12   jurors in the williams case?

13        A.    No, no.  Three.

14        Q.    Sorry.  I actually did not mean to do

15   that.  It's still your memory that you only used

16   it on three black jurors in this case, right?

17        A.    That's what the Supreme Court opinion

18   says.

19        Q.    Okay.  So I want to talk about how you

20   selected the jury in this case.  Okay.  So we

21   already went through this a little bit, but the

22   reason the potential jury pool is so large in this

23   case is because it's a death penalty case.  Right?

24        A.    Correct.

25        Q.    And it's more difficult than other

1    felony cases to get a proper jury pool in a death

2    penalty case, right?

3         A.    That's correct.

4         Q.    Because some people have pretty strong

5    feelings about capital murder, right?

6         A.    One way or the other.

7         Q.    One way or the other.  There's a name

8    for the type of jury that's eligible to get

9    seated, right?

10        A.    To get what, sir?

11        Q.    That's eligible to get seated in a

12   capital murder case, right?

13        A.    There's a name for it?

14        Q.    A death-qualified jury, right?

15        A.    I would say that's -- I've used that

16   term.

17        Q.    Okay.  So typically jury selection in a

18   death penalty case goes through a couple different

19   phases, right?

20        A.    Tell me what you mean.

21        Q.    Yeah.  So starting out first you need to

22   eliminate jurors who have potential conflicts, you

23   know, for example, work or family conflicts that

24   are going to prevent them from being able to serve

25   on the jury; right?

221

 1        A.    That's right.  It was a sequestered

 2   jury.

 3        Q.    Okay.  And then next you move on to

 4   death qualification with the remaining jurors,

 5   right?

 6        A.    If that was the second thing the judge

 7   did, it could very well be.

 8        Q.    Fair enough.  That's what they did here,

 9   they moved on to death qualification for the

10   remaining jurors.

11        A.    Okay.

12        Q.    And then finally after that, after any

13   more strikes for cause you moved on to a more

14   general voir dire with the remaining jurors;

15   right?

16        A.    That's right.

17        Q.    Okay.  So what does it mean to have a

18   death-qualified jury?

19        A.    That meant that the jurors could

20   consider death or life without parole.  Both.  If

21   they could only consider death, if that's the only

22   one -- some people say an eye for an eye and if

23   you kill someone you're going to get death.  You

24   know what I say to that?  You're not on the jury.

25   I don't say it to them, but I tell the judge, get

1    rid of them.  And so does the defense attorney.

2    They don't want a juror like that either.  That's

3    against the law.

4         Q.    That means all jurors, including black

5    jurors, have to be death qualified.  Right?

6         A.    All jurors must be able to consider both

7    punishments.  That's the law.

8         Q.    And you're kind of getting into this,

9    but there's a sequence of questions that you

10   typically ask jurors to figure out whether they're

11   fit to serve on a death penalty jury.  Right?

12        A.    I mean, there's a ton of questions that

13   you ask them.

14        Q.    Yeah.

15        A.    And you ask every juror the same

16   question.

17             MR. POTTS:  And if you'll give me one

18   moment, Your Honor.  I'm thinking this will help.

19   Don't worry, it's just a standup chart.  Can you

20   see that, Your Honor?

21             THE COURT:  I can.

22             MR. POTTS:  You might have to go in the

23   jury box, Mr. Spillane.  I'm sorry.  I'm not

24   trying to do that to you.

25        Q.    (By Mr. Potts)  All right.  So let's go

223

1    through how you pick jurors for a death penalty

2    case.  Okay?  I'm going to put a title up here

3    jury selection.  Okay?

4              So first of all, to serve on a jury in a

5    death penalty case a juror can't be categorically

6    opposed to the death penalty; right?

7        A.    Right.  They have to be able to consider

8    both punishments.

9        Q.    Okay.  I put death right there.  Next, a

10   juror alternatively can't believe that the death

11   penalty should be imposed in every capital murder

12   case, right?

13       A.    Correct.

14       Q.    Meaning they have to be able to consider

15   life without parole?

16       A.    They have to be able to consider both

17   punishments.  If they're only going to vote death,

18   even though I might like that juror as a

19   prosecutor, that's illegal, and I know that.  I

20   ask them if they can consider both punishments.  I

21   always ask every juror, can you consider this one

22   and can you consider that one.  Both of them.  I

23   don't just pick one.

24       Q.    Okay.  So in other words, a

25   death-qualified juror must be willing to consider

224

1    both types of potential punishment?

2        A.    Two punishments that are allowed under

3    the law for murder first degree.

4        Q.    Now, also the juror needs to be willing

5    to weigh aggravating and mitigating factors to

6    determine whether the death penalty is

7    appropriate, right?

8        A.    That's right.

9        Q.    Okay.  There's some other problems that

10   can happen with jurors.  Jurors must be willing

11   to -- must agree to follow the Court's

12   instructions at trial.  Right?

13       A.    Every juror in every case, that's

14   correct.

15       Q.    Yep.  And jurors must be willing to hold

16   the prosecution to its burden of proof, right?

17       A.    Beyond a reasonable doubt is the burden

18   of proof, and you are right.

19       Q.    Okay.  Okay.  Also jurors need to wait

20   to hear all the evidence before they make up their

21   minds?

22       A.    Yes.

23       Q.    Right?

24       A.    Yes.

25       Q.    Now, as a prosecutor do you generally

225

1    want more or fewer death-qualified jurors?

2        A.    Well, depends what you mean by death

3    qualified.  What I mean by death qualified is they

4    can consider both punishments and they'll keep

5    their mind open on both punishments until the

6    absolute very end.  They can't make up their mind

7    before that which way they're going to go.

8        Q.    Yeah.  So maybe another way to put that

9    is you don't want it to be automatic one way or

10   the other?

11       A.    Correct.

12       Q.    Right?

13       A.    That would be illegal.

14       Q.    That would be illegal.  Now, throughout

15   jury selection there are certain ways to protect

16   the jurors that you potentially want, right?

17       A.    You'll have to give me an example.

18       Q.    Well, for example, you can ask those

19   jurors leading questions instead of open-ended

20   questions.  Right?

21       A.    I think both sides can do that.

22       Q.    Yeah.  No, I'm saying both sides can do

23   it.

24       A.    Yeah.

25       Q.    Okay.  And also you can rehabilitate --

226

```
1          A.    I don't know what you mean by leading.
2     Are you, like, putting words in their mouth?  Is
3     that what you mean by leading?  You don't put
4     words in the juror's mouth.  You want to hear
5     their honest opinion whether they can do it or
6     not.
7          Q.    You can ask them a direct yes or no
8     question, right?
9          A.    Yes.
10         Q.    Like the one I just asked you?
11         A.    Yes.
12         Q.    Okay.  Now also you can rehabilitate
13    those jurors afterwards if they potentially give
14    an answer that's not favorable to you when they're
15    being asked questions by defense counsel, right?
16         A.    I question the jurors first, and I'm
17    done.  Then the defense attorney questions the
18    jurors, and they're done.  I don't get another
19    shot at the jurors.  I don't get another chance.
20         Q.    You're absolutely right.  I misspoke.
21    You can rehabilitate jurors after they give you a
22    question that maybe wasn't the perfect answer but
23    you still think they might be a good juror for
24    you, right?
25         A.    I don't know what you mean.  You have to
```

227

 1    give me example.
 2        Q.    Okay.  No.  That's totally fine.  So
 3    let's start by looking at your questioning of
 4    Juror Number 8.
 5            MR. POTTS:  Your Honor, this is just an
 6    excerpt from the trial transcript Pages 205 and
 7    206.
 8        Q.    (By Mr. Potts)  Are you able to see up
 9    on that screen?
10        A.    No.
11        Q.    Okay.  I do have a courtesy copy for you
12    right here.  There you go.
13        A.    Thank you.
14        Q.    So I have blacked out the names of the
15    jurors for the ones I'm putting up on the screen.
16        A.    Okay.
17        Q.    But you should have the un-redacted copy
18    in front of you.  Now, let's go ahead and walk
19    through these questions.  So one of the things
20    that you're doing here is with Juror Number 8
21    you're asking can you legitimately consider
22    imposing the death penalty.  Right?
23        A.    In the proper case.
24        Q.    Yeah, in the proper case?
25        A.    Yes.

228

1          Q.    Yes?

2          A.    Yes.

3          Q.    So that's the very first question up

4     here on the chart, right?  I'm talking about the

5     chart that's right here.  Whether they're willing

6     to sentence someone to death?

7          A.    Okay.  Your question is what, please?

8     I'm sorry.

9          Q.    All right.  And so --

10         A.    Oh, yeah.  Okay.

11         Q.    Yeah, that's Line 7 through 9.  Sorry.

12    And then later in Line 17 through 22 you're asking

13    whether the juror can also consider life without

14    the possibility of parole.  Right?

15         A.    Yeah.

16         Q.    Okay.  You clarify on -- at the bottom

17    of the Page 24 and 25, you consider both

18    punishments.  Right?  Then you ask the juror

19    whether she could stand up in open court and

20    announce the verdict if that was the death

21    penalty.  And that's Lines 2 through 4.  Do you

22    see that?

23         A.    Yes.

24         Q.    Then in Lines 6 through 11 you're

25    clarifying that the burden of proof is always with

229

1    the State.  That's one of these questions right

2    here.  Right?

3         A.    That's right.

4         Q.    Burden of proof?

5         A.    I clarified that.

6         Q.    Okay.  Now, did you ask -- you didn't

7    ask any specific questions about following the

8    judge's instructions that you can see, did you?

9         A.    I don't know.  I'd have to read all the

10   testimony from that witness -- that jury, I mean.

11        Q.    I thought you said that once you're done

12   with the juror, you're done; right?

13        A.    I ask questions until I decide I have

14   gotten answers from the jury, juror, that are --

15   that we know what they meant.

16        Q.    Okay.

17        A.    Sometimes they equivocate.  You have to

18   dig a little deeper.

19        Q.    Did you ask the juror whether she'd be

20   able to weigh aggravating against mitigating

21   factors?

22        A.    If there's more aggravating than

23   mitigating, could you still consider life without

24   parole.  Yes, I asked her that.

25        Q.    You asked whether she could weigh.

```
1         A.   Do I use the word weigh?

2         Q.   No, you don't.  Right?

3         A.   No.  I use -- I compare them.  If

4    there's more aggravating -- even if there's zero

5    mitigating.  Only aggravating could you still vote

6    for life without parole.  And she says, Yes.

7         Q.   Okay.  And did you ask the juror whether

8    she would wait to hear all the evidence before

9    making up her mind?

10        A.   What line?

11        Q.   I'm asking you.  You can review that.

12   Did you ask her?

13        A.   About weighing?

14        Q.   No.  About whether she would wait to

15   hear all the evidence before making up her mind.

16        A.   The judge instructs her of that.  I

17   don't have to instruct her.  But I don't know that

18   I said it to that juror.  The judge instructs the

19   entire panel.  There's an instruction of law on

20   that, and the judge gives it to the jury.

21        Q.   And I'm just asking whether you asked

22   her the question?

23        A.   I don't see that I did with that --

24        Q.   Okay.

25        A.   -- particular case.  I did say, If
```

231

1    there's only bad stuff and that is only

2    aggravating circumstances and zero mitigating, you

3    still have to be able to consider life even if

4    there's nothing on the defense side, even if they

5    got nothing, you still got to consider life

6    without parole, and she said, Yes.

7        Q.    Did you ask her whether she would

8    automatically decide one way or the other?

9        A.    I asked her if she could consider both

10   punishments, and she said, Yes.  So that to me

11   means she wasn't automatic either way.

12       Q.    I can give you a checkmark on that one.

13   So after looking at that do you know whether Juror

14   Number 8 was a black or a white juror?

15       A.    No clue.

16       Q.    Do you remember whether Juror Number 8

17   made the jury?

18       A.    No.  I don't know.

19       Q.    Well, I'll actually go ahead and

20   represent to you Juror Number 8 was a black juror.

21       A.    Okay.

22       Q.    All right.  And we can agree that you do

23   know how to ask some of the right questions to

24   black jurors.  Right?

25       A.    No.  I know all the right questions to

232

1    ask for every juror or I wouldn't have been trying

2    this magnitude of a case, in my opinion.

3         Q.    Let's go ahead and look at some of the

4    other jurors.  Now, as part of your presentation

5    to the jury in this case you gave them an analogy

6    about three doorways.  Is that an analogy that

7    you've used in other cases?

8              MR. SPILLANE:  I'm going to break in now

9    that his question is finished and object to this

10   whole line of questioning.  It has nothing to do

11   with Batson.  The Batson questions were asked and

12   answered.  The Missouri Supreme Court found he did

13   nothing wrong.  There's nothing that can be done

14   about that.  Asking about death qualification is

15   just irrelevant.

16             MR. POTTS:  Under Flowers v. Mississippi

17   and Foster v. Chapman I'm allowed to ask him about

18   his method of questioning jurors to determine

19   whether there's a discriminatory purpose.

20             THE COURT:  Thank you.  The Court has

21   reviewed 1,936 pages of voir dire.  The Court has

22   reviewed all the opinions in this case.  This is

23   not helping this Court with your motion.

24   Objection is sustained.

25        Q.    (By Mr. Potts)  When you were

233

1    questioning black jurors, did you ask them more

2    frequently than white jurors whether they would be

3    willing to stand up and announce their verdict in

4    open court?

5         A.    No.  The reason I would ask that is

6    because if someone can stand up in open court and

7    say that they're voting for death, then they would

8    be a good juror for the State.  Because some

9    people say, oh, I could never do that.  But, you

10   know, if you're the foreman, you have to do that.

11   So if they can't do that, then they can't follow

12   the law.  So I don't want someone that can't stand

13   up and announce in open court in front of

14   everybody that they could vote for death.

15        THE COURT:  Your answer no stands.  The

16   rest of it I didn't need.

17        A.    Okay.  Sorry.

18        Q.    (By Mr. Potts)  Out of 100 plus

19   non-black jurors do you know how many you asked

20   whether they would be willing to stand up in open

21   court and announce the verdict of death?

22        A.    No, I don't.

23        Q.    Would five sound right to you?

24        A.    I have no clue.

25        Q.    Juror Number 2, Juror Number 13, Juror

1    Number 31, Juror Number 44, and Juror Number 53.

2           MR. SPILLANE:  I'm going to object to

3    counsel testifying.  He says he has no clue.  So

4    counsel gives him the answer.  That's leading as

5    well as counsel testifying.

6           THE COURT:  I know he's trying to

7    refresh his recollection.  I'm giving him a little

8    leeway.  I'm sure his answer is going to be the

9    same as he did just a minute ago.

10          A.   I don't know who those jurors were.  It

11   doesn't say whether they're black or white or

12   another race.

13          Q.   By contrast, when you were questioning

14   white jurors did you reassure them more frequently

15   than black jurors that there would be 12 people

16   who needed to agree on the verdict?

17          A.   I have no idea how many times or to whom

18   I asked that particular question.

19          Q.   Do you know the specific number of white

20   jurors that you reassured about needing 12 people

21   to agree on the verdict?

22          A.   I told every juror in voir dire that all

23   12 had to vote the same way to have a verdict.

24   It's call unanimity of the jury.  There's an

25   instruction of law that they got that specifically

1   says that.  When they went back to the jury room

2   they had that instruction in their hand.

3       Q.   Did you tell that specifically to

4   Juror Number 11, Juror Number 18, Juror Number 21,

5   Juror Number 22, Juror Number 26, Juror Number 27,

6   Juror Number 29, Juror Number 30, Juror Number 32,

7   Juror Number 34, Juror Number 35, Juror Number 41,

8   Juror Number 43, Juror Number 50, Juror Number 63,

9   Juror Number 67, Juror Number 70, Juror Number 71,

10  Juror Number 106, and Juror Number 126?

11          MR. SPILLANE:  Now that the question is

12  finished, I'm going to object.  He already said he

13  doesn't remember.  Reading a list of numbers isn't

14  going to change that.

15          MR. POTTS:  I asked him whether he knew

16  the specific number, Your Honor.

17      A.   I do not.

18          THE COURT:  Answer stands.  Objection

19  overruled.

20      Q.   (By Mr. Potts)  How many black jurors

21  did you reassure that there would be 12 people who

22  had to vote that way?

23      A.   I have no idea.  I don't know who the

24  blacks and the whites were.

25      Q.   Well, you were asking them questions;

236

1    right?

2         A.    But I didn't know if they were black or

3    white.  I mean, I didn't care.  I could care less

4    if they're black or white.

5         Q.    Would it surprise you if you didn't tell

6    a single black juror that there would be 12 people

7    who had to agree on the verdict when you were

8    questioning them individually?

9         A.    If the record reflects that, then I

10   would agree.  If not, I don't agree.

11        Q.    Okay.  So the record would reflect that

12   the message to the non-black jurors was that there

13   was safety in numbers.  Right?

14        A.    Wrong.  All 12 had to agree for a

15   verdict whether it's death, whether it's life, or

16   whether it's not guilty.  All 12 have to agree.

17   The jurors were all told that at one point or

18   another during voir dire by me, every one of them.

19        Q.    And the message to the black jurors was

20   that they were all on their own?

21        A.    No.  Are you kidding?  What are you

22   talking about?  I don't have any idea.  So the

23   answer is no.

24             MR. POTTS:  I'll pass the witness.

25             THE COURT:  Cross-examination.

237

1          MR. SPILLANE:  Yes, sir.

2    CROSS-EXAMINATION BY MR. SPILLANE:

3          Q.    Thank you for coming in, sir.  I was

4    going to ask you about Laura Asaro.  Could you

5    tell me about your interaction with her in

6    relation to the reward?  Tell me what happened

7    when she asked for it, if she ever asked for it,

8    that sort of thing.

9          A.    I don't recall talking about the reward

10   with her.  I don't know when, at some point it

11   came up.  I think she got $5,000 afterwards, but

12   that wasn't the focus of my conversations with

13   her.  I don't recall whether I mentioned it or

14   not.  She didn't know about the reward when I

15   first talked to her, as I recall.

16         Q.    I'll ask you a better question.  Do you

17   recall her ever asking you for a reward?

18         A.    Never.

19         Q.    Do you recall how Dr. Picus ended up

20   giving her a reward?

21         A.    Yeah.  I think he gave her $5,000.  It

22   was after the trial.

23         Q.    Right.  But I mean, did you or Mr. Magee

24   say, hey, give her a reward because she earned it

25   by showing us the things?

238

1          A.    I thought she earned it.  I thought the

2    other fellow earned it as well.  So they got five.

3    That was my opinion.  But ultimately it was up to

4    Dr. Picus.  It was his money.

5          Q.    Right.  But you didn't feel that it was

6    a motivating factor for Ms. Asaro, if I understand

7    you correctly, because she came forward before the

8    reward was ever discussed?

9          A.    That's correct.

10         Q.    Let me ask you something that he never

11   got back to that he said he was going to.  Why did

12   you think Mr. Cole and Ms. Asaro were such good

13   witnesses?

14         A.    They knew things that the killer told

15   them that no one else knew.  For example,

16   Henry Cole said that the defendant told him that

17   he jammed the knife in her neck and he twisted it

18   and left it in her neck.  And that's exactly how

19   they found the body.  And the knife was bent.  And

20   no one knew that.  That was not on the news.  That

21   was not in the newspapers.  The only people that

22   knew that were the police.  And Cole had written

23   it on a piece of paper while he was in the jail.

24   He wrote down a list of facts that the defendant

25   said.  And every one of those facts, as I recall,

239

1    and there were a dozen of them approximately, were

2    true.

3            I couldn't catch Cole in anything that

4    wasn't true.  I couldn't catch him.  I was trying

5    to catch him if I could, because they were going

6    to catch him.  I couldn't find anything that Cole

7    said, nothing, that was false.  I'll continue with

8    what Cole said.

9        Q.    And why was Ms. Asaro such a good

10    witness?

11        A.    She was amazing.  She said -- first of

12    all, she was with the defendant when he sold the

13    computer to Glenn Roberts.  She was there in the

14    car.  He walked up to Glenn Roberts' house and he

15    sold him the computer.  She took the police to the

16    house where the computer was.  She said, The guy

17    that lives in that house has the computer.  And

18    the police knock on the door.  Glenn Roberts comes

19    to the door and says, What can I do for you?

20    Officers say, Do you have a computer?  He says,

21    Yes, I do.  The police said, Bring it to me.  He

22    brought it to them, and it was the computer.  They

23    said, Who gave it to you.  And he said, Roberts

24    said Marcellus Williams.

25            Marcellus was staying about three houses

240

1    down living out of his car.  Inside his car was

2    Mrs. Gayle's calculator and Post Dispatch ruler in

3    his car 15 months later.  The computer, these are

4    the things taken at the crime.  The computer was

5    found at Glenn Roberts' house about three doors

6    down from his grandfather's house where he was

7    staying in a car, a Buick, on the front yard or

8    the side yard.

9         Q.    In 2001 had you ever heard of touch DNA?

10        A.    No.

11        Q.    When was the first time you heard of it?

12        A.    In this case.  Probably about 2015 maybe

13   when they asked for additional DNA.  They asked

14   for DNA testing on the handle.  And I thought,

15   what DNA?  And someone said, well, there's

16   possibly something called touch DNA.  If you touch

17   something, you might leave DNA.  Used to not be

18   that way.

19        Q.    Let me ask you this:  What was your

20   procedure in the prosecuting attorney's office for

21   dealing with evidence, particularly weapons, that

22   had already been fully tested in your view?  Did

23   you wear gloves?

24        A.    No.  No reason to.

25        Q.    How many cases besides this one did you

241

1    do where you handled the murder weapon or some

2    other evidence that you didn't wear gloves because

3    testing was done?

4        A.    Probably all of them.

5        Q.    And how many would all of them be?

6        A.    Well, I don't know how many cases had

7    guns and knives, but the majority of my -- most of

8    my cases, I would say, were homicides.  So they

9    could have very well involved a knife or a gun.

10   And if it had been tested -- sometimes there's no

11   issue that you can touch it.  There's no reason

12   not to touch it.  Who knows that someone is going

13   to come in 17 years later or 15 years later and

14   ask for a DNA test when they knew the killer wore

15   gloves?

16       Q.    Let me ask you this.  Even if you hadn't

17   known that he wore gloves, the standard procedure

18   wouldn't have been to wear gloves after everything

19   was fully tested.  Am I understanding you

20   correctly?

21       A.    You are absolutely correct.

22       Q.    Let me ask you about the packaging.  You

23   looked at it earlier today in the evidence.  I

24   guess, I say the evidence room, but it was

25   basically the jury room.  And did that refresh

1    your recollection of what the evidence looked like

2    when you saw it?

3         A.    Yes, it did.

4         Q.    Tell me how?

5         A.    Well, if you read the transcript on

6    Page 2261, Detective Wunderlich talks about how it

7    was packaged in front of the jury.  He said that

8    when the knife was pulled out of victim's neck, it

9    was handed to Detective Wunderlich.  Wunderlich

10   put it in an evidence envelope, sealed it, and

11   took it over to the fingerprint Krull.

12        Krull then opened up the package and

13   tested the handle for fingerprints and found none

14   on that knife handle anywhere.

15        He then sent it over to the lab,

16   St. Louis County Lab, and they then tested it for

17   blood, which they found.

18        Then the lab put the knife in a new

19   package, a box.  So when it was -- first you had

20   Detective Wunderlich putting it in an evidence

21   envelope, and then you had the lab transferring

22   that knife after they had tested it into a box.  I

23   saw that box today.  That refreshed my

24   recollection.  I remember the box.  The box was

25   longer than the knife.  The whole knife was

243

1    inserted into the box and sealed.  Also in the box

2    was the evidence envelope that was brought by --

3    it was put -- initially used by

4    Detective Wunderlich.  It was all there.  The box

5    is what I saw today.  And that refreshed my memory

6    about the box.  I forgot about the box until I

7    read it in the transcript.  And I said to the

8    witness at the trial, I said to

9    Detective Wunderlich, What's this box?  And he

10   said, That's the box that the lab repackaged the

11   knife in after they tested it.  And that's how I

12   got it from U City Police.

13        Q.    Am I understanding your testimony

14   correctly that the knife was inside a sealed

15   package inside a sealed box when you got it?  Is

16   that accurate?

17        A.    The package, the evidence envelope was

18   folded.  It wasn't inside the evidence envelope.

19   The evidence envelope was in the box, and the

20   knife was in the box.

21        Q.    And the box was sealed?

22        A.    The box was sealed.

23        Q.    And the knife was completely inside the

24   sealed box?

25        A.    Completely.  Completely concealed.

244

 1          MR. SPILLANE:  Would it be any use to

 2   you if I showed you the box and the package or

 3   everything or not?  Would that be any use to the

 4   Court?

 5          THE COURT:  No.

 6          MR. SPILLANE:  All right.

 7          THE COURT:  I saw it this morning.

 8          MR. SPILLANE:  That's what I wanted to

 9   know.

10     Q.   (By Mr. Spillane)  As far as

11   preservation of evidence at trial, did you make an

12   effort to preserve every piece of evidence that

13   you thought could possibly be used in the future?

14     A.   No.  Everybody touched that laptop, for

15   example.

16     Q.   Okay.  Well, let me see about things

17   that could be tested.  Did you make an effort to

18   preserve the fingernail clippings?

19     A.   They were put in a package by the

20   medical examiner that cut the fingernail clippings

21   off the victim and put them in some kind of a

22   package.  And the defense asked for half of those

23   to test them for DNA.  And we gave them half.  And

24   the DNA came back being the victim's DNA only.  It

25   was her nails.  It was her DNA.  There was nothing

245

1      else on those nails.

2             My half of the nails I didn't do

3      anything with them.  I didn't test them.  I

4      figured they tested them.  Why do I need to retest

5      them?

6      Q.    Well, my recollection of the testimony,

7      and you tell me if I'm wrong, is that when you

8      were looking at your fingernail clippings, you

9      said, I'm not going to open those because I'm not

10     wearing gloves and I don't want to contaminate

11     them?

12     A.    That's true.  I did say that.

13     Q.    And so you were making an effort to

14     preserve evidence that you thought might be useful

15     in the future?

16     A.    If they would have let me open those

17     nails without gloves, I would have done so.  But

18     the defense attorney said, Don't do it.  Don't

19     open those nails.  And then he asked the judge

20     about that.  And I said, Well, I'll ask the

21     witness, the expert witness on the DNA what her

22     opinion is.  And she said, You really shouldn't

23     open those nails unless you've got gloves on.  And

24     I said, Fine.

25     Q.    Let me ask you this:  Your testimony is

246

1    you were walking around that trial holding the

2    knife.  I think at one point you said, The knife

3    is in my left hand.  You handed it to Detective --

4    well, to Detective Krull.  Did defense counsel at

5    any point jump up and say, no, bad, why aren't you

6    wearing gloves?

7         A.   On Page 2313 Line 17 and 18, I walk up

8    to Detective Krull and I ask him, I say, Let me

9    hand you State's Exhibit 90, comma, a wood-handled

10   knife.  I handed it to him.  I said, Let me hand

11   you.  He didn't have gloves on, and neither did I,

12   on that witness.

13        Q.   And nobody said anything?

14        A.   No one said anything.

15        Q.   And they could see your hands that you

16   weren't wearing gloves?

17        A.   That's correct.  And they didn't ask for

18   any tests as well.

19        Q.   And it was always your practice -- I

20   hate to beat ground that's already been plowed

21   here -- that you never wore gloves on a weapon

22   after it was tested in all of your trials because

23   there was no point in it?

24        A.   That's correct.

25             MR. SPILLANE:  Does the Court have any

247

1    questions in case I missed something?

2         THE COURT:  No.

3         MR. SPILLANE:  Oh, maybe I did miss

4    something.  Oh, okay.  I am told that I did miss

5    something.

6    Q.    (By Mr. Spillane)  You talked earlier on

7    direct about a mistake in the affidavit.  And I

8    think they were going to come back to that, and

9    I'm not sure they did.  Could you tell me about

10   the mistake in the affidavit and what the actual

11   truth is?

12   A.    I referenced that in my testimony.  I

13   said I made a mistake.  When I did the affidavit I

14   said that when I received the knife it was -- the

15   handle, the knife handle was exposed, not

16   completely concealed but exposed so that anyone

17   could pick it up.  You know, the knife handle was

18   just there.  I confused that with another death

19   penalty case I had where a guy used a knife in the

20   kitchen to stab a woman, and he's been executed.

21   Q.    Roberts?

22   A.    Roberts.  Michael Roberts.  About five

23   or ten years before this murder Michael Roberts

24   took a knife from the kitchen, a butcher knife,

25   just similar to this knife, and he killed a woman

248

1    who lived in the house, similar to this case.  And

2    that knife was exposed.  When I got that -- but it

3    wasn't a question of who did it.  That was not a

4    who did it.  That was a psychiatric case.  Not a

5    whodunit case.  That knife was never tested,

6    period.  But it was sticking out of the container

7    that it was in.  It was an evidence envelope, and

8    the handle was sticking out.  I thought that was

9    very odd.

10              I confused that case with this case.  In

11   my affidavit I said that the knife was exposed,

12   the handle.  I'm wrong, and I admit I'm wrong.  I

13   saw what it was exposed in today.  The box.  I

14   read the testimony from Detective Wunderlich, and

15   it was the box.

16        Q.   And the triangular box that's in that

17   bag on the table is what it was in when it came to

18   you and it was sealed?

19        A.   That very box.

20        Q.   You recognize the same box?

21        A.   Absolutely do.  I can look at the

22   writing on the box too.

23        Q.   It's not necessary.  I don't want to

24   take it out and be accused of --

25        A.   Same box.

1        Q.    That sounds good.  Let me ask you about

2    Purkett v. Elem, your St. Louis US Supreme Court

3    case.  Tell me about that.

4        A.    Well, that was a Batson issue.  It

5    was -- in fact, it happened in this courthouse in

6    Division 6 back in around 1990 or so.  It was a --

7    I struck two African Americans, and the defense

8    attorney objected to that.  It went all the way up

9    to the United States Supreme Court on two

10   witnesses that were black.

11            The United States Supreme Court affirmed

12   me, affirmed the case and said those strikes are

13   proper.  The US Supreme Court, on a robbery second

14   degree case.  With Batson it's that important that

15   it had to be -- it went all the way to the Supreme

16   Court.  I won that one.

17       Q.    Do you remember what reasons you struck

18   them for?

19       A.    Well, the one African American had long

20   hair, unkempt long hair, shoulder length or longer

21   and he had a goatee.  And I said that that hair

22   looks suspicious to me.

23            Back in the day people didn't wear --

24   men didn't wear their hair shoulder length.  And

25   the other juror, as I recall, he had a goatee as

250

1    well and his hair, I don't remember what I said

2    about his hair, but I said that it looks --

3         Q.    I think it was unkempt.

4         A.    Unkempt.

5         Q.    I'm not sure.

6         A.    I didn't like the hair.  There was no

7    one else in the courtroom on that case that had

8    facial hair.  I picked the two people that had the

9    beard, the goatee.  I didn't like the way that

10   looked.  And it looked suspicious to me.  And the

11   long, unkempt hair looked suspicious to me.  And

12   Supreme Court said, That's fine.

13        Q.    Because it's race neutral?

14        A.    It's race neutral.  It had nothing to do

15   with race.

16        Q.    Earrings, glasses, I'm jumping around,

17   don't have to do with race.  Unkempt hair doesn't

18   have to do with race.  That's race neutral.

19        A.    And the Supreme Court said that.

20             MR. SPILLANE:  I think I'm done if I

21   haven't missed anything else.

22             THE COURT:  Mr. Jacober, do you have

23   anything else?

24   CROSS-EXAMINATION BY MR. JACOBER:

25        Q.    Hi, Mr. Larner.  Matthew Jacober on

251

1    behalf of the prosecuting attorney's office.

2            You testified earlier that you didn't

3    have a clear recollection of the reasons behind

4    the motions for continuance that were filed by the

5    defense in the month prior to trial.  Is that

6    correct?

7        A.   Yes.

8        Q.   I would like to read from the motion for

9    you.  Specifically this is Paragraph 4(B).  On

10   May 1st, 2001, the State advised defense

11   counsel -- I'm sorry.  This is the verified motion

12   for continuance filed on May 7th, 2001.  I'm

13   actually looking at 4(C), not 4(B).  I apologize.

14           Defense counsel has made numerous

15   requests to the Missouri Department of Corrections

16   for a complete copy of defendant's incarceration

17   records.  These incarceration records contain both

18   psychiatric and medical records needed for the

19   preparation of the penalty phase by defendant.

20   These records are particularly important for

21   mitigation and experts retained by defense counsel

22   for consultation and preparation for the penalty

23   phase.

24           I know you don't have it in front of

25   you, but do you have any reason to doubt that I

252

1    read that accurately?

2         A.    I'll trust you on that.

3         Q.    Okay.  This was argued at the hearing on

4    the motion for continuance.  Do you recall that?

5         A.    If you say so.  I don't dispute what

6    you're saying.  I mean, it could have happened

7    that way.

8         Q.    Do you recall telling the defendant's

9    counsel at that time, Well, I have those records.

10   You can just come get a copy from me?

11        A.    No, I don't remember that.  I probably

12   had them, if that's what the record says.

13        Q.    And you just didn't volunteer that you

14   could produce them to the defendant at that time?

15        A.    If they knew I had them, all they had to

16   do was ask for them.  They came to my office and

17   looked at every single exhibit that I had.  I had

18   350 or more exhibits.  And the defense attorneys,

19   Green and McGraugh, two gentlemen who are now

20   judges, came to my office and they looked through

21   all my exhibits that they wanted to.  They had

22   permission.  That's under the law.  I have to do

23   that.  Supreme Court Rule 25.03, the rules of

24   discovery, I have to let them come and examine or

25   look at my exhibits.

1            I also gave an exhibit list which listed

2     every single exhibit.  Number 90 happens to be the

3     knife.  I had 1 through 350.  I gave a copy to

4     him, defense attorneys.  I gave a copy to the

5     judge.

6            So they looked at all my exhibits.  They

7     would have seen my -- if I had a serial record,

8     they would have seen it.

9        Q.    And if you could answer my question.  My

10    question is:  Did you say, I have those records.

11    You can have them?  Not whether they could come

12    and get them.  I'm asking if you volunteered them?

13       A.    If that's what the record says.  I don't

14    recall if I said what you just quoted.  If you say

15    so, okay.

16       Q.    That motion was denied by the court on

17    May 9th, 2001.  Then a supplemental verified

18    motion was filed on May 25th, 2001.  And in that

19    supplemental motion on Paragraph 4 -- I'm sorry.

20    Paragraph 5 at the time of the drafting of this

21    motion Department of Correction records on

22    defendant still remain lost.  Volume 2 of

23    defendant's Department of Correction records

24    cannot be found by the custodian of the Missouri

25    Department of Corrections.  The last entry for the

1    whereabouts of the records are that they were last

2    checked out to St. Louis County Justice Center.

3    The absence of these records has prejudiced the

4    defendant in that they would contain information

5    not only to defendant's behavior and conduct while

6    in the custody of the Department of Corrections

7    but would also contain mental and psychological

8    evaluations of the defendant.

9              I'm not going to read the rest of it.

10   Well, I will.  This information is not only

11   relevant to rebut the aggravating circumstance of

12   the State whereby it alleges the defendant does

13   not adjust well to incarceration and future

14   dangerousness but would be relevant as proof of

15   mitigation the defendant does, in fact, adjust

16   well to a structured environment as necessary for

17   defense expert Dr. Cunningham to evaluate and

18   offer opinions as to the character and mental

19   makeup of the defendant.

20             That motion was heard and denied on --

21             MR. SPILLANE:  Is there -- I'm going to

22   object, Your Honor.  Is there a question here

23   someplace?  He's just reading.

24             THE COURT:  Oh, I think he's trying to

25   aid the witness.  I mean, he doesn't have the

1    motion in front of him so I think he's just trying

2    to circumvent handing it to him and having him

3    read it.

4             MR. JACOBER:  That's correct, Your

5    Honor.

6             THE COURT:  Overruled.

7        Q.   (By Mr. Jacober)  That was heard and

8    denied on May 25th.  Do you recall at that time

9    telling the defendant, defendant's counsel, I have

10   those records, you can just come and get them from

11   me?

12       A.   No.  You'll have to show me that.

13            MR. SPILLANE:  I'm going to object now

14   that the question is over.  This is completely

15   irrelevant.  The Court struck the continuance

16   claim from the pleading.  This has nothing to do

17   with anything except the claim about the

18   continuance.

19            MR. JACOBER:  Judge, this still weighs

20   into the ineffective assistance of counsel claim

21   which remains before the Court.  It was pled in

22   the original motion.  And under the statute every

23   claim that is still before the Court is one that

24   the Court can rule on in this matter.

25            MR. SPILLANE:  If I could respond, Your

256

1    Honor.

2              THE COURT:  You may.

3              MR. SPILLANE:  The ineffective

4    assistance of counsel claim is two things.  Not

5    better impeaching Ms. Asaro and Mr. Cole with

6    their family members and friends and not putting

7    on different mitigating evidence.  It has nothing

8    to do with this.

9              MR. JACOBER:  This goes directly to

10   mitigating evidence, Judge.  They reference

11   mitigation a number of times in this motion.

12             THE COURT:  As I have indicated before,

13   I'm not happy with the verbiage in this statute,

14   especially when there's no definition of what

15   information means.  So I'm going to go ahead and

16   allow it.  But you're close on running out of your

17   time.

18             MR. JACOBER:  I understand, Your Honor,

19   and I'm being conscious of that.

20        Q.   (By Mr. Jacober)  Do you recall if at

21   that point in time you told them, I have those

22   records, you can come get them whenever you want?

23        A.   No.  I never had those records.  I don't

24   know what you're talking about.  The records I had

25   I thought you were talking about were serial

257

1    records which are records of his incarceration.

2    It says what crimes he committed, when he was

3    received by the Department of Corrections, and

4    when he got paroled.  Those are serial records.  I

5    had those, because I wanted to know what his prior

6    convictions were.

7        Q.    You didn't use the records of his

8    incarceration and alleged escape attempt and

9    alleged assault while he was in prison as part of

10   your penalty phase?

11       A.    That's a different question.  You asked

12   me a different question.  You wanted to know about

13   records of his mental health and all of that.  I

14   never saw any of that.  I would have liked to have

15   seen that.

16       Q.    No --

17       A.    I never saw that.

18       Q.    It also contained the mental and

19   psychological evaluations?

20       A.    I really don't know.

21       Q.    The Missouri Department of Corrections

22   records.

23       A.    If I had it, the defense had it.  I will

24   swear to that.  Everything I had, the defense had

25   it.  And if I didn't have it, they would have made

1    a big stink, and they would have made a big record

2    and would have appealed on that basis.  They had

3    everything that I had.  I didn't have one thing

4    that they didn't have.

5         Q.   Well, they made a record here that they

6    didn't have it?

7         A.   Well, if I had it, they had it.  I

8    didn't have it then.  I did introduce evidence

9    that he tried to break out of the city jail.  I

10   absolutely introduced that at trial.  That's

11   evidence of guilt.  I could go into that.  That

12   was very devastating evidence against him.

13        Q.   And the defense didn't have those

14   records before --

15        A.   I don't know what records you're talking

16   about.  I had witnesses come in and testify that

17   the defendant hit him over the head with a barbell

18   and almost killed him.  And then he took the

19   barbell and tried to bash out the window of the

20   city jail to break out, but it only scratched the

21   window because it's unbreakable glass.  And he did

22   that right after he got sentenced to 20 years for

23   the armed robbery of the donut shop in the City.

24   That night he tried to break out of the jail, the

25   way I just described it.  That was the evidence at

259

1    trial.  That was no surprise to the defense that

2    that evidence was coming in.

3        Q.    Again, what I'm asking is, did you let

4    the defense know that you had those records when

5    they were telling the Court weeks before the trial

6    that you had those records?

7        A.    When you say "those records", I don't

8    know what you're talking about.  You talked about

9    mental health records.  I didn't have any mental

10   health records of the defendant.

11       Q.    Sir, I'm not talking about mental health

12   records.  I'm talking about Department of

13   Correction records.

14       A.    Well, he didn't try and break out of the

15   Department of Corrections.  He tried to break out

16   of the city jail.  So there were records from the

17   city jail about that breakout, about that escape

18   attempt.  The defense attorneys had that.  I had

19   that.  They had that.  That's the only records I'm

20   talking -- I know about.  I don't know any

21   Department of Corrections records.  That's not

22   where he tried to break out.

23       Q.    One additional reason the defense noted

24   that they needed a continuance is counsel is also

25   still waiting for the forensic test results from

1    its own experts with regard to forensic evidence

2    seized by the State.

3            Did that flag for you at all that maybe

4    it was important to keep pristine evidence in the

5    case so further testing could be done?

6    A.   They never had possession of the knife.

7    So I don't know what forensic testing you're

8    talking about.  They never asked for testing of

9    the knife.

10           The only forensic testing they did was

11   on the nails, the fingernail clippings.  They

12   wanted to know if there was anything other than

13   the victim's under his nails -- under her nails in

14   case she during the altercation, if you want to

15   call it, she somehow got his DNA under the nails,

16   the killer's DNA.  So it was tested for that, and

17   there was no other DNA under their nails except

18   hers.  And that was all testified to.  Those were

19   your witnesses.

20           MR. JACOBER:  No further questions, Your

21   Honor.

22           THE COURT:  Thank you.  I'm not sure who

23   gets to go now.

24           MR. POTTS:  Nothing further.

25           THE COURT:  Thank you.  Mr. Spillane.

261

1          MR. SPILLANE:  I just wanted to thank

2    you for your service to St. Louis, sir.  Thank

3    you.

4          MR. LARNER:  Thank you very much.

5          THE COURT:  I have one question, and I

6    apologize.  I know this was several years ago.

7          Did the trial court give you a reason as

8    to why you couldn't consent to the continuance

9    requested by defense counsel?

10     A.    We had a policy in our office that we

11   didn't agree to continuances.  I couldn't agree to

12   that without permission of Bob McCulloch, and he

13   was not going to give that permission.

14          Our witnesses were ready to go.  A month

15   later I don't know where our witnesses -- one came

16   in from New York on a bus, and the other was a

17   prostitute who was living all over town.

18   Anywhere.

19          So we were not in any mood, and there

20   was no additional evidence that anyone was going

21   to produce by a continuance is my recollection.

22          THE COURT:  Thank you.  Any questions

23   based upon my question?

24          MR. POTTS:  No, Your Honor.

25          THE COURT:  Thank you.  Can this witness

262

1    stand down?

2              MR. POTTS:  Yes, Your Honor.

3              MR. JACOBER:  Yes, Your Honor.

4              THE COURT:  I think we need to take a

5    little bit of recess, if you don't mind.  We will

6    be in temporary recess until quarter to 4:00.

7              (At 3:32 a recess was taken.  The Court

8    reconvened at 3:45 and the further following

9    proceedings were had:)

10              THE COURT:  We are back on the record in

11    Cause Number 24SL-CC00422.  We finished our

12    afternoon recess.  It is now approximately

13    3:45 p.m.  Mr. Jacober?

14              MR. JACOBER:  Yes.  Thank you, Your

15    Honor.  We have one final witness.  Patrick

16    Henson.

17                    PATRICK HENSON,

18    Having been sworn, testified:

19                    DIRECT EXAMINATION

20    BY MR. JACOBER:

21        Q.    Good afternoon, Mr. Henson.

22        A.    Good afternoon.

23        Q.    For the record, where are you currently

24    employed?

25        A.    At the St. Louis County Prosecuting

263

1    Attorney's Office.

2         Q.   And what is your position there?

3         A.   I am an investigator in the Conviction &

4    Incident Review Unit.

5         Q.   How long have you been employed in that

6    position?

7         A.   Three years and ten months.

8         Q.   So sometime in the year 2020?

9         A.   Yes, sir.

10        Q.   Are part of your duties to maintain and

11   supervise the maintenance of various files in the

12   prosecuting attorney's office?

13        A.   Yes, sir, with the caveat of those under

14   the auspices of the Conviction & Incident Review

15   Unit.

16        Q.   So you don't -- if it's a case that's

17   being presently tried by an assistant prosecutor,

18   you don't have any supervision over those files?

19        A.   That's correct.

20        Q.   Only the files in the CIU?

21        A.   That is correct.

22        Q.   Are one of those files the file in the

23   Marcellus Williams matter?

24        A.   Yes, sir.

25        Q.   Can you tell us briefly about when the

264

1    Marcellus Williams file came back into the

2    St. Louis County Prosecuting Attorney's Office?

3         A.    Certainly I have to refresh my memory,

4    but I believe we received those files sometimes

5    perhaps in February of 2024.

6         Q.    And since February of 2024 have those --

7    has that file been under your care, custody, and

8    control?

9         A.    Yes, sir.

10        Q.    Where has it been stored in the

11   St. Louis County Prosecuting Attorney's Office?

12        A.    We have an evidence room that's locked,

13   that's locked, and that's where it's stored.

14        Q.    Who has access to that evidence room?

15        A.    Certainly myself, the chief

16   investigators -- or chief investigator and other

17   investigators because they also store their

18   evidence there as well.

19        Q.    Anyone else besides investigators?

20        A.    No, sir, not to my knowledge.

21        Q.    And did I ask you to review that file?

22        A.    Yes.

23        Q.    Have you done so?

24        A.    Yes, sir.

25        Q.    Did I specifically ask you to review

1    that file to see if you could find any notes

2    relating to voir dire in the underlying criminal

3    trial which happened in 2001?

4         A.    You did.

5         Q.    And did you do that?

6         A.    I did.

7         Q.    Did you find any notes relating to voir

8    dire?

9         A.    I did not.

10             MR. JACOBER:  No further questions, Your

11   Honor.

12             THE COURT:  Thank you.  Mr. Clarke?

13             MR. CLARKE:  Yes, Your Honor.

14   CROSS-EXAMINATION BY MR. CLARKE:

15        Q.    Mr. Henson, you said you received the

16   Marcellus Williams file in February of 2024.  Is

17   that correct?

18        A.    I believe that's right, sir.  Yes, I

19   said that.

20        Q.    Okay.  So you didn't have the file when

21   the motion to vacate was filed?

22        A.    I'd have to go back and look.  I'm not

23   sure.

24        Q.    Okay.  But you said February 2024, is

25   that correct?

266

1        A.    I believe so, yes.

2        Q.    Okay.  Now you said it came from

3   somewhere, the file came from somewhere.  The file

4   was always in the St. Louis County Prosecutor's

5   Office, isn't that correct?

6        A.    It's my understanding, sir, that those

7   files or cases are kept in the basement in a

8   secure area.  I don't have access to that so we

9   had to have the then assistant chief investigator

10  retrieve those and bring them up where I took

11  custody and put them in that room.

12       Q.    You say it's a secure room downstairs,

13  is that right?

14       A.    Yes, sir.

15       Q.    Referred to as the vault sometimes?

16       A.    Yes, sir.

17       Q.    Okay.  The vault can't just be accessed

18  by any person off the street, right?

19       A.    Correct.

20       Q.    It has to be accessed by the St. Louis

21  County Prosecuting Attorney's Office, employees,

22  officers, investigators; is that correct?

23       A.    Well, to be specific and my

24  understanding, only the chief investigator and the

25  assistant chief have access to that room.

 1        Q.    Okay.  So the chief investigator and

 2    the assistant chief investigator.  If an attorney

 3    wants a record, they have to go down and grab it?

 4        A.    They have to ask the assistant chief to

 5    retrieve it for them.

 6        Q.    Okay.  So no one else has access to that

 7    room?

 8        A.    Yes, sir.

 9        Q.    Okay.  So someone couldn't come off the

10    street and pull notes out of a file?

11        A.    No, sir.

12        Q.    Couldn't destroy them?

13        A.    No, sir.  I couldn't even go and

14    retrieve a record.  So we know a person off the

15    street couldn't do that.

16        Q.    Okay.  But from -- how long were they in

17    the file at that point?  I'm sorry.  How long from

18    before 2024 was the Marcellus Williams file in the

19    vault?

20        A.    I don't have direct knowledge of that.

21    I would only be guessing to say -- I just -- I

22    don't know the answer to that.

23        Q.    Okay.

24        A.    I did not know about the Marcellus

25    Williams file until this came about, this case,

1    and they were brought to us.  That's the only time

2    I knew about it.

3         Q.    Okay.  But files are stored in the vault

4    or in your CIU storage.  Is that right?

5         A.    Correct.

6         Q.    Only one of a few places?

7         A.    Evidence room.

8         Q.    Okay.  And you said for files stored in

9    the vault the chief investigator or his deputy --

10   I don't know his title.

11        A.    The assistant chief investigator.

12        Q.    Has to go down there.  They're the only

13   ones who have access?

14        A.    And retrieve them, yes.

15        Q.    Now, in your CIU file storage, who has

16   access there?

17        A.    As I said, myself, chief investigator,

18   the assistant chief investigator, and the other

19   investigators within the prosecuting attorney's

20   office.

21        Q.    So no attorneys whatsoever?

22        A.    No, sir, not to my understanding, no.

23              MR. CLARKE:  One moment, Your Honor.

24        Q.    (By Mr. Clarke)  Now, the Attorney

25   General's Office, myself, and individuals from the

269

1    AG's office came to review the file.  Is that

2    correct?

3         A.    Correct, sir.

4         Q.    And you sat with us during that review?

5         A.    Yes, sir.

6         Q.    Okay.  Now when we reviewed that

7    evidence, we didn't see the physical evidence.  Is

8    that right?

9         A.    To my understanding that's correct.

10        Q.    Okay.  Where was the physical evidence

11   stored?

12        A.    The physical evidence was stored in the

13   room that is secured within the prosecuting

14   attorney's office.

15        Q.    Okay.  So is there a reason the physical

16   evidence wasn't brought up at that time?

17        A.    I can't answer that, sir.

18        Q.    Now, the State's trial exhibits were in

19   the possession of the Supreme Court.  Did you ever

20   seek to review those trial exhibits?

21        A.    No, sir.

22        Q.    At any time did any attorney from the

23   St. Louis County Prosecuting Attorney's Office ask

24   you to retrieve those in the Supreme Court?

25        A.    No, sir.

270

1         MR. JACOBER:  I object.  It calls for

2    speculation as to what other people did.

3         THE COURT:  If he knows.  Overruled.

4    A.    No, sir.

5    Q.    (By Mr. Clarke)  So at the time the

6    motion to vacate was filed you had never gone,

7    retrieved the trial exhibits from the Supreme

8    Court?

9    A.    That's correct.

10        MR. CLARKE:  Thank you.  No further

11   questions.

12        MR. POTTS:  No questions, Your Honor.

13        THE COURT:  Thank you.

14        MR. JACOBER:  No redirect, Your Honor.

15        THE COURT:  Thank you.  Can this witness

16   stand down?

17        MR. JACOBER:  Yes, Your Honor.

18        THE COURT:  Thank you.  Any additional

19   evidence on behalf of the prosecuting attorney's

20   office.

21        MR. JACOBER:  On behalf of the

22   prosecuting attorney's office we have no further

23   witnesses to call or evidence to present.

24        We would ask the Court to conform the

25   evidence to the pleadings of the evidence that was

271

1    submitted today.

2              In addition, Judge, Ms. McMullin is

3    going to address our exhibits to make sure that

4    they're all in the record as Mr. Spillane did at

5    the beginning of the day.

6              MS. MCMULLIN:  Your Honor, in lieu of

7    listing off every single exhibit, we have prepared

8    a box file for you similar to the prior box file

9    that you had gotten before that will have all the

10   prosecuting attorney's exhibits and the index for

11   the record, if that's all right.

12             THE COURT:  So I have prosecuting

13   attorney's exhibit list.

14             MS. MCMULLIN:  Yes, those exhibits.

15             THE COURT:  That has been shared with

16   the Attorney General's Office.

17             Is there any specific objections to any

18   of these exhibits?

19             MR. SPILLANE:  Just the ones that I

20   brought up at the beginning, Your Honor.

21   Dr. Bodowle, Dr. Napatoff.

22             Anything I'm missing?  Those weren't in

23   the record before.

24             THE COURT:  Thank you.  Then

25   Petitioner's Exhibits 1 through -- didn't we have

1    an 81 too?

2              MS. MCMULLIN:  We have an 80, Your

3    Honor.

4              MR. JACOBER:  I believe we had an 80 and

5    an 81.

6              THE COURT:  1 through --  There was an

7    81.  It was that additional forensic DNA testing.

8              MR. JACOBER:  Yes.

9              THE COURT:  Those will be received.

10             MR. SPILLANE:  I have an objection.  I

11   heard someone say that the pleadings should be

12   conformed to the exhibits or the exhibits

13   conformed to the pleadings.  I have no idea what

14   that means.

15             THE COURT:  I'm not sure either, but

16   I'll go ahead, as I indicated earlier, I'm

17   allowing everything to come in so I can have a

18   complete record of these proceedings.

19             MR. JACOBER:  Your Honor, if I said

20   exhibits, I misspoke, and I apologize.  I meant to

21   say --

22             THE COURT:  You mean the evidence to

23   conform to the pleadings?

24             MR. JACOBER:  Yes.

25             THE COURT:  Your request will be

```
 1    granted.
 2              MR. JACOBER:  Thank you.
 3              MR. SPILLANE:  And that doesn't mean
 4    they're getting any new claims.  That just means
 5    something else.
 6              THE COURT:  Correct.
 7              MR. SPILLANE:  Okay.
 8              THE COURT:  With that said, Mr. Potts?
 9              MR. POTTS:  Nothing further from us,
10    Your Honor.
11              MR. SPILLANE:  If you want, I can do
12    closing.  If you don't, I won't.
13              THE COURT:  Wax poetically for the
14    Court.
15              MR. SPILLANE:  Okay.  You guys want to
16    go first?
17              MR. JACOBER:  I think you should go
18    first.  We bear the burden.
19              MR. SPILLANE:  Oh, okay.  Well, yeah,
20    you bear the burden so you get to go first.
21              MR. JACOBER:  Your Honor, could we take
22    a recess to maybe prepare for a few minutes?
23              THE COURT:  Sure.  Not a problem.  The
24    court will be in recess for ten minutes.  How does
25    that sound?
```

1              MR. JACOBER:  Thank you.

2              THE COURT:  We will go off the record.

3              (A recess was taken.  The Court

4         reconvened at 4:15 and the further following

5         proceedings were had:)

6              THE COURT:  We're back on the record in

7    Cause Number 24SL-CC00422.

8              The evidence and exhibits have been

9    received.  Closing statement, Mr. Jacober.

10             MR. JACOBER:  Thank you, Your Honor.

11             CLOSING ARGUMENT BY MR JACOBER:

12             MR. JACOBER:  Initially, Your Honor, we

13   want to thank the Court for the significant amount

14   of work today.  We know the Court has spent

15   considerable time reviewing the record to ensure

16   it's prepared for the hearing today.  And on

17   behalf of the prosecuting attorney's office we

18   appreciate that heavy lift that you've been asked

19   to do, Judge.

20             This case is about contamination.  I'm

21   going to go through some of the evidence.

22   Certainly not all of it.

23             We heard from David Thompson, an expert

24   in forensic interviewing, that there was potential

25   witness contamination.  While we've heard from

275

1    every other witness here today that there was

2    potential evidence contamination.  Both of which

3    occurred prior to and during Mr. Williams' trial.

4          Dr. Word provided detailed technical

5    testimony to the Court supporting the need and the

6    well-known knowledge at the time of the need to

7    keep evidence in attestable state.

8          Mr. Larner admitted to multiple

9    instances of his touching the knife because he

10    decided no further testing needed to be

11    accomplished.

12          Given the backdrop of the known state of

13    art at the time, it is impossible to believe a

14    seasoned prosecutor who tried as many cases as

15    Mr. Larner said he did was unaware of the rapidly

16    advancing technology around DNA.

17          In addition, evidence in the record

18    shows fingerprints were collected from the scene.

19    And Ms. Asaro testified in the underlying case

20    that Williams allegedly told her he washed his

21    hands and the knife, demonstrating there was

22    evidence that gloves may not have been worn.

23          To make the record clear, the initial

24    motion to vacate filed pursuant to Revised Statute

25    of Missouri 547.031 remains part of the record.

1              In addition, the Court granted our

2     request to amend the claim per Youngblood v.

3     Arizona and again today granted our request to

4     conform the evidence to the pleadings -- the

5     pleadings to the evidence.  I keep flip flopping

6     those, Judge.  I apologize.

7              All claims contained in the original

8     motion to vacate as well as in the Youngblood

9     claim and any claims supported by the evidence

10    today are before the Court.

11             When reviewing the evidence adduced

12    today, the Court should not only focus on its

13    extensive knowledge of the file, 547.031, which I

14    will read in part into the record.  The Court

15    shall grant the motion of the prosecuting or

16    circuit attorney to vacate or set aside the

17    judgment where the Court finds that there's clear

18    and convincing evidence of actual innocence or

19    constitutional error at the original trial and

20    plea that undermined the confidence in the

21    judgment.

22             In considering the motion the Court

23    shall take into consideration the evidence

24    presented at the original trial or plea, the

25    evidence presented at any direct appeal or

277

1    post-conviction proceeding, including state,

2    federal habeas actions, and the information and

3    evidence presented at the hearing on the motion.

4    The court should also consider the evidence

5    adduced today, obviously.

6           Beginning with 547.031, the AGO would

7    have the Court believe if a court has previously

8    ruled on a claim it is excluded from

9    consideration.  But that is not a conclusion the

10   Court can reach on the plain reading of the

11   statute that I just put into the record.

12          Indeed, it is the opposite of what the

13   statute provides.  Given the prior record of all

14   post-conviction proceedings should be taken into

15   consideration.  All claims and information are

16   available for the court to review.

17          Turning back to the evidence a little

18   bit, Judge.  Today we heard from Judge Green and

19   Judge McGraugh, trial counsel for Mr. Williams in

20   the underlying criminal case.

21          Judge Green was very candid in that he

22   had insufficient time to adequately prepare for

23   Mr. Williams' trial and asked the Court on at

24   least two separate occasions for a continuance to

25   cure that issue.

1          This was compounded, of course, by

2   Judge Green's other capital murder case which was

3   scheduled immediately before and shockingly during

4   Mr. Williams' trial.

5          And the failure of the prosecutor to

6   timely disclose numerous pieces of evidence,

7   including Henry Cole's notes, Henry Cole's medical

8   records, the DOC record prosecutor used to support

9   its request for a death sentence, and fingerprint

10   evidence taken from the crime scene which were

11   destroyed before the defense was able to

12   independently analyze the evidence as they had the

13   right to do.

14          Williams' attorneys were also never told

15   that either the prosecutor or his investigator

16   touched or handled the knife without gloves prior

17   to trial.

18          Judge McGraugh was required to wear

19   gloves and did so while handling the murder weapon

20   in this case.

21          Going back to Dr. Word.  She told us

22   that the DNA profiles found on the murder were

23   consistent with Investigator Magee and

24   Prosecutor Larner, demonstrating their mishandling

25   of the evidence.

279

1            She also told us that touching or

2    handling evidence without gloves can destroy and

3    remove, both add and remove DNA that might

4    otherwise be there.  Which could take away a

5    future exoneration.

6            That's the whole reason that Attorney

7    General Janet Reno formed the commission, which

8    Dr. Word sat on, and the Court has accepted at

9    least one of those papers into evidence.

10           In addition to all of this evidence,

11   St. Louis Prosecuting Attorney's Office has

12   conceded the constitutional error of mishandling

13   the evidence in the Marcellus Williams trial.

14           Finally, the Court heard from Mr. Larner

15   who admitted to touching the knife and thereby

16   robbing Mr. Williams of his ability to conduct

17   effective testing of the knife as DNA technology

18   continues to develop and was rapidly developing at

19   that time.

20           In addition to this, Mr. Larner's

21   testimony was instructive as to the jury selection

22   process.  Mr. Larner in addressing pointed

23   questions from Mr. Potts relating to race-neutral

24   reasons for his venire strikes was unable to

25   explain the difference in how questions were posed

280

1    to different jurors of different races.

2            He also admitted to striking a juror for

3    looking similar to defendant, which in his own

4    words looked like a brother to Mr. Williams.

5            In addition, the prosecutor's voir dire

6    notes, as we learned from Mr. Henson, are missing

7    from the file.  Making it impossible to determine

8    whether his true intentions on strikes were race

9    neutral.

10           When all the evidence both in the file

11   and as presented to the Court today, the motion to

12   vacate is well taken.  Clear and convincing

13   evidence has been presented to the Court of

14   numerous constitutional errors in the prosecution

15   of Mr. Williams.  Evidence was mishandled.

16           Mr. Williams' trial counsel was placed

17   in a shockingly difficult position of having to

18   prepare for two capital murder cases

19   simultaneously.

20           Judge Green provided convincing

21   testimony of how unprepared his team was in lead

22   up to the trial.

23           And all of those reasons were noted in

24   the motions for continuance that were denied by

25   Judge O'Brien.

281

1              Given the constraints on his time,

2    including having to recess this case and finish

3    the Baumruk matter, this alone is sufficient and

4    we would request that the Court grant the motion

5    to vacate in this matter.

6              THE COURT:  Thank you, Mr. Jacober.

7              MR. JACOBER:  Thank you, Your Honor.

8              THE COURT:  Mr. Potts?

9              MR. POTTS:  Your Honor, if it's all

10   right with you and considering the State, I would

11   like to go last, consistent with the sequence we

12   have been doing today.

13             THE COURT:  Any objection?

14             MR. SPILLANE:  They're kind of on the

15   same side so I would kind of like to go last.

16             THE COURT:  Mr. Potts.

17             CLOSING ARGUMENT BY MR. POTTS:

18             MR. POTTS:  Thank you, Your Honor.

19             Like Mr. Jacober, I do want to sincerely

20   thank you.  I think we all know that this wasn't

21   the ideal thing to land on your desk, and we all

22   really appreciate the amount of effort that you've

23   put into this.

24             There's nothing triumphant about the DNA

25   test results that we received last week.  Those

282

1    results only serve as the newest round of proof

2    that Mr. Williams received a death sentence

3    without a fair trial.

4         This case was originally filed because

5    of Mr. Williams' factual innocence.  From the

6    inception of this case Mr. Williams has had

7    nothing to hide, and we've always welcomed every

8    round of DNA testing because we've always known

9    that there was going to be no chance that his DNA

10   would be found on the murder weapon.  On that

11   point we were right.

12        At the same time, everyone believed that

13   the DNA on the knife must belong to the killer

14   because no one could fathom a prosecutor who

15   showed that level of disregard and disrespect for

16   the law.  There we were wrong.

17        Last week's test results were

18   infuriating.  Even a crystal clear constitutional

19   violation like this with clear contamination of

20   the evidence is not the result that anyone on this

21   side of the table wanted.

22        This was a horrible and tragic crime

23   that Mr. Williams did not commit.

24        These DNA results were a sobering

25   revelation that for more than 20 years the full

283

1    extent of the State's disregard for Mr. Williams'

2    rights has been lying in wait.  That disregard for

3    his rights has destroyed what is likely the last

4    and best chance for him ever to prove his

5    innocence.

6                What's worse, after contaminating the

7    trial evidence, we're somehow still before this

8    court debating whether he received a fair trial.

9                This wasn't a fair trial.  It never was.

10   These DNA test results only represent the final

11   blow.

12                Here's what we've always known.  Trial

13   evidence was weak.  There were no eyewitnesses.

14   Then and now there's no forensic evidence

15   connecting Mr. Williams to the crime scene.

16   Bloody footprints didn't belong to Mr. Williams.

17   Even before the contamination we're talking about

18   today there's always been a destroyed fingerprint

19   where we just have to take the prosecution's word

20   for it about what that fingerprint was and what it

21   represented.

22                The only two material witnesses were

23   unreliable people with a host of baggage, no

24   prospects, and a desire for a reward.

25                On that evidence there are a lot of

284

1    prosecutors who would have declined to prosecute

2    or maybe charge him for a lesser crime.

3            Instead, the State sought the death

4    penalty.

5            Leading up to trial Williams' defense

6    team was met with gamesmanship.  While

7    Mr. Williams' trial counsel was hamstrung with

8    back-to-back death penalty trials.

9            People cannot be in two places at once.

10   It is quite literally impossible to simultaneously

11   defend one client in one courtroom while

12   adequately preparing another client in a different

13   courtroom right down the hall.

14           As the court heard today, defense

15   counsel was unprepared for this trial.  Didn't

16   have the information they needed and needed more

17   time.  That wasn't because they were bad lawyers.

18   They're great lawyers.

19           Every single person in this room has the

20   greatest respect for Judge Green and

21   Judge McGraugh.  We hold them in the highest

22   regard.  But sometimes circumstances get in the

23   way.

24           Then jury selection began.  Mr. Williams

25   didn't receive a jury of his peers.  Prosecution

1    made sure of that by eliminating six of seven

2    black jurors.

3            When you heard Mr. Larner today, he

4    couldn't even, evidently couldn't even believe

5    that he had eliminated six of seven black jurors.

6    He kept insisting that it must have been three out

7    of seven.  Because when you have over a hundred

8    people show up and only seven are black and you

9    get rid of six of them, we all know what's going

10   on.

11           Most notably, Mr. Larner made sure to

12   eliminate the only black juror who seemed to be

13   Mr. Williams' actual peer precisely because they

14   looked alike.

15           When you review the transcript, and I

16   made sure that we listed this, he admits that he

17   exercised the peremptory strike on that juror in

18   part because he was black.  That's in the record.

19   That is a Batson violation.

20           Now, the Supreme Court upheld the jury

21   selection on direct appeal.  But the Supreme Court

22   was operating with a different record.  It was

23   based purely on representations the Court made 23

24   years ago.  There's never been a time when

25   Mr. Larner actually had to sit on the stand under

1    oath and be subjected to cross-examination.

2    Basically, 23 years ago he got to provide whatever

3    silver lining coating that he wanted to put on his

4    justification.  But then when he had to be

5    actually subjected to cross-examination, he made

6    that crucial admission.

7            When the Court reviews the record, and

8    we're going to help the Court with our findings,

9    you're going to see that it was a lot more

10   nefarious than systematic.  That will jump off of

11   the page when you're reading it, directly start to

12   finish.

13           What actually is happening, and as I

14   tried to talk about with Mr. Larner, is that there

15   were very subtle ways of discouraging black people

16   from being willing or being qualified to serve on

17   this jury and at the same time there were subtle

18   ways of shepherding white people onto the jury

19   with his methods of questioning.

20           There were closed-ended questions.

21   There were easy yeses to white people.  There were

22   open-ended questions with difficult answers for

23   black people.

24           And what that does is it opens up the

25   opportunity for pretext to find those

287

1    justifications that at least seem valid for those

2    six or seven people.

3              At the same time that doesn't

4    necessarily matter because we heard that admission

5    today.  And as the Supreme Court said, one juror

6    who's struck for racially discriminatory reason is

7    one juror too many and requires a reversal of the

8    conviction.

9              That brings us back to the DNA.  While

10   the prosecution was playing those games with the

11   jury, the prosecution knew that it had spent the

12   past two months contaminating the critical trial

13   evidence.  None of that was known 23 years ago.

14             You heard that from both Judge Green and

15   Judge McGraugh who said Mr. Larner never told them

16   that he was handling the murder weapon without

17   gloves for trial.

18             Any seasoned defense lawyer would have

19   jumped up on the table if they had heard that the

20   prosecutor was walking around without gloves,

21   handing it to witnesses, contaminating evidence.

22             The reason that we haven't heard about

23   this until last week is because for 23 years the

24   reasonable people in this room thought that that

25   was impossible.

288

1          Whether in 2000 or today, there is no

2     good faith basis for a prosecutor to handle a

3     murder weapon without wearing gloves.  Period.

4     Full stop.

5          That principle is even more true in a

6     case in which that prosecutor is asking a jury to

7     sentence the defendant to death.

8          Now, we asked Dr. Word to come in here

9     to tell us what, frankly, everyone in the

10    courtroom already knows.  That handling the knife

11    without gloves was a flagrant violation based on

12    protocols.  It really doesn't matter who you ask,

13    though.  You can ask a forensic expert like

14    Dr. Word.  You can ask a stranger at the

15    supermarket.  You can ask a middle schooler.

16    Everyone knows.  The prosecutors cannot

17    contaminate crime scene evidence.

18          Remarkably, Mr. Larner was unrepentant.

19    On one level he showed us a level of candor that

20    I, frankly, didn't expect.  He told us that there

21    were five separate occasions when he was handling

22    that weapon without gloves.  Two months leading up

23    to trial, the same time that the defense is

24    fighting for a continuance, including when they're

25    asking to conduct additional forensic testing.

1          He's handling it when he's putting the

2     exhibit sticker on.  He's handling it when he's

3     working with Detective Krull.  He's handling it

4     when he's working with Detective Wunderlich.  He's

5     handling it when he's talking to Dr. Picus.  He's

6     handling it when he's talking to Dr. Nanduri.

7     Five times.

8          And he never told the defense about

9     that, and that speaks for itself.  Because his

10    actions are completely inconsistent and show

11    constant dissidence.  He knows that you need to

12    wear gloves but just not when he wants to do it.

13          His hubris just does not square with any

14    notion of fairness.  His supposed justification is

15    that touching the knife without gloves made sense

16    to him.  According to his own personal theory of

17    the case the killer wore gloves.  That is an

18    admission that he has total disregard for the

19    rights of the defense.  Pure nonsense.

20          Prosecutors don't find facts.

21    Prosecutors do not have special powers that allow

22    them to decide what did or did not occur at the

23    crime scene.  And courts can't condone this

24    behavior or look away from it, especially when

25    someone's going to be executed in a month.

290

1              It is quite literally the position the

2    prosecutors are above the rest of the justice

3    system.  They're not.  This is bad faith.  It

4    violated Mr. Williams' right to due process, and

5    it must be corrected.

6              That brings us to the new statute.

7    Mr. Jacober was just saying under plain reading of

8    the law it requires the Court to vacate

9    Mr. Williams' conviction upon finding a

10   constitutional violation.  And there were several

11   violations that were shown today.

12             Nevertheless, over the past few weeks

13   we've spent a lot of time debating these uncharted

14   waters, I think is what the Court's term is, and

15   what this law is trying to tell us.

16             Here's what the law is saying.  This

17   case belongs to this community, St. Louis County.

18   The crime occurred just a few miles away from

19   where we're standing.  The charges against

20   Mr. Williams were filed in this courthouse.  It

21   was members of this community who responded to

22   their jury summons, and it was members of this

23   community who rendered that verdict and death

24   sentence more than 20 years ago.

25             In the new law the legislature could

291

1   have granted the right to file this motion to

2   Mr. Williams itself.  It didn't.  In the law the

3   legislature could have granted that right to the

4   Attorney General.  But it didn't.  Instead, when

5   the legislature enacted this law, they placed

6   decision-making power in two representatives of

7   the people of this community, the prosecuting

8   attorney and this court.

9            The law reaffirms that the prosecuting

10  attorney is a minister of justice in this

11  community with responsibility that's broader than

12  securing criminal convictions.

13           Ninety years ago the US Supreme Court

14  wrote that a prosecutor's interest is not that it

15  shall win a case but that justice shall be done.

16           The point of this law is that the local

17  prosecutor, and only the local prosecutor, has the

18  ability to come forward, admit that an injustice

19  has occurred in his own community, and ensure that

20  he restores his community's favor in the justice

21  system.

22           Now the attorney general gets the

23  opportunity to appear, question witnesses, state

24  his peace.  But then the attorney general drives

25  back to Jefferson City, and the rest of us are

1    left with what this decision represents today.

2              That's why the statute doesn't give the

3    attorney general the right to appeal Your Honor's

4    decision.

5              Over the past few days we've heard the

6    attorney general talk about respecting the

7    decision of the jury.  The problem is that the

8    jury -- the State didn't respect the jury 25 years

9    ago.

10             Members of this community were excluded

11   because of their race.  The State certainly never

12   told those people on the jury that they were

13   quietly contaminating evidence, including the

14   murder weapon that was being passed around.

15             Setting aside this decision is how we

16   show respect for the jury and the other members of

17   our community who show up in this courthouse and

18   participate in our criminal justice system.

19             Today there's only one voice clamoring

20   for death, and that's the attorney general.

21   That's a stark reminder that the attorney general

22   is only a participant and not an advocate for

23   anyone in this case.

24             The attorney general represents the

25   different constituency from St. Louis County.

1              I am acutely aware that I do not speak

2    for Ms. Gayle's family.  But everyone else in this

3    room has listened to their wishes as of last week.

4    And this entire problem began because the

5    prosecution decided to seek the death penalty over

6    their wishes.

7              And as we all heard Dr. Picus tell us on

8    the phone, that decision only led to years of

9    pain.  And last year, last week it looked like we

10   had a resolution.  And again there was only one

11   dissenting voice that departed from the family's

12   wishes.

13             I expect that the attorney general is

14   going to continue to criticize Mr. Williams for

15   his willingness to take that Alford plea last

16   week.

17             As everyone knows, a no contest plea

18   doesn't represent the culpability of Mr. Williams.

19   It only represents what Mr. Williams was forced to

20   accept in an imperfect world, in an imperfect

21   system.

22             When you hear the attorney general claim

23   that no innocent person would take this deal, it

24   shows a point of view that's divorced from the

25   real decisions that real people have to make.

1          Mr. Williams is scheduled for execution

2     less than a month from now.  He was given a

3     Hobson's choice.  Live in prison or die next

4     month.

5          Whether you're staring down the barrel

6     of a gun or the needle of a syringe, it's an

7     understandable choice.  Largely, the attorney

8     general is just an advocate for an abstract

9     concept that office calls finality.  Finality has

10    nothing to do with the justice system.  It's about

11    bureaucracy.  Finality is a code word that it's

12    better to get it over with than to get it right.

13         Mr. Williams' execution doesn't

14    represent finality, much less closure.  It only

15    leaves lingering questions about the unfairness

16    impacting this trial.  There's no court opinion

17    that can persuade the community that this was a

18    fair trial after what we heard today.

19         Here's the biggest takeaway from this

20    new law and why we're here today.  The law

21    symbolizes an opportunity for our local justice

22    system to recognize its mistakes and rebuild trust

23    with the community.

24         You don't build trust by denying your

25    mistakes.  You build trust by owning them.

295

1  Admitting your mistakes is not a sign of weakness.

2  It's a sign of strength.  That our justice system

3  is strong enough to fix itself.

4         Today when you heard from Judge Green,

5  he could have come in here and testified that he

6  did his best.  That justice system is tough but

7  fair, that it always reaches the right result, and

8  then he could return to his own courtroom.  He

9  didn't.

10        It took courage for him to come in here

11  voluntarily and admit that 23 years ago he fell

12  short.  But even if he fell short, the truth of

13  the matter is that no one in this courtroom

14  respects him less.  We only respect him more.

15        So here's where we stand.  Mr. Williams

16  didn't receive the defense he deserved.  The

17  prosecution deliberately tainted evidence.  The

18  prosecution deliberately ensured that he wouldn't

19  be judged by a jury of his peers, including the

20  prosecutor who admitted that he struck a black

21  juror in part precisely because he was black.

22        As a result of those errors,

23  Mr. Williams isn't scheduled to wake up on

24  September 25th unless this court acts.

25        In the meantime, there are a million

1    other people in this community who are going to
2    wake up that day.  We're all going to have an
3    opportunity to understand how our justice system
4    works and whether it really is as strong as we
5    believe it is.
6          So on that, Your Honor, we ask that you
7    set aside Mr. Williams' conviction.  And we thank
8    you again for your time.
9          THE COURT:  Thank you, Mr. Potts.
10   Mr. Spillane.
11         MR. SPILLANE:  Thank you, Your Honor.
12         CLOSING ARGUMENT BY MR. SPILLANE:
13         MR. SPILLANE:  May it please the court,
14   Your Honor.
15         THE COURT:  It does.
16         MR. SPILLANE:  This case is about the
17   rule of law.  We've heard a lot of things here
18   about the community and this and that.  We didn't
19   hear one thing about Article V Section 22 of the
20   Missouri Constitution that says a lower court must
21   follow the decisions of a higher court.  547.031
22   if it tried to overrule that, which it couldn't,
23   would be unconstitutional.
24         The only claim left in this case is the
25   bad faith destruction of evidence.  And not only

297

1    was that not proved by clear and convincing

2    evidence, it was not proved by any evidence.

3            The prosecutor came here and testified

4    today that it was always his practice to once the

5    evidence was tested not to use evidence-saving

6    techniques.

7            And if you look at State v. Deroy

8    623 S.W.3d 778, 791 it says:  When he acts in good

9    faith and in accord with their normal practice, no

10   due process violation lies when potentially useful

11   evidence is destroyed.

12           There is no bad faith here.  There's

13   been argument after argument attempting to impune

14   the character of the prosecutor, and that's

15   terrible.

16           They said that he admitted he struck

17   somebody because he was black.  You heard the same

18   testimony I heard today.  He never said that.

19   They just say it like it's true.  And that's kind

20   of offensive.

21           Let's talk about they mention the bloody

22   footprint.  I think it didn't come in any evidence

23   on it, but the bloody footprint didn't match the

24   shoes that Williams was wearing when he was

25   arrested because he was arrested long after the

298

1    crime.

2              We know from the trial transcript that

3    the clothing he wore that day went in a backpack

4    and into the sewer.  We also know from testimony

5    that sewer workers went to look for it, but it was

6    too late because it had already been vacuumed up

7    and put in a dump.

8              So saying it doesn't match his shoes

9    doesn't tell the whole story.  It didn't match the

10   shoes he was wearing much later.

11             Let me talk about Mr. Thompson who came

12   in and testified.  He didn't read the transcript

13   of any of the investigating officers that was in

14   the trial transcript.  He had no idea about the

15   ruler or the ID or the purse.

16             The only thing that they told him about

17   was the laptop.  And then he says, well, there's

18   nothing to back up her story because it's only the

19   laptop and other people say that she had the

20   laptop.  Just ignores everything else that was in

21   the car.  His testimony is useless.

22             Dr. Word come in and she actually

23   helped, I mean, us, not them.  She said a couple

24   of things that were important.  She had no idea

25   what the protocol was in the St. Louis County

1    Prosecutor's Office for testing evidence -- for

2    preserving evidence that had already been

3    completely tested and was done.  She had no idea.

4    That was an important question.

5              And another important question is that

6    she indicated a couple of times that

7    Marcellus Williams' DNA could have been on the

8    knife.  I don't think it was because of the

9    gloves.  But she said it could have been taken off

10   by the prosecutor.  So she's actually weakened

11   their earlier argument that he could be excluded.

12             Let's talk about Prosecutor Larner.  He

13   came in and did everything right.  He didn't do

14   anything wrong.  He didn't do anything in bad

15   faith.  And I don't even know, you know, why they

16   say that he did.  There's no evidence.

17             And they refer to the evidence in this

18   case as being weak.  It was overwhelming.  Read

19   the Missouri Supreme Court decision.  You have

20   over and over, and you've read the transcript.

21   This isn't weak evidence.  This isn't evidence on

22   which no reasonable jury could convict by -- prove

23   by pure -- excuse me, clear and convincing

24   evidence, which is evidence that instantly tilts

25   the balance in their favor and overcomes

300

1    everything else.

2              Even if the actual innocence claim was

3    still in this case, which I think it isn't, it

4    loses horribly.

5              And something else, Martin Footnote 4

6    says:  Actual innocence has to be based on new

7    evidence.  And the Missouri Supreme Court defined

8    that as evidence that wasn't available at trial.

9              They've got really nothing going to

10   innocence that wasn't available at trial.  They

11   just restate the thing that was rejected about the

12   computer testimony that was excluded and the stuff

13   about ineffective assistance of counsel that

14   already lost in the Missouri Supreme Court.

15             So they have nothing that can win under

16   the standard.

17             Judge McGraugh and Judge Green, I don't

18   think they said anything that was untrue.  But

19   this was a quarter century ago.  One could read

20   the transcript and listen to Mr. Larner and see

21   that he handled the evidence without gloves.  They

22   don't remember that, and I think their memories

23   are flawed in the sense of that.  Because he

24   didn't wear gloves and they didn't jump up and

25   down and scream because everybody didn't wear

301

1    gloves then because nobody -- I won't say nobody

2    in the world had ever heard of touch DNA, but

3    people in St. Louis County didn't know about it.

4    And that's the standard.  Did he use bad faith?

5    He didn't.  He wasn't even negligent.  And if he

6    was negligent, we would still win.  But he

7    certainly didn't use bad faith because he used the

8    protocol that his office always used.  He did what

9    he always does.  Which is, if there's nothing to

10   test, he doesn't use evidence-saving techniques.

11   And we know that from the testimony in the

12   transcript about the fingernail clipping.  Because

13   when he thought maybe that could be tested, he

14   wore gloves -- well, he didn't open the package.

15          Something else we learned today that was

16   helpful is that this didn't come in an unsealed

17   package with the handle sticking out like was the

18   former memory of Mr. Larner because he went and he

19   read the transcript and he looked at the package

20   and he remembered this thing was completely

21   sealed.

22          And so I think the fingerprints --

23   excuse me, the fact that he wore gloves is a good

24   reason.  But if you listen to the question I asked

25   him about, even if he didn't wear gloves, would

302

1    you have done the same thing because the evidence

2    was tested?  And the answer is, yes, that's what I

3    always do.

4              There's no bad faith here.  And they

5    can't win without bad faith.  I mean, something

6    could be invented, be in some laboratory right now

7    in 20 years that's going to help some case in your

8    court, but nobody is responsible for knowing that

9    now.  And that judge wasn't responsible for

10   knowing that.  No one knew.  There was no bad

11   faith.

12             That's essentially it.  This is about

13   the rule of law.  I don't like the disparagement

14   of the prosecutor.  That's not the way you win a

15   case.  You argue what the law is and what the

16   facts are.  You don't call the prosecutor names.

17             The Missouri Supreme Court has already

18   rejected everything in its place except the bad

19   faith claim, and that loses.  They present no

20   evidence that shows bad faith.

21             Like I say, where it helped us on that,

22   and I just wanted to say that everybody here

23   should appreciate the crime victims because, you

24   know, this is about them.  And I don't think

25   dragging this out for year after year on claims

303

1    that they know or should know are legally

2    meritless does anything for the crime victims.

3                Thank you, Your Honor.

4                THE COURT:  Thank you, Mr. Spillane.

5                I would like to thank the attorneys for

6    their professionalism throughout this process.

7    This is very difficult procedure for everyone.

8                This is going to be a decision that I

9    will weigh heavily.

10               Our court reporters indicate that they

11   will try to expedite a copy of the transcript as

12   humanly possibly, which I think will be sometime

13   Monday or early Tuesday morning.  And we will

14   e-mail copies of the transcripts to everyone.

15               Again, I want to thank you for your

16   patience with the court and your understanding of

17   how difficult this matter has been for this

18   particular division.

19               With that said, the Court will be -- I

20   need a memo that the matter has been heard and

21   submitted and indicate to me that you will submit

22   proposed findings of fact and conclusions of law

23   pursuant to the statute by next Wednesday, which

24   is September 4th.

25               And as I indicated off the record, those

1    can be submitted to me both by e-filing and to my

2    direct e-mail address in Word.  Appreciate it.

3    The court will be in recess.  Court is not in

4    recess.  We're done.  Thank you.

5                            -0-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

305

```
 1                    Reporter's Certificate

 2

 3         I, Susan M. Lucht, a Certified Court Reporter,

 4    hereby certify that I was the official court

 5    reporter for Division 13 of the Circuit Court of

 6    the County of St. Louis, State of Missouri; that

 7    on August 28, 2024, I was present and reported the

 8    proceedings had in the case of In Re:  Prosecuting

 9    Attorney, 21st Judicial Circuit, ex rel Marcellus

10    Williams v. State of Missouri, Cause Number

11    24SL-CC00422; and I further certify that the

12    foregoing pages contain a true and accurate

13    reproduction of the proceedings had on that date.

14

15

16

17

18

19                    Susan M. Lucht, CCR #302

20                    Official Court Reporter

21                    Twenty-First Judicial Circuit

22                    (314) 615-2685

23

24

25
```

306

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 4:05-CV-1474-RWS |
| | ) | **Capital Case** |
| DONALD ROPER, | ) | **Execution Scheduled for:** |
| | ) | **September 24, 2024** |
| Respondent. | ) | |

## SUGGESTIONS IN OPPOSITION TO MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60(b)(6)

Applications for writs of habeas corpus filed by prisoners in state custody are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254; *Singleton v. Norris,* 319 F.3d 1018, 1023 (8th Cir. 2003). AEDPA limits the authority of federal courts to entertain habeas applications. In addition, 28 U.S.C. § 2244(b) governs successive habeas applications. This statutory provision requires the dismissal of claims previously raised in a federal habeas action. 28 U.S.C. § 2244(b)(1). Petitioner's motion is a second or successive application for habeas relief.

In the context of Rule 60(b) motions, courts should briefly inquire as to whether these motions raise claims similar to those in previously-filed habeas petitions. *Boyd v. United States,* 304 F.3d 813, 814 (8th Cir. 2002) (*per curiam*) ("[W]e encourage district courts, in dealing with purported Rule 60(b) motions following the dismissal of habeas petitions, to employ a procedure whereby the

1

district court files the purported Rule 60(b) motion and then conducts a brief initial inquiry to determine whether the allegations in the Rule 60(b) motion in fact amount to a second or successive collateral attack under either 28 U.S.C. § 2255 or § 2254."). If a Rule 60(b) motion does raise a second or successive claim, it should be dismissed for failure to obtain authorization from the Eighth Circuit, or the matter should be transferred to the Eighth Circuit. *Id.*

In *Gonzalez v. Cosby*, the United States Supreme Court held that a petitioner does not raise a habeas claim where he is only challenging "a previous ruling which precluded a merits determination. . . for example, a denial for such reasons as failure to exhaust, procedural default or statute of limitations bar." 545 U.S. 524, 532 n.4 (2005). The *Gonzalez* Court further concluded that a claim raised in a Rule 60(b) motion may only be deemed as second or successive where the motion itself or the judgment entered on the movant's prior habeas petition addressed substantive grounds for setting aside his underlying conviction. *Id.* at 532 ("If neither the motion itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's state conviction, allowing the motion to proceed as denominated creates no inconsistency with the habeas statute or rules.").

This Court, in its 2010 order, addressed and denied the *Batson*[1] claims raised in Petitioner's original habeas petition. Doc. 58 at 20–25. Petitioner now appears to allege that this Court's earlier denial of his *Batson* claims was not a decision on the merits because this Court gave AEDPA deference to the Supreme Court of Missouri. Doc. 121 at 35–36. But this Court's prior denial of Petitioner's petition was clearly a merits-based denial. *See Ward v. Norris*, 577 F.3d 925, 933 (8th Cir. 2009) ("'On the merits' refers 'to a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §2254(a) and (d)'"). And, at present, Petitioner is making a claim challenging his conviction and sentence in lieu of alleging that untimeliness, lack of exhaustion, or some other procedural bar prevented this Court from addressing his *Batson* claims. Therefore, his motion is a second or successive application for habeas relief.

Petitioner attempts to use the United States Supreme Court's decision in *Buck v. Davis* to support his assertion that Rule 60(b) "provides this Court the procedural mechanism to consider the newly disclosed evidence and to grant appropriate relief." Pet. Rule 60(b) Mot. at 2. But the findings of the *Buck* Court are not helpful to Petitioner. The issue in *Buck* was whether it was an abuse of discretion not to grant a certificate of appealability. 580 U.S. 100 (2017).

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

3

The *Buck* Court's findings had nothing to do with second or successive applications for habeas relief like the one at issue here. *See id.*

In addition, the United States Supreme Court's decision in *Flowers v. Mississippi* is not helpful to Petitioner. 588 U.S. 264 (2019). *Flowers* stands only for the unremarkable proposition that relevant facts and circumstances may be considered in evaluating a *Batson* claim. *See id.* In *Flowers*, the United States Supreme Court neither excused the bar on second or successive petitions, nor did it permit the filing of a Rule 60(b)(6) motion presenting second or successive claims based upon alleged extraordinary grounds, as Petitioner attempts to do here. *See id.*

In support of the theory that he has extraordinary grounds permitting his filing of the Rule 60(b)(6) motion, Petitioner asserts that the prosecutor ("Larner") now admits that race was part of the reason he struck a juror. Doc. 121 at 40. This fact would not make his motion something other than a second or successive application for habeas relief. In any event, Petitioner's assertion is a mischaracterization of the record. Petitioner does not include the § 547.031[2] motion court's findings of fact; rather, he makes this assertion based upon an inaccurate characterization of Larner's testimony that he did not have any race-based reasons for his strikes. Petitioner attempts to construe Larner's testimony

---

[2] All citations to this statutory provision refer to § 547.031 RSMo 2024.

as an admission that he did have race-based reasons for these strikes. But the record does not support that.

The findings of fact and conclusions of law entered following the hearing in the § 547.031 motion court provide that "Larner denied systematically striking Black jurors or asking Black jurors more isolating questions than White jurors." Resp. Sugg. in Opp. Ex. 1 at 16. The transcript from this hearing also refutes the idea that Larner had partially non-race-neutral reasons for any of his peremptory strikes. *See* Tr. Vol. 2 at 203–237. Larner explicitly *denied* striking potential juror number 64 in part because he was black, stating that he struck this potential juror because he thought Petitioner and said potential juror looked similar, but not because he was black. *Id.* at 211. Larner further stated that if he had struck this potential juror because he was black, which he did not, that such a strike would have been thrown out and caused a retrial. *Id.* When asked specifically if *part of the reason* he struck this potential juror was because he and Petitioner were both black, the prosecutor "*No, absolutely not. Absolutely not.*" *Id.* at 213 (emphasis added). Larner clearly understood that he would have been reversed under *Batson* had he done that. *Id.* To characterize Larner's testimony as being an admission that he struck a potential juror in part because he was black is plainly incorrect.

At bottom, Petitioner is seeking to use a meritless second or successive application for habeas relief as a delay tactic, just days before his scheduled

execution. Nothing new is raised in Petitioner's Rule 60(b)(6) motion. Petitioner has had the trial transcript and record for decades. Petitioner simply attempts to repackage a *Batson* claim that has previously been denied by this Court, using testimony from his § 547.031 motion hearing that fails to establish the elements of such a violation and contradicts the transcript of Petitioner's original criminal trial, which he has had for decades. Even if this motion were not second or successive, which it is, the evidence Petitioner presents would not support the granting of a Rule 60(b)(6) motion under these circumstances. *See Bucklew v. Precythe*, 587 U.S. 119, 149–151 (2019) (noting that last minute challenges to executions "should be the extreme exception, not the norm," and courts "can and should" protect state court judgments from such "dilatory" attacks).

This Court should dismiss Petitioner's Rule 60(b)(6) motion as second or successive.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

/s/ *Michael Spillane*
MICHAEL SPILLANE
Assistant Attorney General
Missouri Bar # 40704
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1307
(573) 751-2096 Fax
mike.spillane@ago.mo.gov

/s/ *Katherine Griesbach*
KATHERINE GRIESBACH
Assistant Attorney General
Missouri Bar #75883
P.O. Box 899
Jefferson City, MO 65102
(573) 751-6009
(573) 751-2096 Fax
katherine.griesbach@ago.mo.gov

Attorneys for Respondent

7

## <u>Certificate of Service</u>

I hereby certify this document was filed with this Court's electronic filing system on September 17, 2010 and should be electronically served by this Court's electronic filing system on

Kent E. Gipson
Kent.gipson@gipsonlaw.com

Laurence E. Komp
Laurence_komp@fd.org

Faith J. Tan
Faith_tan@fd.org

/s/ *Michael Spillane*
MICHAEL SPILLANE
Assistant Attorney General

8

IN THE 21ST JUDICIAL CIRCUIT, COUNTY OF ST. LOUIS
STATE OF MISSOURI, FAMILY COURT

**FILED**

SEP 1 2 2024

JOAN M. GILMER
CIRCUIT CLERK, ST LOUIS COUNTY

In re the matter of:

**Prosecuting Attorney, 21st Judicial
Circuit, ex rel. Marcellus Williams**

      **Movant/Petitioner,**

v.

**State of Missouri**

      **Respondent.**

**Cause No. 24SL-CC00422**

**Division    13**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER AND JUDGMENT

    The Court having called this matter for hearing on August 28, 2024, Movant Prosecuting Attorney appears through counsel, Matthew Jacober, Realtor; Marcellus Williams appears in person and with special counsel, Tricia J. Rojo Bushnell and Jonathan Pott;, State of Missouri appears through Assistant Attorneys General, Michael Spillane, Kelly Snyder, Andrew Clarke, Katherine Griesbach and Kirsten Pryde.

    The Court having considered the record consisting of over 12,000 pages; heard the evidence presented by the Prosecuting Attorney, Attorneys General, and Relator; given proper weight and credibility to the evidence, admitted exhibits and heard arguments; reviewed Proposed Findings of Fact and Conclusions of Law submitted by the parties; None of the parties requested specific Findings of Fact and Conclusions of Law. All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the results reached. Rule 73.01(c). Any finding of fact herein equally applicable as a conclusion of law is adopted as such and any conclusion of law herein equally applicable as a finding of fact is adopted as such. The Court now being fully advised in the premises, hereby makes the following Findings of Facts, Conclusions of Law, Order and Judgment pursuant to § 547.031.2 R.S.Mo.

### PROCEDURAL HISTORY

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS

Appellate Case: 24-2907    Page: 408    Date Filed: 09/19/2024 Entry ID: 5582619 Sep 19 2024 p408
Page 1 of 24

Following a 14-day jury trial, the Circuit Court for St. Louis County on August 27, 2001 entered its judgment finding Marcellus Williams guilty of first-degree murder for the August 11, 1998 killing of F.G., as well as first-degree burglary, two counts of armed criminal action, and robbery and fixing punishment at death. The Missouri Supreme Court affirmed Williams' conviction, *State v. Williams,* 97 S.W.3d 462 (Mo. banc 2003), and affirmed the judgment denying postconviction relief. *Williams v. State,* 168 S.W.3d 433 (Mo. banc 2005).

Williams filed a petition for a writ of habeas corpus in federal court. The federal District Court granted relief, but the 8th Circuit Court of Appeals reversed the judgment and denied habeas relief. *Williams v. Roper,* 695 F.3d 825, 839 (8th Cir. 2012). The United States Supreme Court denied Williams' petition for a writ of certiorari. *Williams v Steele,* 571 U.S. 839 (2013).

In December of 2014, The Missouri Supreme Court issued a warrant of execution setting a January 28, 2015 execution date. Williams then filed a petition for a writ of habeas corpus in the Missouri Supreme Court alleging he was entitled to additional DNA testing to demonstrate actual innocence. That same Court vacated Williams' execution date and appointed a special master to ensure complete DNA testing and to report the results of the additional DNA testing.

The special master provided the Missouri Supreme Court with the results of additional DNA testing conducted on hair and fingernail samples from the crime scene and of the knife used in the murder. The parties fully briefed their arguments to the master. The Missouri Supreme Court, after reviewing the master's files, denied Williams' habeas petition because the additional DNA testing did not demonstrate Williams' actual innocence. The United States Supreme Court denied Williams' petition for a writ of certiorari. *Williams v. Steele,* 582 U.S. 937, 137 S.Ct. 2307, 198 L.Ed.2d 737 (2017).

In 2017, Williams filed another petition for writ of habeas corpus, again alleging DNA testing demonstrated his actual innocence by excluding him as a contributor of DNA found on the knife used in the murder. The Missouri Supreme Court denied relief. The United States Supreme Court denied Williams' petition for writ of certiorari. *Williams v. Larkin,* 583 U.S. 902, 138 S.Ct. 279, 199 L.Ed.2d 179 (2017).

In 2023, Williams filed a petition for a declaratory judgment alleging Governor Parson lacked authority to rescind an executive order issued by Governor Greitens on August 22, 2017 appointing a board of inquiry pursuant to § 552.070 RSMo and staying execution until the final clemency determination. On June 29, 2023 Governor Parsons rescinded said executive order, thereby dissolving the Board of Inquiry established therein. On June 4, 2024, the Missouri

Supreme Court issued a permanent writ of prohibition barring the Circuit Court
from taking further action other than granting the governor's motion for judgment
on the pleadings and denying Williams' petition for declaratory judgment. *State
ex rel. Parson v. Walker,* No. SC100352, ___ S.W.3d ___ at 2-3. (Mo. banc June 4,
2024).

On June 4, 2024 The Missouri Supreme Court issued its order and warrant
for execution setting a September 24, 2024 execution date for Williams.

Williams filed a motion to withdraw the Missouri Supreme Court's June 4,
2024 warrant of execution setting the September 24, 2024 execution date,
claiming the warrant was premature because on January 26, 2024 the St. Louis
County Prosecutor filed a motion to vacate Williams' first-degree murder
conviction and death sentence pursuant to § 547.031, R.S.Mo. Supp. 2021. The
Missouri Supreme Court overruled said motion. *State of Missouri v. Marcellus
Williams,* No. SC83984 (Mo. banc July 12, 2024).

## LEGAL STANDARD

Does this Court have jurisdiction or authority to hear a Motion to Vacate or
Set Aside Judgment pursuant to §547.031.1 R.S.Mo (2021), if the Supreme Court
issues its order and warrant for execution before the motion is heard and ruled on?

The Legislature has expressly provided that a § 547.031 R.S.Mo (2021)
motion collaterally attacking a judgment may be filed at any time in circuit court,
and the statute likely does not impermissibly conflict with controlling Supreme
Court rules pertaining to capital crimes for which a sentence of death has been
imposed.

In 2021, due in part to Judge Draper's concurrence in *State v. Johnson,* 617
S.W.3d 439, 446 (Mo. banc 2021), the Legislature enacted § 547.031 R.S.Mo
(2021) which provides:

1. A prosecuting or circuit attorney, in the jurisdiction in which the person
   was convicted of the offense, may file a motion to vacate or set aside the
   judgment at any time if he or she has information that the convicted
   person may be innocent or may have been erroneously convicted. The
   circuit court in which the person was convicted shall have jurisdiction
   and authority to consider, hear, and decide the motion.

2. Upon the filing of a motion to vacate or set aside the judgment, the court
   shall order a hearing and shall issue findings of fact and conclusions of
   law on all issues presented. The attorney general shall be given notice
   of hearing of such motion by the circuit clerk and shall be permitted to

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS

Appellate Case: 24-2907    Page: 410    Date Filed: 09/19/2024 Entry ID: 5930519 Sep 19 2024 p410
Page 3 of 24

appear, question witnesses, and make arguments in a hearing of such motion.

3. The court shall grant the motion of the prosecuting or circuit attorney to vacate or set aside the judgment where the court finds that there is clear and convincing evidence of actual innocence or constitutional error at the original trial or plea that undermines the confidence in the judgment. In considering the motion, the court shall take into consideration the evidence presented at the original trial or plea, the evidence presented at any direct appeal or post-conviction proceeding, including state or federal habeas action; and the information and evidence presented at the hearing on the motion.

4. The prosecuting attorney or circuit attorney shall have the authority and right to file and maintain an appeal of the denial or disposal of such motion. The attorney general may file a motion to intervene and, in addition to such motion, file a motion to dismiss the motion to vacate or to set aside the judgment in any appeal filed by the prosecuting or circuit attorney.

By its express terms, this statute not only authorizes the appropriate circuit court to decide the motion, but also requires said court to hold a hearing and to issue findings of fact and conclusions of law. Nothing in the statute excepts capital death sentence cases from the circuit court's authority, even those for which the defendant has exhausted all right to seek relief before both the Missouri State Supreme Court and United States Supreme Court. Thus, in order for the Circuit Court to dismiss for lack of authority in the instant case, it would have to find that a conflict exists between the statute and Supreme Court rules requiring exclusive Supreme Court jurisdiction, and that the Supreme Court rules prevail over the statute. *See, Brick v. Koeppen,* 672 S.W.3d 62, 65-66 Mo. App. 2023).

Only three cases have interpreted this statute and none addresses a circuit court's authority to hear the motion under the facts presented in the instant case. In *State v. Johnson,* 654 S.W.3d 883 (Mo. banc 2022), none of the parties raised the issue in what was an arguably more compelling case for restraining the circuit court's authority. In *Johnson,* unlike in the case at bar, the Supreme Court's warrant for execution was issued well before the § 547.031 motion was filed in the circuit court. Ultimately, the circuit court denied the last-minute motion on the grounds that it had insufficient time to conduct a meaningful hearing on the merits. However, rather than addressing the circuit court's authority to act after issuance of its warrant for execution, the Supreme Court denied the motion for stay of execution on the grounds that even if remanded for hearing, defendant could not make the required showing of likely success on the merits under the injunctive relief analysis also applicable when a stay is sought. *Id.* at 892-93. But in doing

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
4

Appellate Case: 24-2907    Page: 411    Date Filed: 09/19/2024    Entry ID: 5439619 Sep 19 2024 p411
Page 4 of 24

so, a majority of the Supreme Court appears to have given at least tacit approval
for a circuit court to proceed with such a motion, notwithstanding the high court's
prior issuance of warrant for execution in that case. Judge Breckenridge wrote in
dissent that the circuit court in her view was in error in not scheduling the
§ 547.031 hearing as required by statute. *Id.* at 903. Defendant Williams likely
titled his Supreme Court filing as a "Motion to Withdraw Warrant of Execution"
in his direct appeal case to avoid confronting the uphill "likelihood of success on
the merits" argument faced when filing a motion to stay execution.

In its Motion to Dismiss the § 547.031 motion, the Attorney General
submits three colorable, but far from definitive, citations of authority in support of
its contention that the Supreme Court has exclusive jurisdiction over this matter.
Although not directly argued, the brief implicitly makes the argument that the
Supreme Court rules cited prevail over the conflicting statute, requiring the motion
to be heard by the Supreme Court.

The first is **Article V, § 2** of the Missouri Constitution. However, that
section simply states that the decision of the Supreme Court shall be controlling in
all other courts. The second citation is Supreme Court Rule 30.03(b), which
provides:

> (b) A date of execution set pursuant to Rule 30.30(a) shall be stayed upon
> the receipt in this Court of proof of filing of a timely appeal or petition for
> writ of certiorari in the Supreme Court of the United States. No other filing
> in this or any other Court shall operate to stay an execution date without
> further order of this Court or other competent authority.

However, none of the parties have requested that the Circuit Court stay the
execution, as it is conceded that it lacks authority to do so. Accordingly, this rule
does not expressly preclude a circuit court from hearing a § 547.031 motion.

Next, the Attorney General cites **Supreme Court Rule 91.02(b)**, which
provides that, in capital convictions involving a sentence of death, any habeas
corpus petition may be filed in the Supreme Court in the first instance and, if first
filed in another court, shall be deemed to have been filed in the Supreme Court.
Although akin to a habeas petition, a § 547.031 motion is made pursuant to
specific legislative enactment to prevent a prosecutor or circuit attorney to seek
relief in addition to, or apart from, the convicted defendant's right to seek post-
conviction and habeas relief. Thus, the statute does not directly conflict with the
mandate contained in Rule 91.02(b), requiring a capital defendant to file his or her
habeas petition exclusively in the Supreme Court.

Finally, the Attorney General cites the following **two cases**, neither of
which directly supports its contention of exclusive Supreme Court jurisdiction in

this matter. *State ex rel. Nixon v. Daugherty*, 186 S.W.3d 253 (Mo. banc 2008) involved a defendant's unprecedented use of a Supreme Court civil practice rule, Rule 74.06(d), to collaterally attack the judgment denying his Rule 24.035 post-conviction relief motion. In that case, the court held that Rule 74.06(d) applied solely to civil actions and that permitting such a motion would eviscerate a post-conviction relief motion's purpose of promptly and finally adjudicating claims concerning the legality of the conviction or sentence of a defendant. In particular the court stated:

> In a death penalty case, a Rule 74.06(d) motion also frustrates the purpose of Rule 91.02(b), Rule 29.08(d), and the Court's order of June 16, 1988. All of these make clear that matters affecting a sentence of death, once it is affirmed on direct appeal and except for a motion filed under Rule 24.035 or Rule 29.15, are to be filed in this Court and not another state court.

*Id.* at 254.

As an initial matter, it should be noted that the above quote expressly exempts post-conviction relief motions from having to be filed directly in the Supreme Court. Moreover, glaringly absent from the Attorney General's brief is any mention that *Daugherty*, which was decided long before enactment of § 547.031, permits **only** (emphasis added) prosecuting attorneys to file a motion to vacate/set aside a conviction if the defendant may be innocent or that constitutional error at trial undermines the confidence in the judgment. Also of significance is the provision in § 547.031 for appellate review of a circuit court's determination, meaning that the Supreme Court would have the last word in a capital death sentence case in any event.

The second case cited is *State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. banc 2003), which allowed capital offenders to raise free-standing claims of actual innocence via habeas corpus. The *Amrine* court pointed to the death penalty statute § 565.035.2 R.S.Mo., as charging it with exclusive authority to review the sentence as well as any errors enumerated by way of appeal. The Attorney General argues that *Amrine* and § 565.035 provide for exclusive Supreme Court review in death penalty cases.

However, the statute does not give the Supreme Court exclusive authority to hear collateral attacks on the judgment and sentence, such as those filed under Rule 29.15 or 24.035. *See, e.g. Anderson v. State*, 190 S.W.3d 28 (Mo. banc 2006)(Post-conviction relief motion filed pursuant to Rule 29.15 in death sentence case overruled by circuit court and reversed and remanded by supreme court for re-trial of penalty phase.) And, in *State ex rel. Bailey v. Fulton*, 659 S.W.3d 909 (Mo. banc 2023), the Supreme Court recently held, "As previously stated,

however, like motions filed under Rules 29.15 and 24.035, a motion to vacate or set aside a conviction under '§ 547.031 is a new civil action' representing a 'collateral attack on the conviction and sentence'" (*quoting, State v. Johnson,* supra 654 S.W.3d at 891 n.10).

Accordingly, § 547.031 does not conflict with any of the Supreme Court rules cited by the Attorney General (24.035; 29.15; 29.08(d); 30.30(b); or 91.02(b)), because it is a legislatively created additional means for a prosecutor to collaterally attack the judgment and sentence under a narrow set of circumstances.

For the foregoing reasons Attorney General's Motion to Dismiss is hereby **DENIED.**

## FINDINGS OF FACT

1. More than twenty-six years ago, on August 11, 1998, Williams murdered F.G.. *State v. Williams,* 97 S.W.3d 462, 466 (Mo. banc 2003).

2. After a 14-day trial, a jury convicted Williams of one count each of first-degree murder, first-degree burglary, and first-degree robbery, and two counts of armed criminal action. *Id.* This Court sentenced Williams to death for the first-degree murder conviction. *Id.*

3. While the Court has reviewed all of the relevant court records, the principle cases affirming Williams' convictions and sentences are as follows:

   Trial:
   *State v. Williams,* 99CR-005297 (Judge Emmett O'Brien St. Louis County Circuit Court 21st Judicial Circuit);

   Direct Appeal:
   *State v. Williams,* 97 S.W.3d 462 (Mo. banc 2023);

   Direct Appeal Petition of Certiorari:
   *Williams v. Missouri,* 539 U.S. 944 (2013);

   Post-Conviction Motion Court Proceedings:
   *Williams v. State,* 03CC-2254 (Judge Emmett O'Brien St. Louis County Circuit 21st Judicial Circuit);

   Post-Conviction Appeal:
   *Williams v. State,* 168 S.W.3d 433, 438 (Mo. banc 2005);

   2015 State Petition for Writ of Habeas Corpus:

*Williams v. Steele*, SC94720 (Mo.);

2017 State Petition for Writ of Habeas Corpus:
*Williams v. Larkin*, SC96625 (Mo.);

Declaratory Judgment Action:
*State ex rel. Parson v. Walker*, 690 S.W.3d 477 (Mo. banc 2024).

4. Following the unanimous opinion denying Williams' appeal and affirming this Court's judgment of conviction, *Williams*, at 466, 475, Williams petitioned the United Supreme Court for a writ of certiorari to review the decision of the Supreme Court of Missouri affirming the circuit court's judgment of conviction. *Williams*, 539 U.S. at 944. The petition was denied. *Id.*

5. Williams then filed a motion for post-conviction relief under Supreme Court Rule 29.15. *Williams*, 168 S.W.3d at 139. In his amended motion Williams asserted in excess of thirteen claims for post-conviction relief. *Id.* at 438-47. The motion court denied Williams' motion for post-conviction relief. *Id.* at 439. The Missouri Supreme Court, in a unanimous opinion, affirmed the circuit court's denial of Williams' post-conviction motion. *Id.* at 447.

6. Williams then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri. Resp. Ex.2.

7. After the federal District Court initially granted Williams' habeas relief, the United States Court of Appeals for the Eighth Circuit reversed the District Court's judgment and denied Williams' federal habeas relief. *Williams v. Roper*, 695 F.3d 825, 839 (8th Cir. 2012).

8. Williams petitioned the United States Supreme Court for a writ of certiorari to review the decision of the United States Court of Appeals for the Eighth Circuit denying his petition for a writ of habeas corpus. *Williams v. Steele*, 571 U.S. 839 (2013).

9. On December 17, 2014, the Missouri Supreme Court issued an execution warrant scheduling Williams to be executed on January 28, 2015.

10. On January 9, 2015, Williams filed a petition for a writ of habeas corpus in the Missouri Supreme Court. Resp. Ex. I-1. Williams alleged that further DNA testing could demonstrate that he was innocent of the murder of F.G..

11. The Missouri Supreme Court appointed a special master to "insure DNA testing of appropriate items at issue in this cause and to report to this Court the results of such testing." Res. Ex. I-14 at 2.

12. On January 31, 2017, after reviewing the special master's report, the Supreme Court of Missouri denied Williams' petition for a writ of habeas corpus. Resp. Ex. I-15 at 1.

13. On April 20, 2017, the Supreme Court of Missouri issued an execution warrant scheduling Williams to be executed on August 22, 2017. Resp. Ex. K3 at 2.

14. Williams sought review of the Supreme Court of Missouri's denial by filing a petition for a writ of certiorari with the United States Supreme Court.  On June 26, 2017, the petition was denied. *Williams v. Steele,* 582 U.S. 937 (2017).

15. On August 14, 2017, Williams filed another petition for a writ of habeas corpus in the Supreme Court of Missouri. Resp. Ex. N-1.

16. On August 15, 2017, the Supreme Court of Missouri denied Williams' petition for a writ of habeas corpus. Resp. Ex. N-5.

17. William again sought review of the Supreme Court of Missouri's denial by filing for a writ of certiorari with the United States Supreme Court. *Williams v. Larkin,* 583 U.S. 902 (2017).  On October 2, 2017, the petition was denied. *Id.*

18. On August 22, 2017, former Governor Eric Greitens issued Executive Order 17-20, which included an executive stay of Williams' execution and created a board of inquiry to investigate Williams' conviction.  It is unknown whether the Board of Inquiry reached a conclusion or issued a report or recommendation.

19. On June 29, 2023, some 5 years and 10 months after former Governor Greitens issued his executive order, Governor Michael L. Parson issued Executive Order 23-06, which dissolved the board and lifted the executive stay of Williams' execution.

20. On June 30, 2023, the Attorney General filed a renewed motion to set Williams' execution date in the Supreme Court of Missouri. Resp. Ex. P-1.

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
Page 9 of 24

9

21. On August 23, 2023, Williams filed a petition for declaratory judgment in the Cole County Circuit Court, naming Governor Parson and the Attorney General as defendants. Resp. Ex. Q-1.

22. After the Cole County Circuit Court denied Governor Parson's motion for judgment on the pleadings, Governor Parson sought a permanent writ of prohibition or, in the alternative, a permanent writ of mandamus from the Supreme Court of Missouri directing Judge S. Cotton Walker, Circuit Judge of Cole County Circuit Court, to grant the motion for judgment on the pleadings. Resp. Ex. Q-14.02.

23. After briefing and argument, the Supreme Court of Missouri made its preliminary writ of prohibition permanent on June 4, 2024, and directed Judge Walker to grant Governor Parson's motion for judgment on the pleadings. Resp. Ex. Q-14.17.

24. Clemency gives the Governor the power to extend mercy to prisoners, but it is not another round of judicial review. *See Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272, 284 (1998). Missouri's Constitution gives Governor Parson the sole power to decide how he will consider clemency applications and whether he will grant them. Governor Parson can grant clemency "for whatever reason or for no reason at all." *Olim v. Wakinekona,* 461 U.S. 238, 250 (1983).

25. On January 26, 2024, Movant filed a motion under § 547.031 R.S.Mo. 2021, to vacate the first-degree murder conviction and death sentence of Marcellus Williams.

26. Four claims were raised: (1) that Williams may be actually innocent of first-degree murder; (2) that Williams' trial counsel provided ineffective assistance in failing to better impeach two witnesses for the State who testified that Williams confessed to them; (3) that Williams' trial counsel provided ineffective assistance in failing to present different mitigating evidence "contextualizing" Williams '"troubled background"; and (4) that the State committed *Baston v. Kentucky,* 476 U.S. 79 (1986) violations by allegedly exercising preemptory strikes of jurors on the basis of race.

27. It is of utmost importance to this Court, that in denying Williams' motion to withdraw the most recently issued execution warrant, the Missouri Supreme Court held that it has already considered and rejected these four claims. *State of Missouri v. Williams,* 2024 WL 3402597 at 3 n.3.

28. During the pendency of this case, the parties received a DNA report dated August 19, 2024, from Bode Technology. Resp. Ex. FF. That report

Resp. Sugg. in Opp, Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
Page 10 of 24

Appellate Case: 24-2907    Page: 417    Date Filed: 09/19/2024 Entry ID: 5441919 Sep 19 2024 p417

indicated that Bode Technology had developed DNA profiles from Keith Larner (the assistant prosecuting attorney now retired who prosecuted Williams' criminal case), and Edward Magee (a former investigator for the St. Louis County Prosecuting Attorney's office).  The August 19, 2024 report, when reviewed in conjunction with the previous DNA reports from the handle of the knife used in the murder of F.G., indicated that the DNA material on the knife handle was consistent with Investigator Magee (matching 15 of 15 loci found by Fienup, who did the DNA testing on the knife handle), and 21 of 21 loci found by Dr. Norah Rudin in her subsequent review of Fienup's results. Resp. Ex. I-13.27 at 4 & Resp. Ex. I-13.29 at 20-23.  Rudin and Fienup were Williams' retained experts. Resp. Ex. I-13.25 at 1; Resp. Ex I-13.29 at 2.

29. This new evidence is not consistent with the Movant's theory that the results found by testing the knife handle for Y-STR "touch DNA" in 2015 matched or could match an unknown person or that the results could exculpate Williams.

30. In addition, the report is consistent with trial testimony by a crime scene investigator, who indicated that the suspect wore gloves.

31. On August 21, 2024, the date on which the evidentiary hearing was originally scheduled, Movant and Williams entered into a consent judgment vacating Williams' first-degree murder conviction and death sentence in exchange for a *North Carolina v. Alford* 400 U.S. 25 (1970) plea to first-degree murder in exchange for a sentence of life without parole.

32. The Attorney General objected after participating in discussions with this Court, which included a phone conversation with a member of F.G.'s family.

33. The Missouri Supreme Court issued a preliminary writ of prohibition overturning the consent agreement and *Alford* plea and directing this Court to conduct a hearing in this matter.

34. On August 25, 2024, Movant filed a motion for leave to amend the motion to vacate or set aside in an attempt to advance two additional claims.  Claim 5 alleged a claim of bad-faith evidence destruction under *Arizona v. Youngblood,* 488 U.S. 51 (1998).  Claim 6 asserted a claim that the original trial judge's denial of a motion for a continuance violated Williams' right to due process.

35. Over the State's objection, this Court granted Movant leave to amend the motion to advance the *Youngblood* claim (Claim 5) of bad-faith destruction

of fingerprints and bad-faith destruction of DNA evidence on the handle of the knife that was used in the murder of F.G.. This Court denied Movant's motion for leave to amend as to the claim of a violation of due process through the denial of a continuance (Claim 6). The Missouri Supreme Court held that the trial court did not abuse its discretion in denying the continuance. *Williams v. State,* 168 S.W.3d 433, 444-45. Under the law of the case doctrine, the decision of a court is the law of the case for all points presented and decided. *State v. Graham,* 13 S.W.3d 290 (Mo. banc 2000).

## AUGUST 28, 2024 HEARING FINDINGS

36. The Prosecuting Attorney called six witnesses in support of its Motion to vacate, including expert David Thompson; Judge Joseph L. Green, Williams' lead penalty phase counsel at his original trial; Dr. Charlotte Word, an expert witness in DNA testing; Judge Christopher E. McGraugh, Williams' lead guilt phase counsel at his original criminal trial; Prosecutor Keith Larner, the prosecuting attorney at Williams' original criminal trial; and Patrick Henson, an investigator for Movant's Conviction and Incident Review Unit.

### DAVID THOMPSON

37. Thompson testified over the State's objection concerning the reliability of witnesses H.C. and L.A. Hrg. Tr. At 25-64.

38. Thompson concluded, based upon evidence-based standards, that H.C. and L.A. gave unreliable information to investigating officers. *Id.*

39. Thompson acknowledges that he did not review the trial transcript, which included the trial testimony of the officers who interviewed H.C. or L.A., or the trial testimony of H.C. or L.A. themselves. *Id.* 53-55. Had he done so he would have had the opportunity to confirm trial counsels' exemplary efforts to discredit the testimony of H.C. and L.A in the presence of the jury. Despite trial counsels' efforts the jury found the testimony of H.C. and L.A. credible.

40. Thompson's testimony does not aide in deciding the issues currently before this Court.

### The Hon. Joseph L. Green

41. Judge Green testified that roughly one month before the Williams' trial, he was co-counsel in another capital case representing Ken Baumruk, who was also tried in the 21st Judicial Circuit. *Id.* at 69. He participated in a half-day

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
Page 12 of 24

Appellate Case: 24-2907    Page: 419    Date Filed: 09/19/2024 Entry ID: 5436819 Sep 19 2024 p419

sentencing proceeding in the Baumruk capital case during Williams' trial.
*Id.* at 69-70.

42. Judge Green testified, which is supported in the record from the trial, his
complaints about the prosecutor's purported failure to disclose information
and evidence in a timely manner, including witness notes and the mental
history of H.C and Williams' MDOC records that were used by the State in
the penalty phase. These issues were memorialized in a Verified Motion for
Continuance and a Supplemental Motion for a continuance filed and argued
on the record and denied by the trial court. *Id.* at 78-79.

43. Judge Green testified that he did not recall one way or the other whether
anyone touched the knife without gloves during trial. *Id.* at 82-83.

44. This Court finds that Judge Green testified earnestly, compassionately,
honestly, and to the best of his recollection, but as he admitted his memory
was better at the time he testified in Williams' post-conviction relief case in
2004.

45. Despite Judge Green's testimony that he believes Williams "did not get our
best". *Id.* at 82, this Court disagrees. Based upon review of the trial
transcript, PCR transcript, and Judge Green's affidavit, Judge Green
without reservation performed his duties as trial counsel in an exemplary
fashion.

46. Judge Green's testimony before this Court does not support either of the
claims of ineffective assistance of counsel raised in Movant's motion to
vacate, which were already rejected by the Supreme Court of Missouri.
*Williams*, 168 S.W.3d at 440-42 (rejecting claim that counsel was
ineffective for not better investigating and impeaching H.C. and L.A.), 443
(rejecting claim that counsel was ineffective for not presenting more or
different mitigation evidence).

47. With respect to Movant's motion to amend his motion regarding the trial
court's denial of the motion for continuance which this Court denied, the
Missouri Supreme Court has already found that the trial court did not abuse
its discretion in denying a continuance. *Id.*

**Dr. Charlotte Word**

48. Dr. Word, an expert witness in DNA testing, testified for Movant, Hrg. Tr.
At 98-152. This Court finds that Dr. Word's testimony established three
important facts, none of which were helpful to Movant.

49. First, the DNA material found on the knife handle likely belongs to Investigator Magee (and also possibly Larner), and not to some other yet identified individual alleged by Williams and Movant to actually be responsible for the murder of F.G.. *Id.* at 152.

50. Second, if DNA material from the murderer was ever present on the knife handle, any such material could have been removed by individuals subsequently touching the knife handle without gloves. *Id.* at 152-53.

51. Third, Dr. Word has no idea what the procedures for evidence handling were in the St. Louis Prosecuting Attorney's Office, or in any crime lab for any St. Louis law enforcement entity at the time of the investigation into F.G.'s murder or at the time of Williams' trial. *Id.* at 151.

52. This Court finds that Dr. Word's testimony did not bolster Movant's claim of actual innocence.

53. Movant claimed that the DNA material of the "actual" killer was on the knife handle. This theory was clearly refuted by Dr. Word's testimony. In addition, Dr. Word's testimony provides no support for the theory of bad-faith destruction of evidence. *State v. Deroy,* 623 S.W.3d 778, 791 (Mo. App. E.D. 2021).

**Judge Christopher E. McGraugh**

54. Judge Christopher E. McGraugh is a circuit judge for the City of St. Louis and was Williams' lead guilt-phase counsel along with the Hon. Joseph Green. Hrg. Tr. at 158-66.

55. Judge McGraugh testified he does not remember anyone touching the evidence "outside the evidence bag" without gloves. *Id.* at 162.

56. Judge McGraugh testified that he was not told prior to trial that an "investigator" had been handling the knife without gloves. *Id.* at 164.

57. This Court finds that Judge McGraugh testified credibly as to his recollection of events. But the Court notes that he had difficulty remembering the events of the trial in 2001, roughly twenty-three years ago. Resp. Ex. D-1 at 47-48, 50, 59, 63, 67, 71, 83. This Court also finds that his memory, that no one handled the knife without gloves, is not consistent with the record and the evidence before this Court, including the fact that he was present in the courtroom when the knife handle was held without gloves. Resp. Ex. A at 2262-64, 2314.

Resp. Sugg. in Opp, Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
Page 14 of 24

14

**Keith Larner**

58. Keith Larner was the lead prosecutor in the Marcellus Williams case. Hrg. Tr. at 166-67.  Larner testified that the two- informant witnesses, H.C and L.A., were the "strongest" witnesses he ever had in a murder case. *Id.* at 172.  Larner testified that H.C. knew things that only the killer could know. *Id.* at 239.  Larner testified that H.C. knew the knife was jammed into F.G.'s neck, that the knife was twisted, and that the knife was left in F.G.'s neck when the murderer left the scene, details which were not public knowledge. *Id.*

59. Larner testified that L.A. was "amazing." *Id.* Larner testified that she led police to where Williams pawned the computer taken from the residence of the murder scene, and that the person there identified Williams as the person who pawned it. *Id.* at 240.  Larner testified that L.A. also led police to items stolen in the burglary in the car Williams was driving at the time of the murder. *Id.* at 240-41.

60. Larner testified that he knew from talking to Detective Vaughn Creach that the killer wore gloves. *Id.* at 183-85.

61. Larner testified that he believed it was appropriate to handle the knife without gloves after the crime laboratory had completed their testing, after he was informed that no one wanted any more testing on the knife, and after he was informed the laboratory found there were no fingerprints and nothing to link any individual to the crime. *Id.* at 192-93.

62. Larner testified he handled the knife without gloves at least five times prior to trial. *Id.* at 180-87.  He showed the knife to four witnesses (two detectives, F.G.'s husband, and the medical examiner) and affixed an exhibit sticker on the knife for use at trial. *Id.* at 180-81.

63. Larner testified credibly that he had never heard of touch DNA in 2001 and probably did not hear of it until 2015. *Id.* at 241.  Larner testified that the standard procedure in the St. Louis Prosecuting Attorney's Office at the time of Williams' trial was not to wear gloves when handling fully tested evidence because there was no reason to. *Id.*

64. Larner testified that he did not open untested fingernail clippings at trial without gloves because he did not want to contaminate them. *Id.* at 246.

65. Larner recalled that he had used three peremptory challenges on African Americans because the Missouri Supreme Court opinion listed three *Baston* challenges addressed in Williams' direct appeal. *Id.* at 220.  The additional

3 preemptory strikes of Black jurors were not challenged in Williams'
direct appeal. *State v. Williams*, 97 S.W.3d 462, 471-72 (Mo. banc 2003).

66. Larner denied systematically striking potential Black jurors or asking Black
jurors more isolating questions than White jurors.

67. This Court finds that Larner had a good faith basis and reasons for handling
the knife without gloves, despite Dr. Word's testimony that agencies that
collected evidence at or near the time of this murder knew about the
importance of properly collecting evidence to preserve any biological
substance. (PA's Ex.80).

**Patrick Henson**

68. This Court heard testimony from Patrick Henson, an investigator for
Movant's Conviction and Incident Review Unit. Hrg. Tr. at 263-71.

69. Henson testified that he did not find Larner's notes from jury selection in
the file retained by the St. Louis Prosecuting Attorney's Office during his
review of the file sometime in 2024. *Id.* at 266.

70. Henson testified he had no knowledge of where or how long the file was
stored, nor what the file did, or did not contain, at anytime prior to 2024. *Id.*
at 268.

71. Henson reviewed the Williams file and did not find any notes from the
prosecutor pertaining to voir dire. *Id.* at 265-66.

72. Henson also testified that he never reviewed the State's trial exhibits,
which were in the possession of the Missouri Supreme Court, and that no
attorney from Movant's office ever asked him to retrieve those exhibits. *Id.*
at 270-72.

73. This Court finds that Henson testified credibly and to the best of his ability,
but that his limited knowledge of relevant facts with what procedures were
in place for file retention during the years in question, undercuts the
probative value of his testimony as to any issue presently before this Court.

## CONCLUSIONS OF LAW

This Court makes the following conclusions of law:

74. In his first claim on behalf of Williams, Movant asserts that Williams'
"may be" actually innocent of first-degree murder. Mot. at 29-36.

75. Generally, in support of his claim that Williams is innocent, Movant alleged that DNA testing excludes Williams as the person whose DNA was found on the knife used in the murder. Mot. 22-24; that members of H.C.'s family would provide testimony that H.C. is a liar and "known" informant, Mot. at 24; that L.A.'s friends would provide testimony that she is a liar and "known informant [,]" *Id.*; and that G.R., to whom the stolen laptop was sold, was prevented "from testifying about where he learned Mr. Williams obtained the laptop." *Id* at 35.

76. Prior to the enactment of § 547.031, offenders who were sentenced to death could raise a freestanding claim of innocence in the Supreme Court of Missouri. *State ex rel. Armine v. Roper*, 102 S.W.3d 541, 547 (Mo. banc 2003). Williams asserted such a claim before the Supreme Court of Missouri. *Williams v. Steele*, SC94720 (Mo. 2017), Resp. Ex. I-1 at 6. The Supreme Court of Missouri has heard the majority of the DNA evidence Movant now asks this Court to consider, with the exception of the recent DNA results that weakens Movant's claim and demonstrates that Investigator Magee is the likely source of the DNA on the knife. Further, the Supreme Court has already denied that claim. *Williams* 2024 WL 3402597 at 3 n.3. Further, the Supreme Court of Missouri has already determined that the other evidence underpinning Movant's first claim allegations of the existence of impeachment material concerning H.C. and L.A. was at least in part not admissible at Williams' trial. *Williams v. State*, 168 S.W.3d 433, 439-42 (Mo. banc 2005). The same is true about the self-serving hearsay concerning the location of the laptop. *Williams v. State*, 97 S.W.3d 462, 468-69 (Mo. banc 2003).

77. In his second claim on behalf of Williams, Movant asserted that Williams' trial counsel provided ineffective assistance of counsel by failing to investigate and impeach witnesses H.C and L.A.. Mot. at 41-43. Williams has raised these claims before. The Supreme Court of Missouri rejected Williams' claims that his counsel provided ineffective assistance regarding investigating and impeaching H.C. and L.A.. *Id.* at 440-43. After considering the entire record, the Supreme Court of Missouri denied each of these claims. *Id.*

78. In his third claim, Movant alleges on behalf of Williams that penalty-phase counsel provided ineffective assistance by not presenting a penalty-phase defense based on Williams' allegations that he experienced an abusive childhood. Mot. at 44-53.

79. At the post-conviction hearing, Judge Green testified that it was the trial team's defense strategy to present Williams in a positive light as a person who had good qualities and was a positive influence on his children, rather

than an "inhuman beast," and to combine that strategy with a residual doubt strategy. Resp. Ex. D-1 at 122-23.

80. Once again Williams presented this claim to the Supreme Court of Missouri during his Rule 29.15 post-conviction proceedings. *Williams v. State,* 168. S.W.3d 433, 443 (Mo. banc 2005). And, as with the other claims, the Supreme Court of Missouri denied Williams' claim of ineffective assistance and affirmed the motion court's decision that presenting an abusive childhood strategy would have been contrary to the chosen defense strategy and would not have changed the outcome. *Id.* The Court went on to hold that the motion court did not clearly err in denying this claim without an evidentiary hearing. *Id.*

81. In relation to claims two and three, the Missouri Supreme Court has already rejected these claims when it considered them under *Strickland v. Washington,* 466 U.S. 668 (1984). Movant cannot repackage these claims into actual innocence claims to receive relief for Williams, especially when the actual innocence standard is much harder to meet than the *Strickland* prejudice standard. *Id.* at 703.

82. In his fourth claim, Movant alleges two *Baston* challenges on behalf of Williams. Mot. at 53-63. Specifically, Movant alleges that the State exercised discriminatory peremptory strikes of two members of the venire. Venireperson 64 and Venireperson 65. Mot. at 53-62.

83. The Supreme Court of Missouri rejected Williams' *Baston* challenges to these same venirepersons on direct appeal. *State v. Williams,* 97 S.W.3d 462, 471-72. The Supreme Court of Missouri found that the State had provided race neutral reasons to support its strikes of Venireperson 64, *Id.,* and Venireperson 65. *Id.* at 472.

84. Our Missouri Constitution vests the State's judicial power in "a supreme court, a court of appeals…and circuit courts." Mo. Const. art. V, § 1. It further provides, "The supreme court shall be the highest court in the state…. Its decisions shall be controlling in all other courts." Mo. Const. art. V, § 2; *see also State ex rel. Strong v. Griffith,* 462 S.W.3d 732, 734 (Mo. 2015) (stating that it is not appropriate to raise a post-conviction claim in habeas corpus that the court has already rejected in ordinary course). This Court, therefore, cannot reverse, overrule, or otherwise decline to follow the previous decisions of the Supreme Court of Missouri that populate the long procedural history in Williams' case. *See* Mo. Const. rt. V. § 2; *see also Strong,* 462 S.W.3d at 734.

85. Because Movant's first, second, third, and fourth claims before this Court have previously been denied by the Supreme Court of Missouri when the very same claims were raised by Williams in his § 547.031 motion, this Court must now deny them. *See State v. Williams,* 2024 WL 3402597 at 3 n.3; *see also State v. Johnson,* 654 S.W.3d 883, 891-95 (Mo. 2023).

86. Movant's fifth claim in his amended motion which this Court granted leave to file shortly before the hearing, over the States objection, alleged that the State had engaged in bad-faith destruction of evidence under *Arizona v. Youngblood,* 488 U.S. 1051 (1988).

87. Movant alleged that the bad faith destruction of evidence occurred when police destroyed fingerprint lifts determined to be without evidentiary value, and when the prosecutor and his investigator touched the handle of the murder weapon without wearing gloves.

88. The United States Supreme Court has "held that when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fischer,* 540 U.S. 544, 547 (2004). "[I]n *Youngblood,* by contrast, [the Court] recognized that the Due Process Clause 'requires a different result when [a court] deal[s] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subject to tests, the results of which might have exonerated the defendant." *Id. quoting Youngblood,* 488 U.S. at 57). The Court stated that the "failure to preserve this potentially useful evidence does not violate due process '*unless a criminal defendant can show bad faith on the part of the police.*'"*Id.* at 547-48.

89. Our state courts have similarly applied *Youngblood,* finding that when the State fails to preserve evidence that "might have exonerated the defendant [,]" a defendant must show that the State acted in "bad faith" in order to establish a due process violation. *State v. Deroy,* 623 S.W.3d 778, 790 (Mo. App. 2021). When the State acts in good faith in accordance with its normal practice, no due process violation lies when potentially useful evidence is destroyed. *Id.* at 791. The requirement to show that bad faith has no exceptions. *See Id.* (citing cases from the Missouri Supreme Court holding that there is a bad faith requirement and holding that those cases must be followed).

90. Movant and Williams have made arguments before this Court indicating that the knife handle was central to the State's case or that, without additional unblemished testing, Williams has no avenue to prove his actual innocence. The United States Supreme Court has specifically refuted

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
Page 19 of 24

Appellate Case: 24-2907    Page: 426    Date Filed: 09/19/2024 Entry ID: 5438419 Sept 19 2024 p426

similar arguments that have also attempted to change or remove the bad faith requirement of *Youngblood*. *See Illinois v. Fisher*, <u>540 U.S. at 547</u>.

91. Here, neither Movant nor Williams presented any evidence from which this Court could find that the State destroyed potentially useful evidence in bad-faith, let alone clear and convincing evidence of the same.

92. The record before this Court refutes the allegation of bad-faith destruction of latent fingerprints. Indeed, the trial transcript indicates that latent fingerprints of insufficient quality for comparison were destroyed. Resp. Ex. A at 95-96, 3241. Specifically, Detective Thomas Krull testified that he received fingerprint lifts that were of insufficient quality to be used for comparison and those were destroyed after it was determined that the lifts were useless. *Id.* at 2324, 2340-41. No evidence was presented that this was done in bad faith. Because Movant has failed to met his burden of proof, this Court finds the claim of bad-faith destruction of fingerprint evidence to be without merit.

93. In addition, Movant did not carry his burden to demonstrate bad-faith destruction of whatever genetic material, if any, was present on the handle of the murder weapon prior to the knife handle being touched by Larner, Investigator Magee, and any other individuals.

94. Larner testified that he believed it was appropriate to handle the knife without gloves after the crime laboratory had completed their testing, he was informed that no one wanted any more testing on the knife, and the laboratory found there were no fingerprints and nothing on the knife to link any individual to the crime. *Id.* at 192-93. Larner stated that this belief was bolstered by the information provided by Detective Creach indicating that the killer had worn gloves, which, in turn was supported by the testimony of H.C. *Id.* at 192-93.

95. Larner testified that he carried the knife around without gloves during Williams' trial and handed it to a witness who was not wearing gloves and "[n]o one said anything." *Id.* at 247.

96. This Court finds that Larner testified credibly concerning the touching of the knife and that his testimony, as well as the other evidence in the state court record, refutes a claim that he, or any other State-actor, acted in bad faith by touching the knife handle without gloves and Movant's theory has no probative value.

97. Because Movant failed to prove his claim by clear and convincing evidence, this Court finds Movant's fifth claim to be without legal merit.

*See Fisher,* <u>540 U.S. at 547-48</u>; *see also Youngblood,* <u>488 U.S. at 57-58</u>; *Deroy,* <u>623 S.W.3d at 790</u>. Movant's fifth claim is denied.

98. The State argues that Movant is judicially estopped from proceeding on Movant's first claim, which alleges Williams may be actually innocent of first-degree murder. This Court rejects this argument as the State has failed to show that Movant's position is clearly inconsistent with his earlier position. In addition, Movant's attempt to enter an *Alford* plea did not create an unfair advantage or impose an unfair detriment on the State if not estopped. *Vacca v. Mo. Dep't of Labor & Ind. Rels.,* <u>575 S.W.3d 233, 236</u>-37 (Mo. 2019).

99. "To make a free-standing claim of actual innocence, [Movant] must make a clear and convincing showing of [Williams'] innocence. *State ex rel. Dorsey v. Vandergriff,* <u>685 S.W.3d 18, 25</u> (Mo. 2024). Clear and convincing evidence "instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (*quoting Armine,* <u>102 S.W.3d at 548</u>). In *Dorsey,* the Supreme Court of Missouri found that new expert opinions that Dorsey could not deliberate did not meet this test in light of the facts of the crime. *Id.* at 25-26.

100. The Supreme Court of Missouri has emphasized that the first step in actual innocence analysis is considering whether the "new" evidence is new in the sense that it was "not available at trial." *State ex rel. Barton v. Stange,* <u>597 S.W.3</u>d. 661 n.4 (Mo. 2020); *accord Dorsey,* <u>685 S.W.3d at 24</u>-25 (Both gateway and freestanding claims of actual innocence require "new evidence to support the claim that was not available at trial...."). Other appellate courts have expressed a similar requirement. *State ex rel. Nixon v. Sheffield,* <u>272 S.w.3d 277, 284-85</u> (Mo. App. 2008) (stating evidence is only "new" if not available at trial and could not have been discovered through the exercise of due diligence.) Additionally, when considering whether excluded evidence supports innocence only, evidence "tenably claimed to have been wrongfully excluded" may be considered in a claim of innocence. *Schlup v. Delo,* <u>513 U.S. 298, 328</u> (1995).

101. A claim that cannot meet the gateway standard of showing by a preponderance of the evidence that no reasonable juror would convict in light of new evidence, necessarily cannot meet the higher freestanding innocence standard of proof by clear and convincing evidence. *Barton,* <u>597 S.W.3d 661, 665</u> (Mo. 2020) ("Because the evidence is insufficient to make a gateway claim of actual innocence by a preponderance of the evidence, it necessarily is also insufficient to support a freestanding claim of actual innocence, which requires clear and convincing evidence of actual

innocence."); *State ex rel. McKim v. Cassady*, <u>457 S.W.3d 831, 843</u> (Mo. App. 2015).

102. Here, Movant's evidence regarding Williams' freestanding innocence claim fails.

103. As herein above described, the freestanding innocence claim pled in Movant's original motion unraveled during the pendency of this case, when the parties received a DNA report, dated August 19, 2024, from Bode Technology. Resp. Ex. FF.

104. In light of this report, Movant cannot demonstrate that the genetic material on the knife handle can form a basis for "a clear and convincing showing" of Williams' innocence. *Dorsey*, <u>685 S.W.3d at 25</u>. Movant failed to present "clear and convincing evidence of actual innocence…that undermines the confidence in the judgment [,] and his claim must be denied. § 547.031.3 R.S.Mo.

105. Movant's remaining evidence amounts to nothing more than re-packaged arguments about evidence that was available at trial and involved in Williams' unsuccessful direct appeal and post-conviction challenges. That repackaged material cannot form the basis for relief under § 547.031.3 or the *Armine* standard. *See Johnson*, <u>554 S.W.3d at 895</u> (denying a stay for claims that were "largely just re-packaged versions of claims [the convicted individual] ha[d] brought (and seen rejected) many times before"); *see also Barton*, <u>597 S.W.3d at 664</u> n.4 (describing the required threshold showing that the proffered evidence is new).

106. As stated above, in support of his claim of innocence on behalf of Williams, Movant alleged that members of H.C.'s family would provide testimony that H.C. is a liar and "known informant." Mot. at 24. Movant alleges that L.A.'s friends would provide testimony that she is a liar and "known informant." *Id.* Movant further alleged that G.R., to whom the stolen laptop was pawned, was prevented by objection "from testifying about where he learned Mr. Williams obtained the laptop." *Id.* at 35. Movant asserted that Williams "had not himself secured the laptop, but rather had gotten it from his 'girl'[L.A.]." *Id.* Movant alleges that this information makes a clear and convincing showing of actual innocence. It does not.

107. None of this evidence is "new" as it was available at trial. And, in relation to the evidence found to be inadmissible by the Missouri Supreme Court, Movant cannot now claim that the purported evidence was wrongfully excluded under Missouri law because the Missouri Supreme Court, the

highest authority on Missouri law, has held that the evidence was properly excluded. Mo. Const. art. V, § 2; *Schlup*, 513 U.S. at 328.

108. Movant alleged in his motion that Williams' trial counsel provided ineffective assistance in not presenting the evidence he inconsistently alleged was new. *See* Mot. at 29-36, 36-43. But setting that aside, the record demonstrates that the evidence allegedly impeaching H.C. and L.A. was available at the time of trial. *See Williams v. State*, 168 S.w.3d at 440-42. And Movant's assertions that L.A.'s purported unreliability, "was similarly not presented to the jury [,]" Mot. at 34, is summarily refuted by the Supreme Court of Missouri. *See Williams v. State*, 168 S.W.3d at 441. In denying Williams' ineffective-assistance-of-counsel, the Supreme Court of Missouri stated: "As the motion court correctly found, this testimony would have been cumulative to the evidence at trial because the record contained evidence of [L.A.]'s drug addiction, prostitution, and that she might receive reward money for testifying at trial. Counsel will not be found ineffective for deciding not to introduce cumulative evidence." *Id.*

109. As for G.R.'s laptop testimony, the Supreme Court of Missouri found the circuit court properly excluded the evidence as self-serving hearsay. *State v. Williams*, 97 S.W.3d at 468. Movant has not explained why this Court should now consider evidence that remains inadmissible in considering whether Williams has made a showing of innocence, and this Court may not second-guess the Supreme Court of Missouri's ruling on the issue of admissibility. *See* Mo. Const. art. V, § 2; *see also Strong*, 462 S.W.3d at 734.

110. Further, contrary to Movant's argument that the jury did not hear this evidence, the Missouri Supreme Court, in discussing the rule of completeness objection from Williams, found that, "Williams was not precluded from showing that [L.A.] once had possession of the laptop. He introduced evidence from two witnesses who said they saw [L.A.] with the laptop during the summer of 1998." *State v. Williams*, 97 S.W.3d at 468-69. The substance of the evidence concerning G.R. was before the jury in Williams' trial and they nevertheless found him guilty. *Id.* Thus Movant cannot now use that same evidence to mount a freestanding innocence challenge. *Barton*, 597 S.W.3d at 664 n. 4; *Sheffield*, 272 S.W.3d at 284-85.

111. Movant's remaining evidence in support of Williams' claim of freestanding innocence amounts to nothing more than old evidence, self-serving hearsay, and evidence the jury could never hear.  The evidence presented fails under the standard enumerated in § 547.031.3 or in *Amrine*. Movant has failed to demonstrate any basis for this Court to find Williams actually innocent of first-degree murder.

112. As the Supreme Court of the United States recognized nearly fifty years ago, the trial occupies a special role in our constitutional tradition:

> A defendant has been accused of a serious crime and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.

*Wainwright v. Sykes*, 433 U.S. 72, 90 (1977).

113. Every claim of error Williams has asserted on direct appeal, post-conviction review, and habeas review has been rejected by Missouri's courts.

114. There is no basis for a court to find that Williams is innocent, and no court has made such a finding. Williams is guilty of first-degree murder, and has been sentenced to death.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

Movant's motion to vacate or set aside Williams' conviction and sentence is hereby **DENIED.**

SO ORDERED:

Honorable Bruce F. Hilton
Circuit Judge, Division 13
September 12, 2024

Cc: Attorneys of record e-filed pursuant to Rule 103

Resp. Sugg. in Opp. Ex. 1
Williams v. Vandergriff
4:05-CV-1474-RWS
34
Page 24 of 24

Appellate Case: 24-2907    Page: 431    Date Filed: 09/19/2024 Entry ID: 5439915 Sep 19 2024 p431

## IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-CV-1474-RWS |
| | ) | |
| DONALD ROPER, | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| Respondent. | ) | 9/24/24 at 6:00 P.M. |

### PETITIONER'S REPLY IN SUPPORT OF HIS
### MOTION FOR RELIEF FROM A JUDGMENT OR ORDER
### PURSUANT TO FED. R. CIV. P. 60(b)

On September 17, 2024, Petitioner moved, pursuant to Fed. R. Civ. P. 60(b), for relief from this Court's Judgment. (R. 121). Later that day, Respondent opposed Petitioner's Motion. (R. 122). Petitioner now timely files his reply in support.

Respondent's reply is brazenly wrong about the law and the facts and is an improper minimization of the glaring racism that occurred here. It is a sad day when the Attorney General's Office of a state defends the improper use of race to exclude jurors simply to bring about an execution no other interested party except for the Attorney General wants.

This Court should address the Supreme Court's warning: "Racial bias [is] a familiar and recurring evil that, **if left unaddressed**, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017) (emphasis added). Mr. Williams asks this Court to address the racial bias that infected his trial. Evidence just recently that came to light demonstrates that the basis of the state court ruling is now rebutted by clear and convincing evidence and that Mr. Williams' *Batson* claim should be reheard.

The starting and ending point of this Court's analysis is Respondent's concession that the recent testimony "contradicts the transcript of Petitioner's original criminal trial."

1

R. 122 p. 6. This is exactly the point. Larner's testimony at the August 28, 2024 hearing
contradicts the self-serving *Batson* colloquy from trial. Mr. Williams should not suffer the
ultimate consequence of Larner's racially-based strike against a Black venireperson because
he looked so much like Mr. Williams that he could have been his "brother."

## I.    Larner stated race was a factor—and this is an evil this Court should address.

Before getting to Respondent's erroneous factual statements, it is critical to note
what Respondent chooses to avoid altogether:

- Larner's sworn statements about how Mr. Williams and a Black venireperson
  looked like "brothers," and then his immediate discomfort and backpedaling
  explanation that he did not mean that in a racially divisive way (HT2 212) ("I
  don't mean black people.");

- Where are Larner's voir dire notes? He stated that he had taken notes during
  voir dire. Why were they destroyed other than to cover-up the real bases for
  the peremptory strikes? Respondent has no response to the evil described in
  *Amadeo v. Zant*, <u>486 U.S. 214</u> (1988).

Respondent wrongly accuses Mr. Williams's of mischaracterizing the record. That
simply is not true. Mr. Williams accurately recounted the following statements that, as
Respondent concedes, "contradicts the transcript of Petitioner's original criminal trial":

- "A. They were both young black men. Q. Okay. A. But that's not necessarily
  the **full reason** that I thought they were so similar." (HT2 p. 211) (emphasis
  added).

2

- "Q. So you struck them because they were both young black men with glasses? A. Wrong. **That's part of the reason**." (*Id.* p. 212) (emphasis added);

- "I thought they looked like they were brothers." (*Id.*);

- The juror and Mr. Williams, both Black men, "looked like they were brothers." (*Id.* p. 213).

Respondent takes liberties describing what the circuit court held regarding Larner, intimating the trial court made findings that Larner did not act in an improper manner. A close review reveals the trial court indicates Larner only denied that he had struck jurors based on their race—but the circuit court did **not** specifically find that Larner's strikes were in fact race-neutral. *See* R. 122-1 p. 16. The trial court simply recited his testimony. Unlike in other findings, however, the court did not credit it. *See* R. 122-1 p. 15 ("Larner testified credibly…" referring to other areas of testimony). The absence of that statement about the truth of Larner's testimony undercuts Respondent's argument that the circuit court concluded the peremptory strikes were race-neutral.

The absence of a finding that the strikes were race-neutral makes sense given Larner's actual testimony, as set forth above, as well as other instances revealing racial animus in Larner's testimony. When asked about other potential *Batson* issues, Larner forcefully responded he had "never" done wrong.

Q. Have you ever been found to have violated Batson v. Kentucky in another case?

A. **Now let me say this perfectly clear. Never**.

Q. Never?

3

A. **Never**.

HT2 218 (emphasis added). Despite his unequivocal averment that he had committed no *Batson* violation ever, Larner then quickly backtracked and agreed that his "never" needed to be amended. *Id.* Indeed, in *State v. McFadden*, another case where Larner was the trial prosecutor, the trial judge found Larner had failed to provide race neutral reasons for excluding three Black jurors, and also found that his initial reason for striking a Black juror was pretextual. *Id.* at 218-19. Larner blamed his failure to mention, or even acknowledge, this history at first on thinking the question asked whether he ever been "reversed" on *Batson*, which of course is nowhere in the question.[1] *Id.*

The trial court's failure to credit Larner also makes sense given his attempt at the hearing to minimize the number of peremptory challenges he used on Black jurors. Larner repeatedly and argumentatively asserted he had only exercised a peremptory against Black venirepersons three times, cutting in half the real number.

A. I know how many I struck. I had nine peremptory strikes. I struck three. Three of nine blacks -- not three of nine blacks. Three of nine people were black. Six of nine people were white. I struck six whites, three blacks. Leaving one black on the jury is the way it came out.

Q. We'll get to that, but I think you have those numbers reversed.

A. No. I think you have them reversed, actually.

---

[1] And even when explicitly asked, "So you have been found to have violated Batson?" Larner gave a non-answer, blustering, "Yes and no. It depends . . ." HT2 218. Whether he violated *Batson* is not a question that calls for an "It depends" answer—it is either a yes or a no.

4

HT2 218. Actually, Larner was wrong. During jury selection, Larner utilized six of his nine peremptory strikes (67% of the available strikes) against six of the seven (86%) Black venirepersons. (Tr. 1568-69).

In *Miller-El v. Dretke*, 545 U.S. 231, 232 (2005), the Supreme Court required consideration of "the totality of the relevant facts" about a prosecutor's conduct during the trial. It is not enough for the Respondent to rely on one instance where Larner vehemently said "Absolutely not" that his peremptory strikes were race-based. This Court is required to look at everything Larner said and view them in context and in relation with each other.

Larner's testimony in this case is shifting. He uses the term "brother" and then attempts to shift away from the racial overtones that term carries. He says "never," but then immediately shifts to a "yes and no, it depends." He says "I did not" but then states it was "part" but not the "full reason." Larner misrepresented the number of peremptory challenges he exercised against Blacks. All of these shifting explanations are significant under the Supreme Court's decision in *Foster v. Chatman*, 578 U.S. 488 (2016),

In *Foster*, the Court found troubling: "There are also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file." *Id*. at 512. As a result, the Court lifted the procedural bar imposed by the State and granted relief. This case is even more troubling—worse than in *Foster*, the prosecutor's voir dire notes in this case are mysteriously missing from the file.

Racism has no place in a capital trial.  It injures not just a defendant, but "the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose v. Mitchell*, 443 U.S. 545, 556 (1979). And importantly for the procedural posture before this Court: "Such concerns are precisely among those we have

identified as supporting relief under Rule 60(b)(6)." *Buck v. Davis*, 580 U.S. 100, 124 (2017) quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988).

Respondent misses altogether the significance of Mr. Williams' discussion of *Flowers v. Mississippi*, 588 U.S. 284 (2019). Mr. Williams cites *Flowers* to highlight the significance of Larner's failure to explain why he questioned Black jurors differently than white jurors. Critically, Larner could offer no explanation for the disparate treatment when confronted with evidence of it. Notably, Respondent does not defend his failure. The obvious reason is that Larner had no race-neutral explanation.

A prosecutor's role is to see that justice is done. *Connick v. Thompson*, 563 U.S. 51, 71 (2011) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935). "'It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. The prosecutor's role is to protect those innocent of crimes and to uphold the constitutional rights of the accused--to seek justice and fairness, not solely convictions.'" *Smith v. Groose*, 205 F.3d 1045, 1054-55 (8th Cir. 2000) (quoting *Berger*, 295 U.S. at 88)). The prosecutor's role is decidedly not to win at any cost and is certainly not to win via racially discriminatory practices. In conclusion, because the recent testimony contradicts the self-serving trial colloquy (as conceded by Respondent), there is clear and convincing evidence to rebut this Court's earlier ruling.

## II.    Mr. Williams properly filed a 60(b) motion.

Respondent claims this is a successor. That is not true. Perhaps Respondent's confusion is best displayed by their mischaracterization or total failure to understand *Buck v. Davis*, 580 U.S. 100 (2017).

6

Respondent again misses the point altogether—*Buck* is a 60(b)(6) case. *Buck*, 580 U.S. at 104 ("In 2014, Buck sought to reopen that 2006 judgment by filing a motion under Federal Rule of Civil Procedure 60(b)(6)"). The *Buck* Court found that a 60(b) was appropriate. *Buck* also involved racism (as here) and an admission of error (as here). *Buck* then applied 60(b)(6) and *Gonzalez v. Crosby*, 545 U.S. 524 (2005) principles. *Buck*, 580 U.S. at 104. It could not be more relevant and applicable.

This Court was quite clear in its earlier denial of Mr. Williams's Fifth Ground that he failed to satisfy the AEDPA standard of either § 2254(d)(2) or (e)(1): "This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence." R. 58 p. 25. At no point did this Court pierce the veil of the merits. Rather, it restricted itself to the cold, antiseptic, and required AEDPA review that must be satisfied before considering the § 2254(a) question.

As explained in his Motion, Mr. Williams pursues a reopening of a habeas claim denied on the basis that no clear and convincing evidence rebutted the basis of the state court ruling. That clear and convincing evidence now exists—and what damning evidence it is that undermines the Court's previous finding.

A Rule 60(b) motion is appropriate here because the judgment entered on the § 2254 Petition makes clear that the denial of the claim was on the basis of an application of § 2254 (e)(1), meaning there was no clear and convincing evidence undermining the state court ruling. Thus, this Court found it was precluded from a proper consideration of the merits of Petitioner's Fifth Claim. Petitioner's allegation here is a "true" 60(b), as envisioned by *Gonzalez*, 545 U.S. 524, and cannot be construed as a successive petition pursuant to § 2244(b)(2).

Indeed, In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), another case involving a *Batson* violation, the Supreme Court explained that AEDPA considerations constitute a threshold question. The Court stated that "The concept of a threshold, or gateway, test was not the innovation of AEDPA. . . . By enacting AEDPA, using the specific standards the Court had elaborated earlier for the threshold test, Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." If AEDPA were not a threshold inquiry the Court must find has been satisfied before it reaches the merits of a petition, there would be no point whatsoever to a tiered review structure—the Court could consider the merits automatically in what would be merely another normal round of appellate review. *Cf. Renico v. Lett*, 559 U.S. 766, 773 (2010) ("Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Rather, that application must be 'objectively unreasonable.' This distinction creates 'a substantially higher threshold for obtaining relief than *de novo* review." (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000), and citing *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007))). Where "AEDPA's purpose [is] to further the principles of comity, finality, and federalism," the only logical conclusion is that AEDPA is a threshold determination that must be decided before a court can even reach the merits of a petition.

Petitioner is not presenting a claim. Rather, Petitioner "merely asserts that a previous ruling which precluded a merits determination was in error … ." Because Petitioner challenges the Court's inability to consider evidence that had not been fairly

presented in state court due to no fault of the Petitioner. Because this is not a new claim,
Petitioner's request properly invokes 60(b).

Petitioner has not filed a disguised second or successive motion under § 2254.
Petitioner's 60(b) Motion should be evaluated on its own merit.  Petitioner is not trying to
present a new reason why he should be relieved of either his conviction or his sentence.
Instead, he seeks to reopen his existing § 2254 proceeding on the basis of the recent
testimony, which contradicted the prosecutor's self-serving trial colloquy, and overcome a
barrier to the proper adjudication of his Fifth Habeas Ground.

The reality of the situation rebuts Respondent's arguments.  If Petitioner were
pursuing a true claim, Petitioner would be entitled to relief.  Petitioner is not asking for
such – only that the habeas be reopened and *then* the merits be addressed.   He still may
lose.  This reality embraces the principles underlying *Gonzales* by establishing that
Petitioner is not pursuing a successor.  Thus, this basis of Respondent's opposition should
be denied.

### III.    Mr. Williams satisfies the applicable, liberal standard this Court is bound to employ.

Respondent does not dispute this Court has the inherent power in these habeas
proceedings to "vacate judgments whenever such action is appropriate to accomplish
justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949).  Respondent fails to mention
altogether that the standard to be employed by this Court "should be liberally construed."
*Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989).  Applying this liberal standard,
Petitioner satisfies the 60(b) requirements, and the judgment should be reopened.

9

"'The fundamental requisite of due process of law is the opportunity to be heard.'. The hearing must be at 'a meaningful time and in a meaningful manner.'." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citations omitted).  At minimum, Respondent's arguments support the existence of factual disputes that support the need for a hearing.  *See Philos Technologies, Inc. v. Philos & D, Inc.*, 645 F.3d 851 (7th Cir. 2011) (remanding for hearing in 60(b)(4) context for resolution of factual dispute).   In appropriate circumstances, a hearing may occur. *See Schultz v. Commerce First Fin.*, 24 F.3d 1023 (8th Cir. 1994).  This Court should exercise that discretion, particularly in light of the evidence that the pernicious factor of racism is present here and represents clear and convincing evidence rebutting this Court's previous ruling.

## IV.    Mr. Williams did not delay because he brought this to the Court within 20 days of discovering evidence that "contradicts the transcript of Petitioner's original criminal trial."

Respondent dusts off the well-worn accusation of delay. This is rich, given that Respondent took 131 days to respond to the § 547.031 petition, 121 days of which occurred after they notified the circuit court they would respond.[2] Mr. Williams comes to this Court 111 days, or 101 days respectively, faster than Respondent filed a promised response.

Delay also occurred when Respondent indicated unavailability for a July evidentiary hearing date due to an Assistant Attorney General's' schedule—but then that attorney never participated, or even attended, either the August 21 or August 28 hearing. This cost Mr.

---

[2] However, when it benefitted them, Respondent made sure not to delay. Once the Missouri Supreme Court set an execution date for Mr. Williams, it was to their tactical advantage to respond quickly at that point, because they could try to protest that the circuit court did not have jurisdiction when there was an active execution warrant. Respondent filed their response *the next day* after the Missouri Supreme Court set the date, despite waiting 131 days from the filing of the Motion to Vacate.

Williams another 30 plus days. Again, this is over 10 days more than it took Mr. Williams to act in bringing this new evidence to this Court.

Any delay was the fault of Respondent. Further, it bears repeating Larner's mysteriously disappeared voir dire notes and Larner's revelation of the true reasons behind his peremptory strikes, contradictory to his trial colloquy, constitute evidence solely in the possession of the State of Missouri that only recently came to light. It is their lack of diligence and candor in exploring with Larner his colloquy, and their failure to maintain their files in a way that preserved crucial evidence, that contributed to Mr. Williams' inability to learn earlier of the evidence upon which he now relies.

**V.    Extraordinary circumstances exist.**

Mr. Williams presents extraordinary circumstances, and thus, he properly invokes Rule 60(b)(6).  Mr. Williams is set to die in a matter of days for a conviction where there is clear and convincing evidence that contradicts (as Respondent concedes) the *Batson* trial colloquy. In this manner, nearly all of the extraordinary factors described in *Buck* are satisfied.

Further and similar to *Buck*, almost no one wants this execution to be carried out— Respondent stands alone in their bloodlust, with the St. Louis community, the prosecuting attorney, and the family of the victim all calling for this pursuit for Mr. Williams' death to end. In an unprecedented move, the St. Louis County Prosecuting Attorney conceded constitutional error and admitted that in 2001, they struck venirepersons on account of their race. The same office that brought about Mr. Williams' death sentence seeks now to prevent it because they know they have committed wrong.

These are extraordinary circumstances. Express admittance that a prosecutor struck
Black venirepersons because they were Black is an affront not just to Mr. Williams as a
defendant, but to the St. Louis community. That racial animus invaded the civic duty of this
community is not something that should be allowed to stand. This Court can remedy that.

## **CONCLUSION**

WHEREFORE, for the above stated reasons, this Court should GRANT Petitioner's
request, and reopen habeas proceedings.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, #40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Michael Spillane and Ms. Katherine Griesbach, Assistant Attorney Generals, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 18th day of September 2024.

*/s/Laurence E. Komp*
Attorney for Petitioner

13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05 CV 1474 RWS |
| | ) | |
| DAVID VANDERGRIFF[1], | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

Petitioner Marcellus Williams was convicted of first degree murder in
Missouri state court and sentenced to death.  After exhausting his state court
remedies Williams filed a federal habeas petition in this Court.  On March 26,
2010, I denied Williams' habeas petition on his underlying conviction but granted
the petition on the penalty phase of the trial.  The United States Court of Appeals
for the Eighth Circuit reversed my decision regarding the penalty phase and
Williams' habeas petition was denied in its entirety.

Williams' execution is set on September 24, 2024.  On September 17, 2024,
Williams filed a motion for relief from judgment under Fed.R.Civ.P. 60(b)(6).
Williams' motion requests that I set aside the judgment in this matter and reopen

---

[1] Williams is now confined in the Missouri Department of Corrections' Potosi Correctional Center facility. The
warden of that facility is David Vandergriff.  As a result, David Vandergriff is hereby substituted as the Respondent
in this matter.

this habeas case to address Williams' <u>Batson</u>[2] challenge raised in his habeas

petition.  The basis for Williams' 60(b)(6) motion is the recent testimony at a state

court hearing by Keith Larner, the lead prosecutor at Williams' trial.  Williams

asserts that Larner's recent testimony undermines the Missouri Supreme Court's

resolution of his <u>Batson</u> claim on direct appeal.  I will deny Williams' motion

because it is a successive habeas petition which I cannot entertain absent

permission from the United States Court of Appeals for the Eighth Circuit.

Moreover, the motion fails to establish grounds for relief under Rule 60(b)(6).

*Successive habeas petition*

On March 26, 2010, I issued a memorandum opinion that rejected Williams'

<u>Batson</u> challenge directed at African American venirperson Henry Gooden.

Prosecutor Larner had used a peremptory strike to exclude Gooden from the jury.

The trial court denied Williams' <u>Batson</u> challenge.  Williams raised the issue on

direct appeal before the Missouri Supreme Court.  The State of Missouri

articulated three "facially permissible" explanations for the strike of venireperson

Gooden: his demeaner and appearance and clothing "too closely" resembled

Williams', his job as a postal worker, and his views on the death penalty.  With

respect to Gooden's demeaner and appearance, the Missouri Supreme Court noted

that Larner "stated that the venireperson resembled Williams, had the same glasses,

---

[2] <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

2

and had a similar demeanor."  The Court concluded that "[t]hese reasons are not inherently race based."  <u>State of Missouri v. Williams</u>, 97 S.W.3d 462, 472 (Mo. 2003).

> In my memorandum opinion I stated that:

> The Missouri Supreme Court found that the prosecutor's explanations for the [] challenged peremptory strike[] [was] facially race-neutral and [was] not inherently discriminatory. <u>Williams</u>, 97 S.W.3d at 471- 472. This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence. I find that Williams has not established that the Missouri Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

<u>Williams v. Roper</u>, No. 4:05CV1474 RWS, 2010 WL 11813203, at *13 (E.D. Mo. Mar. 26, 2010), rev'd and remanded on other grounds, 695 F.3d 825 (8th Cir. 2012).

Williams' motion seeks to relitigate my <u>Batson</u> decision.  As noted above I found that the Missouri Supreme Court's decision was supported by the record. This was a merits decision of Williams' claim.  A Rule 60(b) motion is deemed to be a successive habeas petition if it "attacks the federal court's previous resolution of a claim on the merits." <u>Gonzalez v. Crosby</u>,  545 U.S. 524, 525 (2005).  Because Williams' motion seeks to revisit a claim that I have already denied on the merits, 28 U.S.C. § 2244(b)(3)(A) requires Williams to obtain an authorization from the United States Court of Appeals for the Eighth Circuit Court to proceed with his

3

motion as a successive habeas petition. Williams had failed to obtain this authorization and his motion will be denied on this ground.

*Rule 60(b)(6) analysis*

"Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered evidence. Rule 60(b)(6), … permits reopening when the movant shows 'any ... reason justifying relief from the operation of the judgment' other than the more specific circumstances set out in Rules 60(b)(1)-(5)." Gonzalez, 545 U.S. at 528–29. A motion under Rule 60(b) that seeks to present newly discovered evidence in support of a claim previously denied is a successive habeas petition. Id. at 531. "Relief under Rule 60(b)(6) is available only in 'extraordinary circumstances.'" Buck v. Davis, 137 S. Ct. 759, 766 (2017) (quoting Gonzalez, 545 U.S. at 535).

Williams' Rule 60(b) motion asks me to consider the testimony of prosecutor Larner obtained at a hearing in the Circuit Court of St. Louis, Missouri on August 28, 2024. Larner was examined about his decision to strike Gooden. When explaining that one reason for the strike was that Gooden looked very similar to Williams, Larner testified how Gooden and Williams had similar types of glasses and the same type of piercing eyes. He testified that that looked like they were "brothers." "Familial brothers." [ECF 121-1 at 212] Larner clarified, "I don't mean black people. I mean, like, you know, you got the same mother, you

4

got the same father. You know, you're brothers, you're both men, you're brothers."
[Id.]  When Larner was asked "[s]o you struck them because they were both young
black men with glasses?"  Larner responded, "Wrong.  That's part of the reason.
And not just the glasses. I said the same type glasses. And I said they had the same
piercing eyes."  [Id.]

Williams asserts that Larner's use of the term "brothers" indicates racial
animus because he was using the term to indicate unrelated black men.  That
reading is not supported by the testimony

Williams asserts that Larner's statement, "Wrong. That's one of the reason."
in response to the question, "[s]o you struck them because they were both young
black men with glasses?" shows that one of the reasons Gooden was struck was
because he was black.  That also is a mischaracterization of Larner's testimony.
Larner had just previously stated that Gooden and Williams looked very similar.
The fact that they wore similar glasses was one reason for striking Gooden.
Larner's testimony does not support Williams' inference that the fact that Gooden
was black was "one reason" for striking him.  As a result, Williams' motion for
Rule 60(b)(6) relief regarding Larner's testimony is unsupported and will be
denied.

Accordingly,

**IT IS HEREBY ORDERED that** Petitioner Marcellus Williams' motion
for relief from judgment [121] is **DENIED**.

5

**IT IS FURTHER ORDERED** that the Clerk of Court shall substitute

David Vandergriff as the Respondent in this matter.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 19th day of September, 2024.

6

## IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **MARCELLUS WILLIAMS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:05-CV-1474-RWS** |
| | ) | |
| **DONALD ROPER,** | ) | **DEATH PENALTY CASE** |
| | ) | **EXECUTION SCHEDULED** |
| **Respondent.** | ) | **09/24/24 at 6:00 P.M.** |

### NOTICE OF APPEAL

Notice is hereby given that Marcellus Williams, Petitioner, appeals from this Court' s September 19, 2024 Order denying Petitioner's FRCP 60(b) motion (R. 124), to the United States Circuit Court of Appeals, Eighth Circuit.

Respectfully submitted,

*/s/ Laurence E. Komp*
LAURENCE E. KOMP
Capital Habeas Unit, Chief
FAITH TAN
Assistant Federal Public Defender
Federal Public Defender,
Western District of Missouri
818 Grand Avenue, Suite 300
Kansas City, MO 64106
(816) 675-0923
Laurence_komp@fd.org
faith_tan@fd.org

1

KENT E. GIPSON, Mo. Bar #34524
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 / fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, via the ECF system on this 19th day of September, 2024.

Mike Spillane
Assistant Attorney General
P.O. Box 899
Jefferson City, Missouri 65102

*/s/ Laurence E. Komp*
LAURENCE E. KOMP
Attorney for Petitioner

2