# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | **CASE NO. 24-2907** |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID VANDERGRIFF, | ) | **DEATH PENALTY CASE** |
| | ) | **EXECUTION SCHEDULED** |
| Respondent-Appellee. | ) | **9/24/24 at 6:00 P.M. (central)** |

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

Appellant Marcellus Williams pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22 and moves for a Certificate of Appealability ("COA"). Williams seeks to appeal the district court's denial of his 60(b)(6). R. 124.

As noted by Respondent below (R. 122 p. 6), recent evidence provided by the trial attorney contradicts the self-serving trial *Batson* colloquy. Thus, the race of Black prospective jurors played a factor when they were stricken from the jury by the State. "Racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado,* 580 U.S. 206, 224 (2017) (internal quotation marks omitted). "Permitting racial prejudice in the jury system damages both the fact and the

1

Appellate Case: 24-2907    Page: 1    Date Filed: 09/20/2024 Entry ID: 5438295

perception of the jury's role as a vital check against the wrongful exercise of power by the State." *Id.*

With the contradiction recognized by Respondent, it called into question the district court's earlier application of § 2254(e)(1) where the district court denied the original habeas petition because Williams did not present clear and convincing evidence rebutting the trial colloquy upon which the Missouri Supreme Court denied. R. 58 p. 25.

**COA Standard**

A COA should issue when an appellant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A COA does not require a showing that an appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). Instead, a COA should issue when the district court's decision is "debatable among jurists of reason" or "the issues presented are adequate to deserve encouragement to proceed further." *Id*. at 336; *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Flieger v. Delo*, 16 F.3d 878, 883 (8th Cir. 1994).

The standard is minimal; as the *Miller-El* Court stated: "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not

2

Appellate Case: 24-2907     Page: 2     Date Filed: 09/20/2024 Entry ID: 5438295

prevail." 537 U.S. 322, 338 (2003). In other words, a claim is "debatable" when it is "open to dispute on any logical basis. The focus is on the existence of a debatable issue, not on which party was correct." *Adam v. Stonebridge Life Ins. Co.*, 612 F.3d 967, 974 (8th Cir. 2010).

Each of the below issues relates to the district court's treatment of the 60(b)(6) motion in the context of the Fifth Habeas Claim. The district court rejected what was a proper 60(b)(6) motion on the basis it was a successor. R. 124 p. 2, 4. Thereafter, the district court conducted a minimalistic examination of extraordinary circumstances under *Buck* and found 60(b) not to have been satisfied. R. 124 p. 5. Based upon that ruling, Appellant seeks certification of the following questions for appeal:

> a. *Did the district court unfairly circumscribe the Buck v. Davis, 580 U.S. 100 (2017), extraordinary circumstances test in considering the recent admissions from the trial prosecutor that race did play a factor in his exercise of its peremptory challenges?*

The district court committed a number of errors in its attenuated 60(b)(6) analysis. It failed to address other racially problematic circumstances of the trial prosecutor's recent testimony. It failed to address the missing voir dire notes— specifically, the cover up of the disappearance of those notes—and to even consider Williams's argument regarding *Amadeo v. Zant*, 486 U.S. 214 (1988). It

3

failed to address the St. Louis County Prosecutor's concession of error for the constitutional violations that occurred during trial and that the victim's family wanted finality through the agreement that error occurred and imposition of a life sentence. R. 121-1 (Attachment A). It failed to address current Supreme Court case law and its significance when trial counsel could not answer why the trial prosecutor asked Black jurors different types of questions than white jurors and the fact that trial counsel kept shifting his answers. *See Foster v. Chatman*, 578 U.S. 488 (2016); *Flowers v. Mississippi*, 588 U.S. 284 (2019). Indeed, while *Batson* was mentioned by the district court, the discussion was abbreviated and did not address any of *Batson*'s progeny implicated by the recent testimony of trial counsel.

The district court merely paid lip-service to *Buck*. *Buck* requires more than what the district court addressed: "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Buck*, 580 U.S. at 123. The district court considered none of these factors.

The circumstances in Mr. Williams's case are indeed extraordinary under *Buck*. As in *Buck,* race impermissibly affected Mr. Williams's trial—the denial of

4

constitutional rights the St. Louis County Prosecuting Attorney's Office, the entity that secured Mr. Williams's conviction and death sentence, has conceded—as evidenced by the recent testimony of the trial prosecutor. That testimony amounts to clear and convincing evidence of a racial basis for the prosecutor's peremptory strikes against Black jurors. Even Respondent admits the trial prosecutor's August 28, 2024 testimony "contradicted" his *Batson*-related statements at Mr. Williams's trial, during which the trial prosecutor offered self-serving explanations for his peremptory strikes. R. 122 p. 6. The Supreme Court has unequivocally and repeatedly decried the use of race as a factor in striking prospective jurors, and permitting this admitted constitutional violation to go unchecked undermines confidence in the judicial system. *Pena-Rodriguez*, 580 U.S. at 224; *Buck*, 580 U.S. at 124; *Davis v. Ayala*, 576 U.S. 257, 285 (2015); *Rose v. Mitchell*, 443 U.S. 545, 556 (1979). As the *Buck* Court explained, "Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6)." *Buck*, 580 U.S. at 124.

The risk of injustice to all interested parties in Mr. Williams's case if his motion is not properly considered also must not be ignored, as the district court did. The St. Louis County Prosecutor's Office has conceded constitutional error

5

and sought to vacate Mr. Williams's conviction and death sentence, taking the extraordinary step of attempting to undo the injustice that underpinned Mr. Williams's case. Even more extraordinarily, the family of the victim agreed with a consent judgment that would have resentenced Mr. Williams to life in prison rather than death, expressing their view that this resentencing would represent finality in their eyes. In other words, the St. Louis community, the prosecuting attorney, and the family of the victim have all called for this pursuit for Mr. Williams' death to end.

Pushing through an execution that no one but Respondent actually wants, in spite of admitted constitutional violations underpinning the conviction and sentence, does not achieve any measure of justice and is instead the kind of injustice the *Buck* Court held should be considered. Considering that Respondent's duty is to see that justice is done—as the St. Louis County Prosecutor's Office is attempting to do—rather than to win at all costs, Respondent can claim no injustice by the fair consideration of Mr. Williams's 60(b)(6) motion. *Connick v. Thompson*, 563 U.S. 51, 71 (2011) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The recent testimony by the trial prosecutor, which contradicted his statements during trial, presents clear and convincing evidence that race played a

6

role in the use of peremptory strikes of Black jurors. Recently, the trial prosecutor admitted that "part of the reason" he struck a juror was that he was a young Black man with glasses. (HT2 212). He later backtracked and claimed that race was not part of the reason for striking the jurors, *id.* p. 213 ("Q. And part of the reason is that they were both black? A. No. Absolutely not. Absolutely not."); however, this was after he once again repeated that the juror and Mr. Williams, both Black men, "looked like they were brothers." *Id.* Further, the prosecutor admitted that "[t]hey were both young black men…[a]nd **that's not necessarily the full reason** that I thought they were so similar." *Id.* p. 211 (emphasis added). As previously noted, Respondent admitted this testimony was inconsistent with the trial prosecutor's self-serving *Batson* colloquy at trial, upon which the Missouri Supreme Court and the district court based their previous denial of Williams's *Batson* claim.

In addition to admitting race was a factor in striking jurors, the trial prosecutor admitted he took notes during voir dire and that he saved them in the file. *Id.* p. 217. Incredibly (and suspiciously, because the rest of the prosecutor's notes were present in the file), those notes are now missing from the State's file. *Id.* p. 265-66. The prosecutor's true reasons for exercising peremptory strikes, and his missing voir dire notes, were in the exclusive possession of the State.

7

When asked about other potential Batson issues, Larner forcefully responded he had "never" done wrong.

> Q. Have you ever been found to have violated Batson v. Kentucky in another case?
> A. **Now let me say this perfectly clear. Never.**
>
> Q. Never?
>
> A. **Never.**

(HT2 218) (emphasis added). Despite his unequivocal averment that he had committed no *Batson* violation ever, Larner then quickly backtracked and agreed that his "never" needed to be amended. *Id.* Indeed, in *State v. McFadden*, another case where Larner was the trial prosecutor, the trial judge found Larner had failed to provide race neutral reasons for excluding three Black jurors, and found that his initial reason for striking a Black juror was pretextual. *Id.* at 218-19. Larner blamed his failure to mention, or even acknowledge, this history at first on thinking the question asked whether he ever been "reversed" on Batson, which of course is nowhere in the question. *Id.*

And even when explicitly asked, "So you have been found to have violated Batson?" Larner gave a non-answer, blustering, "Yes and no. It depends . . ." (HT2 218). Whether he violated *Batson* is not a question that calls for an "It depends"

8

answer—it is either a yes or a no. He simply did not want to say yes, and when he saw the follow-up questions coming he had to try to provide a modified "yes."

Larner also attempted to minimize the number of peremptory challenges he used on Black jurors at Mr. Williams's trial. Larner repeatedly and argumentatively asserted he had only exercised a peremptory against Black venirepersons three times, cutting in half the real number.

> A. I know how many I struck. I had nine peremptory strikes. I struck three. Three of nine blacks -- not three of nine blacks. Three of nine people were black. Six of nine people were white. I struck six whites, three blacks. Leaving one black on the jury is the way it came out.

> Q. We'll get to that, but I think you have those numbers reversed.

> A. No. I think you have them reversed, actually.

(HT2 218). Larner was wrong. During jury selection, Larner utilized six of his nine peremptory strikes (67% of the available strikes) against six of the seven (86%) Black venirepersons. (Tr. 1568-69).

Larner's recent testimony constantly shifted. He used the term "brother" and then attempted to shift away from the racial overtones that term carries. He said "never," but then immediately shifted to "yes and no, it depends." He said, "I did not," but then states it was "part" but not the "full reason." Larner misrepresented the number of peremptory challenges he exercised against Blacks. All of these

9

Appellate Case: 24-2907    Page: 9    Date Filed: 09/20/2024 Entry ID: 5438295

shifting explanations are significant under the Supreme Court's decision in *Foster*, 578 U.S. 488,

In *Foster*, the Court found similar behavior troubling: "There are also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file." *Id.* at 512. As a result, the Court lifted the procedural bar imposed by the State and granted relief. This case is even more troubling—worse than in *Foster*, the prosecutor's voir dire notes in this case are mysteriously missing from the file.

In *Miller-El v. Dretke*, 545 U.S. 231, 232 (2005), the Supreme Court required consideration of "the totality of the relevant facts" about a prosecutor's conduct during the trial. It was not enough for the district court to isolate a few pieces of Larner's testimony to the exclusion of everything else. The court was required to look at everything Larner said and view his statements in context and in relation with each other. That did not happen, and it is a dramatic flaw in the district court's analysis. And it is identical to the error the district court committed when it addressed *Buck's* extraordinary circumstances test, failing to address the totality of the circumstances.

10

Appellate Case: 24-2907     Page: 10     Date Filed: 09/20/2024 Entry ID: 5438295

Racism has no place in a capital trial.  It injures not just a defendant, but "the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose v. Mitchell*, 443 U.S. 545, 556 (1979). And importantly for the procedural posture before this Court: "Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6)." *Buck*, 580 U.S. at 124 (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

Because race impermissibly pervaded the prosecutor's peremptory strikes and, thus, Mr. Williams's conviction and death sentence, this Court can and should find that reasonable jurists could find that this evidence to meet the "extraordinary circumstances" test set forth in *Buck v. Davis* for when 60(b)(6) relief is appropriate and warranted. In *Buck*, racism irreparably tainted the defendant's trial, conviction, and death sentence because a defense expert testified to the jury about how the defendant's race affected his "future dangerousness." The United States Supreme Court found that this infected the case to the extent that it met the "extraordinary circumstances" standard of Rule 60(b)(6) and thus warranted 60(b)(6) relief. The circumstances of Mr. Williams' case amount to the same, and perhaps even greater, level of extraordinariness as those present in *Buck* upon

11

which the United States Supreme Court found 60(b)(6) relief appropriate. In Mr. Williams' case, racism was introduced at trial when the trial prosecutor struck Black venirepersons from the jury because they were the same race as Mr. Williams. Two decades after the trial, the prosecutor admitted to it. Similar to *Buck*, that racism prevented the jury from being a true jury of Mr. Williams' peers and from being a check against the State. *See Pena-Rodriguez v. Colorado,* 580 U.S. at 224 ("Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State."). That infected the rest of the trial and, ultimately, Mr. Williams' conviction and death sentence.

Furthermore, in addition to overt racism, Mr. Williams' case includes more factors that amount to extraordinary circumstances—the St. Louis County Prosecuting Attorney expressly admits it committed constitutional error, Respondent agrees the new testimony presents a different evidentiary picture than the prosecutor's trial colloquy, *see* R. Doc. 122 at 6, and most importantly, the family of the victim has unambiguously and repeatedly voiced their opposition to Mr. Williams' execution.

12

In short, reasonable jurists *do* find such evidence meet the "extraordinary circumstances" standard and *do* find that rule 60(b)(6) relief is warranted when such evidence is present—and those reasonable jurists are United States Supreme Court justices. Where racism pervades a capital case and where evidence of that racism is revealed only after the trial, reasonable jurists have agreed Rule 60(b)(6) is appropriate. Thus, this Court should grant the COA because this issue is debatable and serves encouragement to proceed further.

b. *When a federal court affirms a state court ruling without conducting § 2254(a) review, but instead restricts itself to § 2254(d) and (e)(1), and new evidence clearly and convincingly rebuts the state court findings, does the AEDPA review count as a true merits review or is it an impediment to considering the merits?*

The district court indicated that its previous ruling was a merits review and thus Williams's 60(b)(6) was a successor. However, AEDPA is a bar to relief on the merits. No federal court has ever addressed the merits of Mr. Williams's *Batson* claim. Because of that, when the recent evidence above clearly and convincingly substantiates the *Batson* violation and the trial prosecutor has now testified in a manner contradictory to his trial colloquy (as Respondent conceded), a federal court should reassess the impediment it relied upon to deny § 2254(a) review.

13

The court never addressed *Batson* the first time. Rather, the court applied AEDPA, which is a far cry from a merits ruling, and found AEDPA imposed a bar to relief. R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence."). This type of denial precluded a merits determination. "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Section 2254(d) thus restricts a federal court's ability to litigate—and consider the merits—of a *Batson* claim unless and until the provisions of subsections (1) and (2) are overcome.

On Williams's *Batson* claim, the Court never went past the initial § 2254(d) question. Because the application of § 2254(d)'s standard is non-merits-based, *see Medellin v. Dretke*, 544 U.S. 660, 664–65 (2005) (per curiam) (including § 2254(d) among "several threshold issues that could independently preclude habeas relief"), the district court never considered the merits of the *Batson* claim. Rather, the court merely conducted an inquiry into its own power to grant relief irrespective of whether Williams was in custody in violation of the United States Constitution under § 2254(a).

14

That Williams challenges a procedural—rather than substantive—basis for the denial of habeas relief is confirmed by the Supreme Court's reminders that a finding that § 2254(d) precludes the federal habeas remedy does not mean that, as a matter of substantive law, a person's custody is constitutional. *See, e.g., Glebe v. Frost*, 574 U.S. 21, 23–24 (2014) (per curiam) (finding that § 2254(d) may preclude relief even "[a]ssuming for argument's sake that the trial court violated the Constitution"); *Lopez v. Smith*, 574 U.S. 1, 5–7 (2014) (per curiam) (assuming arguendo that a constitutional violation occurred while concluding that § 2254(d) precluded de novo merits review).

Indeed, In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), another case involving a *Batson* violation, the Supreme Court explained that AEDPA considerations constitute a threshold question. The Court stated that "[t]he concept of a threshold, or gateway, test was not the innovation of AEDPA. . . . By enacting AEDPA, using the specific standards the Court had elaborated earlier for the threshold test, Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." If AEDPA were not a threshold inquiry, the Court must find has been satisfied before it reaches the merits of a petition, there would be no point whatsoever to a tiered

15

review structure—the Court could consider the merits automatically in what would be merely another normal round of appellate review. *Cf. Renico v. Lett*, 559 U.S. 766, 773 (2010) ("Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Rather, that application must be 'objectively unreasonable.' This distinction creates 'a substantially higher threshold for obtaining relief than *de novo* review." (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000), and citing *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007))). Where "AEDPA's purpose [is] to further the principles of comity, finality, and federalism," the only logical conclusion is that AEDPA is a threshold determination that must be decided before a court can even reach the merits of a petition.

For the above reasons, a motion such as the instant one challenging a court's assessment under AEDPA of a now-changed record, is a proper subject of a 60(b) application in a habeas proceeding. *Id.* at 532 n.4. Indeed, "Rule 60(b) allows a court to grant relief from a final judgment or order." *Cornell v. Nix*, 119 F.3d 1329, 1332 (8th Cir. 1997).

16

This issue is debatable among jurists and deserves encouragement to proceed further. This Court should thus issue a COA.

**Conclusion**

WHEREFORE, Williams respectfully requests a COA as to the above questions raised in a 60(b)(6) Motion related to his Fifth Habeas Grounds.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, #40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

17

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document contains 3,432 words and is within the word limit of Fed. R. App. P. 27(d)(2)(A).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 and 14-point Times New Roman font.

*/s/Laurence E. Komp*
Attorney for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Michael Spillane and Ms. Katherine Griesbach, Assistant Attorneys General, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 20th day of September 2024.

*/s/Laurence E. Komp*
Attorney for Petitioner

18