# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

MARCELLUS WILLIAMS,    )
    )    **CASE NO. 24-2907**
    Petitioner-Appellant,    )
    )
v.    )
    )
DAVID VANDERGRIFF,    )    **DEATH PENALTY CASE**
    )    **EXECUTION SCHEDULED**
    Respondent-Appellee.    )    **9/24/24 at 6:00 P.M. (central)**

## MOTION FOR STAY OF EXECUTION

Now comes Appellant Marcellus Williams, by and through undersigned counsel, and respectfully moves this Honorable Court for a stay of execution while this Court considers the appeal[1] from the Order of the United States District Court for the Eastern District of Missouri, dated September 19, 2024, (R. Doc. 124), denying his Motion for Relief from Judgment under Fed. R. Civ. P. 60(b)(6). Mr. Williams's execution is scheduled for September 24, 2024, at 6:00 PM.

---

[1] Mr. Willaims concurrently filed an application for a certificate of appealability ("COA").

1

Appellate Case: 24-2907    Page: 1    Date Filed: 09/20/2024 Entry ID: 5438316

# BACKGROUND

Mr. Williams' 60(b) motion is based on newly-discovered evidence of *Batson v. Kentucky*[2] violations that occurred during his 2001 trial. At a hearing on August 28, 2024, the trial prosecutor in Mr. Williams's case offered sworn testimony for the first time regarding the state's use of peremptory strikes against Black jurors, the prosecutor admitted that "part of the reason" he struck a venireperson was that he was a young, Black man with glasses. (HT2 212).

> Q. So you struck them because they were both young black men with glasses?
>
> A. Wrong. **That's part of the reason**.

*Id.* (emphasis added).

This admission occurred immediately after the following exchange in which the trial prosecutor had to backtrack and attempt to correct his characterization of a Black venireperson:

> A. . . . . I thought they looked like they were brothers.
>
> Q. They looked like brothers?
>
> A. Familial brothers.

---

[2] 476 U.S. 79 (1986).

Appellate Case: 24-2907    Page: 2    Date Filed: 09/20/2024 Entry ID: 5438316

Q. Okay.

A. I don't mean black people. I mean, like, you know, you got the same mother, you got the same father. You know, you're brothers, you're both men, you're brothers.

*Id.* Realizing he had crossed a line with his initial sworn statements, the trial prosecutor again backpedaled and claimed that race was not part of the reason for striking the Black venireperson, *id.* p. 213 ("Q. And part of the reason is that they were both black? A. No. Absolutely not. Absolutely not."); however, this was after he once again repeated that the venireperson and Mr. Williams, both Black men, "looked like they were brothers." *Id.* Further, the trial prosecutor admitted that "[t]hey were both young black men…[a]nd that's not necessarily **the full reason** that I thought they were so similar." *Id.* p. 211 (emphasis added).

In addition to admitting race was a factor in striking jurors, the trial prosecutor admitted he took notes during voir dire and that he saved them in the State's trial file. *Id.* p. 217. Incredibly (and suspiciously), those notes are now missing from the State's file, although the prosecutor's other notes, including from pre-trial and trial, are included in the file. *Id.* p. 265-66. Considering the broader context, namely the intense scrutiny surrounding the St. Louis County Prosecuting

3

Attorney's history of using peremptory strikes against Black venirepersons from the community,[3] the unexplained disappearance of the trial prosecutor's notes reflecting his thinking at the time he struck the Black veniremembers is telling. The prosecutor's true reasons for exercising peremptory strikes, and his missing voir dire notes, were in the exclusive possession of the State of Missouri and were unknown to Mr. Williams until the August 28, 2024 hearing.

As a result of these recent admissions by the trial prosecutor, which, as Respondent conceded (R. Doc. 122 at 6), contradicted the same prosecutor's self-serving *Batson* colloquy during Mr. Williams's 2001 trial, Mr. Williams moved in the district court to reopen his *Batson* habeas claim pursuant to Fed. R. Civ. P. 60(b)(6). The district court had previously denied Mr. Williams's claim on AEDPA grounds under § 2254(d) and, as a result, had not reached the merits of his *Batson* claim. The new evidence developed at the August 28, 2024, hearing clearly and convincingly rebuts the state court's fact-finding and supports Mr. Williams's

---

[3] The intense scrutiny surrounding the St. Louis County Prosecuting Attorney's race-based strikes was particularly heightened after reversal of the *McFadden* cases. The Missouri Supreme Court reversed two separate convictions and death sentences after finding the St. Louis County trial prosecutor had committed *Batson* violations. *State v. McFadden* (*McFadden I*), 191 S.W.3d 648 (Mo. banc 2006); *State v. McFadden* (*McFadden II*), 216 S.W.3d 673 (Mo. 2007).

4

*Batson* claim. Moreover, the St. Louis County Prosecutor's Office conceded that constitutional errors, including violations under *Batson*, infected Mr. Williams's 2001 trial. *See* R. Doc. 121-1 (Attachment A p. 1657); (Attachment B pp. 1667, 1682); (Attachment D pp. 1971, 1972).

On September 19, 2024, the district court denied Mr. Williams's motion pursuant to Fed. R. Civ. P. 60(b) on the basis that recently revealed evidence of racial animus in the trial prosecutor's testimony at the August 28, 2024, hearing did not establish a *Batson* violation and that the motion itself was a successor habeas petition. R. 124. Mr. Williams filed a notice of appeal. R. 125.

As more fully set forth in his application for a COA, which is concurrently filed with this motion, reasonable jurists could disagree with the district court's order denying Mr. Williams's motion. The district court found that "Williams' motion for Rule 60(b)(6) relief regarding Larner's testimony is unsupported by the record and will be denied." R. 124 at 5. The district court also held that Mr. Williams' 60(b) motion was a successive habeas petition, and thus concluded that the court could not address it without authorization from this Court. But the district court's decision contradicts clearly established precedent from the Supreme Court, specifically *Buck v. Davis*, 580 U.S. 100 (2017), and establishes that Mr. Williams

5

properly brought this newly revealed evidence of racial animus in his Rule 60(b) motion.

A stay of execution should therefore issue so this Court can address this critically important question of constitutional law on appeal.

**DISCUSSION**

**I.      This Court should grant a stay of execution to adequately consider Mr. Williams's non-frivolous appeal.**

This Court should grant Mr. Williams a stay to permit a thorough and reasoned assessment of his appeal. A stay is justified when a petitioner presents "substantial grounds on which relief may be granted." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983). This Court should grant a COA when "jurists of reason would find it debatable whether the petition[er] states a valid claim of the denial of a constitutional right, and [if] jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Put simply, a COA should issue if "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

In *Barefoot*, the Supreme Court made clear that federal courts "need not, and should not, . . . fail to give non-frivolous claims of constitutional error the careful

6

attention that they deserve" and when the court is "unable to resolve the merits . . . before the scheduled date of execution, the petitioner is entitled to a stay of execution to permit due consideration of the merits." 463 U.S. at 888-89. Mr. Williams's claim of constitutional error is non-frivolous—indeed, the St. Louis County Prosecuting Attorney's Office conceded constitutional error, *see* R. Doc. 121-1 (Attachment A p. 1657); (Attachment B pp. 1667, 1682); (Attachment D pp. 1971, 1972), —and an appeal on the merits of this motion pursuant to Rule 60(b) cannot properly be completed before the scheduled execution on September 24. 2024. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

The "critical question" is whether the claims are "palpably incredible" and "patently frivolous or false." *Blackledge v. Allison*, 431 U.S. 63, 76 (1977). If the petition is not frivolous, the petitioner is "entitled to have his allegations fairly tested." *O'Blasney v. Solem*, 774 F.2d 925, 926 (8th Cir. 1985) ("If the petition is not frivolous and alleges facts which, even though unlikely, would justify granting the writ, then the petitioner is entitled to have his allegations fairly tested.").

Mr. Williams's claim is far from "patently frivolous." As an initial matter, the St. Louis County Prosecuting Attorney has affirmed on multiple occasions that the office committed constitutional errors, including *Batson* violations, during Mr.

7

Williams's 2001 trial. *See* R. Doc. 121-1 (Attachment A p. 1657); (Attachment B pp. 1667, 1682); (Attachment D pp. 1971, 1972).

In other words, after investigating the evidence against Mr. Williams and how his trial unfolded, the very same office that once brought these capital charges against Mr. Williams now admits to wrongdoing. That office believes those constitutional errors and that wrongdoing so infected the trial that it no longer has confidence in Mr. Williams' entire conviction and subsequent sentence and believes they are wrongful. *Id.* The Prosecuting Attorney's concession of error on this *Batson* issue, made after almost 3 years of investigation, demonstrates that the petition is not "patently frivolous or false." *See Blackledge*, 431 U.S. at 76. Moreover, clearly "jurists of reason" find it "debatable" whether the trial prosecutor's peremptory strikes were race-based as he admitted to in his August 28, 2024, testimony and whether a *Batson* violation occurred—St. Louis County Prosecuting Attorney Wesley Bell, who as a prosecutor has the duty to seek and uphold justice, and to refrain from improper means in securing convictions, believes the recently discovered evidence establishes a *Batson* violation. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 71 (2011); *Young v. ex rel. Vuitton et Fils S.A.*,

8

481 U.S. 787, 803 (1987); *Smith v. Groose*, 205 F.3d 1045, 1053-54 (8th Cir. 2000).

On the stand on August 28, 2024, the trial prosecutor finally stated his true reasons for striking a Black venireperson. In addition to declaring that Mr. Williams and the venireperson "looked like they were brothers,"[4] (HT2 212), he admitted that "part of the reason" he struck the venireperson was because he was a young, Black man, (*id.*), and that the fact that both Mr. Williams and the venireperson were young, Black men was not the "full reason" he used excluded the venireperson, (*id.* at 213). This testimony supports racial animus in violation of *Batson* and thus renders the 60(b) motion non-frivolous.

Further, as the United States Supreme Court has warned, "Racial bias [is] a familiar and recurring evil that, **if left unaddressed**, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado,* 580 U.S. 206, 224 (2017) (emphasis added). "Permitting racial prejudice in the jury system damages

---

[4] Since Mr. Williams is Black, the only way he and the venireperson could look like brothers who "have the same mother" and "have the same father," as the trial prosecutor insisted he meant, (HT2 at 212), is with an acknowledgement that both men were Black. It follows then, that if the reason the trial prosecutor struck the venireperson because he looked like Mr. Williams' brother, the prosecutor struck him because he was Black. This obvious conclusion is supported by the prosecutor's other statements related to race during his testimony.

Appellate Case: 24-2907    Page: 9    Date Filed: 09/20/2024 Entry ID: 5438316

both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State." *Id.* Furthermore, the infiltration of racial animus into a criminal trial "poisons public confidence" in the judicial process. *Davis* v. *Ayala*, 576 U. S. 257, 285 (2015). This Court should not allow the blatant racial bias that tainted Mr. Williams' trial from the beginning and prevented the jury from being a true "vital check" against the St. Louis County Prosecuting Attorney to go unaddressed. This is especially the case when the St. Louis County Prosecuting Attorney now wants to comply with that "vital check."

Additionally, although the district court concluded that Mr. Williams' habeas petition is a successive habeas petition, reasonable jurists have disagreed with the district court, making the 60(b) motion non-frivolous. The district court failed to address significant portions of the record, particularly revelations from the August 28, 2024, hearing about the trial prosecutor's true thought process during jury selection and circumstances surrounding jury selection including mysteriously missing voir dire notes and his record of race-based strikes. Additionally, in reaching its determination that Mr. Williams' Rule 60(b)(6) motion is a successive habeas petition, the district court ignored AEDPA's purpose and the procedural bar it imposes upon district courts that they must overcome before reaching the merits.

10

In denying the *Batson* claim in Mr. Williams' original habeas petition, the court stated, "This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence." R. 58 p. 25. Thus, the district court now fails to address that its original denial was based on the finding that Mr. Williams had not brought "clear and convincing evidence" of a *Batson* violation—it did not reach the merits of whether a *Batson* violation had occurred based on the record. The district court now has the authority under Rule 60(b)(6) to consider the merits of Mr. Williams' original *Batson* claim in light of Larner's recently revealed (and damning) testimony.

Moreover, in *Buck v. Davis*, 580 U.S. 100 (2017), which involved another earlier denied Rule 60(b)(6) motion centered around racism that was infused into the trial, the United States Supreme Court—hardly unreasonable jurists—chided the lower courts for allowing racial animus to uphold the defendant's capital conviction. The Court determined that if a defendant may have been sentenced to

11

death "in part"[5] because of his race, "extraordinary circumstances" exist that warrant 60(b) relief. *Id.* at 122-26.

Here in Mr. Williams' case, there are circumstances amounting to the same level of extraordinariness as those present in *Buck*. Like the defendant in *Buck*, Mr. Williams' trial was tainted by racism. While in *Buck*, racism came into play regarding evidence of the defendant's "future dangerousness," in Mr. Williams' case, racism came into play when the trial prosecutor struck Black venirepersons from the jury because they were the same race as Mr. Williams and, two decades later, admitted his unconstitutional conduct. Furthermore, in addition to the overt racism, Mr. Williams' case includes even more factors that amount to extraordinary circumstances: the St. Louis County Prosecuting Attorney expressly admits it committed constitutional error; Respondent agrees that the new testimony presents a different evidentiary picture than the prosecutor's trial colloquy, *see* R. Doc. 122 at 6; and most importantly, the family of the victim adamantly opposes Mr. Williams' execution. Under Supreme Court jurisprudence, these extraordinary circumstances warrant 60(b) relief.

---

[5] It is worth noting that Larner testified that "part" of the reason, but not the "full reason," he struck a young Black venireperson was because like Mr. Williams, he was a young Black man.

12

Mr. Williams' appeal is not frivolous. As the St. Louis County Prosecuting Attorney has conceded and as the trial prosecutor stated during his recent testimony, the prosecutor at Mr. Williams' 2001 trial based at least one peremptory strike on the venireperson and Mr. Williams' shared race—he struck the venireperson because he was Black. This is an obvious violation of *Batson*. Additionally, this evidence, which came to light for the first time less than a month ago, was brought properly under the vehicle of 60(b)(6) because the district court's earlier review of the original *Batson* claim was not a merits determination.

## II.     Mr. Williams is entitled to a stay of execution under *Hill v. McDonough*.

Pursuant to *Hill v. McDonough*, 547 U.S. 573 (2006), Mr. Williams is entitled to a stay of execution because all factors weigh in his favor. Considerations for granting a stay of execution include the prisoner's likelihood of success on the merits, the extent to which the petitioner has unnecessarily delayed bringing his claims, and the relative harm to the parties. 547 U.S. at 584; *Nooner*, 491 F.3d at 808.

## A.     Mr. Williams is likely to succeed on the merits of his claim.

To show a likelihood of success on a particular claim, Mr. Williams need not "prove a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold,*

13

*Inc. v SpeedNet, LLC*, 508 F. 3d 1137, 1143 (8th Cir. 2007), but rather must only show that his claim provides a "fair grounds for litigation." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *see, e.g., Planned Parenthood Minn., N.D., S.D. v Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (explaining movant must show it has a "fair chance of prevailing").

As the St. Louis County Prosecuting Attorney's Office has conceded multiple times, Mr. Williams's 2001 trial was infected by pernicious racial discrimination in the use of peremptory strikes against Black prospective jurors. *See* R. Doc. 121-1 (Attachment A p. 1657); (Attachment B pp. 1667, 1682); (Attachment D pp. 1971, 1972).

At the August 28, 2024, hearing in the circuit court, the trial prosecutor admitted—contrary to his self-serving *Batson* colloquy during trial—that "part of the reason" he used a peremptory strike against a venireperson because, like Mr. Williams, he was a Black man:

Q. So you struck them because they were both young black men with glasses?

A. Wrong. **That's part of the reason.**

14

Appellate Case: 24-2907    Page: 14    Date Filed: 09/20/2024 Entry ID: 5438316

HT2 212. This exchange came immediately after the trial prosecutor declared that the venireperson and Mr. Williams, both Black men, looked like "brothers." *Id.* He quickly tried to backpedal, blustering, "I don't mean black people. . . ." *Id.* At another point, he also proclaimed:

> A. They were both young black men.
>
> Q. Okay.
>
> A. But that's not necessarily **the full reason** that I thought they were so similar."

*Id.* at 211.

Although the trial prosecutor vehemently denied that he had struck the venireperson because he was Black ("Q. And part of the reason is that they were both black? A. No. Absolutely not. Absolutely not."), he clarified that the reason was because had he done so, the case would have to be retried ("If I strike someone because they're black, under the Supreme Court of the United States Batson and other cases, then the case gets sent back for a new trial. It gets reversed if I do that."). *Id.* at 213. In other words, his concern was less that he would be depriving the defendant of his constitutional rights to a fair jury and a fair trial (or that he

15

would have been engaging in racism), and more that a higher court would reverse him if they thought he did something wrong.[6]

The trial prosecutor's attempts to elaborate on why he believed the venireperson and Mr. Williams looked so similar fared little better than his express admittance of basing his strikes on race. He said they were wearing similar glasses, *id.* at 211, and they both had piercing eyes (apparently, of the approximately 130 venirepersons, only one had piercing eyes—and he just happened to be a Black man), *id.* at 212. But he admitted that there were significant differences in their appearances too, including that the venireperson was wearing a shirt with an "orange dragon and Chinese or Arabic letters," (Mr. Williams was not wearing this kind of shirt), *id.* at 213-14, a "large gold cross outside of his shirt" which the prosecutor thought "was ostentatious looking," (Mr. Williams was not wearing a large gold cross), *id.* at 214, "gray shiny pants," (Mr. Williams was not wearing gray shiny pants), and "two earrings in his left ear," (Mr. Williams was not

---

[6] And even when he was found to have done something wrong, he still was unconcerned with how he had done wrong. He shared that in another St. Louis County capital case, Judge Ross "thought I didn't have sufficient reasons. He actually, he told me that, he says, before I even struck them, he said, if you strike them, I'm going to put them back on. And I struck them anyway because I thought I was right." HT2 219-20. When asked, "You struck them anyway?" he responded, "Yeah, because I thought he was wrong." *Id.* at 220.

16

wearing two earrings in his left ear), *id.* at 215. Yet, somehow to the trial prosecutor, the two men looked alike.

In short, the trial prosecutor struck Black venirepersons from Mr. Williams' jury because they were Black. He admitted as such on the stand in open court on August 28, 2024. This is clearly a violation of *Batson*, and the trial prosecutor's new testimony is clear and convincing evidence of racial animus in the jury selection process.

**B.      Mr. Williams has at all times acted with diligence, including in moving to reopen his habeas proceedings in light of the recent testimony by the trial prosecutor.**

The trial prosecutor's testimony admitting that race was a factor in the use of peremptory strikes, upon which Mr. Williams's Motion under Fed. R. Civ. P. 60(b)(6) is based, occurred on August 28, 2024. Mr. Williams filed his motion in district court 20 days later. This can hardly be considered delay, and the only reason the hearing took place so close to Mr. Williams's scheduled execution is because of the Attorney General's dilatory tactics.

Prosecuting Attorney Wesley Bell filed the Motion to Vacate Mr. Williams' judgment on January 26, 2024. On February 5, 2024, the Attorney General filed a Notice of Intent to Oppose that Motion to Vacate. But they did not file their

17

opposition motion until **four months later**, at which point the Missouri Supreme Court had already set Mr. Williams' execution date.

At the status conference in the circuit court on July 2, 2024, the circuit court proposed holding an evidentiary hearing in mid-July. Mr. Williams immediately agreed, as did Prosecutor Bell's office. However, the Attorney General declined, saying that one of their Assistant Attorneys General had a conflict during that week. The circuit court thus scheduled an evidentiary hearing for over a month later on August 21, 2024. However, the Assistant Attorney General who had the conflict in July did not participate in, or even attend, the August 21, 2024 hearing. Nor did he participate in or attend the subsequent August 28, 2024 hearing. The Attorney General thus forced a monthlong delay on the hearing for no reason at all.

Mr. Williams and the parties working to correct his wrongful conviction and sentence have acted promptly and diligently in every respect. Mr. Williams applied his case to the Conviction and Incident Review Unit of Prosecutor Bell's office in August 2021, just days after § 547.031, the statute providing for such review, took effect. There was clearly no delay here. Although totally out of Mr. Williams' immediate control, Prosecutor Bell filed the Motion to Vacate Mr. Williams' judgment in January 2024, well before an execution date was ever set. Mr.

18

Appellate Case: 24-2907     Page: 18     Date Filed: 09/20/2024 Entry ID: 5438316

Williams and Prosecutor Bell agreed to the earliest possible date for the evidentiary hearing and agreed to every other related date and complied with every deadline set by the circuit court. After the circuit court issued its findings of fact and conclusions of law denying the Motion to Vacate on Thursday, September 12, 2024, Prosecutor Bell filed a notice of appeal just two business days later, on Monday, September 16, 2024.

Mr. Williams has been diligent every step of the way and in every aspect of his case.

**C.      Mr. Williams will be irreparably harmed if he is executed without first having the opportunity to litigate his *Batson* claim, a constitutional violation the prosecutor's office has conceded.**

Failing to grant a stay will irreparably harm Mr. Williams. "[I]rreparable harm [that] will result if a stay is not granted . . . is necessarily present in capital cases." *Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Powell, J., concurring). The only interested party in this case with an "interest" in seeing Mr. Williams executed is Respondent. The State, via the St. Louis County Prosecuting Attorney's Office—the same office that brought about Mr. Williams's death sentence in the first place—has conceded constitutional error and seeks to halt Mr. Williams's execution, and the victim's family has indicated they do not seek Mr.

19

Williams's execution and instead would have been satisfied with a sentence of life without parole. *See* R. Doc. 121-1 (Attachment A p. 1657); (Attachment B p. 1682). Whatever interest Respondent has in executing Mr. Williams must give way to Mr. Williams's interest in having the constitutionally infirm basis for his conviction and sentence fully adjudicated, especially in light of the State's own concessions of error.

Without this Court's intervention, Mr. Williams will be executed despite the fact that his conviction and sentence were obtained in violation of the United States Constitution, as conceded by the very prosecutor's office that obtained that conviction and sentence, and even though the trial prosecutor admitted under oath that race was at least part of the basis for striking a Black juror. This is so even though the prosecutor's office and the victim's family have both sought to halt this execution. Therefore, this Court should issue a stay of execution pending review of Mr. Williams's application for a COA and review of his appeal on the merits.

**D. There is no harm to other parties or to the public if this Court grants a stay of execution.**

Although Mr. Williams is poised to lose his life based on a conviction obtained through racist and unlawful means, if this Court grants a stay to review the evidence, there will be *no harm* to *any* party or to the public.

20

The St. Louis County Prosecuting Attorney's office, representing not only the interests of St. Louis County but also the State of Missouri, certainly will suffer no harm. That office filed the Motion to Vacate and initiated these proceedings on behalf of Mr. Williams to correct the constitutional violations underpinning his conviction and sentence, including this *Batson* violation. The office seeks to prevent him from suffering the irreparable injury of death. After presenting the Motion to Vacate and the supporting evidence at the August 28, 2024 hearing, the Prosecuting Attorney's office, representing the community from which this case originated, still acknowledges the constitutional error the office committed in 2001 in striking Black jurors on account of their race and seeks to correct Mr. Williams' wrongful conviction and sentence. A stay of execution will give time for that evidence, which the prosecutor wants heard, to be reviewed.

Likewise, Respondent will suffer no harm. There is no legitimate interest in carrying out an execution that circumvents federal law or in defending a capital conviction that was obtained in a racially offensive manner. Adherence to the United States Constitution and representing the people of Missouri, including the Black Missouri community whom the trial prosecutor sought to exclude in 2001, are some of the Attorney General's most fundamental duties.

21

Moreover, where the Attorney General has engaged in dilatory tactics to gain a time advantage over Mr. Williams, this Court should not reward them for their games and for dragging this process out to circumvent a meaningful § 547.031.4 appeal as of right by giving them what they apparently want—a wrongful execution.

More importantly, there is no harm to the family of the victim, Ms. Gayle, and the Attorney General cannot claim to have a legitimate interest in serving their interests by seeking Mr. Williams' execution. As the family has expressed to the circuit court, to the St. Louis County Prosecuting Attorney's office, to Mr. Williams' counsel, and to the Attorney General, they do not want Mr. Williams' execution to be carried out. Consent Order and Judgment dated 8/21/24. They expressed a wish for Mr. Williams to be sentenced to life in prison without the possibility of parole and when the St. Louis County Prosecuting Attorney and Mr. Williams reached an agreement for that to happen, expressed satisfaction with that result. *Id.* Ms. Gayle's family bears no harm if this Court grants a stay of execution because they do not want an execution at all.

## III.    A stay is permitted under the All Writs Act

22

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Act permits Courts of Appeal to enjoin government conduct that threatens to upset their appellate jurisdiction. *See, e.g., Michael v. I.N.S.*, 48 F.3d 657, 664 (2d Cir. 1995). This power includes the authority to temporarily enjoin an execution to protect the Court's jurisdiction over an appeal. *See, e.g., Diaz v. McDonough*, 472 F.3d 849, 851 (11th Cir. 2004). Because this Court is empowered to grant a stay under the All Writs Act pending appeal, and because Mr. Williams's application for a COA and petition are meritorious, this Court should grant a stay of execution.

## CONCLUSION

For the foregoing reasons, Mr. Williams prays this Honorable Court for a stay of execution pending its determination of his application for a Certificate of Appealability and review of his appeal on the merits.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, MO Bar#40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri

23

1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, MO Bar #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

24

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.      This document contains 4,771 words and is within the word limit of Fed. R. App. P. 27(d)(2)(A).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 and 14-point Times New Roman font.

*/s/Laurence E. Komp*
Attorney for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Michael Spillane and Ms. Katherine Griesbach, Assistant Attorneys General, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 20th day of September 2024.

*/s/Laurence E. Komp*
Attorney for Petitioner

Appellate Case: 24-2907    Page: 25    Date Filed: 09/20/2024 Entry ID: 5438316